# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

COUNTY OF NASSAU,

       Plaintiff,

  v.

ABBOTT LABORATORIES, INC., AGOURON
PHARMACEUTICALS, INC., AMGEN, INC.,
ASTRAZENECA PHARMACEUTICALS L.P.,
ASTRAZENECA U.S., AVENTIS BEHRING,
AVENTIS PHARMACEUTICALS INC., BARR
LABORATORIES, INC., BAXTER HEALTH CARE
CORP., BAYER CORPORATION, BERLEX
LABORATORIES, INC., BIOGEN, INC.,
BOEHRINGER INGELHEIM CORP., BRISTOL-
MYERS SQUIBB COMPANY, CHIRON
CORPORATION,  ELI LILLY AND COMPANY,
FOREST PHARMACEUTICALS INC., FUJISAWA
HEALTH CARE, INC., GENENTECH, INC.,
GENZYME CORP., IMMUNEX CORPORATION,
IVAX CORPORATION, IVAX
PHARMACEUTICALS INC., JANSSEN
PHARMACEUTICAL, JOHNSON & JOHNSON,
KEY PHARMACEUTICALS, INC., MEDIMMUNE,
INC., MERCK & CO., INC., MYLAN
LABORATORIES, INC., ORGANON INC., USA,
NOVARTIS PHARMACEUTICALS
CORPORATION, ORTHO BIOTECH, ORTHO-
MCNEIL PHARMACEUTICALS, PFIZER INC.,
PHARMACIA CORPORATION, PURDUE
PHARMA, L.P., RELIANT PHARMACEUTICALS,
SANOFI-SYNTHELAB, INC., SCHERING-
PLOUGH CORP., SERONO, INC., SMITHKLINE
BEECHAM CORPORATION, D/B/A
GLAXOSMITHKLINE, TAKEDA
PHARMACEUTICALS NORTH AMERICA, INC.,
TAP PHARMACEUTICALS, WARRICK
PHARMACEUTICALS, and WYETH

       Defendants.

Civil Action No. 05-10179-PBS

MDL No. 1456

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................1

II.   JURISDICTION AND VENUE ...............................................................7

III.  PARTIES ................................................................................................8

      UNNAMED CO-CONSPIRATORS ......................................................21

IV.   GENERAL ALLEGATIONS ..................................................................22

      A.   THE AWP SYSTEM ....................................................... 22

      B.   THE MEDICAID STATUTORY SCHEME............................ 25

      C.   DEFENDANTS' FRAUDULENT CONDUCT WITH RESPECT
           TO REPORTING AND THE FAILURE TO REPORT BEST
           PRICES ....................................................................... 28

           1.   Artificially Inflating and Fraudulently Reporting AWPs ..............28

           2.   Failure to Report Best Prices .........................................29

      D.   THE DEFENDANT DRUG MANUFACTURERS' USE OF AWP
           FRAUD TO INCREASE AND MAINTAIN VOLUME AND
           MARKET SHARE FOR GENERIC AND MULTI-SOURCE
           DRUGS ....................................................................... 33

      E.   MOTIVATION FOR DEFENDANTS' AWP PRICING SCHEME........ 36

      F.   THE DEFENDANTS HAVE ADMITTED TO AN INDUSTRY-
           WIDE PRACTICE OF FRAUDULENTLY INFLATING AWPS .......... 37

V.    GOVERNMENT INVESTIGATIONS ...........................................................39

VI.   ALLEGATIONS PARTICULAR TO NASSAU COUNTY AND THE
      INDIVIDUAL DEFENDANTS.....................................................................46

      A.   ABBOTT LABS ................................................................. 48

      B.   AGOURON........................................................................ 50

      C.   AMGEN ........................................................................... 51

      D.   ASTRAZENECA................................................................. 53

E.   AVENTIS ................................................................................................ 57

F.   BARR ...................................................................................................... 59

G.   BAXTER ................................................................................................. 60

H.   BAYER .................................................................................................... 62

I.   BERLEX ................................................................................................... 65

J.   BIOGEN ................................................................................................... 66

K.   BOEHRINGER ........................................................................................ 67

L.   BRISTOL-MEYERS SQUIBB .................................................................. 69

M.   CHIRON .................................................................................................. 70

N.   ELI LILLY ................................................................................................ 71

O.   FOREST ................................................................................................... 72

P.   FUJISAWA .............................................................................................. 73

Q.   GENENTECH .......................................................................................... 74

R.   GENZYME ............................................................................................... 75

S.   THE GSK DEFENDANTS ........................................................................ 76

T.   IMMUNEX CORPORATION ................................................................... 80

U.   IVAX CORPORATION ............................................................................ 80

V.   JOHNSON & JOHNSON DEFENDANTS ................................................ 81

W.   KEY ......................................................................................................... 83

X.   MEDIMMUNE ......................................................................................... 84

Y.   MERCK .................................................................................................... 84

Z.   MYLAN ................................................................................................... 85

AA.   NOVARTIS ............................................................................................. 86

BB.   ORGANON .............................................................................................. 87

  CC. THE PFIZER DEFENDANTS (PFIZER, AGOURON AND
    SANOFI-SYNTHELAB, INC.).................................................. 88

  DD. PHARMACIA........................................................................... 91

  EE. PURDUE................................................................................... 93

  FF. RELIANT PHARM .................................................................. 94

  GG. SCHERING-PLOUGH ........................................................... 95

  HH. SERONO.................................................................................. 97

  II. TAKEDA ................................................................................. 98

  JJ. TAP ......................................................................................... 99

  KK. WARRICK............................................................................. 102

  LL. WYETH ................................................................................ 104

VII. DAMAGES TO NASSAU COUNTY.................................................105

VIII. FRAUDULENT CONCEALMENT................................................107

IX. CLAIMS FOR RELIEF ......................................................................109

  COUNT I VIOLATIONS OF 18 U.S.C.§ 1962(C) (AGAINST DEFENDANT
    DRUG MANUFACTURERS IDENTIFIED HEREIN FOR
    UNLAWFUL CONDUCT ASSOCIATED WITH
    MEDICAID COVERED DRUGS).............................................109

  COUNT II VIOLATION OF FEDERAL MEDICAID STATUTE, 42 U.S.C.
    § 1396r-8 FAILURE TO REPORT BEST PRICE .....................145

  COUNT III VIOLATION OF N.Y. SOCIAL SERVICES LAW § 367-a(7)(d)
    FAILURE TO REPORT BEST PRICE......................................147

  COUNT IV VIOLATION OF NEW YORK DEPARTMENT OF HEALTH
    REGULATIONS 18 N.Y.C.RR § 515.2(b,)(4) and (5)..............149

  COUNT V VIOLATION OF NEW YORK SOCIAL SERVICES LAW § 145-
    b OBTAINING PUBLIC FUNDS BY FALSE
    STATEMENTS.........................................................................150

  COUNT VI BREACH OF CONTRACT................................................151

COUNT VII UNFAIR TRADE PRACTICES (Violations of N.Y. Genl. Bus. Law & 349 *et seq.*)........................................................................152

COUNT VIII FRAUD ................................................................................155

COUNT IX UNJUST ENRICHMENT ......................................................156

X.    PRAYER FOR RELIEF .............................................................................156

Plaintiff, the County of Nassau (hereinafter "Nassau County"), brings this action under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the Social Security Act, 42 U.S.C. § 1396r-8, New York Social Services Law §§ 367 and 145-b, New York General Business Law §§ 349, 350 and common law to recover monetary damages, civil penalties, declaratory and injunctive relief, restitution, disgorgement of profits, treble and punitive damages suffered as a result of Defendants' unlawful scheme to overcharge for prescription medications paid for by New York State Medicaid. Nassau County is required by New York State law to pay 25% of New York State Medicaid costs, including the cost of prescription drugs ("pharmacy costs"). Nassau County is also required to balance its budget annually. Every dollar wrongfully spent on Medicaid could have properly been allotted to other public needs. Nassau County's claims as to itself and its own actions are based upon its personal knowledge. All other allegations are based upon information and belief pursuant to the investigation of counsel.

## I.    INTRODUCTION

1.    Each of the Defendants is or has been engaged in the business of manufacturing, marketing and/or selling prescription pharmaceuticals throughout the United States. The principal payors for such prescription pharmaceuticals are federal, state and local governments (under the Medicare and Medicaid Programs), private insurers and self-insured employers (Third-Party Payors), and private individuals (Patients). Plaintiff is a municipal corporation and local government required by New York State law to contribute 25% towards New York States Medicaid costs. The County Medicaid program paid over $26 million for prescription drugs for Nassau County residents in 2004.

2.      For the last decade, Defendants have engaged in a systematic and pervasive fraudulent scheme with others in the pharmaceutical distribution chain, including but not limited to pharmacies, physicians, hospitals and other medical providers (hereinafter "providers"), to collect inflated prescription drug payments from Nassau County. The scheme generally involves two types of wrongdoing, one of which impacts the other. The first is the fraudulent reporting of false and inflated average wholesale prices ("AWPs") or wholesale acquisition costs ("WACs") on which AWPs are based for certain drugs. The second is the failure to report the "Best Price" for certain drugs in violation of federal and state Medicaid statutory requirements, which failure also inflates the AWP.

3.      It is standard practice for federal Medicare and Medicaid Programs, state and local Medicaid entities (such as Nassau County), Third Party Payors and patients to reimburse providers for multi-source (generic) and brand name prescription drugs for which there is no "Federal Upper Limit" based upon the AWP for such drugs, as published and reported by third-party reporting services such as the Blue Book, Medispan or RedBook.

4.      Nassau County pays for most prescription drugs based on AWP pursuant to federal and state statute and regulation. Because Defendants artificially inflate the AWP in order to manipulate reimbursements, plaintiff has made excessive payments. As set forth in Exhibit A hereto, Defendants have reported false and inflated AWPs for certain Medicaid Covered Drugs. The improper inflation rates range is at least as high as approximately 32%, based on Nassau County's research (*see* Exhibit A). This practice has resulted in millions of dollars in overcharges to Nassau County.

5.      The inflationary scheme is successful in part because Pharmaceutical companies either self-report an artificially inflated AWP to publishers, who then publish the AWP provided

to them; or self-report artificially inflated WACs, which the publisher then converts to AWP.  In either case, the AWP is not independently determined by the publishers.  Nassau County must rely on these published AWPs because Defendants withhold more accurate pricing information from the states and other payors.  As Representative Henry Waxman stated in a recent House Subcommittee Hearing:

> [T]he drug industry was powerful and they succeeded in securing a provision in the basic legislation that kept the Best Price and the AMP information a secret.  Can you imagine that?  The federal government knew this information, but we kept it a secret from the states.  This has provided to be a costly error.  Without this crucial piece of information, states who were after all responsible for establishing the reimbursement rate for prescription drugs could not set their reimbursement rates appropriately.  As a result they continued to rely on the average wholesale price, minus some arbitrary amount simply because they did not have information they needed to set a more appropriate reimbursement rate…

*Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much:  Hearing Before the House Subcomm. on Oversight and Investigations*, 108th Cong., December 7, 2004, Tr. at 8-9 (*hereinafter* "House Subcommittee Hearing").

6.    By federal and state statute and regulation, and industry practice, the AWP is intended and required to be based upon and directly related to actual prices paid by providers to pharmaceutical manufactures (or wholesalers) for such prescription drugs.

7.    In fact, as has been revealed by Nassau County's own investigation (*See* Exhibit A) and extensive and ongoing Congressional and federal investigations, and numerous recent settlements involving many of the Defendants herein, pharmaceutical manufacturers have engaged in a pervasive scheme, commencing in 1993 if not earlier, whereby they report or cause to be reported, fraudulent, fictitious and inflated AWPs or WACs for certain prescription pharmaceuticals, including prescription pharmaceuticals paid for by Medicaid and thus by Nassau County.

8.    The fraudulent AWP Scheme described herein also has involved the affirmative failure of Defendants to report their Best Prices as required by federal and state Medicaid statutes, thereby further inflating the reported AWPs.  Pursuant to 42 U.S.C. § 1396r-8, each of the Defendants was required to report to the Secretary of Health and Human Services the lowest price it sold a drug to any for-profit entity.  Each defendant agreed to offer the Medicaid Program its "best price." A like requirement appears in New York State's Medicaid Statute.  *See* New York Social Services Law § 367-a(7)(d).  Yet Defendants exclude from their reporting of best prices certain drugs offered at discounts or other rebates that would have reduced the price paid. They do so to avoid paying rebates to Medicaid and to avoid having to disclose the true best price, which would have required a reduction in the reported AWP.

9.    The fraudulent reporting of Average Wholesale Prices has the effect of materially misrepresenting and overstating the true AWP on which reimbursement should be based.

10.    The motivations for the scheme are straight-forward.  By inflating the AWP, on which Medicaid reimbursement is based, Defendants motivate providers to distribute the drugs with the highest reimbursement rate.  This practice is known as "marketing the spread." Providers benefit by pocketing the difference between the reported AWP and the actual cost paid for the drug.

11.    This scheme is not a matter of speculation.  Defendant Bayer recently paid $260 million in civil and criminal fines in connection with allegations that they failed to report Best Prices for certain drugs, thereby resulting in overcharges to Medicaid and Medicare.  Defendant GlaxoSmithKline recently paid $88 million to resolve civil charges that it caused Medicaid and Medicare to overpay for certain drugs.  Defendant Abbott is paying $621 million in criminal and civil penalties for defrauding Medicare and Medicaid and has affirmatively acknowledged its

involvement in the fraud. Defendant Bristol-Myers is under investigation in connection with its pricing practices for drugs covered by Medicare and Medicaid. Defendant AstraZeneca paid $355 million to settle federal fraud charges that it induced doctors to falsely bill Medicare and Medicaid. Defendant Pfizer paid $49 million for failure to disclose discounts and properly report best prices for a certain drug. Defendant Schering-Plough faces threat of indictment for cheating the government out of Medicaid rebates and submitting false price information. Defendant TAP Pharmaceuticals paid $875 million in connection with its fraudulent pricing practices respecting Lupron.

12.    The foregoing settlements, the government investigations that prompted them, and the corporate integrity agreements executed by the settling companies are discussed herein. Certain of the settlements may impact a portion of Nassau County's damages for certain years with respect to certain drugs. In any event, the settlements and compliance agreements executed by the settling parties confirm the allegations of wrongdoing herein.

13.    Even as to the Defendants not mentioned above, Nassau County's initial research confirms that the practice of routinely and systematically inflating the reported AWPs for certain drugs and failing to report Best Prices is pervasive. *See* Exhibit A. Indeed, Defendants must participate lockstep in the fraud to prevent dispensers such as pharmacies and doctors from prescribing drugs of a competitor with a higher spread between Medicaid reimbursement rate and direct price.

14.    The fraudulent scheme devised and initiated by Defendants and implemented by its co-conspirators is effectuated by: (i) overstating the AWP for drugs for which Medicaid provides reimbursement based upon AWP ("Covered Drugs"); (ii) marketing and promoting the sale of Covered Drugs to providers based on the providers' ability to collect inflated payments

from the government and Medicaid beneficiaries that exceeded payments possible for competing

drugs; (iii) providing healthcare providers with unreported discounts, free samples and financial

incentives to over-prescribe Covered Drugs or to prescribe Covered Drugs in place of competing

drugs; and (iv) overcharging the Medicaid program for illegally inflated Covered Drugs

reimbursements.

15.    According to one member of the Congressional Ways and Means Committee,

describing the conduct of one defendant herein:

> The price manipulation scheme is executed through Bristol's
> falsely inflated representations of average wholesale price
> ("AWP"), direct price ("DP"), and wholesale acquisition cost
> ("WAC"), which are utilized by the Medicare and Medicaid
> programs in establishing drug reimbursements to providers.  The
> difference between the inflated representations of AWP, DP, and
> WAC versus the true price providers are paying, is regularly
> referred to . . . as "the spread."
>
> *    *    *
>
> The evidence clearly shows that Bristol has intentionally reported
> inflated prices and has engaged in other improper business
> practices in order to cause its customers to receive windfall profits
> from Medicare and Medicaid when submitting claims for certain
> drugs.  The evidence further reveals that Bristol manipulated prices
> for the express purpose of expanding sales and increasing market
> share of certain drugs where the arranging of a financial benefit or
> inducement would influence the decisions of healthcare providers
> submitting the Medicare and Medicaid claims.

(February 27, 2001 letter from Representative Pete Stark to Peter Dolan, President, Bristol-

Myers Squibb Co.).

16.    Nassau County alleges upon information and belief that, in many instances, the

AWP reported by the defendant pharmaceutical manufacturers bears a minimal relationship to

the prices actually paid by providers and is "made up" by corporate pricing committees literally

out of "thin air" for the purpose of manipulating pharmaceutical markets and increasing market

share.  Many of the facts underlying this fraud, such as the volume and nature of the discounts provided and free samples distributed, are peculiarly within Defendants' control.

17.    Thus, Defendants knowingly have violated federal and state statutes by deliberately publishing false, inflated and misleading price data that directly results in excessive payments by Nassau County.  Neither federal nor state statutory schemes, even to the extent they base reimbursement on AWPs, permit Defendants to engage in this widespread, concerted fraud. Nassau County would not have been damaged if Defendants complied with the existing federal and state laws.

18.    As a result of the fraudulent and illegal manipulation of AWP for covered drugs by Defendants, Defendants have reaped billions of dollars in illegal profits at the expense of American consumers, taxpayers, and entities such as Plaintiff that pay reimbursements for Medicaid pharmacy costs.

## II.    JURISDICTION AND VENUE

19.    This action is brought for and on behalf of the County of Nassau, pursuant to, *inter alia*, the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, New York's Social Services Law §§ 145-b and 367-a, New York's Consumer Protection Statute, Gen. Bus. Law §§ 349, 350 and for breach of contract, unjust enrichment, and common law fraud.

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* and the Social Security Act, 42 U.S.C. § 1396 *et seq.*  This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants do business and are qualified to do business in this District; certain acts giving rise to the claims asserted in this Complaint occurred within this District; and the illegal actions of Defendants, as alleged in this Complaint, caused damage to Plaintiff within this District.

### III.    PARTIES

22.     Plaintiff, the County of Nassau, New York is a municipal corporation organized pursuant to the laws of New York State.  Nassau County maintains its principal place of business at 1 West Street, Mineola, New York.  The county is statutorily required to pay 25% of Medicaid prescription drug cases for Nassau County residents.  N.Y. Sec. Serv. L. § 367-68 .

23.     Defendant Abbott Laboratories, Inc. ("Abbott") is an Illinois corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Abbott's principal place of business is at 100 Abbott Park Road, Abbott Park, Illinois.  Abbott conducts extensive business in the State of New York, including Nassau County.  Abbott manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Depakote® and Kaletra®.

24.     Defendant Agouron Pharmaceuticals Inc. ("Agouron") is a California corporation whose principal business is the development, manufacture and sale of health care products including pharmaceuticals and a wholly owned subsidiary of Pfizer.  Agouron's principal place of business is 10350 North Torrey Pines Road, Suite 100 La Jolla, California.  Agouron does extensive business in the State of New York, Nassau County.  Agouron manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Viracept®.

25.     Defendant Amgen, Inc. ("Amgen") is a Delaware corporation whose principal business is the development, manufacture and sale of health care products including pharmaceuticals.  Amgen's principal place of business is One Amgen Drive, Thousand Oaks, California.  Amgen does extensive business in the State of New York, including Nassau County.  Amgen manufactures and/or sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Neuprogen®, Enbrel® and Epogen®.

26.     Two AstraZeneca PLC subsidiaries, Defendant AstraZeneca U.S. and Defendant Astr&Zeneca Pharmaceuticals L.P.  (collectively referred to as "AstraZeneca") are Delaware corporations whose principal businesses are the development, manufacture and sale of health care products including pharmaceuticals.  AstraZeneca's principal place of business is at 1800 Concord Pike, Wilmington, Delaware.  AstraZeneca does extensive business in the State of New York, including Nassau County.  AstraZeneca manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Nexium®, Prilosec® and Seroquel®.

27.     Two wholly-owned subsidiaries of French-domiciled Aventis S.A., Defendant Aventis Behring L.L.C. and Defendant Aventis Pharmaceuticals Inc., (collectively referred to as "Aventis") are located in the U.S.  Defendant Aventis Behring is located at 1020 First Avenue, King of Prussia, Pennsylvania.  Defendant Aventis Pharmaceuticals Inc. is located at 300-400 Somerset Corporate Boulevard, Bridgewater, New Jersey.  Aventis Behring formerly did business as Centeon LLC, a joint venture between Rhone-Poulenc Rorer, S.A. and Hoechst Marion Roussel, Inc. ("Hoechst").  Aventis manufactures, markets and sells prescription drugs

with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Helixate FS® and Allegra®.

28.     Defendant Barr Laboratories, Inc. ("Barr") is a specialty pharmaceutical company primarily engaged in the development, manufacture and marketing of generic and proprietary prescription pharmaceuticals.  Its business address is 2 Quaker Road, Box 2900, Pomona, New York.  Barr conducts extensive business in the State of New York, including Nassau County. Barr manufactures and/or sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Fluoxetine® and Warfarin®.

29.     Defendant Baxter Health Care Corp. ("Baxter") is a Delaware corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Baxter's principal place of business is at One Baxter Parkway, Deerfield, Illinois.  Baxter conducts extensive business in the State of New York, including Nassau County.  Baxter manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Gammagard®.

30.     Defendant Bayer Corporation ("Bayer") is an Indiana corporation whose principal business is the development, manufacture and sale of health care products including pharmaceuticals.  Bayer's principal place of business is located at 100 Bayer Road, Pittsburgh Pennsylvania.  Bayer's pharmaceutical division is located at 400 Morgan Lane, West Haven, Connecticut.  Bayer conducts extensive business in the State of New York, including Nassau County.  Bayer is a wholly owned U.S. subsidiary of Bayer AG, a German corporation.  Bayer manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Cipro®.

31.    Defendant Berlex Laboratories, Inc. ("Berlex") is a Delaware corporation whose principal business is the development, manufacture and sale of health care products, including pharmaceuticals.  Berlex's principal place of business is P.O.  Box 1000, Montville, New Jersey. Berlex conducts extensive business in the State of New York, including Nassau County.  Berlex Laboratories manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Betaseron®.

32.    Defendant Biogen, Inc. ("Biogen") is a highly diversified health care company whose principal business is the development, manufacture and sale of health care products, including pharmaceuticals.  Biogen's principal place of business is 14 Cambridge Center, Cambridge, Massachusetts.  Biogen conducts extensive business in the State of New York, including Nassau County.  Biogen manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Avonex®.

33.    Defendant Boehringer Ingelheim Corporation ("Boehringer") is a Connecticut corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Boehringer's principal place of business is at 900 Ridgebury Road, Ridgefield, Connecticut.  Boehringer conducts extensive business in the State of New York, including Nassau County.  Boehringer is a wholly owned U.S. subsidiary of Boehringer Ingelheim Auslandsbeteiligung GmbH, a German corporation.  Boehringer manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Combivent® and Flomax®.

34.    Defendant Bristol-Myers Squibb Company ("Bristol-Myers") is a Delaware corporation whose principal business is the development, manufacture and sale of health care

- 11 -

products, including pharmaceuticals. Bristol-Myers's principal place of business is 345 Park Avenue, New York, New York. Bristol-Myers does extensive business in the State of New York, including Nassau County. Bristol-Myers manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Glucophage®, Sustiva®, Pravachol®, Buspar®, and Plavix®.

35.    Defendant Chiron Corporation's ("Chiron") principal business is the development, manufacture and sale of health care products including pharmaceuticals. Chiron's principal place of business is 4560 Horton Street, Emeryville, California. Chiron conducts extensive business in the State of New York, including in the County of Westchester. Chiron manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid to Nassau County, including such medications as Tobi®.

36.    Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation whose principal business is the development, manufacture and sale of health care products including pharmaceuticals. Eli Lilly's principal place of business is Lilly Corporate Center, Indianapolis, Indiana. Eli Lilly does extensive business in the State of New York, including Nassau County. Eli Lilly manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Zyprexa®, and Prozac®.

37.    Defendant Forest Pharmaceuticals Inc. ("Forest") is a Delaware corporation whose principal business is the development, manufacture and sale of health care products including pharmaceuticals. Forest's principal place of business is 13600 Shoreline Drive, St. Louis, Missouri. Forest conducts extensive business in the State of New York, including Nassau County. Forest manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Celexa®.

38.     Defendant Fujisawa Health Care, Inc. ("Fujisawa") is a Delaware corporation headquartered at Three Parkway North, Deerfield, Illinois.  Fujisawa is a wholly-owned subsidiary of Fujisawa Pharmaceutical Co., Ltd., a Japanese corporation.  Fujisawa conducts extensive business in the State of New York, including Nassau County.  Fujisawa manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Prograf®.

39.     Defendant Genentech, Inc. ("Genentech") is a Delaware corporation whose principal business is the discovery, development, manufacture, and sale of pharmaceuticals.  Genentech's principal place of business is One DNA Way, South San Francisco, California.  Genentech conducts extensive business in the State of New York, including Nassau County.  Genentech manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Pulmozyme®.

40.     Defendant Genzyme Corp. ("Genzyme") is a Massachusetts corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Genzyme's principal place of business is at 500 Kendall Street, Cambridge, Massachusetts.  Genzyme conducts extensive business in the State of New York, including Nassau County.  Genzyme manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Renagel®.

41.     Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK") is a Delaware corporation engaged in the manufacture and sale of pharmaceuticals.  Its principal place of business is at One Franklin Plaza, Philadelphia, Pennsylvania 19102.  GSK does extensive business in the State of New York, including Nassau County.  GSK manufactures and

sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Epivir® and Wellbutrin®, Lamictal®, Serevent®, Paxil®, Augmentin, Avandia®, Ziagen®, Flovent®, Flonase®.

42.    Defendant Immunex Corporation ("Immunex") is a Washington State corporation, with its principal place of business at 51 University Street, Seattle, Washington, that was acquired by Amgen in July 2002, and has been a wholly-owned subsidiary since this merger. Immunex does business in the State of New York, including Nassau County. Immunex manufactures prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including Enbrel® which is marketed and sold by Amgen and Wyeth.

43.    Defendant Ivax Corp. ("Ivax") is a Florida corporation engaged in the research, development, manufacture and marketing of pharmaceutical products. Its principal place of business is 4400 Biscayne Blvd., Miami, FL. Ivax is the corporate parent of defendant Ivax Pharmaceuticals, Inc. Ivax manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Clozapine®.

44.    The Johnson & Johnson Defendants are as follows:

(a)    Defendant Johnson & Johnson ("J&J") is a New Jersey corporation engaged in the manufacture and sale of a broad range of products in the healthcare field. Its principal place of business is One Johnson & Johnson Plaza, New Brunswick, New Jersey. Johnson & Johnson is the corporate parent of defendants Janssen Pharmaceutical, Ortho-McNeil, and Ortho Biotech and is responsible for the marketing and distribution of its subsidiaries' drugs, which have false and inflated AWPs as set forth herein. The four defendants are at times referred to collectively herein as "the J&J Defendants."

- 14 -

(b)    Defendant Janssen Pharmaceutical Products ("Janssen") is a New Jersey limited partnership whose principal business is the development, manufacture and sale of health care products including pharmaceuticals.  Janssen's principal place of business is 1125 Trenton-Harbourton Road, Titusville, New Jersey.  Janssen is subsidiary of defendant Johnson & Johnson.  Janssen conducts extensive business in the State of New York, including Nassau County.  Janssen manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Risperdal® and Duragesic®.

(c)    Defendant Ortho-McNeil Pharmaceuticals ("Ortho-McNeil") is a highly diversified health care company incorporated in New Jersey whose principal business is the development, manufacture and sale of health care products including pharmaceuticals.  Ortho-McNeil's principal place of business is1000 U.S. Route 202 South, Raritan, New Jersey.  Ortho-McNeil conducts extensive business in the State of New York, including Nassau County.  Ortho-McNeil manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Levaquin®, Topamax® and Ultram®.

(d)    Defendant Ortho Biotech is a New Jersey Corporation and has been a wholly owned subsidiary of defendant Johnson and Johnson since its formation in 1990.  Ortho Biotech's principal place of business is located at 700 U.S. Highway 202, Raritan, New Jersey.  Ortho Biotech manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Procrit®.

45.    Defendant Key Pharmaceuticals, Inc. ("Key") is a New Jersey corporation whose principal business is the development, manufacture, and sale of health care products and

services, including pharmaceuticals. Key's principal place of business is at 1011 Morris Ave., U-13-2 2900, Union, New Jersey. Key conducts extensive business in the State of New York, including Nassau County. Key manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as K-Dur®.

46.    Defendant MedImmune, Inc. ("MedImmune") is a Delaware corporation whose principal business is the development, manufacture and sale of health care products including pharmaceuticals. MedImmune conducts extensive business in the State of New York, including Nassau County. MedImmune's principal place of business is 35 W. Watkins Mill Road, Gaithersburg, Maryland. MedImmune manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Synagis®.

47.    Defendant Merck & Co., Inc. ("Merck") is a New Jersey corporation whose principal business is the development, manufacture and sale of health care products including pharmaceuticals. Merck's principal place of business is One Merck Drive, P.O. Box 100, Whitehouse Station, New Jersey. Merck conducts extensive business in the State of New York, including Nassau County. Merck manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Crixivan®, Vioxx®, Zocor®, Singulair®, and Fosamax®.

48.    Defendant Mylan Laboratories, Inc. ("Mylan") is a Pennsylvania corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals. Mylan's principal place of business is at 1500 Corporate Drive, Suite 400, Canonsburg, Pennsylvania. Mylan conducts extensive business in the State of New York, including Nassau County. Mylan manufactures and sells prescription drugs with

false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Nifedipine®.

49.    Defendant Novartis Pharmaceuticals Corporation ("Novartis") is a New Jersey Corporation with its main place of business at One Health Plaza, East Hanover, New Jersey. Novartis is a U.S. affiliate of Novartis AG.  Novartis is a highly diversified health care corporation whose principal business is the development, manufacture and sale of health care products including pharmaceuticals.  Novartis conducts extensive business in the State of New York, including Nassau County.  Novartis manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Clozaril®.

50.    Defendant Organon Inc., USA ("Organon") is a New Jersey corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Organon's principal place of business is at 375 Mount Pleasant Avenue, West Orange, New Jersey.  Organon conducts extensive business in the State of New York, including Nassau County.  Organon is a wholly owned U.S. subsidiary of Akzo Nobel, a Netherlands corporation.  Organon manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Remeron®.

51.    Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation whose principal business was the development, manufacture and sale of health care products including pharmaceuticals.  Pfizer's principal place of business is 235 East 42nd Street, New York, New York.  Pfizer does extensive business in the State of New York, including Nassau County.  Pfizer manufactures and/or sells prescription drugs with false and inflated AWPs that are paid for by

Medicaid in Nassau County, including such medications as Ambien®, Lipitor®, Neurontin®, Norvasc®, Zoloft®, Zyrtec®.

52.    Defendant Pharmacia Corporation ("Pharmacia"), which became a wholly owned subsidiary of Pfizer on April 16, 2003, is a Delaware corporation with its principal place of business located at 100 Route 206, North Peapack, New Jersey.  Pharmacia was created through the merger of Defendant Pharmacia and Upjohn, Inc. and Monsanto Company on March 31, 2000.  Pharmacia is a highly diversified health care company whose business includes the manufacture and sale of prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Detrol®.

53.    Defendant Purdue Pharma, L.P. ("Purdue") is a pharmaceutical company whose principal business is the development, manufacture and sale of health care products including pharmaceuticals.  Purdue's principal place of business is One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut.  Purdue conducts extensive business in the State of New York, including Nassau County.  Purdue manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Oxycontin®.

54.    Defendant Reliant Pharmaceuticals ("Reliant") is based in New Jersey with its principal place of business at 721 Route 202/206 South Bridgewater, NJ.  Reliant manufactures and sells drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County such as Axid®.

55.    Defendant Sanofi-Synthelab, Inc. ("Sanofi") is a highly diversified health care corporation whose principal business was the development, manufacture and sale of health care products including pharmaceuticals.  Sanofi's principal place of business is One Wall Street,

New York, New York.  Sanofi conducts extensive business in the State of New York, including Nassau County.  Sanofi manufactures and/or sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Plavix® and Ambien®.

56.    Defendant Schering-Plough Corp. ("Schering") is a highly diversified health care corporation whose principal business was the development, manufacture and sale of health care products including pharmaceuticals.  Schering is a New Jersey corporation whose headquarters are located at 2000 Galloping Hill Rd., Kenilworth, New Jersey.  Schering-Plough does extensive business in the State of New York, including Nassau County.  Schering, directly or through its subsidiary Warrick, manufactures and/or sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County including Claritin® and Clarinex®.

57.    Defendant Serono, Inc. ("Serono") is a Massachusetts corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Serono's principal place of business is at One Technology Place, Rockland, Massachusetts.  Serono conducts extensive business in the State of New York, including Nassau County.  Serono is a wholly owned U.S. subsidiary of Serono International S.A., a Swiss corporation.  Serono manufactures and sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications as Serostim®.

58.    Defendant Takeda Pharmaceuticals North America, Inc., ("Takeda") is an Illinois corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals.  Takeda's principal place of business is at 475

Half Day Road, Lincolnshire, Illinois.  Takeda conducts extensive business in the State of New

York, including Nassau County.  Takeda is a wholly owned U.S. subsidiary of Takeda

Pharmaceutical Company Limited, a Japanese corporation.  Takeda manufactures and sells

prescription drugs with false and inflated AWPs that are paid for by Medicaid in Nassau County,

including such medications as Actos®.

59.    Defendant TAP Pharmaceutical Products, Inc. ("TAP") is a highly diversified

health care company whose principal business was the development, manufacture, marketing and

sale of health care products including pharmaceuticals.  TAP is a joint venture between

Defendant Abbott and Takeda Chemical Industries, Ltd., of Osaka, Japan.  TAP conducts

extensive business in the State of New York, including Nassau County.  TAP's principal place of

business is 675 North Field Drive, Lake Forest, Illinois.  Prior to April, 2000, TAP was known as

TAP Holdings, Inc.  TAP, together with its subsidiary TAP Pharmaceuticals, Inc., manufactures

and/or sells prescription drugs with false and inflated AWPs that are paid for by Medicaid in

Nassau County, including such medications as Prevacid®.

60.    Defendant Warrick Pharmaceuticals Corporation ("Warrick") is a Delaware

corporation with its principal place of business at 12125 Moya Boulevard, Reno, Nevada.

Warrick is a wholly-owned subsidiary of Defendant Schering-Plough and has been since its

formation in 1993.  Schering-Plough and Warrick manufacture and/or sell prescription drugs

with false and inflated AWPs that are paid for by Medicaid in Nassau County including such

medications as Claritin® and Albuterol®, and Isosorbide®.

61.    Defendant Wyeth is a highly diversified health care corporation whose principal

business is the development, manufacture and sale of health care products including

pharmaceuticals.  Wyeth is a Delaware corporation whose principal place of business is Five

Giralda Farms, Madison, New Jersey.  Wyeth conducts extensive business in the State of New

York, including Nassau County.  Wyeth manufactures and/or sells prescription drugs with false

and inflated AWPs that are paid for by Medicaid in Nassau County, including such medications

as Effexor XR® and Protonix®.

## UNNAMED CO-CONSPIRATORS

62.     Various other individuals, partnerships, sole proprietors, business entities,

companies, and corporations, presently unknown to Nassau County and not named as defendants

in this Complaint, participated as co-conspirators in the violations alleged in this Complaint and

performed acts and made statements in furtherance thereof.  Such unknown persons or entities

acted as co-conspirators and aided, abetted, or participated with Defendants in the commission of

the wrongful acts alleged herein or otherwise caused the damages suffered by Nassau County.

63.     Except as described herein, Plaintiff is unaware of the true names, capacities,

nature and extent of the participation in the course of conduct alleged herein.  Nassau County

will amend this Complaint to allege the true names and capacities of the Doe defendants when

ascertained.

64.     Defendants unknown at this time may include independent pharmacies,

dispensers, and other medical providers who prescribed drugs and received inflated Medicaid

reimbursements and engaged in fraudulent billing practices, as well as various other persons,

partnerships, sole proprietors, firms, corporations and individuals that may have participated as

coconspirators with Defendants in the offenses alleged in this complaint and may have

performed acts and made statements in furtherance of the alleged illegal conduct.

65.     Each of the defendants designated herein as a Doe defendant is legally responsible

in some manner for the unlawful acts referred to herein.  Plaintiff will seek leave of Court if

necessary to amend this Complaint to reflect the true names and capacities of the defendants

designated herein as Does when such identities become known.

## IV.    GENERAL ALLEGATIONS

66.    The allegations contained herein apply generally to all defendants.

## A.    THE AWP SYSTEM

67.    There are approximately 65,000 different drug products in the United States

market, including different dosages of the same drug.  Prescription drugs are dispensed to

patients by or through different types of medical providers, including but not limited to:

(a) physicians who administer the drug in an office, (b) retail pharmacies, (c) home infusion

pharmacies, and (d) other medical providers, including hospitals (collectively referred to

hereinafter as "providers").

68.    This case concerns "Covered Drugs", which are those drugs for which, pursuant

to N.Y. Soc. Serv. Law § 367-a(9), Nassau County's Medicaid pharmacy cost reimbursement

rate is pegged to AWP.  In New York's statutory scheme, AWP is also known as "Estimated

Acquisition Cost" or "EAC."

69.    Providers regularly submit claims for reimbursement, seeking payment for the

drugs from Medicare, Medicaid, insurers and patients.  At all times relevant hereto, Defendants

knew that the Medicare/Medicaid programs rely on published AWPs to reimburse providers for

drugs.

70.    AWPs are published for each drug identified by a National Drug Code ("NDC").

There are several pharmaceutical industry compendia that periodically publish, in printed and

electronic media, the AWPs for the tens of thousands of drugs.  Medical Economics Company

Inc., publishes the Drug Topics RedBook (the "RedBook").  First DataBank compiles the

National Drug Datafile.  There is also the American Druggist First DataBank Annual Directory

of Pharmaceuticals and Essential Director of Pharmaceuticals (the "Blue Book") and Medi-

Span's Master Drug Database (collectively referred to herein as the "publishers").

71.    In periodically announcing the AWP for each drug, the publishers publish the

prices that are supplied to them by the Defendants for their respective drugs.  The forward to the

1999 edition of the RedBook stated that "all pricing information is supplied and verified by the

products' manufacturers, and it should be noted that no independent review of those prices for

accuracy is conducted."  A June 1996 Dow Jones news article reported that Phil Southerd, an

associate product manager of the RedBook, stated that it only publishes prices that are faxed

directly from the manufacturer.  Thus, the AWP generally is not independently determined by

the Publishers.[1]  Defendants control the prices listed as the AWPs for each drug.

72.    A system that bases its reimbursement rates for drugs on the published AWP is

dependent on the honesty of the drug manufacturers.

73.    Extensive and ongoing federal and Congressional investigations, and settlements

as described herein, have revealed that numerous pharmaceutical manufacturers (including

certain of the defendants named herein and others not yet named) have engaged in a scheme

---

[1]    As if in acknowledgement of the scheme, the forward to the 2002 RedRook now reads:

> All pricing information in RedBook is published by manufactures,
> distributors, and other suppliers.  While great care has been taken
> in compiling the data, we conduct no independent review and
> therefore cannot guarantee that accuracy of these prices.  We
> continue to regard AWP as one guideline in the pricing equation
> and to encourage the dissemination of fair, accurate prices by all
> suppliers.

See 2002 Drug Topics® RedBook, Forward (emphasis added).

involving the fraudulent reporting of AWPs for certain prescription pharmaceuticals including but not limited to prescription pharmaceuticals covered by Medicaid.

74.    Specifically, Defendants' AWP Scheme involves the reporting by each defendant of inflated Average Wholesale Prices.  The fraudulent reporting of Average Wholesale Prices has the effect of materially misrepresenting the actual prices paid to Defendants by providers, in violation of federal and state law.

75.    Defendants know that they can directly control, fabricate and inflate the AWP for their drugs at any time by forwarding to the Publishers a new and higher AWP.  Actual transaction price data – the amounts actually paid by providers for drugs – is not readily publicly available, and Defendants keep this information (on which AWPs should have been calculated) highly confidential and secret.  This makes it practically impossible to efficiently calculate Medicaid reimbursements based on anything other than AWP.  Defendants' concealment of actual price data is one of the many reasons the facts underlying Defendants' fraud are peculiarly within Defendants' control, and why any applicable statute of limitations should be tolled.

76.    Plaintiff alleges upon information and belief that, in many instances, the AWP reported by Defendants bears little or no relationship to the prices actually paid by providers, in direct violation of federal and state law.  Rather, the reported AWPs for covered drugs were simply fabricated in furtherance of Defendants' scheme to generate the profit spread to providers, to increase Defendants' profits at the expense of Nassau County and other Medicaid payors, and to control the market for their products.

77.    Defendants' pattern of fraudulent conduct in artificially inflating the AWPs for the Covered Drugs (sometimes referred to herein as the "AWP Scheme") directly and foreseeably causes and has caused Nassau County to overpay substantially for those drugs, given

Nassau County's federal and state statutory obligations, of which Defendants have, at all times relevant, been aware.

**B.      THE MEDICAID STATUTORY SCHEME**

78.     Medicaid was established by Title XIX of the Federal Social Security Act (the "Act"), 42 U.S.C. 1396, *et seq.* (the "Medicaid Program").  The Act mandates the establishment of minimum health and safety standards which must be met by providers and suppliers, such as Defendants, participating in the Medicaid Program.  While participation in Medicaid is voluntary, once a state agrees to participate, as New York has (most recently at New York Social Services Law § 363 *et seq.*, as amended 1998) the state must comply with all federal statutory requirements.

79.     Among other services and supports, the Medicaid Program pays for certain prescription drugs for those who qualify.  Under New York law, N.Y. Social Services Law § 367-a, if such a covered drug is a multiple source prescription drug (generic) or a brand name prescription drug for which no upper limit has been set by the Federal Health Care Financing Administration ("HCFA"), now known as the Centers for Medicare & Medicaid Services ("CMS"), then reimbursement under Medicaid is the lower of the providers' usual and customary charge to the general public or the Estimated Acquisition Cost (EAC), of the drug plus a reasonable dispensing fee.

80.     The dispensers' usual and customary charge is not available anywhere.  As a result, and as a practical matter, reimbursement is based entirely upon EAC.

81.     The EAC is calculated by using the AWP for a drug less a percentage discount. New York's Social Services Law § 367-a(9)(b) expressly defines EAC as follows:

> (i)      if the drug is a multiple source prescription drug for which an upper limit has been set by the federal health care financing

administration, an amount equal to the specific upper limit set by such federal agency for the multiple source prescription drug, and

(ii)    if the drug dispensed is a multiple source prescription drug or a brand-name prescription drug for which no specific upper limit has been set by such federal agency, the lower of the estimated acquisition cost of such a drug to pharmacies, or the dispensing pharmacy's usual and customary price charged to the general public. Estimated acquisition cost means the average wholesale price of a prescription drug based upon the package size dispensed from, as reported by the prescription drug pricing service used by the department less twelve percent thereof, and updated monthly by the department.

The 2002 New York Medicaid Reimbursement Rate is therefore AWP - 12% + $3.50/$4.50 (dispensing fee). As set forth herein, and confirmed by governmental studies which estimate the average AWP inflation to be in excess of 20%, even this 12% discounted formula results in an overpayment for covered drugs by Medicaid payors such as Nassau County. Prior to May 15, 2003, this rule in relevant part defined the EAC as AWP - 10%. N.Y. Laws 2003, Ch. 62, Part Z2.

82.    Thus, Nassau County reimburses providers for Covered Drugs at an amount that is based upon the Covered Drugs' EAC or AWP, as published and reported by the publishers discussed above. As alleged, given that these AWPs are false and inflated, Nassau County has been overcharged.

83.    In 2001, only two of Nassau County's leading Medicaid reimbursed drugs (Albuterol Aer and Augmentin) had HCFA upper limits established. For all other drugs where Medicaid reimbursements were made by Nassau County, such payments were based on AWP and therefore wrongfully and falsely inflated pursuant to the scheme alleged herein. This means that the vast majority of at least Nassau County's top Medicaid reimbursements in 2001 were inflated.

84.     As stated, there is another aspect to the Medicaid Statutory Scheme implicated here.  Under 42 U.S.C. § 1396r-8, in order for a manufacturer of a drug to have its products compensated under Medicaid, the manufacturer must enter into a rebate agreement with the Secretary of Health and Human Services.  Pursuant to the rebate agreement, the manufacturer promises to report to Medicaid its "best price" and to pay rebates to Medicaid to ensure that the nation's insurance program for the poor receives the same favorable drug prices offered to other large purchasers of drugs.  The statute defines the best price as "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity or governmental entity."  The section also provides that "best price" includes "cash discounts, free goods that are contingent on any purchase requirement, volume discounts and rebates" and does not include "prices that are merely nominal in amount."

85.     Upon information and belief, each defendant herein entered into such a rebate agreement with the Secretary of Health and Human Services.  In that agreement, each agreed to comply with Section § 1396r-8, and hence:

(a)     Agreed to report its best price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, in any quarter and to make rebates where necessary;

(b)     Agreed that it would determine its best price based upon its average manufacturer's price, calculated as "net Sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements)," and that it would include in that calculation cash discounts and all other price reductions "which reduce the actual price paid"; and

- 27 -

(c)     Agreed that the best price would not take into account nominal prices, defined as prices that are less than ten percent of the average manufacturer's price in that quarter, so long as the sale of product at a nominal price was not contingent on any other sale.

86.     New York Social Services Law § 367-a(7)(d) expressly incorporates the rebate requirements of 42 U.S.C. § 1396r-8 and provides that where a manufacturer has entered into a rebate agreement, as outlined above, Medicaid reimbursements shall be made only pursuant to the terms of that rebate agreement.

87.     Non-compliance with the best price requirements carries strict penalties.  For example, 42 U.S.C. § 1396r-8(c)(ii) expressly provides that "any manufacturer with an agreement under this section that knowingly provides false information is subject to a civil money penalty in an amount not to exceed $100,000 for each item of false information."

88.     Nassau County, like any Medicaid payor, was an intended third-party beneficiary of these rebate agreements.

## C.   DEFENDANTS' FRAUDULENT CONDUCT WITH RESPECT TO REPORTING AND THE FAILURE TO REPORT BEST PRICES

### 1.   Artificially Inflating and Fraudulently Reporting AWPs

89.     Each Defendant Drug Manufacturer provided directly, or caused to be provided (i.e., through WACs that are converted to AWPs) AWPs for each of its drugs to the RedBook, the Blue Book, Medi-Span and other pharmaceutical compendia for Covered Drugs.

90.     At all times relevant hereto, the defendant drug manufacturers deliberately, routinely and intentionally published or caused to be published AWPs for Covered Drugs that did not reflect the actual prices for the drugs.  These inflated prices were reported to cause Medicaid and other governmental programs to overpay for the Covered Drugs.  The purpose of artificially inflating the providers' profits was to create an illegal kickback to the providers

funded by Medicaid and other government insurers.  In other words, the scheme was perpetrated so that providers who purchased the drugs at a low cost would bill patients and their insurers at the inflated AWPs and earn a substantial profit from the "spread" between the real cost and the various AWP related reimbursement rates.  This practice of taking advantage of the difference between the supplier's purchase price and the amount that a provider receives via Medicaid is referred to internally by Defendants as "marketing the spread."

91.    Defendants inflated the reported AWPs for both brand name and generic drugs, which have a higher average spread due to competition in the market.  According to a 2002 HHS report, in 1999 pharmacists paid on average only 34.1% of AWP for generic drugs and 78.2% of AWP for brand name drugs.  Department of Health and Human Services, Office of Inspector General, Medicaid Pharmacy-Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products (Sept. 16, 2002) (A-06-02-00041).

92.    Defendants knew and understood that Medicaid relied on the RedBook and other compendia to determine the AWPs of the covered drugs.  Because Defendants, acting on behalf of their relevant Manufacturer-Publisher enterprises, controlled the published AWPs, Defendants knew and understood that they could manipulate the providers' profits from Medicaid contributors, such as Nassau County.

**2.    Failure to Report Best Prices**

93.    After execution of the rebate agreement required pursuant to 42 U.S.C. § 1396r-8, each Defendant is required to report its average manufacturer's price in each quarter.  Yet, consistent with their artificial inflation of AWPs to publishers, Defendants routinely do not report the actual "best price" but, instead, excludes from best price discounts, free samples and other inducements offered to providers to increase use of a drug, being reimbursed by governmental entities at a reimbursement rate pegged to AWP.

94.     The AWP scheme succeeds precisely because providers are able to obtain drugs at prices significantly below current Medicaid reimbursements.  Most manufacturers sell drug products to physicians and other suppliers at a discount from AWP.  Sometimes these discounts are substantial.

95.     The widely available prices from wholesalers and group purchasing organizations ("GPOs") for covered drugs are considerably less than the AWPs used to establish the Medicaid reimbursement.  For most of the high-expenditure or high volume physician-administered drugs, widely available discounts from AWP range at the low end from 13 percent to 34 percent. Recent ongoing federal investigations and settlements involving certain named Defendants reveal much greater discounts sometimes as high as 85%.  Providers who have been identified as low-volume billers for certain drugs can also purchase drugs for considerably less than the Medicaid reimbursement.

96.     Upon information and belief, each of the defendant pharmaceutical companies has also utilized an array of other inducements to stimulate sales of their drugs.  These inducements, including educational grants, volume discounts, and rebates or free goods, were designed to result in a lower net cost to the purchaser while concealing the actual cost price beneath a high invoice price.  A product invoiced at $100 for ten units of a drug item might really only cost the purchaser one-half that amount.  If one assumes a subsequent shipment of an additional ten units at no charge, or a "grant," "rebate" or "credit memo" in the amount of $50, the transaction would truly cost just $5 per unit net.  Through all these "off-invoice" means, drug purchasers were provided the substantial discounts that induced their patronage while maintaining the fiction of a higher invoice price-the price that corresponded to reported AWPs and inflated reimbursement from Medicaid.  One example is this from Bayer:

> BAYER: "I have been told that our present Kogennate price, $.66, is the highest price that Quantum is paying for recombinant factor VIII. In order to sell the additional 12mmlu we will need a lower price. I suggest a price of $.60 to $.62 to secure this volume.

97.     Manufacturers or wholesalers also offer purchasers rebates based on the volume of products purchased not in a single sale but over a period of time. Manufacturers also establish "chargeback" arrangements for purchasers, which result in the AWP overstating what those purchasers pay. Under these arrangements, the purchaser negotiates a price with the manufacturer that is lower than the price the wholesaler charges for the product. The wholesaler provides the product to the purchaser for the lower negotiated price, and the manufacturer then pays the wholesaler the difference between the wholesale price and the negotiated price.

98.     The Defendants also engage in extensive distribution of free samples through their sales and marketing representatives as a means of lowering price. The free samples are used to offset the total cost associated with the drugs, thereby increasing the "spread." Upon information and belief, and as confirmed by certain recent settlements as described herein, Defendants specifically instruct providers to bill the government for the free samples, which Defendants know is unlawful. The free samples are not taken into account by the drug companies in calculating the AWP, which in turns inflates the AWP.

99.     Every free sample of a drug for which a provider bills the government effectively reduces the provider's overall cost for that drug.

100.    Thus, while federal and state Medicaid statutes law require the Defendants to provide quarterly rebates if they charge more than the lowest or "best price" offered to any commercial customer, the Defendants routinely fail to do so. This is because Defendants know that, due to practical problems with ascertaining actual cost charges or street prices, Medicaid administrators routinely determine the allowable payment for a prescription drug based upon the

AWP reported by the applicable pharmaceutical manufacturer.  *See* New York Social Services Law § 367-a(9).

101.    Recently, two defendants herein, Bayer and GlaxoSmithKline, agreed to pay $344 million to resolve allegations that they engaged in health care fraud against state programs by failing to report their "best price."  The wrongful scheme in which they engaged was known as "lick and stick" wherein they sold re-labeled products to an HMO at deep discounts, and then concealed and avoided their obligations to pay millions of dollars in additional rebates to the Medicaid program.

102.    At the time of the offenses, Kaiser Permanente Medical Care Program ("Kaiser") was the nation's largest HMO, providing care and treatment to more than 6 million persons, and often purchased drugs directly from drug manufacturers to save on costs for its members, negotiating aggressively for lower prices.  Both Bayer and Glaxo provided discounted prices to Kaiser for their drugs and engaged in private labeling for the HMO, affixing different labels to their drug products.  These slightly altered labels allowed Bayer and Glaxo to avoid reporting to the federal government the new low prices given to Kaiser and to avoid paying millions of dollars in additional drug rebates to the Medicaid program.  The type of fraud scheme is known as "lick and stick" in reference to the use of a new label on the drug.  This is but one example of the ways in which Defendants avoid paying proper rebates.

103.    According to a 2001 HHS report, many manufacturers have excluded from the Best Price calculations the discounted prices paid by HMOs, which are as much as 75% below the reported Best Price.  *See* Medicaid Drug Rebates – Sales to Repackagers Excluded from Best Price Determinations, HHS Office of the Inspector General (Mar. 27, 2001).

104.    The Rebate Agreement which has been executed by each Defendant and the Secretary of Health and Human Services is not materially different from the Model Rebate Agreement, which is similar to the statutory rebate provision but provides greater protections for local social services districts in some circumstances:

(a)    The Model Rebate Agreement defines Best Price as "the lowest price at which the manufacturer sells the [relevant drug] to any purchaser in the United States in any pricing structure (including capitated payments), in the same quarter for which the AMP is computed." Further, it states that with regard to Bundled Sales, "the allocation of the discount is made proportionately to the dollar value of the units of each drug sold under the bundled agreement." Model Rebate Agreement, at I(d).

(b)    The Model Rebate Agreement defines Bundled Sales as "the packaging of drugs of different types where the condition of rebate or discount is that more than one type of drug is purchased, or where the resulting discount or rebate is greater than that which would have been received had the drug products been purchased separately." Id. at I(e).

## D.    THE DEFENDANT DRUG MANUFACTURERS' USE OF AWP FRAUD TO INCREASE AND MAINTAIN VOLUME AND MARKET SHARE FOR GENERIC AND MULTI-SOURCE DRUGS

105.    The Defendant Drug Manufactures' AWP fraud is most exacerbated for generic drugs or for brand name drugs, such as Fluoxetine and Albuterol, for which there are biological or therapeutic equivalents.

106.    Multi-source drugs or biologicals are also reimbursed on the basis of AWP. New York's Social Services Law defines AWP for multi-source drugs as equal to the lesser of the median AWP of all of the generic forms of the drug or biological, or the lowest brand name product AWP. NY CLS Soc Serv § 367-a(9). Because reimbursement is pegged to the AWP,

drug makers act in unison by elevating the AWP for all generic drugs, thereby inflating the

amount of the reimbursement that occurs through Medicaid.

107.    As stated by one industry consultant:

> . . . This situation is more pronounced with generic drugs.  Many
> generic companies have taken advantage of this use of AWP by
> substantially inflating their published AWPs . . . .  [T]he system
> allows a retailer to acquire a drug at a low cost $2.50 per 100
> tablets, for example, while relying on a published AWP ($20.00 or
> more) for its own pricing.  It is not uncommon that the $25.00
> retail price for a generic drug renders a gross profit well above
> $20.00 for the retailer.  It is also common for the AWP of a generic
> product to remain stable while the actual selling price declines  . . .
> It is obvious that AWP is not an accurate measure of the prices
> manufacturers charge.  It must also be noted that not all generic
> products will be priced similarly.  Some, in fact, use the more
> traditional method of a 20% markup to reach an AWP.  This can be
> a handicap for generic companies choosing this method because
> retailers often use the AWP as the starting point for many pricing
> decisions and an artificially high AWP provides the retailer with
> greater profits.

108.    The raising of an individual defendant's reported AWP for a multi-source drug

raises the median AWP at which the generic drug is reimbursed.  While any one generic

manufacturer can only affect the median generic reimbursement AWP for a product, Defendants

can and do create a spread between the median AWP and the actual prices paid by reporting

AWPs that are far in excess of the actual wholesale prices while simultaneously maintaining or

lowering actual wholesale prices.

109.    On information and belief, according to HHS and industry experts, the actual

average prices paid by prescription drug wholesalers are on average 27% lower than average

retail prices, yet the AWPs reported by defendants are routinely and significantly higher than

they should be per that ratio.  Exhibit A to this Complaint sets forth the year 2004 reported

AWPs for certain defendants' drugs and the approximate amount of overcharge to Nassau

County based on this estimate of the true average wholesale price of each drug, with retail prices from a survey of five major pharmacies, where available.

110.    Upon information and belief, generic manufacturers are aware of the AWPs reported by their competitors and of the actual sales price of their generic competitors.  Generic drug manufacturers manipulate their own AWPs in order to gain or maintain a competitive advantage in the market for their generic products.  Each Defendant generic maker or distributor competes by inflating its AWP and thereby inflating the median AWP.  The natural and expected result of the "leap frogging" of increasing AWPs is that multi-source drugs have some of the highest spreads of any drugs, sometimes resulting in an AWP over 50,000% over actual costs.  A few examples are set forth below:

| Defendant | Multi-Source Drug | *RedBook* AWP | DOJ Determined Actual AWP | Percentage Spread |
|-----------|-------------------|--------------|---------------------------|-------------------|
| Baxter | Dextrose | $ 928.51 | $ 2.25 | 41,167% |
| Baxter | Sodium Chloride | $ 928.51 | $ 1.71 | 54,199% |
| Boehrigner | Leucovorin Calcium | $ 184.40 | $ 2.76 | 6,581% |
| B.  Braun | Sodium Chloride | $   11.33 | $ 1.49 | 660% |
| BMS Group* | Etoposide (Vepesid) | $ 136.49 | $ 34.30 | 298% |
| Dey | Albuterol Sulfate | $   30.25 | $ 9.17 | 230% |
| Immunex* | Leucovorin Calcium | $ 137.94 | $ 14.58 | 846% |
| Pharmacia* | Etoposide | $ 157.65 | $  9.47 | 1,565% |
| Sicor Group | Tobramycin Sulfate | $ 342.19 | $  6.98 | 4,802% |
| Watson | Vancomycin HCL | $   70.00 | $  3.84 | 1,567% |

  *  Defendants herein.

111.    In sum, generic or multi-source drugs are subject to the same fraudulent AWP manipulation as set forth in this Amended Complaint.

E.    **MOTIVATION FOR DEFENDANTS' AWP PRICING SCHEME**

112.    The purpose and intent of Defendants' fraudulent AWP Scheme is to manipulate and thereby increase the amount of reimbursement received by providers of drugs manufactured and sold by Defendants.

113.    Specifically, Defendants' AWP Scheme contemplates that: (a) Defendants will intentionally report falsely and fraudulently inflated AWP prices for these drugs to industry publications; and (b) Defendants will actually charge providers amounts for these drugs that are substantially less than the AWP that Defendants have fraudulently reported.

114.    The provider then receives reimbursement from Medicaid, based upon the fraudulently inflated AWP.  This circumstance results in a substantial financial incentive to the provider, representing the difference between the inflated AWP-based reimbursement to the provider and the significantly lower direct price charged by Defendants to the provider.

115.    Defendants refer to the amount received by the provider resulting from the difference between the fraudulently inflated AWP reimbursement and the price actually paid by the provider as the "spread."

116.    Each of the Defendants has sought to manipulate the market for drugs at issue by inducing providers to prescribe these drugs, rather than competing drugs, because of the higher "spread" resulting from the falsely and fraudulently inflated AWP.

117.    By participating in the AWP Scheme, Defendants seek to influence providers to prescribe the drug with the greatest "spread" between the AWP and the actual direct price paid by the provider to the manufacturer.  In fact, Defendants have greatly increased their profits by manipulating the AWP to create falsely inflated "spreads," which result in financial incentives to providers to prescribe specific drugs subject to the AWP Scheme.

118.     The manipulation of AWP at the expense of Medicaid is further revealed when the Defendants sell drugs that are not reimbursed by Medicaid.  In these circumstances, the drug companies often report accurate AWPs and actually compete with other drug companies on the basis of having a lower AWP than the other company.  The company with the lower AWP will urge physicians to consider the cost to the patient when selecting drugs and promote its lower AWP as a selling tool.  Thus, when Medicaid is not involved, Defendants often ensure that their AWPs are accurate so as to compete for market share based on price.

119.     Defendants were aware that providers would purchase and utilize products that have the widest spread between the providers' true costs and the reimbursement paid by third parties.  All Defendants made representations of their AWP for various drugs, which representations were not accurate.  In doing so, Defendants hoped that providers would view the inflated AWP as a reason for selecting their drug.  Defendants also knew that this selection would be at the expense governmental payors, like Nassau County.

**F.     THE DEFENDANTS HAVE ADMITTED TO AN INDUSTRY-WIDE PRACTICE OF FRAUDULENTLY INFLATING AWPS**

120.     The most telling evidence of AWP inflation comes from the defendants themselves.  In their November 4, 2002 Consolidated Memorandum in Support of Defendants' Motion to Dismiss the Master Consolidated Class Action Complaint ("Consolidated Memo"), the Defendants concede that "AWPs bear no relationship to actual acquisition costs."  Consolidated Memo at 1.  Defendants cite several reports from the Department of Health and Human Services ("HHS") and the media for the proposition that "physicians and others benefited from the 'huge spread' between the published wholesale prices used in insurance claims and the far lower wholesale prices actually paid," *Id.* citing Bill Alpert, *Hooked on Drugs, Why Do Insurers Pay*

*Such Outrageous Prices for Pharmaceuticals?*, Barron's, June 10 1996 (Appendix Vol. II, Ex. 56).

121.    Individual Defendants have restated this position in their papers in this proceeding. For Example, Defendant Bristol-Myers Squibb has stated:

> In a 1997 report, the Office of Inspector General of HHS reported: 'The published AWPs that are currently being used by Medicare-contracted carriers to determine reimbursement bear little or no resemblance to actual wholesale prices that are available to the physician and supplier communities that bull for these drugs.' <u>Excessive Medicare Payments for Prescription Drugs</u>, Office of Inspector General, Department of Health and Human Services, at ii (Dec. 1997).

Memorandum of Bristol-Myers Squibb Defendants in Support of its Motion to Dismiss, Nov. 4, 2002, at 3.

122.    Warrick has taken a similar position, stating:

> [P]laintiffs do not explain how or why it is fraudulent for an AWP to exceed actual acquisition cost. Both the federal government and the media understood AWP to be a benchmark price that was significantly higher than the price at which drugs were sold. *See* Cons. Mem. at 3-20. Plaintiffs do not allege how it is fraudulent for an AWP to exceed the acquisition cost when Congress and HCFA repeatedly called AWP a "sticker price" that is not related to sales price.

Memorandum of Warrick Pharmaceuticals Corporation in Support of its Motion to Dismiss, Nov. 4, 2002 at 4.

123.    Finally, Defendants restated their admission, "Plaintiffs essentially concede the legislative and regulatory history showing that Congress and HHS knew of the significant gap between many published AWPs and provider acquisition cost (for some drugs, the gap was 1000%)." Consolidated Reply Memorandum in Support of Defendants' Motion to Dismiss the Master Consolidated Class Action Complaint, Dec. 20, 2002 at 1; *See also id. at* 1 - 7.

124.    This Court, in rejecting Defendants' "political question" defense, itself stated:

> Defendants concede that the "national wholesale price figures upon which Medicare Part B reimbursements and co-payments are based are not the <u>actual</u>

> average of wholesale prices they charge for their drugs. Nonetheless, pointing to legislative hearings and statements on AWP's, they contend that Congress knows that the AWP's they report represent only an "undiscounted sticker price" that has no direct relation to the actual average price they charge for their drugs…

Memorandum and Order, May 13, 2003 (emphasis in original). Without this justification, Defendants' statements simply assert fraudulent behavior.

125.    Defendants are operating under the mistaken belief that because they have been defrauding the Government for so many years, they should now be immune from litigation by those they have harmed. The argument that Congress has condoned their actions is belied by the investigations commenced by the U.S. Attorney's office and the actions taken by the Government to collect fines for this unlawful conduct. Melody Petersen, *2 Drug Makers to Pay $875 Million to Settle Fraud Case*, N.Y. Times, Oct. 4, 2001, at C1.

## V.    GOVERNMENT INVESTIGATIONS

126.    The United States Department of Justice ("DOJ'), the United States General Accounting Office ("GAO"), the Office of the Inspector General at the United States Department of HHS ("OIG"), and certain Congressional subcommittees have been investigating Defendants and other pharmaceutical manufacturers for questionable practices regarding the industry's calculation of AWPs and for offering illegal incentives to providers.

127.    In connection with the investigation of the United States Congress, Congressman Stark wrote most, if not each, of the Defendants herein in a letter dated October 31, 2000:

> You should by now be aware of Congressional investigations revealing that Abbott has for many years reported and published inflated and misleading data and has engaged in other deceptive business practices. This letter is a call for your company to immediately cease overcharging taxpayers and jeopardizing public health . . . . The price manipulation scheme is executed through Abbott's inflated representations of average wholesale price (AWP) and direct price ("DP") which are utilized by the Medicare and Medicaid Programs in establishing drug reimbursements to

- 39 -

providers.  The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to in your industry as "the spread."  The evidence amassed by Congress clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs.  The evidence further reveals that Abbott manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs.  This was achieved by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims . . . .  Based on the evidence collected, Abbott should make arrangements to compensate taxpayers for the financial injury caused to federally funded programs.  Any refusal to accept responsibility will most certainly be indicative of the need for Congress to control drug prices.  If we cannot rely upon drug companies to make honest and truthful representations about their prices, then Congress will be left with no alternative but to take decisive action to protect the public.

128.    Congressman Stark made the following five "shocking conclusions":

First — Certain drug manufacturers have abused their position of privilege in the United States by reporting falsely inflated drug prices in order to create a de facto improper kickback for their customers.

Second — Certain drug manufacturers have routinely acted with impunity in arranging improper financial inducements for their physicians and other healthcare provider customers.

Third — Certain drug manufacturers engage in the fraudulent price manipulation for the express purpose of causing federally funded health care programs to expend scarce tax dollars in order to arrange de facto kickbacks for the drug manufacturers' customers at a cost of billions of dollars.

Fourth — Certain drug manufacturers arrange kickbacks to improperly influence physicians' medical decisions and judgments notwithstanding the severely destructive effect upon the physician/patient relationship and the exercise of independent medical judgment.

Fifth — Certain drug manufacturers engage in illegal price manipulation in order to increase utilization of their drugs beyond that which is necessary and appropriate based on the exercise of

independent medical judgment not affected by improper financial incentives.

129.    The Stark materials indicate that Defendants employed a number of other financial inducements to stimulate the sales of their drugs at the expense of Medicaid.  Such inducements include the practices described herein, i.e., volume discounts, rebates, off-invoice pricing and free goods designed to lower the net cost to the purchaser while concealing the actual cost of the drug from reimbursement officials.

130.    Congressman Stark released numerous examples of the manipulation of AWP:

(a)    In the 2000 edition of the RedBook, Defendant Bristol-Myers reported an AWP of $1,296.64 for one 20mg/ml, 50mg vial of Vepesid (Etoposide) for injection, while selling the exact same drug in the same quantity to a GPO for $70.  This represents a spread between Bristol-Myers' falsely inflated AWP and the real price of $1,226.64.  Bristol-Myers is a defendant herein.

(b)    Effective January 10, 1995, Defendant Glaxo increased the AWP for Zofran by 8.5 percent while simultaneously fully discounting this increase to providers.  The net effect of these adjustments was to increase the amount of reimbursements available to providers from Medicaid and others whose reimbursement is based on the AWP.  Because the net price paid to Glaxo for the non-hospital sales of the Zofran multi-dose vial is actually lower, it does not appear that the increase in the AWP was designed to increase revenue per unit to Glaxo.  Absent any other explanation, this adjustment appears to reflect an intent to induce providers to purchase Zofran based on the opportunity to receive increased reimbursement from Medicaid and other third-party payors.

(c)    Other examples include Adriamycin, an antibiotic used in cancer treatment and manufactured by Pharmacia, a defendant herein, which had a reported AWP of $241.36 as of

April 2000.  The real wholesale price was $33.43.  In 1997, when the reported AWP for this drug

was $946.94, it was being offered to physicians for as low as $152.00.

> (d)     Toposar, also manufactured by Pharmacia, is used to treat testicular and

lung cancer.  Its AWP as of April 2000 was $28.38; DOJ found that retailers were buying it for

$1.70.

> (e)     Amikacin, used to treat an infection that HIV positive people are

susceptible to and manufactured by defendant Abbott, had an AWP of $54.56.  The actual best

price was $6.75.  Vancomycin, an antibiotic used to treat intestinal infections and manufactured

by Abbott, had an AWP of $68.77 as of April 2000.  DOJ adjusted it to $8.14.

131.    During a December 7, 2004 House Subcommittee hearing, Chairman Joe Barton

stated:

> During the course of this investigation, the committee's uncovered evidence that
> several manufacturers either inflate their AWP or actively market their products
> not based on the lowest price but on the difference between price and the
> reimbursement amount, better known in the industry as the spread.

*House Subcommittee Hearing*, Tr. at 1 (statement of Joe Barton, Chairman, House Subcomm. on

Oversight and Investigations).

132.    At the same hearing Pamela Marrs, Senior Vice President & Chief Financial

Officer for Dey Pharmaceuticals, testified:

> Why doesn't Dey lower its AWP on generic drugs?  The simple answer is that
> given the system that now exists, our customers won't buy from us if we lower
> our AWP.

*Id.* at 51.

133.    The Department of Health and Human Services, Office of Inspector General and

Department of Justice also are actively investigating the fraudulent pricing practices.  Certain of

these investigations are discussed in the allegations respecting the individual defendants, *infra*.

In sum, however, the investigations confirm unlawful practices herein described.

134.   The Office of Inspector General ("OIG") 2001 review estimated that actual price

of brand name prescription drugs was, at the low end, 21.84% below the reported AWP across

the board.  The OIG estimated that as much as $1.08 billion nationwide could have been saved

for the 200 most frequently reimbursed drugs in Calendar Year 1999, if reimbursement had been

based on a greater percentage discount off of AWP, or actual price.  Other reports, such as a

September 21, 2000 GAO Report had determined that actual prices for top Medicaid/Medicare

drugs such as Albuterol and Ipratropium bromide were 85% and 75% less than their AWPs.

Applying this range of percentages to Nassau County's Medicaid result in millions of dollars of

illegal overcharges since 1995 alone.

135.   That same September 21, 2000, GAO report found that:

> Widely available discounts for 17 of the physician-billed drugs we
> examined averaged between 13 percent and 34 percent less than
> AWP.
>
> For two other physician-billed drugs, Dolasetron mesylate and
> Leucovorin calcium, average discounts were considerably larger –
> 65 percent and 86 percent less than AWP

136.   The report specifically implicated the conduct of defendants Amgen and Johnson

& Johnson with respect to at least one of the drugs, paid for by Nassau County as a Medicaid

pharmacy cost i.e., epoetin alfal sold as Epogen®.

137.   In sum, according to the GAO report, the discounts on physician-billed drugs

(based on wholesaler and the GPOs' catalogue prices) were notably lower than Medicaid's

payment of ten percent below AWP.

138.    The government investigation confirmed the effectiveness of the AWP scheme.

For example, an April 2002 GAO report focusing on sales of a drug in Florida found that

Medicaid usage of Vancomycin nearly doubled when Abbott raised the AWP.

139.    This is further demonstrated by comments made in publicly available documents

by defendants SmithKline Beecham and TAP:

> SMITHKLINE:  "In the clinic setting however, since Medicare
> [like Medicaid] reimbursement is based on AWP, product selection
> is largely based upon the spread between acquisition cost and
> AWP . . . .  Therefore, the spread between the AWP and clinic cost
> represents a profit to the clinic of $50.27 for the medication
> alone . . . .  From this analysis, there seems to be no other reason,
> other than profitability, to explain uptake differentials between the
> hospital and clinic settings, therefore explaining why physicians
> are willing to use more expensive drug regiments."

> TAP:  "As we have also discussed, Northwest Iowa Urology is
> very upset about the allowable not going up.  I personally met with
> the doctors to discuss the issue 4/17.  The physicians have started
> using Zoladex but would stop if the allowable issue was taken care
> of.  NWI Urology has 180 patients on Lupron."

140.    The OIG recently re-admonished pharmaceutical companies to provide an

accurate AWP.  In its April 2003 report "Compliance Program Guidance for Pharmaceutical

Manufacturers," the OIG reminded that "government sets reimbursement with the expectation

that the data provided are complete and accurate" (emphasis added).  The OIG report made it

clear that the AWP must be a meaningful figure that is not artificially inflated:

> Where appropriate, manufacturers' reported prices should
> accurately take into account price reductions, cash discounts, free
> goods contingent on a purchase agreement, rebates, up-front
> payments, coupons, goods in kind, free or reduced-price services,
> grants, or other price concessions or similar benefits offered to
> some or all purchasers.  Any discount, price concession, or similar
> benefit offered on purchases of multiple products should be fairly
> apportioned among the products (and could potentially raise anti-
> kickback issues).  Underlying assumptions used in connection with
> reported prices should be reasoned, consistent, and appropriately
> documented, and pharmaceutical manufacturers should retain all

- 44 -

relevant records reflecting reported prices and efforts to comply
with federal health care program requirements.

141.    And, the OIG rejected the notion that purposeful AWP manipulation was a

lawful practice:

> The "spread" is the difference between the amount a customer pays
> for a product and the amount the customer receives upon resale of
> the product to the patient or other payer.  In many situations under
> the federal programs, pharmaceutical manufacturers control not
> only the amount at which they sell a product to their customers, but
> also the amount those customers who purchase the product for
> their own accounts and thereafter bill the federal health care
> programs will be reimbursed.  To the extent that a manufacturer
> controls the "spread," it controls its customer's profit.

> Average Wholesale Price (AWP) is the benchmark often used to
> set reimbursement for prescription drugs under the Medicare Part
> B program.  For covered drugs and biologicals, Medicare Part B
> generally reimburses at "95 percent of average wholesale price."
> 42 U.S.C. 1395u(o).  Similarly many state Medicaid programs and
> other payers base reimbursement for drugs and biologicals on
> AWP.  Generally, AWP or pricing information used by
> commercial price reporting services to determine AWP is reported
> by pharmaceutical manufacturers.

> If a pharmaceutical manufacturer purposefully manipulates the
> AWP to increase its customers' profits by increasing the amount
> the federal health care programs reimburse its customers, the anti-
> kickback statute is implicated.  Unlike bona fide discounts, which
> transfer remuneration from a seller to a buyer, manipulation of the
> AWP transfers remuneration to a seller's immediate customer from
> a subsequent purchaser (the federal or state government).  Under
> the anti-kickback statute, offering remuneration to a purchaser or
> referral source is improper if one purpose is to induce the purchase
> or referral of program business.  In other words, it is illegal for a
> manufacturer knowingly to establish or inappropriately maintain a
> particular AWP if one purpose is to manipulate the "spread" to
> induce customers to purchase its product.

> In the light of this risk, we recommend that manufacturers review
> their AWP reporting practices and methodology to confirm that
> marketing considerations do not influence the process.
> Furthermore, manufacturers should review their marketing
> practices.  The conjunction of manipulation of the AWP to induce
> customers to purchase a product with active marketing of the

spread is strong evidence of the unlawful intent necessary to
trigger the anti-kickback statute.  Active marketing of the spread
includes, for example, sales representatives promoting the spread
as a reason to purchase the product or guaranteeing a certain profit
or spread in exchange for the purchase of a product.

## VI.   ALLEGATIONS PARTICULAR TO
## NASSAU COUNTY AND THE INDIVIDUAL DEFENDANTS

142.    Nassau County's own investigations of pricing data confirm that the Average

Wholesale Prices reported by Defendants for the Covered Drugs reimbursed by Nassau County

are fraudulent and inflated.  The results of these investigations are set forth in Exhibit A hereto.

A complete list of drugs manufactured by Defendants and purchased by Nassau County in 2004

is set forth in Exhibit B hereto.

143.    As set forth in detail below for every defendant, Nassau County's research

establishes that every reported AWP is false and fraudulently inflated, and that Nassau County

was overcharged for every Covered Drug.

144.    Even these overcharge estimates are understatements because they do not include

the Defendants' failure to report Best Price as required by federal and state rebate statutes.  The

impact of these failures on the AWPs at issue and Nassau County's overcharges as a result will

be revealed through discovery of Defendants' discounting, promotional and rebate practices.

When Defendants' failure to report Best Prices are factored in, the spread between reported and

true AWPs will be even greater.  The facts surrounding Defendants' pricing and promotional

activities, which implicate the true Best Price for Covered drugs are uniquely within Defendants'

control at this time.

145.    Though the above investigations refer to specific defendants, numerous

investigations have been announced concerning the allegations contained in this complaint as

they relate to the pharmaceutical industry as a whole.  More specifically, the U.S. Attorney's

office in Boston, the Department of Justice, and the General Accounting Office of the

Department of Health and Human Services have announced that they are conducting

investigations concerning the industry-wide practice of overstating AWPs and marketing of the

spread:

> At least 20 pharmaceutical companies are being investigated by
> law enforcement and legislative bodies looking into their
> marketing practices, particularly those related to drugs billed and
> paid for under federal health programs.
>
> ***
>
> Industry-wide investigations: Beyond TAP, the current
> investigation includes about 20 pharmaceutical companies and
> untold numbers of physicians, according to a number of sources.
> "The Justice Department is casting *as broad a net as possible* to
> get as much information as it can," Holcomb[, executive vice
> president of the consulting firm Policy Directions, Inc.,] said

Milton Liebman, *Beyond Ethics: Companies deal with legal attacks on marketing
practices*, Medical Marketing & Media No. 2, Vol. 37, Feb. 1, 2002, at 74 (Emphasis added).

> Authorities in Massachusetts and across the nation are not waiting
> for Congress to act.  Government sources said prosecutors at the
> US Attorney's office in Boston and the Massachusetts attorney
> general's office are investigating whether at least 20
> pharmaceutical companies committed fraud by manipulating the
> prices of drugs reimbursed through Medicare and Medicaid…
> "The waste gets bigger every year," said George Grob, deputy
> inspector general for evaluation and inspections, "The current
> system is based on make-believe numbers that are too easy to
> manipulate…"

Alice Dembner, Medicare Waste Raises Cost of Drugs by $1B: Congress to Hear Report
on Overpayment Excess, The Boston Globe, Sept. 21, 2001, at A2.

> …the U.S. attorney's office in Boston has reportedly initiated
> AWP probes against 20 drug companies and GlaxoSmithKline has
> confirmed that it has received subpoenas from the U.S. attorney in
> Boston, the U.S. Justice Department and state prosecutors in
> Texas, California and Nevada, all involving drug-pricing issues.

Joseph Slobodzian, *Suits claim overpricing; Cases filed in a dozen courts in a few weeks*,
The National Law Journal, Dec. 10, 2001, at A15.

- 47 -

> Earlier this year, the Department of Justice confirmed that the U.S.
> Attorney's Office for the District of Massachusetts in Boston was
> investigating the pharmaceutical industry's marketing and pricing
> practices.

Keith Lind, Drug Marketing and Pricing Practices: Major Enforcement Target, All
Regions, Dec. 21, 2001, sec. Consultancy.

## A.    ABBOTT LABS

146.    At all times relevant hereto, Abbott Labs routinely has reported or caused to be

reported, inflated average wholesale prices resulting in overcharges to Nassau County.  Based on

Nassau County's investigation, in 2004 Abbott reported inflated AWPs for Norvir®, as shown in

Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it

has been overcharged based on recent retail prices listed in Exhibit A, and that it has been

overcharged for every drug listed in Exhibit B, and possibly other Abbott drugs since at least

1993.

147.    Upon information and belief, Abbott has engaged in similar inflationary practices

in prior and subsequent years resulting in comparable damage to Nassau County for all covered

drugs.

148.    Even these investigations  do not reveal the full impact of Abbott's fraud because

they do not include Abbott's failures to report Best Price as required by federal and state rebate

statutes.  The full impact of these failures on Nassau County's overcharges will be revealed

through discovery of Abbott's promotional, discounting and pricing practices.

149.    When Abbott's failure to report Best Price for these drugs is factored in, the

spread between reported AWP and true AWP will be even greater.  The facts surrounding

Abbott's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely

within Abbott's control at this time and will be revealed through discovery.

150.    In connection with its scheme to inflate AWPs, Abbott has been investigated by at least the United States Department of Justice, the United States Congress, Commonwealth of Massachusetts, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, the Attorney General for the State of California, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

151.    Recently, Abbott agreed to pay $622 million in criminal and civil penalties for the activities of its Ross Products Unit in defrauding Medicare and Medicaid in a manner substantively identical to the allegations herein concerning failure to report Best Price.  In that proceeding, the U.S. Attorney's Office in the Southern District of Illinois had probed whether Ross Units and its rivals had been using kickbacks to boost sales and defraud government insurers by discounting or giving away products.  Providers, thereafter, would seek government reimbursements at higher prices.

152.    Abbott was also, notably, co-venturer with Japan's Takeda Chemical Industries, Ltd. in TAP Pharmaceuticals, which paid $875 million in a 2001 settlement of allegations that TAP provided free and unreported samples of Lupron®, a prostate cancer drug, to physicians with the understanding that the doctors would bill Medicaid and Medicare for reimbursement at an inflated AWP rate.

153.    In an HHS-published report "An Additional Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program," PM Rev. AB-00-86 (Sept. 8, 2000) ("HHS Report"), the DOJ gathered data from wholesalers' catalogues that published the wholesalers' list prices, which the DOJ indicated are more accurate than the published AWPs.  The chart below lists the 16 drugs identified by the DOJ and their associated

spreads, comparing an accurate AWP determined by the DOJ with the 2001 *RedBook* price

reported by Abbot.

| Drug | 2001 *RedBook* AWP | Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| **Anzemet Injectable** | **$35.87** | $21.90 | $13.97 | 64% |
| **Factor VIII/Bioclate** | **$1,047.38** | $349.05 | $698.33 | 200% |
| **Factor VIII/Helixate** | **$995.84** | $125.00 | $870.84 | 697% |
| **Gammar** | **$1,390.66** | $1,079.00 | $311.66 | 29% |
| **Cimetidine Hydrochloride** | **$214.34** | $35.00 | $179.34 | 512% |
| **Clindamycin Phosphate** | **$340.52** | $75.35 | $265.17 | 352% |
| **Dextrose** | **$239.97** | $3.91 | $236.06 | 6,037% |
| **Dextrose with Sodium Chloride** | **$304.38** | $2.24 | $302.14 | 13,488% |
| **Diazepam** | **$28.50** | $2.03 | $26.47 | 1,304% |
| **Furosemide** | **$74.52** | $14.38 | $60.14 | 418% |
| **Gentamicin Sulfate** | **$64.42** | $0.51 | $63.91 | 12,531% |
| **Heparin Lock Flush** | **$38.30** | $13.60 | $24.70 | 182% |
| **Methylprednisolone Sodium Succinate** | **$34.08** | $2.30 | $31.78 | 1,382% |
| **Sodium Chloride** | **$670.89** | $3.22 | $667.67 | 20,735% |
| **Tobramycin Sulfate** | **$150.52** | $2.94 | $147.58 | 5,020% |
| **Vancomycin Hydrochloride** | **$382.14** | $4.98 | $377.16 | 7,573% |

154.    At all times relevant herein, Abbott, on behalf of the relevant Manufacturer-

Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its

pharmaceutical products through direct communications with industry compendia.

**B.    AGOURON**

155.    At all times relevant hereto, Agouron routinely has reported or caused to be

reported inflated AWPs, resulting in overcharges to Nassau County.  Based on Nassau County's

- 50 -

investigation, in 2004 Agouron reported inflated average wholesale prices for Viracept®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County. Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Agouron drugs since at least 1993.

156.    Upon information and belief, Agouron has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

157.    Even these investigations do not reveal the full impact of Agouron's fraud because they do not include Agouron's failures to report Best Price as required by federal and state rebate statutes. The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Agouron's promotional, discounting and pricing practices.

158.    When Agouron's failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Agouron's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Agouron's control at this time and will be revealed through discovery.

159.    At all times relevant herein, Agouron, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

C.    AMGEN

160.    At all times relevant hereto, Amgen routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau County. Based on Nassau County's investigation, in 2004 Amgen reported inflated average wholesale prices for Epogen®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County. Nassau County alleges that

it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Amgen drugs since at least 1993.

161.    Upon information and belief, Amgen has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

162.    Amgen has utilized other impermissible inducements to stimulate sales of its drugs.  These inducements were designed to result in a lower net cost to the provider while concealing the actual wholesale price beneath a high invoice price.

163.    A 1993 OIG Report detailed how Amgen gave substantial year-end rebates to its customers based on their purchases of Epogen®.  The report noted that Medicare and Medicare beneficiaries did not receive the benefit of any rebates; all monies remained with the provider. There was no way to provide for any rebates on Medicare claim forms, and Amgen's rebates were not provided until year-end:

> [T]he effect of the rebates is that it reduces the actual cost of EPO to a dialysis facility, thus increasing their gross profit.  Presently, the rebates represent price reductions which benefit the facilities exclusively.

164.    By utilizing hidden inducements; Amgen provided purchasers with substantial discounts meant to gain their patronage while maintaining the fiction of a higher wholesale price.

165.    Even these investigations are understated because Nassau County's estimates do not take into account Amgen's failures to include Best Price as required by federal and state statute.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Amgen's promotional, discounting and pricing practices.

166.    In addition, Amgen has stated in government filings:

> Our sales depend on payment and reimbursement from third-party payors, and a
> reduction in the payment rate or reimbursement rate could result in decreased
> sales of our products.
>
> In both domestic an foreign markets, sales of our products are dependent, in part,
> on the availability of reimbursement from third-party payors . . . we believe that
> sales of Aranesp and Neulasta are and will be affected by government and private
> payor reimbursement policies . . .  If reimbursement for our marketed products
> changes adversely or if we fail to obtain adequate reimbursement for our other
> current or future products, health care providers may limit how much or under
> what circumstances they will administer them, which could reduce the use of our
> products or cause us to reduce the price of our products.  This could result in
> lower product sales or revenues . . .

Amgen 2002 Form 10-K at 43-44.

167.    When Amgen's failure to report Best Price for the drugs paid for by Nassau
County is factored in the spread between reported AWP and true AWP will be even greater.  The
facts surrounding Amgen's discounting and rebate activities, which affect the Best Prices for its
drugs, are uniquely within Amgen's control at this time and will be revealed through discovery.

168.    At all times relevant herein, Amgen, on behalf of the relevant Manufacturer-
Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its
pharmaceutical products through direct communications with industry compendia.

**D.    ASTRAZENECA**

169.    At all times relevant hereto, AstraZeneca routinely has reported or caused to be
reported, inflated AWPs, resulting in overcharges to Nassau County.  In 2004, based on Nassau
County's investigation, AstraZeneca reported inflated average wholesale prices for Prilosec®, as
shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County
alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it
has been overcharged for every drug listed in Exhibit B, and possibly other AstraZeneca drugs
since at least 1993.

170.    Upon information and belief, AstraZeneca has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs manufactured by AstraZeneca.

171.    Even these investigations do not reveal the full impact of AstraZeneca's fraud because Nassau County's estimates do not include AstraZeneca's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of AstraZeneca's promotional and pricing practices.

172.    When AstraZeneca's failure to report Best Price for these drugs is factored in the spread between reported AWP and true AWP will be even greater.  The facts surrounding AstraZeneca's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within AstraZeneca's control at this time and will be revealed through discovery.

173.    In connection with the improper AWP scheme discussed herein, AstraZeneca has been investigated by at least the United States Department of Justice, the Office of the Inspector General of the U.S. Department of Health and Human Services and the U.S. Food and Drug Administration.  In January 2002, a federal grand jury in Wilmington, Delaware returned an indictment accusing a New Jersey doctor of conspiring with AstraZeneca to resell free samples of Zoladex® that an AstraZeneca sales representatives had given the doctor.  The indictment alleged that AstraZeneca: (i) sold Zoladex® to the New Jersey doctor and others at prices substantially below the AWP reported by AstraZeneca; and (ii) provided the New Jersey doctor with materials showing how much more profit he could make by using Zoladex® instead of its competitor, Lupron®.

174.    In June 2003, AstraZeneca pled guilty and paid $354.9 million to settle the

Zoladex® charges.  As the U.S. Food and Drug Administration said in it s statement regarding

the settlement, "AstraZeneca provided thousands of free samples of Zoladex® to physicians

knowing that they would charge their patients and insurance programs for the samples."

175.    Upon information and belief, the Zolodex® example is merely one of the ways in

which AstraZeneca wrongfully and falsely has inflated its reported AWPs.  This unlawful

activity, has resulted in excessive overpayments by Nassau County.

176.    On May 29, 2003, AstraZeneca entered into a Corporate Integrity Agreement

("CIA") with the OIG of the United States Department of Health and Human Services "to

promote compliance… with the statutes, regulations and written directives of Medicare,

Medicaid and all other federal health care programs as defined in 42 U.S.C. 1320a-7b(f)"

("Federal Health Care Program Requirements").  Contemporaneously, AstraZeneca entered into

a Settlement Agreement with the United States and various states.

177.    The CIA covers any individuals who sell or market government reimbursed

products on behalf of AstraZeneca, calculate or report prices, and/or include, negotiate,

implement or report information related to government contracts relating to federal health care

programs, including Medicare and the Medicaid Drug Rebate program (codified at 42 U.S.C.

1396r-8 *et seq.*)  The CIA also covers any AstraZeneca employee or agent responsible for

"(1) sales and marketing activities for Government Reimbursed Products; (2) the calculation and

reporting of prices for federal health care programs, including . . .  Medicaid or (3) the

negotiation, implementation, and any reporting of information related to government contracts."

178.    In addition to promising compliance with federal health care program

requirements, the CIA requires AstraZeneca to establish a written code of conduct to be agreed

to by each covered person that confirms AstraZeneca's "commitment to full compliance with all federal health care program requirements, including its commitment to comply with all government contracting requirements and to market and sell its government reimbursed products in accordance with federal health care program requirements."

179.   The CIA requires further that AstraZeneca implement policies and procedures that address:

(a)   the code of conduct described above as well as;

(b)   the calculation and reporting of accurate prices for Government Reimbursed Products to certain entities, including the Centers for Medicare & Medicaid Services ("CMS"), the State Medicaid programs, and the drug price reporting services on which government agencies now rely (etc., First DataBank Inc., the RedBook, etc.) or shall rely in the future;

(c)   the proper calculation and reporting of all data and information reported to CMS and/or the State Medicaid programs in connection with the Medicaid Drug Rebate program, codified at 42 U.S.C. § 1396r-8;

(d)   the proper uses and tracking of drug samples in accordance with all applicable requirements, including, but not limited to, the Prescription Drug Marketing Act, codified in 21 U.S.C. §§ 331, 333 and 352; and

(e)   measures designed to promote marketing and sales practices that conform with all statutes, regulations and requirements applicable to Government Reimbursed Products. The Policies and Procedures shall specify that AstraZeneca shall comply with the federal anti-kickback statute, codified at 42 U.S.C. § 1320a-7b(1) & (2), and other applicable statutes, regulations or requirements.

180.    The CIA contemplates monetary penalties for non-compliance, and the retention of an independent review organization ("IRO").  The IRO shall perform two types of review: (1) a systems review of AstraZeneca's systems, processes, policies and practices relating to the Medicaid Drug Rebate Program ("Medicaid Rebate Systems Review"); and (2) a review of specific contract price transactions to determine whether those transactions were considered for purposes of determining Best Price in accordance with AstraZeneca's policies and procedures and Medicaid Drug Rebate Program requirements.

181.    At all times relevant herein, AstraZeneca, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the AWPs for its pharmaceutical products through direct communications with industry compendia.

E.    **AVENTIS**

182.    At all times relevant hereto, Aventis routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Aventis reported inflated average wholesale prices for Allegra®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Aventis drugs since at least 1993.

183.     Upon information and belief, Aventis has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

184.    Even these investigations do not reveal the full impact of Aventis' fraud because they do not include Aventis' failures to report Best Price as required by federal and state rebate

statutes. The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Aventis' promotional, discounting and pricing practices.

185.    When Aventis' failure to report Best Price for its drugs is factored in, the spread between reported AWP and true AWP will be even greater. The facts surrounding Aventis' discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Aventis' control at this time and will be revealed through discovery.

186.    In a report published by the Department of Health and Human Services, the DOJ documented at least 15 instances where the published AWPs for various dosages of drugs manufactured by Aventis were substantially higher than the actual prices listed by wholesalers

187.    An OIG report (*see* "Medicare Reimbursement of Prescription Drugs," OEl03-00-00310, Jan. 2001) further revealed that: (i) the AWP for all immune globulin 5 mg doses listed in the 1997 RedBook were inflated by an average spread of 32.21%; (ii) a 10 mg dose of Anzemet® had a Medicare Median of $14.82 and a Catalog Median of $8.29, resulting in a spread of 78.76%; and (iii) a 20 mg dose of Taxotere® had a Medicare Median of $283.65 and a Catalog Median of $8.29, resulting in a spread of 18.75%.

188.    Aventis also has been investigated in connection with its pricing activities by the Commerce Committee of the U.S. House of Representatives, the Attorney General for the State of Texas, the Attorney General for the State of California, and the State of California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse.

189.    In the HHS Report, the DOJ gathered data from wholesalers' catalogues that published the wholesalers' list prices, which the DOJ indicated are more accurate than the published AWPs. The chart below lists the four drugs identified by the DOJ and their associated

spreads, comparing an accurate AWP determined by the DOJ with the 2001 *RedBook* price reported by Aventis.

| Drug | 2001 *RedBook* AWP | Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| *Anzemet Injectable* | $166.50 | $74.08 | $92.42 | 125% |
| *Factor VIII/Bioclate* | $1.25 | $0.91 | $0.34 | 37% |
| *Factor VIII/Helixate* | $1.18 | $0.78 | $0.40 | 51% |
| *Gammar* | $400.00 | $296.67 | $103.33 | 35% |

190.    At all times relevant herein, Aventis, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

F.    **BARR**

191.    At all times relevant hereto, Barr routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Barr reported inflated AWPs for Warfarin®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Barr drugs since at least 1993.

192.    Upon information and belief, Barr has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

193.    Even these investigations do not reveal the full impact of Barr's fraud because Nassau County's estimates do not include Barr's failures to report Best Price for Fluoxetine® as

required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Barr's promotional, discounting and pricing practices.

194.    When Barr's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Barr's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Barr's control at this time and will be revealed through discovery.

195.    At all times relevant herein, Barr, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## G.    BAXTER

196.    At all times relevant hereto, Baxter routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Baxter reported inflated AWPs for Gammagard®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Baxter drugs since at least 1993.

197.    Upon information and belief, Baxter has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

198.    Even these investigations do not reveal the full impact of Baxter's fraud because Nassau County's estimates do not include Baxter's failures to report Best Price for Gammagard® as required by federal and state rebate statutes.  The full impact of these failures on Nassau

County's overcharges will be revealed through discovery of Baxter's promotional, discounting and pricing practices.

199.    In the HHS Report, the DOJ gathered data from wholesalers' catalogues that published the wholesalers' list prices, which the DOJ indicated are more accurate than the published AWPs.  The chart below lists the five drugs identified by the DOJ and their associated spreads, comparing an accurate AWP determined by the DOJ with the 2001 *RedBook* price reported by Baxter.

| Drug | 2001 *RedBook* AWP | Actual AWP | Difference | Percentage Spread |
|------|------|------|------|------|
| *Dextrose* | $9.25 | $1.47 | $7.78 | 529% |
| *Dextrose with Sodium Chloride* | $11.81 | $2.25 | $9.56 | 425% |
| *Immune Globulin (Gammagard)* | $870.00 | $700.00 | $170.00 | 24% |
| *Cyclophospamide (Neosar)* | $100.28 | $21.60 | $78.68 | 364% |
| *Sodium Chloride* | $9.86 | $2.03 | $7.83 | 386% |

200.    When Baxter's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Baxter's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Baxter's control at this time and will be revealed through discovery.

201.    At all times relevant herein, Baxter, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

H.    BAYER

202.    Bayer routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Bayer reported false and inflated AWPs for the drug Cipro®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Bayer drugs since at least 1993.

203.    Upon information and belief, Bayer has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

204.    Even these investigations do not reveal the full impact of Bayer's fraud because Nassau County's estimate does not include the Bayer's failures to report the Best Price for Cipro® as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Bayer's discounting, promotional and pricing practices.

205.    When Bayer's failure to report Best Price for these drugs is factored in, the spread between reported and true AWP will be even greater.  The facts surrounding Bayer's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Bayer's control at this time.

206.    Bayer's wrongful conduct in this arena is not speculative.  In January 2001, Bayer agreed to pay a total of $14 million to the United States and 45 states to settle allegations under the federal False Claims Act that the company caused physicians and other health care providers to submit fraudulently inflated reimbursement claims to the state and federally funded Medicaid program.  Bayer reached the agreement with the Justice Department, the United States

Attorney's Office for the Southern District of Florida in Miami, the Office of Inspector General

for the Department of Health and Human Services, and a team of state negotiators from Maine,

Nevada, New York and Washington representing the National Association of Medicaid Fraud

Control Units.

207.     The government's investigation of the allegations, contained in a *qui tam* or

whistleblower lawsuit in which the government intervened against Bayer, revealed that,

beginning in the early 1990's, Bayer falsely inflated the reported drug prices referred to by the

industry as the Average Wholesale Price (AWP), the Direct Price, and the Wholesale Acquisition

Cost used by State Governments to set the reimbursement rate for the Medicaid program.

According to the DOJ's January 23, 2001 press release, by setting an extremely high AWP, and

subsequently selling the product to doctors at a dramatic discount, Bayer induced physicians to

purchase its products rather than those of competitors by enabling doctors to profit from

reimbursement paid to the by the government.  The Bayer AWPs at issue in this settlement were

Kogenate®, Koate-HP®, and Gamimmune®, which are widely used in treating hemophilia and

immune deficiency diseases.

208.     The Bayer investigation revealed that the practice in which Bayer selectively

engaged, commonly referred to by drug manufacturers as "marketing the spread," also had the

effect of discouraging market competition from manufacturers that do not inflate AWPs as a way

of inducing doctors to purchase their products.  In addition to entering into the monetary

settlement, Bayer reached a five year agreement with the OIG of HHS that the company's

conduct will be monitored by the government under a corporate integrity agreement.  Under the

compliance agreement, Bayer will provide the state and federal governments with the average

selling prices of its drugs in order to facilitate the government's setting of fair reimbursement

rates for the company's products, and potentially the products of any competitors attempting to take advantage of Bayer's cooperation.

209.    This Bayer settlement also included settlement of allegations that Bayer knowingly underpaid the Medicaid program for rebates owed by it to the states.

210.    Additionally, recently Bayer settled certain charges in connection with its efforts to evade paying rebates to states' Medicaid programs which were based on the lowest drug prices they were paying to an HMO, Kaiser Permanente for Cipro® and another Bayer drug, Adalat CC®. Bayer is to pay a total of $275 million to resolve criminal charges and civil liabilities in connection with the fraudulent drug pricing of Cipro® and Adalat®. The criminal portion of the global agreement calls for Bayer to plead guilty to charges that it violated the Food, Drug and Cosmetic Act by failing to notify the FDA between August and December 1995, of its production of private label Cipro® for Kaiser. Bayer has agreed to pay a criminal fine of $5.6 million and will admit that it engaged in this conduct with the intent to defraud or mislead. In the civil portion of its global settlement, Bayer will resolve its federal civil False Claims Act liabilities and pay the United States, 49 states, the District of Columbia, and Public Health Service Entities $251 million in civil damages for losses suffered by the Medicaid program and the Public Health Service entities due to Bayer's failure to report its Kaiser private label price to the government as the true "best price" for its drugs.

211.    The 2001 Bayer settlement may resolve any claims Nassau County has with respect to the drugs at issue there, but it certainly goes no further. To the extent Bayer's recent Best Price Settlement concerns overcharges paid for by Nassau County for Cipro® it purports to resolve only one or two years of such overcharges.

212.    In the HHS Report, the DOJ gathered data from wholesalers' catalogues that published the wholesalers' list prices, which the DOJ indicated are more accurate than the published AWPs.  The chart below lists the drug identified by the DOJ and its associated spread, comparing an accurate AWP determined by the DOJ with the 2001 *RedBook* price reported by Bayer.

| Drug | 2001 *RedBook* AWP | Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| *Immune Globulin (Gamimune)* | $450.00 | $363.50 | $86.50 | 24% |

213.    At all times relevant herein, Bayer, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

**I.    BERLEX**

214.    At all times relevant hereto, Berlex routinely has reported or caused to be reported, inflated average wholesale prices, resulting in overcharges to Nassau County.

215.    Based on Nassau County's investigation, in 2004 Berlex reported false and inflated AWPs for Betaseron®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Berlex drugs since at least 1993.

216.    Upon information and belief, Berlex has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

217.    Even Nassau County's investigations do not reveal the full impact of Berlex's fraud because Nassau County's estimates do not include Berlex's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Berlex's discounting, promotional and pricing practices.

218.    When Berlex's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Berlex's discounting and rebate activities, which affect its Best Price, are uniquely within Berlex's control at this time and will be revealed through discovery.

219.    At all times relevant herein, Berlex, on behalf of the relevant Manufacturer-Publisher enterprise, reported or set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

**J.    BIOGEN**

220.    At all times relevant hereto, Biogen routinely has reported or caused to be reported inflated average wholesale prices, resulting in overcharges to Nassau County.

221.    Based on Nassau County's investigation, in 2004 Biogen reported false and inflated AWPs for Avonex®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Biogen drugs since at least 1993.

222.    Upon information and belief, Biogen has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

223.    Even these investigations do not reveal the full impact of Biogen's fraud because Nassau County's estimate does not include Biogen's failures to report its Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Biogen's discounting, promotional and pricing practices.

224.    When Biogen's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Biogen's discounting and rebate activities, which affect its Best Price, are uniquely within Biogen's control at this time and will be revealed through discovery.

225.    At all times relevant herein, Biogen, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

## K.    BOEHRINGER

226.    At all times relevant hereto, Boehringer routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Boehringer reported inflated AWPs for Flomax®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Boehringer drugs since at least 1993.

227.    Upon information and belief, Boehringer has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

228.    In the HHS Report, the DOJ gathered data from wholesalers' catalogues that published the wholesalers' list prices, which the DOJ indicated are more accurate than the

published AWPs.  The chart below lists the nine drugs identified by the DOJ and their associated

spreads, comparing an accurate AWP determined by the DOJ with the 2001 *RedBook* price

reported by Boehringer.

| Drug | 2001 *RedBook* AWP | Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| *Acyclovir Sodium* | $528.00 | $207.00 | $321.00 | 155% |
| *Amikacin Sulfate* | $437.50 | $65.53 | $371.97 | 568% |
| *Mitomicyn* | $128.05 | $51.83 | $76.22 | 147% |
| *Cytarabine* | $62.50 | $3.55 | $58.95 | 1,661% |
| *Doxorubicin HCL* | $945.98 | $139.75 | $806.23 | 577% |
| *Etoposide* | $110.00 | $8.45 | $101.55 | 1,202% |
| *Leucovorin Calcium* | $184.40 | $2.76 | $181.64 | 6,581% |
| *Methotrexate Sodium* | $68.80 | $2.63 | $66.17 | 2,516% |
| *Vinlastine Sulfate* | $212.50 | $8.19 | $204.31 | 2,495% |

229.    Even these investigations do not reveal the full impact of Boehringer's fraud

because Nassau County's estimates do not include Boehringer's failures to report Best Price for

Combivent® as required by federal and state rebate statutes.  The full impact of these failures on

Nassau County's overcharges will be revealed through discovery of Boehringer's promotional,

discounting and pricing practices.

230.    When Boehringer's failure to report Best Price for these drugs is factored in, the

spread between reported AWP and true AWP will be even greater.  The facts surrounding

Boehringer's discounting and rebate activities, which affect the Best Prices for its drugs, are

uniquely within Boehringer's control at this time and will be revealed through discovery.

231.    At all times relevant herein, Boehringer, on behalf of the relevant Manufacturer-

Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the

pharmaceutical products through direct communication with industry compendia.

L.     **BRISTOL-MEYERS SQUIBB**

232.     Bristol-Meyers Squibb ("BMS") routinely has reported or caused to be reported, inflated average wholesale prices resulting in overcharges to Nassau County.  Based on Nassau County's research, in 2004 BMS reported false and inflated average wholesale prices for Plavix®®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County. Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other BMS drugs since at least 1993.

233.     Upon information and belief, BMS has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

234.     Even these investigations do not reveal the full impact of BMS' fraud because Nassau County's estimates do not include Bristol-Meyers' failures to report its Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Bristol-Meyers' promotional, discounting and pricing practices.

235.     When Bristol-Meyers' failure to report Best Price for these drugs is factored in, the difference between reported AWP and true AWP will be even greater.  The facts surrounding Bristol-Meyers' discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Bristol-Meyers' control at this time.

236.     In connection with its scheme to inflate AWPs, BMS has been investigated by the United California Department of Justice Office of the Attorney General, State of California Department of Justice, Bureau of Medi-Cal Fraud and Elder Abuse, and the U.S. House of Representatives Committee on Commerce.

237.    These investigations confirm BMS' involvement in the wrongful activity underlying this Complaint.  For example, by letter dated February 27, 2001 to BMS, Representative Stark outlined numerous examples of illegal practices by BMS.  Referring to a letter from Denis Kaszuba, a senior pricing analyst at BMS to Medispan dated August 10, 1992 (BMSAWP/0011247), Rep. Stark noted:

> Bristol has control over the AWPs, DPs, and WACs published for its drugs and directs national publishers to change their prices. Bristol directed a national publisher of drug prices to increase all of Bristol's AWPs for oncology drugs by multiplying Bristol's supplied direct prices by a 25% factor rather than the previous 20.5% factor . . .  The increasing the AWP created a spread that, in itself, provided a financial kickback to oncologists for prescribing Bristol's cancer drugs.

238.    In the same letter, Rep. Stark noted:

> The evidence clearly shows that Bristol has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs.  The evidence further reveals that Bristol manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs where the arranging of a financial benefit or inducement would influence the decisions of healthcare providers submitting the Medicare and Medicaid claims.

239.    At all times relevant herein, Bristol-Myers Squibb, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

## M.    CHIRON

240.    At all times relevant hereto, Chiron has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Chiron reported inflated average wholesale prices for the drug Tobi®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has

been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Chiron drugs since at least 1993.

241.    Upon information and belief, Chiron has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County.

242.    Even these investigations do not reveal the full impact of Chiron's fraud because they do not include Chiron's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Chiron's promotional, discounting and pricing practices.

243.    When Chiron's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Chiron's discounting and rebate activities, which affect the Best Prices for its drugs, and uniquely within Chiron's control at this time and will be revealed through discovery.

244.    At all times relevant herein, Chiron, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

N.    ELI LILLY

245.    At all times relevant hereto, Eli Lilly routinely has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Eli Lilly reported false and inflated AWPs for Zyprexa®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Eli Lilly drugs since at least 1993.

246.    Upon information and belief, Eli Lilly has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

247.    Even these investigations do not reveal the full impact of Eli Lilly's fraud because Nassau County's estimates do not include Eli Lilly's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Eli Lilly's discounting, promotional and pricing practices.

248.    When Eli Lilly's failure to report Best Price for their drugs is factored in, the spread between reported and true AWP will be even greater.  The facts surrounding Eli Lilly's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Eli Lilly's control at this and will be revealed through discovery.

249.    At all times relevant herein, Eli Lilly, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

O.    **FOREST**

250.    At all times relevant hereto, Forest has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Forest reported inflated average wholesale prices for Lexapro®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Forest drugs since at least 1993.

251.    Upon information and belief, Forest has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County.

252.    Even these investigations do not reveal the full impact of Forest's fraud because they do not include Forest's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Forest's promotional, discounting and pricing practices.

253.    When Forest's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Forest's discounting and rebate activities, which affect the Best Prices for its drugs, and uniquely within Forest's control at this time and will be revealed through discovery.

254.    At all times relevant herein, Forest, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

P.    **FUJISAWA**

255.    At all times relevant hereto, Fujisawa routinely has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau County.  For example, based on Nassau County's investigations, Fujisawa reported false and inflated AWPs for Prograf®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Fujisawa drugs since at least 1993.

256.    Upon information and belief, Fujisawa has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

257.    Even these investigations do not reveal the full impact of Fujisawa's fraud because Nassau County's estimates do not include Fujisawa's failures to report Best Price as

required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Fujisawa's discounting, promotional and pricing practices.

258.    When Fujisawa's failure to report Best Prices for its drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding Fujisawa's discounting and rebate activities, which affect Best Price, are uniquely within Fujisawa's control at this time.

259.    In connection with its scheme to inflate AWPs, Fujisawa has been investigated by the United States Department of Justice, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, and the Attorney General for the State of California.

260.    At all times relevant herein, Fujisawa, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

## Q.    GENENTECH

261.    At all times relevant hereto, Genentech routinely has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County.  For example, based on Nassau County's investigation, in 2004 Genentech reported false and inflated AWPs for Pulmozyme®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County. Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Genentech drugs since at least 1993.

262.    Even these investigations do not reveal the full impact of Genentech's fraud because Nassau County's estimates do not include Genentech's failures to report Best Price as

required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Genentech's discounting, promotional and pricing practices.

263.    When Genentech's failure to report Best Price for their drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding Genentech discounting and rebate activities, which affect Best Price, are uniquely within Genentech's control at this time and will be revealed through discovery.

264.    Upon information and belief, Genentech has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

265.    At all times relevant herein, Genentech, on behalf of the relevant Manufacturer-Publisher enterprise, reported or set, or caused to be set, the reported AWP for its pharmaceutical products through direct communications with industry compendia.

**R.    GENZYME**

266.    At all times relevant hereto, Genzyme routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Genzyme reported inflated AWPs for Renagel®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Genzyme drugs since at least 1993.

267.    Upon information and belief, Genzyme has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

268.    Even these investigations do not reveal the full impact of Genzyme's fraud because Nassau County's estimates do not include Genzyme's failures to report Best Price for Renagel® as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Genzyme's promotional, discounting and pricing practices.

269.    When Genzyme's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Genzyme's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Genzyme's control at this time and will be revealed through discovery.

270.    At all times relevant herein, Genzyme, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

**S.    THE GSK DEFENDANTS**

271.    At all times relevant hereto, the GSK Defendants have reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County.  In 2004, based on Nassau County's investigation, GlaxoSmithKline reported false and inflated AWPs for Flovent® , as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other GlaxoSmithKline drugs since at least 1993.

272.    Upon information and belief, GSK has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

273.    Even these preliminary investigations do not reveal the full impact of GSK's fraud because Nassau County's estimates do not include GSK's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of GSK's discounting, promotional and rebate practices.

274.    When GSK's failure to report Best Price for their drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding the GSK Defendants' discounting and rebate activities, which affect the Best Price for their drugs, are uniquely within the GSK Defendants' control at this and will be revealed through discovery.

275.    At all times relevant hereto, the GSK Defendants reported or set, or caused to be set, the reported AWP for their pharmaceutical products through direct communications with industry compendia.

276.    In connection with its scheme to inflate AWPs, the GSK Group has been investigated by the United States Department of Justice, the Office of Inspector General of the Department of Health and Human Services, the Attorney General for the State of Texas, the Attorney General for the State of California, and the Attorney General for the State of Nevada, Medicaid Fraud Control Unit.

277.    These investigations confirm that the GSK Group has engaged in the wrongful conduct at the heart of this Complaint.

278.    As set forth above, GlaxoSmithKline recently agreed to settle its federal False Claims Act liabilities and pay $87,600,922 to the United States, 49 states, the District of Columbia and Public Health Service Entities for losses suffered by the Medicaid programs and the Public Health Service entities due to GSK's conduct.

279.    That proceeding alleged that GSK repackaged and privately labeled Paxil®, an antidepressant, and Flonase®, a nasal spray, for Kaiser at discounted prices, but failed to report these lower prices as "best prices" to the government.

280.    The GSK Defendants deliberately conceal and have concealed their fraudulent reporting and marketing of the AWP spread.  The GSK Defendants routinely require that their customers keep secret the prices they were being charged for GSK Defendants' drugs.

281.    At all times relevant herein, the GSK Defendants, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for their pharmaceutical products through direct communication with industry compendia.

282.    On April 13, 2003, SmithKline Beecham Corporation, d/b/a/ GlaxoSmithKline entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United Dates Department of Health and Human Services "to promote compliance" with the statutes, regulations and written directives of Medicare, Medicaid and all other federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) ("Federal Health Care Program Requirements").  Contemporaneously, GSK entered into a Settlement Agreement with the United States and various states.

283.    Persons covered by the "CIA" include all employees of the U.S. pharmaceuticals division of G1axoSmithKline responsible for, *inter alia*, "reporting of pricing information for any products that are reimbursed by federal health care programs, including under the Medicaid Drug Rebate program, codified at 42 U.S.C. § 1396r-8," and "obligations related to government contracts, including the agreements entered with the Department of Health and Human Services under the Medicaid Drug Rebate program and the Drug Pricing program under the Public Health Service (PHS) Act, 42 U.S.C. 11256."

284.    In addition to promising compliance with federal health care program requirements, the CIA requires GSK to establish a written code of conduct to be agreed to by each covered person that confirms GSK's "commitment to full compliance with all federal health care program requirements, including its commitment to comply with all government contracting requirements and to market and sell its Government Reimbursed Products in accordance with federal health care program requirements."

285.    The CIA requires further that GSK implement policies and procedures that address:

(a)    The code of conduct described above as well as;

(b)    The methods for gathering, calculating, verifying and reporting the data and information reported to the Centers for Medicare and Medicaid Services ("CMS") and/or the state Medicaid programs in connection with the Medicaid Drug Rebate program;

(c)    Promotional practices that conform with all applicable federal health care program requirements, including the Medicaid Drug Rebate program and the Federal antikickback statute, codified at 42. U.S.C. § 1302a-7b; and

(d)    The requirements of all government contracts, including those under the Medicaid Drug Pricing program.

286.    The CIA contemplates monetary penalties for non-compliance, and the retention of an independent review organization ("IRO").  The IRO shall perform two types of review: (1) a systems review of GSK's systems, processes, policies and practices relating to the Medicaid Drug Rebate program ("Medicaid Rebate Systems Review"); and (2) a review of specific contract price transactions to determine whether those transactions were considered for purposes

of determining Best Price in accordance with GSK's policies and procedures and Medicaid Drug Rebate program requirements.

T.    **IMMUNEX CORPORATION**

287.    At all times relevant hereto, upon information and belief, Immunex has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County for its drugs, including Enbrel®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Immunex drugs since at least 1993.

288.    Like all other defendants herein, Immunex failed to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Immunex's promotional, discounting and pricing practices.

289.    The facts surrounding Immunex's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Immunex's control at this time and will be revealed through discovery.

290.    At all times relevant herein, Immunex, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

U.    **IVAX CORPORATION**

291.    At all times relevant hereto, upon information and belief, Ivax has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County for its drugs, including Clozapine®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed

in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Ivax drugs since at least 1993.

292.    Like all other defendants herein, Ivax failed to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Ivax's promotional, discounting and pricing practices.

293.    The facts surrounding Ivax's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Ivax's control at this time and will be revealed through discovery.

294.    At all times relevant herein, Ivax, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

V.    JOHNSON & JOHNSON DEFENDANTS

295.    At all times relevant hereto, the Johnson & Johnson Defendants (Johnson & Johnson, Janssen, Ortho-McNeil, and Ortho Biotech) routinely have reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County.

296.    Based on Nassau County's research, in 2004 Janssen reported false and inflated AWPs for Duragesic®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Janssen drugs since at least 1993.

297.     With respect to Ortho-McNeil and Ortho Biotech, based on Nassau County's investigation, in 2004 Ortho-McNeil reported false and inflated AWPs for Procrit®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it

has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Ortho-McNeil and Ortho Biotech drugs since at least 1993.

298.    Upon information and belief, the Johnson & Johnson Defendants have engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

299.    Even these investigations do not reveal the full impact of the Johnson & Johnson Defendants' fraud because Nassau County's estimates do not include the Johnson & Johnson Defendants' failures to report Best Price as required by federal and state rebate statutes.

300.    When Johnson & Johnson's failure to report Best Price for their drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding Johnson & Johnson's promotional, discounting and rebate activities, which affect Best Price, are uniquely within Johnson & Johnson's control at this and will be revealed through discovery.

301.    In connection with its scheme to inflate AWPs, the Johnson & Johnson Defendants have been investigated by the General Accounting Office and the Office of the Attorney General for the Commonwealth of Massachusetts.

302.    The Johnson & Johnson Defendants deliberately conceal and have concealed their fraudulent reporting and marketing of the AWP spread.  The J&J Defendants routinely require that their customers keep secret the prices they were being charged for Johnson & Johnson drugs.

303.    At all times relevant herein, the Johnson & Johnson Defendants, on behalf of the relevant Manufacturer-Publisher enterprise, have controlled and set, or caused to be set, the reported AWPs for their pharmaceutical products through direct communication with industry compendia.

**W.    KEY**

304.    At all times relevant hereto, Key routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Key reported inflated AWPs for K-Dur®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Key drugs since at least 1993.

305.    Upon information and belief, Key has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

306.    Even these investigations do not reveal the full impact of Key's fraud because Nassau County's estimates do not include Key's failures to report Best Price for K-Dur® as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Key's promotional, discounting and pricing practices.

307.    When Key's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Key's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Key's control at this time and will be revealed through discovery.

308.    At all times relevant herein, Key, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## X.    MEDIMMUNE

309.    At all times relevant hereto, Medimmune routinely has reported or caused to be reported false and inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Medimmune reported false and inflated AWPs for Synagis®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Medimmune drugs since at least 1993.

310.    Upon information and belief, Medimmune has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

311.    At all times relevant herein, Medimmune, on behalf of the relevant Manufacturer-Publisher enterprise, have controlled and set, or caused to be set, the reported AWPs for their pharmaceutical products through direct communication with industry compendia.

## Y.    MERCK

312.    At all times relevant hereto, Merck routinely has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Merck reported false and inflated average wholesale prices for Zocor®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Merck drugs since at least 1993.

313.    Upon information and belief, Merck has engaged in similar inflationary practices in prior years, resulting in comparable damage to Nassau County for all covered drugs.

314.    Even these investigations do not reveal the full impact of Merck's fraud because the true average wholesale prices for these drugs are even lower than the estimated average retail prices Nassau County has calculated here.  Thus, the real spreads between reported and true AWP are even greater than Nassau County's estimates.  In addition, Nassau County's estimates do not include Merck's failures to report Best Price as required by federal and state rebate statutes.  The full impact of their failures on Nassau County's overcharges will be revealed through discovery of Merck's promotional, discounting and pricing practices.

315.    When Merck's failure to report Best Price for these drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding Merck's discounting and rebate activities, which affect the Best Prices of its drugs, are uniquely within Merck's control at this time.

316.    At all times relevant herein, Merck, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

## Z.    MYLAN

317.    At all times relevant hereto, Mylan routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Mylan reported inflated AWPs for Nifedipine®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Mylan drugs since at least 1993.

318.    Upon information and belief, Mylan has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

319.    Even these investigations do not reveal the full impact of Mylan's fraud because Nassau County's estimates do not include Mylan's failures to report Best Price for Nifedipine® as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Mylan's promotional, discounting and pricing practices.

320.    When Mylan's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Mylan's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Mylan's control at this time and will be revealed through discovery.

321.    At all times relevant herein, Mylan, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## AA.    NOVARTIS

322.    At all times relevant hereto, upon information and belief, Novartis has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County for its drugs, including Lamisil®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Novartis drugs since at least 1993.

323.    Like all other defendants herein, Novartis also fails to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Novartis's promotional, discounting and pricing practices.

324.    The facts surrounding Novartis's discounting and rebate activities, which affect the Best Prices for its drugs, and uniquely within Novartis's control at this time and will be revealed through discovery.

325.    At all times relevant herein, Novartis, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communications with industry compendia.

## BB.    ORGANON

326.    At all times relevant hereto, Organon routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Nassau County alleges that it has been overcharged for every drug listed in Exhibit B, and possibly other Organon drugs since at least 1993.

327.    Upon information and belief, Organon has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

328.    Even these investigations do not reveal the full impact of Organon's fraud because Nassau County's estimates do not include Organon's failures to report Best Price for Remeron® as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Organon's promotional, discounting and pricing practices.

329.    When Organon's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Organon's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Organon's control at this time and will be revealed through discovery.

330.    At all times relevant herein, Organon, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## CC.    THE PFIZER DEFENDANTS (PFIZER, AGOURON AND SANOFI-SYNTHELAB, INC.)

331.    Pfizer and its subsidiaries (Agouron and Sanofi-Synthelab, Inc.), collectively referred to herein as the "Pfizer Defendants," routinely has reported or caused to be reported, inflated AV/Ps, resulting in overcharges to Nassau County.  Based on Nassau County's research, in 2004 the Pfizer Defendants reported false and inflated AWPs for its drugs, including Ambien®, Lipitor®, Neurontin®, and Celebrex®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Pfizer drugs since at least 1993.

332.    Upon information and belief, Pfizer has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

333.    Even these investigations do not reveal the full impact of Pfizer's fraud because Nassau County's estimates do not include Pfizer's failures to report Best Price as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Pfizer's promotional, discounting and rebate practices.

334.    When Pfizer's failure to report Best Price for these drugs is factored in, the difference between reported ant true AWP will be even greater.  The facts surrounding Pfizer's

discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Pfizer's control at this time.

335.    Pfizer has been investigated by the Office of the Inspector General of the Department of Health and Human Services and has entered into a $49 million settlement arising from illegal practices with respect to Lipitor®.  The OIG found that Pfizer has been providing unrestricted educational grants and rebates that were in fact discounts off the purchase price of Lipitor®.  Pfizer concealed these discounts from states who were entitled to receive the "Best Price" for Lipitor®.

336.    On October 24, 2002, Pfizer entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United Dates Department of Health and Human Services "to promote compliance… with the statutes, regulations and written directives of Medicare, Medicaid and all other federal health care programs (as defined in 42 U.S.C. § 11320(f)" ("Federal Health Care Program Requirements").  Contemporaneously, Pfizer entered into a Settlement Agreement with the United States and various states.

337.    The CIA applies specifically to, *inter alia*, "all employees of the Pfizer Pharmaceuticals Group whose job responsibilities directly relate to the gathering calculation, verification or reporting of information for purposes of the Medicaid Drug Rebate program." (codified at 42 U.S.C. § 1396 *et seq.*).

338.    In addition to promising compliance with federal health care program requirements, the CIA requires Pfizer to establish a written code of conduct to be agreed to by each covered person that confirms Pfizer's "commitment to full compliance with all federal health care program requirements, including its commitment to comply with all government

contracting requirements and to market and sell its Government Reimbursed Products in accordance with federal health care program requirements."

339. The CIA requires further that Pfizer implement policies and procedures that address:

(a) The code of conduct described above as well as;

(b) The methods for gathering, calculating, verifying and reporting the data and information reported to the Centers for Medicare and Medicaid Services ("CMS") and/or the state Medicaid programs in connection with the Medicaid Drug Rebate Program; and

(c) Promotional practices that conform with all applicable federal health care program requirements, including the Medicaid Drug Rebate Program and the Federal Antikickback Statute, codified at 42 U.S.C. § 1302a-7b.

340. The CIA contemplates monetary penalties for non-compliance, and the retention of an independent review organization, ("IRO"). The IRO shall perform two types of review: (1) a systems review of Pfizer's systems, processes, policies and practices relating to the Medicaid Drug Rebate program ("Medicaid Rebate Systems Review"); and (2) a review of specific contract price transactions to determine whether those transactions were considered for purposes of determining Best Price in accordance with Pfizer's policies and procedures and Medicaid Drug Rebate program requirements.

341. Pfizer deliberately conceals and has concealed its fraudulent reporting and marketing of the AWP spread. Pfizer routinely requires that its customers keep secret the prices they were being charged for Pfizer's drugs.

342.     At all times relevant herein, Pfizer, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## DD.   PHARMACIA

343.     Pharmacia routinely has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County.  For example, based on Nassau County's investigations, in 2004 Pharmacia reported false and inflated AWPs for Detrol®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Pharmacia drugs since at least 1993.

344.     Even these investigations do not reveal the full impact of the fraud because Nassau County's estimates do not include Pharmacia's failures to report Best Price as required by federal and state rebate statutes.  The full impact of Pharmacia's failures on Nassau County's overcharges will be revealed through discovery of Pharmacia's promotional and pricing practices.

345.     In the HHS Report, the DOJ gathered data from wholesalers' catalogues that published the wholesalers' list prices, which the DOJ indicated are more accurate than the published AWPs.  The chart below lists the thirteen drugs identified by the DOJ and their associated spreads, comparing an accurate AWP determined by the DOJ with the 2001 *RedBook* price reported by Pharmacia.

| Drug | 2001 *RedBook* AWP | Actual AWP | Difference | Percentage Spread |
| --- | --- | --- | --- | --- |

| *Etoposide (Toposar)* | $768.51 | $44.00 | $724.51 | 1,647% |
|---|---|---|---|---|
| *Vincristine Sulfate (Vincasar)* | $86.46 | $8.35 | $78.11 | 935% |
| *Doxorubicin Hydrochloride (Adriamycin)* | $1,104.13 | $150.86 | $953.27 | 632% |
| *Cyclophospamide (Neosar)* | $100.28 | $21.60 | $78.68 | 364% |
| *Testosterone Cypionate (Depo-Testosterone)* | $78.88 | $24.78 | $54.10 | 218% |
| *Heparin Lock Flush* | $38.30 | $13.60 | $24.70 | 182% |
| *Cytarabine (Cytosar)* | $132.58 | $49.82 | $82.76 | 166% |
| *Amphotercin B (Amphocin)* | $36.26 | $16.00 | $20.26 | 127% |
| *Fluorouracil (Adrucil)* | $32.06 | $14.44 | $17.62 | 122% |
| *Methylprednisolone Sodium Succinate (Solu-Medrol)* | $11.70 | $5.51 | $6.19 | 112% |
| *Bleomycin Sulfate* | $305.78 | $158.67 | $147.11 | 93% |
| *ClindamycinPhosphate (Cleocin)* | $7.79 | $5.04 | $2.75 | 55% |
| *Hydrocortisone Sodium Succinate (Solu-Cortef)* | $15.66 | $11.57 | $4.09 | 35% |

346.    When Pharmacia's failure to report Best Price for its drugs is factored in, the

difference between reported and true AWP will be even greater.  The facts surrounding

Pharmacia's promotional, discounting and rebate activities, which affect Best Price, are uniquely

within Pharmacia's control at this time.

347.    Upon information and belief, Pharmacia has engaged in similar inflationary

practices in prior and subsequent years resulting in comparable damage to Nassau County for all

Covered Drugs.

348.    At all times relevant herein, Pharmacia, on behalf of the relevant Manufacturer-

Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its

pharmaceutical products through direct communication with industry compendia.

**EE.    PURDUE**

349.    At all times relevant hereto, Purdue routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Purdue reported inflated AWPs for Oxycontin®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Purdue drugs since at least 1993.

350.    Upon information and belief, Purdue has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

351.    Even these investigations do not reveal the full impact of Purdue's fraud because Nassau County's estimates do not include Purdue's failures to report Best Price for Oxycontin® as required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Purdue's promotional, discounting and pricing practices.

352.    When Purdue's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Purdue's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Purdue's control at this time and will be revealed through discovery.

353.    At all times relevant herein, Purdue Pharma, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

**FF.    RELIANT PHARM**

354.    At all times relevant hereto, Reliant has reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau County.  For example, based on Nassau County's own investigation, in 2004 Reliant reported false and inflated AWPs for Axid®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Reliant drugs since at least 1993.

355.    Upon information and belief, Reliant Pharm has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all Covered Drugs.

356.    Even these investigations do not reveal the full impact of Reliant's fraud because Nassau County's estimates do not include Reliant's failures to report Best Price for Axid® as required by federal and state rebate statutes.  The full impact of Reliant's failures on Nassau County's overcharges will be revealed through discovery of Reliant's promotional and pricing practices.

357.    When Reliant's failure to report Best Prices for its drugs is factored in, the spread between reported and true AWP and actual cost will be even greater.  The facts surrounding Reliant's discounting and rebate activities, which affect the Best Price for its drugs, are uniquely within Reliant's control at this time.

358.    At all times relevant herein, Reliant, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## GG.   SCHERING-PLOUGH

359.   At all times relevant hereto, Schering-Plough has reported or caused to be reported false and inflated AWPs, resulting in overcharges to Nassau County.  For example, based on Nassau County's investigation, in 2004 Schering-Plough reported false and inflated AWPs for Clarinex®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Schering-Plough drugs since at least 1993.

360.   Even these investigations do not reveal the full impact of Schering-Plough's fraud because Nassau County's estimates do not include Schering's failures to report Best Price as required by federal and state rebate statutes.  The full impact of Schering's failures on Nassau County's overcharges will be revealed through discovery of Schering's promotional and pricing practices.

361.   When Schering-Plough's failure to report Best Prices for its drugs is factored in, the spread between reported and true AWP will be even greater.  The facts surrounding Schering's discounting and rebate activities, which affect the Best Price for its drugs, are uniquely within Schering's control at this time.

362.   Upon information and belief, Schering has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

363.   In connection with its practices of inflating AWPs, Schering-Plough has been investigated by the Department of Justice, Texas Attorney General, West Virginia Attorney General, California Attorney General, California Bureau of Medi-Cal Fraud and Elder Abuse,

and the Department of Health and Human Services Office of the Inspector General, and the U.S.

Attorney for the District of Massachusetts.

364.     On May 30, 2003, Schering-Plough announced that the U.S. Attorney for the

District of Massachusetts had advised that its subsidiary, Schering Corporation, is the subject of

a federal grand jury investigation.  Schering-Plough is the target of a criminal investigation

involving:  (i) providing remuneration, such as drug samples, to providers to induce the purchase

of Schering products for which payment was made through federal health care programs;

(ii) selling misbranded or unapproved drugs; (iii) submitting false wholesale pricing information

for its pharmaceutical products to the government; and (iv) destroying evidence and obstructing

justice relating to the government's investigation.  *See* Schering-Plough Press Release dated May

30, 2003, located at http://www.sch-plough.com/news/2003/business/20030530.html).

365.     Moreover, according to Schering-Plough's Form 10-K for the year 2000, this

investigation has focused on "whether the AWP set by pharmaceutical companies for certain

drugs improperly exceeds the average prices paid by dispensers . . . and other pricing and/or

marketing practices."

366.     Schering took a charge of $150 million for the fourth quarter of 2002 to reflect its

estimate of the likely legal liability from this government probe.  The key basis for the

government investigation is the federal anti-kickback statute, which prohibits pharmaceutical

companies from giving money or other items of value to doctors in exchange for prescribing

particular products to Medicaid patients.

367.     This probe is not a unique experience for Schering.  A 2000 Medicaid

investigation by the Texas Attorney General revealed that Schering-Plough, with its subsidiary

Warrick, defrauded the State of Texas in the amount of $14.5 million.  Investigators determined

that Schering-Plough provided the greatest "spread" amongst the drug companies selling albuterol in Texas, and thereby obtained the largest market share for albuterol. Schering-Plough sold a box of albuterol to pharmacies for $13.50, while it charged the Texas Medicaid program $40.30 — a 200% increase. *See* Cornyn Sues Three Drug Companies for Medicaid Fraud, Press Release by the Office of the Attorney General, State of Texas, September 7, 2000 (www.oag.state.tx.us.gov).

368.    Schering deliberately concealed and has concealed its fraudulent reporting and marketing of the AWP spread. Schering routinely requires that its customers keep secret the prices they were being charged for Schering's drugs.

369.    At all times relevant herein, Schering, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## HH.    SERONO

370.    At all times relevant hereto, Serono routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County. Based on Nassau County's investigation, in 2004 Serono reported inflated AWPs for Serostim®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County. Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Serono drugs since at least 1993.

371.    Upon information and belief, Serono has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

372.    Even these investigations do not reveal the full impact of Serono's fraud because Nassau County's estimates do not include Serono's failures to report Best Price for Serostim® as

required by federal and state rebate statutes.  The full impact of these failures on Nassau County's overcharges will be revealed through discovery of Serono's promotional, discounting and pricing practices.

373.    When Serono's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Serono's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Serono's control at this time and will be revealed through discovery.

374.    At all times relevant herein, Serono, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

## II.    TAKEDA

375.    At all times relevant hereto, Takeda routinely has reported or caused to be reported, inflated AWPs resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Takeda reported inflated AWPs for Actos®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Takeda drugs since at least 1993.

376.    Upon information and belief, Takeda has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

377.    Even these investigations do not reveal the full impact of Takeda's fraud because Nassau County's estimates do not include Takeda's failures to report Best Price for Actos® as required by federal and state rebate statutes.  The full impact of these failures on Nassau

County's overcharges will be revealed through discovery of Takeda's promotional, discounting and pricing practices.

378.    When Takeda's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding Takeda's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within Takeda's control at this time and will be revealed through discovery.

379.    At all times relevant herein, Takeda, on behalf of the relevant Manufacturer-Publisher enterprise, controlled and set, or caused to be set, the reported AWPs for the pharmaceutical products through direct communication with industry compendia.

**JJ.    TAP**

380.    At all times relevant hereto, TAP has reported or caused to be reported, inflated AWPs, resulting in overcharges to Nassau County.  For example, based on Nassau County's investigation, in 2004 TAP reported false and inflated AWPs for Lupron®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other TAP drugs since at least 1993.

381.    Even these investigations do not reveal the full impact of the fraud because Nassau County's estimates do not include TAP's failures to report Best Price as required by federal and state rebate statutes.  The full impact of TAP's failures on Nassau County's overcharges will be revealed through discovery of TAP's promotional and pricing practices.

382.    When TAP's failure to report Best Price for these drugs is factored in, the spread between reported AWP and true AWP will be even greater.  The facts surrounding TAP's discounting and rebate activities, which affect the Best Prices for its drugs, are uniquely within TAP's control at this time.

383.     Upon information and belief, TAP has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

384.     In connection with its scheme to inflate AWPs, TAP has been investigated by the Department of Justice.  In addition, on October 13, 2001, the United States Attorney in Boston, Massachusetts announced that TAP Pharmaceutical Products, Inc., a corporation that arose from a partnership between Takeda Chemical Industries Ltd. and Abbott Laboratories, a defendant herein, had agreed to pay $875 million to resolve criminal charges and civil liabilities in connection with its fraudulent pricing and marketing practices for the drug named Lupron®. As part of the agreement:

(a)     TAP agreed to plead guilty to a conspiracy to violate the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t) and 333(b), and to pay a $290 million criminal fine, the largest criminal fine ever in a health care fraud prosecution.  The plea agreement between the United States and TAP specifically stated that TAP's criminal conduct caused the Government losses of $145,000,000;

(b)     TAP agreed to pay the United States Government $559,483,560 for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes and sales and marketing misconduct;

(c)     TAP agreed to pay the fifty states and the District of Columbia $25,516,440 for filing false and fraudulent claims with the States, as a result of TAP's drug pricing and marketing misconduct, and for TAP's failure to provide state Medicaid programs TAP's best price for Lupron®, as required by law;

(d)     TAP agreed to comply with the terms of a sweeping Corporate Integrity Agreement that, among other things, significantly changes the manner in which TAP supervises its marketing and sales staff and ensures that TAP will report to the Medicare and Medicaid programs the true average sale price for drugs reimbursed by those programs;

(e)     Abbott and Takeda (the TAP co-venturers) agreed to cooperate fully with the ongoing government investigation of TAP and its former officers and employees in exchange for the United States declining prosecution of Abbott and Takeda for conduct relating to Lupron®; and

(f)     An Indictment was unsealed in the District of Massachusetts against six current or former TAP employees (including an account executive, three District Managers, a National Accounts Manager and the former Vice President of Sales) and a urologist, alleging that they conspired to (i) bill Medicare for free samples of Lupron® and (ii) market Lupron® using the "spread" and the "return to practice" program.

385.    The TAP Defendants have been sued in a separate class action in connection with their fraudulent pricing and marketing practices for Lupron®.

386.    At a hearing in the criminal matter, which has an extensive record, United States District Court Judge William G. Young found:

> This has been a gross abuse of the Medicare/Medicaid repayment system, knowing, intelligent.  You have demonstrated, and it's all been confirmed in open court, and I don't want anyone forgetting about the fact that this company, not under its present management, knowingly abused the public trust in a most, and I use my words carefully, despicable way.

*United States v. TAP Pharm. Prods., Inc.*, No. CR-01-10354-WGY (D. Mass. Dec. 6, 2001).

387.    In the HHS Report, the DOJ gathered data from wholesalers' catalogues that published the wholesalers' list prices, which the DOJ indicated are more accurate than the

published AWPs.  The chart below lists the thirteen drugs identified by the DOJ and their

associated spreads, comparing an accurate AWP determined by the DOJ with the 2001 *RedBook*

price reported by Pharmacia.

| Drug | 2001 *RedBook* AWP | Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| *Etoposide (Toposar)* | $768.51 | $44.00 | $724.51 | 1,647% |
| *Vincristine Sulfate (Vincasar)* | $86.46 | $8.35 | $78.11 | 935% |
| *Doxorubicin Hydrochloride (Adriamycin)* | $1,104.13 | $150.86 | $953.27 | 632% |
| *Cyclophospamide (Neosar)* | $100.28 | $21.60 | $78.68 | 364% |
| *Testosterone Cypionate (Depo-Testosterone)* | $78.88 | $24.78 | $54.10 | 218% |
| *Heparin Lock Flush* | $38.30 | $13.60 | $24.70 | 182% |
| *Cytarabine (Cytosar)* | $132.58 | $49.82 | $82.76 | 166% |
| *Amphotercin B (Amphocin)* | $36.26 | $16.00 | $20.26 | 127% |

388.    At all times relevant herein, TAP, on behalf of the relevant Manufacturer-

Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its

pharmaceutical products through direct communications with industry compendia.

**KK.    WARRICK**

389.    Warrick, a division of Schering-Plough, routinely has reported or caused to be

reported, inflated AWPs, resulting in overcharges to Nassau County.  For example, based on

Nassau County's investigations, in 2004 Warrick reported false and inflated AWPs for

Isosorbide®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.

Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Warrick drugs since at least 1993.

390.    Even these investigations do not reveal the full impact of the fraud because Nassau County's estimates do not include Warrick's failures to report Best Price as required by federal and state rebate statutes.  The full impact of Warrick's failures on Nassau County's overcharges will be revealed through discovery of Warrick's promotional and pricing practices.

391.    In the HHS Report, the DOJ gathered data from wholesalers' catalogues that published the wholesalers' list prices, which the DOJ indicated are more accurate than the published AWPs.  The chart below lists the drug identified by the DOJ and its associated spread, comparing an accurate AWP determined by the DOJ with the 2001 *RedBook* price reported by Warrick.

| Drug | 2001 *RedBook* AWP | Actual AWP | Difference | Percentage Spread |
|---|---|---|---|---|
| *Albuterol Sulfate* | $72.60 | $21.92 | $50.68 | 231% |

392.    When Warrick's failure to report Best Price for its drugs is factored in, the difference between reported and true AWP will be even greater.  The facts surrounding Warrick's promotional, discounting and rebate activities, which affect Best Price, are uniquely within Warrick's control at this time.

393.    Upon information and belief, Warrick has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all Covered Drugs.

394.    At all times relevant herein, Warrick, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## LL.    WYETH

395.    Wyeth routinely reported or caused to be reported inflated AWPs, resulting in overcharges to Nassau County.  Based on Nassau County's investigation, in 2004 Wyeth reported false and inflated AWPs for Protonix®, as shown in Exhibit A, resulting in a significant overcharge to Nassau County.  Nassau County alleges that it has been overcharged based on recent retail prices listed in Exhibit A, and that it has been overcharged for every drug listed in Exhibit B, and possibly other Wyeth drugs since at least 1993.

396.    Upon information and belief, Warrick has engaged in similar inflationary practices in prior and subsequent years resulting in comparable damage to Nassau County for all covered drugs.

397.    Even these investigations do not reveal the full impact of the fraud because Nassau County's estimates do not include Wyeth's failures to report Best Price as required by federal and state rebate statutes.  The full impact of Wyeth's failures on Nassau County's overcharges will be revealed through discovery of Wyeth's promotional and pricing practices.

398.    When Wyeth's failure to report Best Price for its drugs is factored in, the difference between reported and true AWP is even greater.  The facts surrounding Wyeth's promotional, discounting and rebate activities, which affect Best Price, are uniquely within Wyeth's control at this time.

399.    At all times relevant herein, Wyeth, on behalf of the relevant Manufacturer-Publisher enterprise, has controlled and set, or caused to be set, the reported AWPs for its pharmaceutical products through direct communication with industry compendia.

## VII.   DAMAGES TO NASSAU COUNTY

400.    Consistent with nationwide trends, Medicaid costs for Nassau County have been increasing dramatically each year.  Pursuant to N.Y. Soc. Serv. Law § 368-a, Nassau County is mandated to contribute 25% of its Medicaid costs ("Medicaid Local Share Costs").  The County is billed a total weekly share by the State of New York, and has no input into what it is billed. Nassau County's 2004 Budget includes $260.6 million for Medicaid Local Share Costs, and it has requested a $296 million Medicaid budget for 2005, a 13.6% increase.  This increase is typical of what other counties in New York State are expecting next year.

401.    One of the primary forces, if not the principal force, behind Nassau County's increased Medicaid costs is the cost of prescription drugs, whose prices are inflated pursuant to the AWP scheme alleged herein.  Nassau County's Medicaid pharmacy costs have risen approximately 270% between 1997 and 2004.  They totaled over $26 million in 2004 alone. Total pharmacy costs for Nassau County from 1997 to 2004 are as follows:

| Year | Total Pharmacy Costs |
| --- | --- |
| 1997 | $9.7 million |
| 1998 | $11.5 million |
| 1999 | $13.9 million |
| 2000 | $14.8 million |
| 2001 | $16.9 million |
| 2002 | $19.7 million |
| 2003 | $21.7 million |
| 2004 | $26.1 million |

Source: New York State Department of Health

402.    Applying even the most conservative estimates of improper AWP spread, the overcharges resulted in millions of dollars in excessive payments by Nassau County for Medicaid pharmacy costs.

403.    Nassau County's experience is consistent with the trend nationwide and statewide.

404.    Expenditures for prescription drugs in the United States is the fastest growing component of health care, and has risen 15% or more per year over the past several years. Spending on prescription drugs now accounts for around 10% of total spending on health care in the United States.  The federal government estimates that drug expenditures will rise 13.5% in 2002, an average of 11.7% a year between 2003 and 2007, and an average of 10.3% a year between 2008 and 2011.  If these growth rates are sustained, prescription drugs will increase from 10% to nearly 15% of total national health spending by 2011.  By comparison, increased spending on physician and hospital services is projected to decline over time, with physician services up 8.2% in 2002, 6.9% per year between 2003 and 2007 and 6% per year between 2008 and 2011.  Spending on hospital care is projected to rise 6.7% in 2002, 5.8% per year between 2003 and 2007, and 5.2% per year between 2008 and 2011.

405.    Prescription drug costs under Medicaid are soaring.  They increased by an average 18.1% per year from 1997 to 2000, almost three times the rate of increase of all medical services combined.  See NIHCM Foundation Report dated June, 2002, "A Primer Generic Drugs, Patents and the Pharmaceutical Marketplace." In 2002, local, state and the federal governments spent $20 billion on outpatient prescription drugs for Medicaid beneficiaries, up from $12.1 billion in 1997.  Overall, Medicaid spending on prescription drugs rose from $4.8 billion in 1990

(6.6% of total Medicaid costs) to $21 billion in 2000. (107% of total Medicaid costs). This increase has been especially dramatic the past three years, with Medicaid pharmacy costs rising nationwide 19% in 2001, 22% in 2000 and 18% in 1999. This contrasts with a 9% increase in total Medicaid expenditures.

406.    Thus, this case is brought by Nassau County, *inter alia*, to recover the millions of dollars overpaid as a result of Defendants' fraudulent scheme to inflate and maintain the high reimbursement amounts upon which payments made by Nassau County for prescription drugs are based. Defendants' misconduct has unjustly enriched the Defendants at the expense of New York's health care system, and ultimately, all New York residents, consumers and taxpayers. In particular, the AWP Scheme directly has cost Nassau County millions of dollars in excess Medicaid pharmacy costs.

## VIII.   FRAUDULENT CONCEALMENT

407.    Each Defendant concealed its fraudulent conduct from Nassau County by controlling the process by which the AWPs for Covered Drugs were inflated and reported falsely to Publishers. Defendants prevented Nassau County from knowing what the actual pricing structures for these drugs were, and failed to inform them of the usage of free samples and the provision of other financial incentives to providers and other intermediaries to lower their respective costs for the drugs. Moreover, Defendants' fraudulent conduct was of such a nature as to be self-concealing.

408.    Each Defendant closely guarded its pricing structures, promotional practices and sales figures for their Covered Drugs.

409.    Each Defendant also concealed its fraudulent conduct by instructing providers and others not to report the prices they paid for the Covered Drugs.

410.    Each Defendant worked with and motivated provider and intermediary trade associations to halt any investigations or change in the AWP system.

411.    Each Defendant's efforts to conceal its pricing structures for Covered Drugs is evidence that it knew that its conduct was fraudulent.

412.    Thus, each Defendant concealed that: (i) its AWPs were highly-inflated (and were inflated solely to cause Nassau County to overpay for the Covered Drugs); (ii) it was manipulating the AWPs of the Covered Drugs; and (iii) the AWPs bore no relationship to the prices paid for, or the pricing structure of, the Covered Drugs and brand name drugs as they were sold to providers and others.

413.    Nassau County, unaware of the true facts about the pricing of the Covered Drugs and statutorily obligated to a 25% Medicaid contribution, has paid and continues to pay for them based upon and in reliance on the AWPs.

414.    Nassau County was diligent in pursuing an investigation of the claims asserted in this Complaint.  Through no fault of its own, it did not receive inquiry notice nor learn of the factual basis for the claims in this Complaint and the injuries suffered therefrom until recently.

415.    Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Nassau County has been kept in ignorance of vital information essential to knowledge of and the pursuit of these claims, without any fault or lack of diligence on its part.  Nassau County could not reasonably have discovered the fraudulent nature of the published AWPs.

416.    Defendants were and continue to be under a continuing statutorily-imposed duty to disclose to Nassau County the fact that the published AWPs bore and continue to bear no relationship to the prices or pricing structures for Covered Drugs.  Because of their knowing,

affirmative, and/or active concealment of the fraudulent nature of the published AWPs,

Defendants are estopped from relying on any statutes of limitations.

## IX.    CLAIMS FOR RELIEF

### COUNT I

**VIOLATIONS OF 18 U.S.C.§ 1962(C)**
**(AGAINST DEFENDANT DRUG MANUFACTURERS IDENTIFIED HEREIN FOR**
**UNLAWFUL CONDUCT ASSOCIATED WITH MEDICAID COVERED DRUGS)**

417.    The County of Nassau realleges and incorporates by reference the preceding

paragraphs as if fully set forth herein.

418.    This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C.

§ 1962(c), is asserted against the Defendants.

419.    The County of Nassau and Defendants are each "persons" as that term is defined

in 18 U.S.C. § 1961(3).

420.    The following publishers of pharmaceutical industry compendia that periodically

publish the AWPs, both in printed and electronic media, for various dosages of drugs are each

"persons" as that term is defined in 18 U.S.C. 1961(3):  (a) Thomson Medical Economics is a

division of Thomson Corporation, a Delaware corporation with its principal place of business

located at One Station Place, Stamford, Connecticut, and it is the publisher of the *Drug Topics*

*RedBook* ("Redbook"); (b) First DataBank, Inc., a Missouri corporation, with its principal place

of business at 1111 Bayhill Drive, San Bruno, California, and it is the publisher of drug pricing

information including, but not limited to, *American Druggist First DataBank Annual Directory*

*of Pharmaceuticals and Essential Directory of Pharmaceuticals*, commonly referred to as the

Blue Book; (c) and Facts & Comparisons, Inc., a division of Lippincott Williams & Wilkins,

Inc., a Pennsylvania corporation which acquired all drug information reference products

formerly published by Medi-Span, Inc. and which currently make available drug pricing information, including, but not limited to, the Medi-Span Master Drug Data Base. These entities are sometimes collectively referred to herein as "the Publishers."

421.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants each conducted the affairs of certain association-in-fact enterprises identified herein as the "Manufacturer-Publisher Enterprises." The affairs of each enterprise affected interstate commerce and, through a pattern of racketeering activity, Defendants conducted the affairs of these enterprises.

### The Manufacturer-Publisher Enterprises

422.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact consisting of (a) one of the Publishers that reported AWPs and (b) a Defendant Drug Manufacturer, including its directors, employees and agents. These associations-in-fact are sometimes collectively referred to herein as the "Manufacturer-Publisher Enterprises." Each of the Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs which are often supplied by the Manufacturers as WACs and then converted by the Publishers into artificially inflated AWPs, and (b) deriving profits from these activities. Each of the enterprises had a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry, generally, and specifically for the drugs of that defendant. The manufacturing Defendants have this as a purpose because without the AWP scheme, they would not be able to push the spread. The publishers agreed to this scheme, because if they did not, the manufacturers could easily revert to the other methods of publishing prices or the publishers

would have to independently investigate the AWP at significant expense. The Publishers also have an economic incentive to merely report the AWPs provided to them by the manufacturers, because to do otherwise would require the Publishers to spend money to extensively survey actual sales prices in the market. By simply republishing what is submitted to them by the drug manufacturers, the Publishers save on expenses and consequently reap greater profits. Thus, each of the Manufacturer-Publisher Enterprises has a common purpose of perpetuating the use of AWPs as a benchmark for reimbursement in the pharmaceutical industry.

423.    The AWP scheme is reliant on the cooperation and coordination of both the Publishers and the Manufacturers. The Manufacturers' ability to market the spread created by the publication of false and inflated AWPs depends on the cooperation of the Publishers, through both misfeasance in converting WACs into AWPs, and nonfeasance in not independently affirming the accuracy of the AWPs as they had in the past. The Publishers' entire product was reliant on the information supplied to them by the Manufacturers, and to protect that supply the Publishers forewent their duty to report honest AWP was to the Medicare system and the public at large. Without both groups participating in the scheme, the AWP scheme could not have succeeded.

424.    Each of the Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendant Drug Manufacturer and the specific Publisher that are its associates. As to each of the Manufacturer-Publisher Enterprises, there is a common communication network by which the Defendant Drug Manufacturer and the specific Publisher functioned as a continuing unit. At all relevant times, each of the Manufacturer-Publisher Enterprises was operated by the

specific Defendant Drug Manufacturer for criminal purposes, namely, carrying out the AWP scheme.

425.    On information and belief, at all relevant times Thomson Medical Economics, First DataBank, and Facts & Comparisons were each aware of the Defendant Drug Manufacturers' AWP Scheme, was a knowing and willing participant in that scheme, and reaped profits from that scheme.  Each of the publishing manufacturers is aware that the published AWPs are inflated.  This awareness comes from the following sources: First, at some point prior to 1992 the Publishers in many instances obtained AWPs themselves by survey.  From their surveys of those in the distribution chain, they were and are aware that the reported AWPs were not accurate.  Second, as various congressional bodies and government agencies reported on AWP inflation, the Publishers did not change or challenge the self-reported AWPs, but continued blindly accepting the requested AWPs.  Third, public documents confirm that when the State of Texas began prosecuting Dey Pharmaceuticals for its AWP practices, and when other states began focusing on Dey, the Publishers stopped accepting Dey's reported AWPs and published a different, far lower AWP.  They withdrew from the Day enterprise due to fear that they would be sued if they continued to publish Dey's false AWPs.  This prompted a lawsuit by Dey alleging that the Publishers were treating Dey differently than they were treating all other manufacturers.

426.    The foregoing evidences the Publishers' willing participation in the enterprise, their common purpose in the AWP scheme, and their agreement to a structure wherein the manufacturers made decisions as to what AWPs would be reported.  This structure was the basis in which each of the enterprises was structured and its affairs conducted.

427.    For purposes of this count, the Manufacturer-Publisher Enterprises are identified as follows:

(a)    *The Abbott Manufacturer-Publisher Enterprises*: The Abbott Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Abbott, and Abbott, including its directors, employees and agents:  (1) the Abbott-Thomson Medical Enterprise; (2) the Abbott-First DataBank Enterprise; and (3) the Abbott-Facts & Comparisons Enterprise. Each of the Abbott Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common of shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b) deriving profits from those activities.  Each of the Abbott Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons.  As to each of these Abbott Manufacturer-Publisher Enterprises, there is a common communication network by which Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons share information on a regular basis.  As to each of these Abbott Manufacturer-Publisher Enterprises, Abbott and Thomson Medical, Abbott and First DataBank, and Abbott and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Abbott Manufacturer-Publisher Enterprises was operated and conducted by Abbott for criminal purposes, namely, carrying out the AWP Scheme.

(b)    *The Agouron Manufacturer-Publisher Enterprise*:  The Agouron Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Agouron, and Agouron, including its directors, employees and agents:  (1) the Agouron-Thomson Medical Enterprise;

(2) the Agouron-First DataBank Enterprise; and (3) the Agouron-Facts & Comparisons Enterprise. Each of the Agouron Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Agouron Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Agouron and Thomson Medical, Agouron and First DataBank, and Agouron and Facts & Comparisons. As to each of these Agouron Manufacturer-Publisher Enterprises, Agouron and Thomson Medical, Agouron and First DataBank, and Agouron and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Agouron Manufacturer-Publisher Enterprises was operated and conducted by Agouron for criminal purposes, namely, carrying out the AWP Scheme.

(c) *The Amgen Manufacturer Publisher Enterprises*: The Amgen Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Amgen, and Amgen, including its directors, employees and agents: (1) the Amgen-Thomson Medical Enterprise; (2) the Amgen-First DataBank Enterprise; and (3) the Amgen-Facts & Comparisons Enterprise. Each of the Amgen Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Amgen Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Amgen and

Thomson Medical, Amgen and First DataBank, and Amgen and Facts & Comparisons.  As to

each of these Amgen Manufacturer-Publisher Enterprises, Amgen and Thomson Medical,

Amgen and First DataBank, and Amgen and Facts & Comparisons functioned as continuing but

separate units.  At all relevant times, each of the Amgen Manufacturer-Publisher Enterprises was

operated and conducted by Amgen for criminal purposes, namely, carrying out the AWP

Scheme.

           (d)      *The AstraZeneca Manufacturer Publisher Enterprises*:  The AstraZeneca

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by AstraZeneca, and

AstraZeneca, including its directors, employees and agents:  (1) the AstraZeneca-Thomson

Medical Enterprise; (2) the AstraZeneca-First DataBank Enterprise; and (3) the AstraZeneca-

Facts & Comparisons Enterprise.  Each of the AstraZeneca Manufacturer Publisher Enterprises

is an ongoing and continuing business organization consisting of both corporations and

individuals that are and have been associated for the common or shared purposes of

(a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits

from these activities.  Each of the AstraZeneca Manufacturer-Publisher Enterprises has a

systemic linkage because there are contractual relationships, financial ties, and continuing

coordination of activities between AstraZeneca and Thomson Medical, AstraZeneca and First

DataBank, and AstraZeneca and Facts & Comparisons.  As to each of these AstraZeneca

Manufacturer-Publisher Enterprises, AstraZeneca and Thomson Medical, AstraZeneca and First

DataBank, and AstraZeneca and Facts & Comparisons functioned as continuing but separate

units.  At all relevant times, each of the AstraZeneca Manufacturer Publisher Enterprises was

operated and conducted by AstraZeneca for criminal purposes, namely, carrying out the AWP Scheme.

(e)    *The Aventis Group Manufacturer Publisher Enterprises*:  The Aventis Group Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Aventis Group, and Aventis Group, including its directors, employees and agents:  (1) the Aventis Group-Thomson Medical Enterprise; (2) the Aventis Group-First DataBank Enterprise; and (3) the Aventis Group-Facts & Comparisons Enterprise.  Each of the Aventis Group Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Aventis Group Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Aventis Group and Thomson Medical, Aventis Group and First DataBank, and Aventis Group and Facts & Comparisons.  As to each of these Aventis Group Manufacturer-Publisher Enterprises, Aventis Group and Thomson Medical, Aventis Group and First DataBank, and Aventis Group and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Aventis Group Manufacturer Publisher Enterprises was operated and conducted by Aventis Group for criminal purposes, namely, carrying out the AWP Scheme.

(f)    *The Barr Manufacturer-Publisher Enterprises*:  The Barr Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Barr, and Barr, including its directors,

employees and agents:  (1) the Barr-Thomson Medical Enterprise; (2) the Barr-First DataBank

Enterprise; and (3) the Barr-Facts & Comparisons Enterprise.  Each of the Barr Manufacturer-

Publisher Enterprises is an ongoing and continuing business organization consisting of both

corporations and individuals that are and have been associated for the common or shared

purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and

(b) deriving profits from these activities.  Each of the Barr Manufacturer-Publisher Enterprises

has a systemic linkage because there are contractual relationships, financial ties, and continuing

coordination of activities between Barr and Thomson Medical, Barr and First DataBank, and

Barr and Facts & Comparisons.  As to each of these Barr Manufacturer-Publisher Enterprises,

Barr and Thomson Medical, Barr and First DataBank, and Barr and Facts & Comparisons

functioned as continuing but separate units.  At all relevant times, each of the Barr Manufacturer

Publisher Enterprises was operated and conducted by Barr for criminal purposes, namely,

carrying out the AWP Scheme.

    (g)    *The Baxter Manufacturer-Publisher Enterprises*:  The Baxter

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by Baxter, and Baxter,

including its directors, employees and agents:  (1) the Baxter-Thomson Medical Enterprise; (2)

the Baxter-First DataBank Enterprise; and (3) the Baxter-Facts & Comparisons Enterprise.  Each

of the Baxter Manufacturer-Publisher Enterprises is an ongoing and continuing business

organization consisting of both corporations and individuals that are and have been associated

for the common or shared purposes of (a) publishing or otherwise disseminating false and

misleading AWPs, and (b) deriving profits from these activities.  Each of the Baxter

Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Baxter and Thomson Medical, Baxter and First DataBank, and Baxter and Facts & Comparisons. As to each of these Baxter Manufacturer-Publisher Enterprises, Baxter and Thomson Medical, Baxter and First DataBank, and Baxter and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Baxter Manufacturer Publisher Enterprises was operated and conducted by Baxter for criminal purposes, namely, carrying out the AWP Scheme.

(h)     *The Bayer Manufacturer-Publisher Enterprises*: The Bayer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Bayer, and Bayer, including its directors, employees and agents: (1) the Bayer-Thomson Medical Enterprise; (2) the Bayer-First DataBank Enterprise; and (3) the Bayer-Facts & Comparisons Enterprise. Each of the Bayer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Bayer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Bayer and Thomson Medical, Bayer and First DataBank, and Bayer and Facts & Comparisons. As to each of these Bayer Manufacturer-Publisher Enterprises, Bayer and Thomson Medical, Bayer and First DataBank, and Bayer and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Bayer Manufacturer-Publisher Enterprises was operated and conducted by Bayer for criminal purposes, namely, carrying out the AWP Scheme.

(i)    *The Berlex Manufacturer-Publisher Enterprises*:  The Berlex

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by Berlex, and Berlex,

including its directors, employees and agents: (1) the Berlex-Thomson Medical Enterprise; (2)

the Berlex-First DataBank Enterprise; and (3) the Berlex-Facts & Comparisons Enterprise.  Each

of the Berlex Manufacturer-Publisher Enterprises is an ongoing and continuing business

organization consisting of both corporations and individuals that are and have been associated

for the common or shared purposes of (a) publishing or otherwise disseminating false and

misleading AWPs, and (b) deriving profits from these activities.  Each of the Berlex

Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Berlex and

Thomson Medical, Berlex and First DataBank, and Berlex and Facts & Comparisons.  As to each

of these Berlex Manufacturer-Publisher Enterprises, Berlex and Thomson Medical, Berlex and

First DataBank, and Berlex and Facts & Comparisons functioned as continuing but separate

units.  At all relevant times, each of the Berlex Manufacturer-Publisher Enterprises was operated

and conducted by Berlex for criminal purposes, namely, carrying out the AWP Scheme.

(j)    *The Biogen Manufacturer-Publisher Enterprises*:  The Biogen

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by Biogen, and Biogen,

including its directors, employees and agents: (1) the Biogen-Thomson Medical Enterprise; (2)

the Biogen-First DataBank Enterprise; and (3) the Biogen-Facts & Comparisons Enterprise.

Each of the Biogen Manufacturer-Publisher Enterprises is an ongoing and continuing business

organization consisting of both corporations and individuals that are and have been associated

for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Biogen Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Biogen and Thomson Medical, Biogen and First DataBank, and Biogen and Facts & Comparisons. As to each of these Biogen Manufacturer-Publisher Enterprises, Biogen and Thomson Medical, Biogen and First DataBank, and Biogen and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Biogen Manufacturer-Publisher Enterprises was operated and conducted by Biogen for criminal purposes, namely, carrying out the AWP Scheme.

(k)     *The Boehringer Manufacturer-Publisher Enterprises*:  The Boehringer Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Boehringer, and Boehringer, including its directors, employees and agents:  (1) the Boehringer-Thomson Medical Enterprise; (2) the Boehringer-First DataBank Enterprise; and (3) the Boehringer-Facts & Comparisons Enterprise. Each of the Boehringer Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Boehringer Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Boehringer and Thomson Medical, Boehringer and First DataBank, and Boehringer and Facts & Comparisons. As to each of these Boehringer Manufacturer-Publisher Enterprises, Boehringer and Thomson Medical, Boehringer and First DataBank, and Boehringer

and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each

of the Boehringer Manufacturer Publisher Enterprises was operated and conducted by

Boehringer for criminal purposes, namely, carrying out the AWP Scheme.

(l)    *The BMS Manufacturer-Publisher Enterprises*:  The BMS Manufacturer-

Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers

that reported the AWPs that were provided to them by BMS, and BMS, including its directors,

employees and agents: (1) the BMS-Thomson Medical Enterprise; (2) the BMS First DataBank

Enterprise; and (3) the BMS-Facts & Comparisons Enterprise.  Each of the BMS Manufacturer-

Publisher Enterprises is an ongoing and continuing business organization consisting of both

corporations and individuals that are and have been associated for the common or shared

purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b)

deriving profits from these activities.  Each of the BMS Manufacturer-Publisher Enterprises has

a systemic linkage because there are contractual relationships, financial ties, and continuing

coordination of activities between BMS and Thomson Medical, BMS and First DataBank, and

BMS and Facts & Comparisons.  As to each of these BMS Manufacturer-Publisher Enterprises,

BMS and Thomson Medical, BMS and First DataBank, and BMS and Facts & Comparisons

functioned as continuing but separate units.  At all relevant times, each of the BMS

Manufacturer-Publisher Enterprises was operated and conducted by BMS for criminal purposes,

namely, carrying out the AWP Scheme.

(m)    *The Chiron Manufacturer-Publisher Enterprises*:  The Chiron

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by Chiron, and Chiron,

including its directors, employees and agents:  (1) the Chiron-Thomson Medical Enterprise;

(2) the Chiron-First DataBank Enterprise; and (3) the Chiron-Facts & Comparisons Enterprise.

Each of the Chiron Manufacturer-Publisher Enterprises is an ongoing and continuing business

organization consisting of both corporations and individuals that are and have been associated

for the common or shared purposes of (a) publishing or otherwise disseminating false and

misleading AWPs, and (b) deriving profits from these activities.  Each of the Chiron

Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Chiron and

Thomson Medical, Chiron and First DataBank, and Chiron and Facts & Comparisons.  As to

each of these Chiron Manufacturer-Publisher Enterprises, Chiron and Thomson Medical, Chiron

and First DataBank, and Chiron and Facts & Comparisons functioned as continuing but separate

units.  At all relevant times, each of the Chiron Manufacturer-Publisher Enterprises was operated

and conducted by Chiron for criminal purposes, namely, carrying out the AWP Scheme.

(n)      *The Eli Lilly Manufacturer-Publisher Enterprises*:  The Eli Lilly

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by Eli Lilly, and Eli Lilly,

including its directors, employees and agents: (1) the Eli Lilly-Thomson Medical Enterprise;

(2) the Eli Lilly-First DataBank Enterprise; and (3) the Eli Lilly-Facts & Comparisons

Enterprise.  Each of the Eli Lilly Manufacturer-Publisher Enterprises is an ongoing and

continuing business organization consisting of both corporations and individuals that are and

have been associated for the common or shared purposes of (a) publishing or otherwise

disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of

the Eli Lilly Manufacturer-Publisher Enterprises has a systemic linkage because there are

contractual relationships, financial ties, and continuing coordination of activities between Eli

Lilly and Thomson Medical, Eli Lilly and First DataBank, and Eli Lilly and Facts & Comparisons. As to each of these Eli Lilly Manufacturer-Publisher Enterprises, Eli Lilly and Thomson Medical, Eli Lilly and First DataBank, and Eli Lilly and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Eli Lilly Manufacturer-Publisher Enterprises was operated and conducted by Eli Lilly for criminal purposes, namely, carrying out the AWP Scheme.

(o)     *The Forest Manufacturer-Publisher Enterprise*:  The Forest Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Forest, and Forest, including its directors, employees and agents: (1) the Forest-Thomson Medical Enterprise; (2) the Forest-First DataBank Enterprise; and (3) the Forest-Facts & Comparisons Enterprise. Each of the Forest Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Forest Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Forest and Thomson Medical, Forest and First DataBank, and Forest and Facts & Comparisons. As to each of these Forest Manufacturer-Publisher Enterprises, Forest and Thomson Medical, Forest and First DataBank, and Forest and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Forest Manufacturer-Publisher Enterprises was operated and conducted by Forest for criminal purposes, namely, carrying out the AWP Scheme.

(p)     *The Fujisawa Manufacturer-Publisher Enterprises*:  The Fujisawa Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPID AWPs that were provided to them by Fujisawa, and Fujisawa, including its directors, employees and agents:  (1) the Fujisawa-Thomson Medical Enterprise; (2) the Fujisawa-First DataBank Enterprise; and (3) the Fujisawa-Facts & Comparisons Enterprise.  Each of the Fujisawa Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Fujisawa Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Fujisawa and Thomson Medical, Fujisawa and First DataBank, and Fujisawa and Facts & Comparisons.  As to each of these Fujisawa Manufacturer-Publisher Enterprises, Fujisawa and Thomson Medical, Fujisawa and First DataBank, and Fujisawa and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Fujisawa Manufacturer-Publisher Enterprises was operated and conducted by Fujisawa for criminal purposes, namely, carrying out the AWP Scheme.

(q)     *The Genentech Manufacturer-Publisher Enterprise*:  The Genentech Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Genentech, and Genentech, including its directors, employees and agents:  (1) the Genentech-Thomson Medical Enterprise; (2) the Genentech-First DataBank Enterprise; and (3) the Genentech-Facts & Comparisons Enterprise.  Each of the Genentech Manufacturer-Publisher Enterprises is an ongoing and

continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Genentech Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Genentech and Thomson Medical, Genentech and First DataBank, and Genentech and Facts & Comparisons.  As to each o€these Genentech Manufacturer-Publisher Enterprises, Genentech and Thomson Medical, Genentech and First DataBank, and Genentech and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Genentech Manufacturer-Publisher Enterprises was operated and conducted by Genentech for criminal purposes, namely, carrying out the AWP Scheme.

(r)     *The Genzyme Manufacturer-Publisher Enterprises*:  The Genzyme Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Genzyme, and Genzyme, including its directors, employees and agents:  (1) the Genzyme-Thomson Medical Enterprise; (2) the Genzyme-First DataBank Enterprise; and (3) the Genzyme-Facts & Comparisons Enterprise.  Each of the Genzyme Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Genzyme Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Genzyme and Thomson Medical, Genzyme and First DataBank, and Genzyme and Facts &

Comparisons.  As to each of these Genzyme Manufacturer-Publisher Enterprises, Genzyme and Thomson Medical, Genzyme and First DataBank, and Genzyme and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Genzyme Manufacturer Publisher Enterprises was operated and conducted by Genzyme for criminal purposes, namely, carrying out the AWP Scheme.

(s)    *The GSK Defendants' Manufacturer-Publisher Enterprises*: The GSK Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by the GSK Defendants, including their directors, employees and agents: (1) the GSK Defendants-Thomson Medical Enterprise; (2) the GSK Defendants-First DataBank Enterprise; and (3) the GSK Defendants-Facts & Comparisons Enterprise.  Each of the GSK Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the GSK Defendants Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the GSK Defendants and Thomson Medical, the GSK Defendants and First DataBank, and GSK Group and Facts & Comparisons.  As to each of the GSK Defendants Manufacturer-Publisher Enterprises, the GSK Defendants and Thomson Medical, the GSK Defendants and First DataBank, and the GSK Defendants and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the GSK Defendants Manufacturer-Publisher Enterprises was operated and conducted by the GSK Defendants for criminal purposes, namely, carrying out the AWP Scheme.

(t)    *The Immunex Manufacturers-Publisher Enterprises*:  The Immunex

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by Immunex, and Immunex,

including its directors, employees and agents: (1) the Immunex-Thomson Medical Enterprise; (2)

the Immunex-First DataBank Enterprise; and (3) the Immunex-Facts & Comparisons Enterprise.

Each of the Immunex Manufacturer-Publisher Enterprises is an ongoing and continuing business

organization consisting of both corporations and individuals that are and have been associated

for the common or shared purposes of (a) publishing or otherwise disseminating false and

misleading AWPs, and (b) deriving profits from these activities.  Each of the Immunex

Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Immunex and

Thomson Medical, Immunex and First DataBank, and Immunex and Facts & Comparisons.  As

to each of these Immunex Manufacturer-Publisher Enterprises, Immunex and Thomson Medical,

Immunex and First DataBank, and Immunex and Facts & Comparisons functioned as continuing

but separate units.  At all relevant times, each of the Immunex Manufacturer-Publisher

Enterprises was operated and conducted by Immunex for criminal purposes, namely, carrying out

the AWP Scheme.

(u)    *The Ivax Manufacturers-Publisher Enterprises*:  The Ivax Manufacturer-

Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers

that reported the AWPs that were provided to them by Ivax, and Ivax, including its directors,

employees and agents: (1) the Ivax-Thomson Medical Enterprise; (2) the Ivax-First DataBank

Enterprise; and (3) the Ivax-Facts & Comparisons Enterprise.  Each of the Ivax Manufacturer-

Publisher Enterprises is an ongoing and continuing business organization consisting of both

corporations and individuals that are and have been associated for the common or shared

purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b)

deriving profits from these activities.  Each of the Ivax Manufacturer-Publisher Enterprises has a

systemic linkage because there are contractual relationships, financial ties, and continuing

coordination of activities between Ivax and Thomson Medical, Ivax and First DataBank, and

Ivax and Facts & Comparisons.  As to each of these Ivax Manufacturer-Publisher Enterprises,

Ivax and Thomson Medical, Ivax and First DataBank, and Ivax and Facts & Comparisons

functioned as continuing but separate units.  At all relevant times, each of the Ivax Manufacturer-

Publisher Enterprises was operated and conducted by Ivax for criminal purposes, namely,

carrying out the AWP Scheme.

(v)      *The Johnson & Johnson Defendants[2] Manufacturer-Publisher Enterprises*:

The Johnson & Johnson Defendants Manufacturer-Publisher Enterprises are three separate

associations-in-fact consisting of each of the Publishers that reported the AWPs that were

provided to them by the Johnson & Johnson Defendants, and the Johnson & Johnson Defendants,

including its directors, employees and agents: (1) the Johnson & Johnson-Thomson Medical

Enterprise; (2) the Johnson & Johnson-First DataBank Enterprise; and (3) the Johnson &

Johnson-Facts & Comparisons Enterprise.  Each of the Johnson & Johnson Manufacturer

Publisher Enterprises is an ongoing and continuing business organization consisting of both

corporations and individuals that are and have been associated for the common or shared

purposes of (a) publishing or otherwise disseminating false and misleading AWPs and (b)

deriving profits from these activities.  Each of the Johnson & Johnson Manufacturer-Publisher

Enterprises has a systemic linkage because there are contractual relationships, financial ties, and

---

[2]    The Johnson & Johnson Defendants are Johnson & Johnson, Janssen, Ortho-McNeil, and
Ortho Biotech.

continuing coordination of activities between Johnson & Johnson and Thomson Medical, Johnson & Johnson and First DataBank, and Johnson & Johnson and Facts & Comparisons. As to each of these Johnson & Johnson Defendants Manufacturer-Publisher Enterprises, Johnson & Johnson Defendants and Thomson Medical, Johnson & Johnson and First DataBank, and Johnson & Johnson Defendants and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Johnson & Johnson Defendants Manufacturer-Publisher Enterprises was operated and conducted by the Johnson & Johnson Defendants for criminal purposes, namely, carrying out the AWP Scheme.

(w)    *The Key Manufacturer-Publisher Enterprises*: The Key Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Key, and Key, including its directors, employees and agents: (1) the Key-Thomson Medical Enterprise; (2) the Key-First DataBank Enterprise; and (3) the Key-Facts & Comparisons Enterprise. Each of the Key Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Key Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Key and Thomson Medical, Key and First DataBank, and Key and Facts & Comparisons. As to each of these Key Manufacturer-Publisher Enterprises, Key and Thomson Medical, Key and First DataBank, and Key and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Key Manufacturer Publisher

Enterprises was operated and conducted by Key for criminal purposes, namely, carrying out the AWP Scheme.

(x)    *The Medimmune Manufacturer-Publisher Enterprises*:  The Medimmune Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Medimmune, and Medimmune, including its directors, employees and agents: (1) the Medimmune-Thomson Medical Enterprise; (2) the Medimmune-First DataBank Enterprise; and (3) the Medimmune-Facts & Comparisons Enterprise.  Each of the Medimmune Manufacturer Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Medimmune Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Medimmune and Thomson Medical, Medimmune and First DataBank, and Medimmune and Facts & Comparisons.  As to each of these Medimmune Manufacturer-Publisher Enterprises, Medimmune and Thomson Medical, Medimmune and First DataBank, and Medimmune and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Medimmune Manufacturer Publisher Enterprises was operated and conducted by Medimmune for criminal purposes, namely, carrying out the AWP Scheme.

(y)    *The Merck Manufacturer-Publisher Enterprises*:  The Merck Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Merck & Co., including its directors, employees and agents: (1) the Merck & Co.-Thomson Medical Enterprise; (2) the

Merck & Co.-First DataBank Enterprise; and (3) the Merck & Co.-Facts & Comparisons Enterprise.  Each of the Merck & Co. Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Merck & Co. Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Merck & Co. and Thomson Medical, Merck & Co. and First DataBank, and Merck & Co., Inc. and Facts & Comparisons.  As to each of these, Merck & Co. Publisher Enterprises, Merck & Co. and Thomson Medical, Merck & Co. and First DataBank, and Merck & Co. and Facts & Comparisons function as continuing but separate units.  At all relevant times, each of the Merck & Co. Publisher Enterprises was operated and conducted by Merck & Co. for criminal purposes, namely, carrying out the AWP Scheme.

(z)     *The Mylan Manufacturer-Publisher Enterprises*:  The Mylan Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Mylan, and Mylan, including its directors, employees and agents:  (1) the Mylan-Thomson Medical Enterprise; (2) the Mylan-First DataBank Enterprise; and (3) the Mylan-Facts & Comparisons Enterprise.  Each of the Mylan Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Mylan Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Mylan and

Thomson Medical, Mylan and First DataBank, and Mylan and Facts & Comparisons.  As to each

of these Mylan Manufacturer-Publisher Enterprises, Mylan and Thomson Medical, Mylan and

First DataBank, and Mylan and Facts & Comparisons functioned as continuing but separate

units.  At all relevant times, each of the Mylan Manufacturer Publisher Enterprises was operated

and conducted by Mylan for criminal purposes, namely, carrying out the AWP Scheme.

(aa)    *The Novartis-Manufacturer Publisher Enterprises*:  The Novartis

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by Novartis, and Novartis,

including its directors, employees and agents: (1) the Novartis-Thomson Medical Enterprise;

(2) the Novartis-First DataBank Enterprise; and (3) the Novartis-Facts & Comparisons

Enterprise.  Each of the Novartis Manufacturer-Publisher Enterprises is an ongoing and

continuing business organization consisting of both corporations and individuals that are and

have been associated for the common or shared purposes of (a) publishing or otherwise

disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of

the Novartis Manufacturer-Publisher Enterprises has a systemic linkage because there are

contractual relationships, financial ties, and continuing coordination of activities between

Novartis and Thomson Medical, Novartis and First DataBank, and Novartis and Facts &

Comparisons.  As to each of these Novartis Manufacturer-Publisher Enterprises, Novartis and

Thomson Medical, Novartis and First DataBank, and Novartis and Facts & Comparisons

functioned as continuing but separate units.  At all relevant times, each of the Novartis

Manufacturer-Publisher Enterprises was operated and conducted by Novartis for criminal

purposes, namely, carrying out the AWP Scheme.

(bb)    *The Organon Manufacturer-Publisher Enterprises*:  The Organon

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by Organon, and Organon,

including its directors, employees and agents:  (1) the Organon-Thomson Medical Enterprise; (2)

the Organon-First DataBank Enterprise; and (3) the Organon-Facts & Comparisons Enterprise.

Each of the Organon Manufacturer-Publisher Enterprises is an ongoing and continuing business

organization consisting of both corporations and individuals that are and have been associated

for the common or shared purposes of (a) publishing or otherwise disseminating false and

misleading AWPs, and (b) deriving profits from these activities.  Each of the Organon

Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Organon and

Thomson Medical, Organon and First DataBank, and Organon and Facts & Comparisons.  As to

each of these Organon Manufacturer-Publisher Enterprises, Organon and Thomson Medical,

Organon and First DataBank, and Organon and Facts & Comparisons functioned as continuing

but separate units.  At all relevant times, each of the Organon Manufacturer Publisher Enterprises

was operated and conducted by Organon for criminal purposes, namely, carrying out the AWP

Scheme.

(cc)    *The Pfizer Defendants' Manufacturer-Publisher Enterprises*:  The Pfizer

Defendants' Manufacturer-Publisher Enterprises are three separate associations-in-fact

consisting of each of the Publishers that reported the AWPs that were provided to them by the

Pfizer Defendants, and Pfizer, including its directors, employees and agents: (1) the Pfizer

Defendants-Thomson Medical Enterprise; (2) the Pfizer Defendants-First DataBank Enterprise;

and (3) the Pfizer-Facts & Comparisons Enterprise.  Each of the Pfizer Defendants Manufacturer

Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Pfizer Defendants' Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Pfizer and Thomson Medical, Pfizer and First DataBank, and Pfizer and Facts & Comparisons.  As to each of these Pfizer Defendants' Manufacturer-Publisher Enterprises, the Pfizer Defendants' and each of Thomson Medical, First DataBank, and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Pfizer Defendants' Manufacturer-Publisher Enterprises was operated and conducted by the Pfizer Defendants' for criminal purposes, namely, carrying out the AWP Scheme.

(dd)     *The Pharmacia Manufacturer-Publisher Enterprises*:  The Pharmacia Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Pharmacia, and Pharmacia, including its directors, employees and agents:  (1) the Pharmacia-Thomson Medical Enterprise; (2) the Pharmacia-First DataBank Enterprise; and (3) the Pharmacia-Facts & Comparisons Enterprise.  Each of the Pharmacia Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Pharmacia Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between

Pharmacia and Thomson Medical, Pharmacia and First DataBank, and Pharmacia and Facts & Comparisons. As to each of these Pharmacia Manufacturer-Publisher Enterprises, Pharmacia and Thomson Medical, Pharmacia and First DataBank, and Pharmacia and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Pharmacia Manufacturer-Publisher Enterprises was operated and conducted by Pharmacia for criminal purposes, namely, carrying out the AWP Scheme.

(ee)    *The Reliant Manufacturer-Publisher Enterprises*: The Reliant Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Reliant, and Reliant, including its directors, employees and agents: (1) the Reliant-Thomson Medical Enterprise; (2) the Reliant-First DataBank Enterprise; and (3) the Reliant-Facts & Comparisons Enterprise. Each of the Reliant Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Reliant Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Reliant and Thomson Medical, Reliant and First DataBank, and Reliant and Facts & Comparisons. As to each of these Reliant Manufacturer-Publisher Enterprises, Reliant and Thomson Medical, Reliant and First DataBank, and Reliant and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Reliant Manufacturer-Publisher Enterprises was operated and conducted by Reliant for criminal purposes, namely, carrying out the AWP Scheme.

(ff)     *The Serono Manufacturer-Publisher Enterprises*:  The Serono

Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of

the Publishers that reported the AWPs that were provided to them by Serono, and Serono,

including its directors, employees and agents:  (1) the Serono-Thomson Medical Enterprise; (2)

the Serono-First DataBank Enterprise; and (3) the Serono-Facts & Comparisons Enterprise.

Each of the Serono Manufacturer-Publisher Enterprises is an ongoing and continuing business

organization consisting of both corporations and individuals that are and have been associated

for the common or shared purposes of (a) publishing or otherwise disseminating false and

misleading AWPs, and (b) deriving profits from these activities.  Each of the Serono

Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual

relationships, financial ties, and continuing coordination of activities between Serono and

Thomson Medical, Serono and First DataBank, and Serono and Facts & Comparisons.  As to

each of these Serono Manufacturer-Publisher Enterprises, Serono and Thomson Medical, Serono

and First DataBank, and Serono and Facts & Comparisons functioned as continuing but separate

units.  At all relevant times, each of the Serono Manufacturer Publisher Enterprises was operated

and conducted by Serono for criminal purposes, namely, carrying out the AWP Scheme.

(gg)     *The Schering-Plough Manufacturer-Publisher Enterprises*:  The Schering-

Plough Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of

each of the Publishers that reported the AWPs that were provided to them by Schering-Plough

Group, and Schering-Plough Group, including its directors, employees and agents:  (1) the

Schering-Plough Group-Thomson Medical Enterprise; (2) the Schering-Plough Group-First

DataBank Enterprise; and (3) the Schering-Plough Group-Facts & Comparisons Enterprise.

Each of the Schering-Plough Manufacturer-Publisher Enterprises is an ongoing and continuing

business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Schering-Plough Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Schering-Plough and Thomson Medical, Schering-Plough and First DataBank, and Schering-Plough and Facts & Comparisons.  As to each of these Schering-Plough Manufacturer Publisher Enterprises, Schering-Plough and Thomson Medical, Schering-Plough and First DataBank, and Schering-Plough and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Schering-Plough Manufacturer-Publisher Enterprises was operated and conducted by Schering-Plough for criminal purposes, namely, carrying out the AWP Scheme.

(hh)    *The Takeda Manufacturer-Publisher Enterprises*:  The Takeda Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Takeda, and Takeda, including its directors, employees and agents:  (1) the Takeda-Thomson Medical Enterprise; (2) the Takeda-First DataBank Enterprise; and (3) the Takeda-Facts & Comparisons Enterprise. Each of the Takeda Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Takeda Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Takeda and Thomson Medical, Takeda and First DataBank, and Takeda and Facts & Comparisons.  As to

each of these Takeda Manufacturer-Publisher Enterprises, Takeda and Thomson Medical, Takeda and First DataBank, and Takeda and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Takeda Manufacturer Publisher Enterprises was operated and conducted by Takeda for criminal purposes, namely, carrying out the AWP Scheme.

(ii)    *The TAP Pharmaceuticals Manufacturer-Publisher Enterprises*: The TAP Pharmaceuticals Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by TAP Pharmaceuticals, and TAP Pharmaceuticals, including its directors, employees and agents: (1) the TAP Pharmaceuticals-Thomson Medical Enterprise; (2) the TAP Pharmaceuticals-First DataBank Enterprise; and (3) the TAP Pharmaceuticals-Facts & Comparisons Enterprise. Each of the TAP Pharmaceuticals Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the TAP Pharmaceuticals Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between TAP Pharmaceuticals and Thomson Medical, TAP Pharmaceuticals and First DataBank, and TAP Pharmaceuticals and Facts & Comparisons. As to each of these TAP Pharmaceuticals Manufacturer-Publisher Enterprises, TAP Pharmaceuticals and Thomson Medical, TAP Pharmaceuticals and First DataBank, and TAP Pharmaceuticals and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the TAP

Pharmaceuticals Manufacturer-Publisher Enterprises was operated and conducted by TAP Pharmaceuticals for criminal purposes, namely, carrying out the AWP Scheme.

(jj)    *The Warrick Manufacturer-Publisher Enterprises*:  The Warrick Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported.  The AWPs that were provided to them by Warrick, and Warrick, including its directors, employees and agents: (1) the Warrick-Thomson Medical Enterprise; (2) the Warrick-First DataBank Enterprise; and (3) the Warrick-Facts & Comparisons Enterprise. Each of the Warrick Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities.  Each of the Warrick Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Warrick and Thomson Medical, Warrick and First DataBank, and Warrick and Facts & Comparisons.  As to each of these Warrick Manufacturer-Publisher Enterprises, Warrick and Thomson Medical, Warrick and First DataBank, and Warrick and Facts & Comparisons functioned as continuing but separate units.  At all relevant times, each of the Warrick Manufacturer-Publisher Enterprises was operated and conducted by Warrick for criminal purposes, namely, carrying out the AWP Scheme.

(kk)    *The Wyeth Manufacturer-Publisher Enterprises*:  The Wyeth Manufacturer-Publisher Enterprises are three separate associations-in-fact consisting of each of the Publishers that reported the AWPs that were provided to them by Wyeth, and Wyeth, including its directors, employees and agents: (1) the Wyeth-Thomson Medical Enterprise;

(2) the Wyeth-First DataBank Enterprise; and (3) the Wyeth-Facts & Comparisons Enterprise. Each of the Wyeth Manufacturer-Publisher Enterprises is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating false and misleading AWPs, and (b) deriving profits from these activities. Each of the Wyeth Manufacturer-Publisher Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Wyeth and Thomson Medical, Wyeth and First DataBank, and Wyeth and Facts & Comparisons. As to each of these Wyeth Manufacturer-Publisher Enterprises, Wyeth and Thomson Medical, Wyeth and First DataBank, and Wyeth and Facts & Comparisons functioned as continuing but separate units. At all relevant times, each of the Wyeth Manufacturer-Publisher Enterprises was operated and conducted by Wyeth for criminal purposes, namely, carrying out the AWP Scheme.

428.    The Defendants' use of the U.S. mails and interstate wire facilities to perpetrate their AWP Schemes involved thousands of communications throughout the relevant time including, *inter alia*:

(a)     Marketing materials about the AWPs for Covered Drugs and the available spread, which were sent to providers located across the country;

(b)     Written representations of the false and inflated AWPs for Covered Drugs as set forth in Exhibit A made to the RedBook and similar publications, which were made at least annually, and in many cases, several times during a single year;

(c)     Thousands of written and oral communications discussing, confirming, and forwarding free samples of drugs, for which the Defendants understood that the providers would unlawfully seek inflated reimbursement;

(d)    Documents providing information or incentives designed to lessen the prices that providers paid for the drugs, and/or to conceal those prices or the AWP Scheme alleged herein;

(e)    Written communications, including checks, documents discussing and relating to grants, payments of consulting fees, debt forgiveness and/or other financial inducements, as detailed herein;

(f)    Written and oral communications with U.S. and state Government agencies and private insurers that fraudulently misrepresented what the AWPs for Covered Drugs were, or that were intended to deter investigations into the AWPs for the Covered Drugs or to forestall changes to reimbursement based on something other than AWPs;

(g)    Written and oral communications with health insurers and patients, inducing payments for Covered Drugs that were made in reliance on AWPs; and

(h)    Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Defendants' AWP Scheme.

429.    In addition to the above-referenced RICO predicate acts, the Defendants' respective corporate headquarters have communicated by use of the U.S. mails and by interstate wire facilities with their various local headquarters or divisions, in furtherance of the AWP Scheme.

**Conduct of the RICO Enterprises' Affairs and RICO Conspiracy**

430.    During all relevant times, each defendant has exerted control over its particular Publisher Enterprise in violation of Section 1963(c) of RICO, has conducted or participated in the conduct of the affairs of that particular RICO enterprise, directly or indirectly, in the following ways:

(a)    Each defendant has directly controlled the price at which providers purchase its Covered Drugs;

(b)    Each Manufacturer/Publisher enterprise has directly controlled the false and inflated AWPs that are reported in the RedBook as set forth in Exhibit A and similar industry publications;

(c)    Each defendant has directly controlled the price at which providers are reimbursed by the Medicaid Program;

(d)    Each defendant has directly controlled the creation and distribution of marketing, sales, and other materials used to inform providers located nationwide of the profit potential of its Covered Drugs;

(e)    Each defendant has directly controlled the marketing and sales scheme to artificially and unlawfully inflate the Medicaid reimbursement rate (and co-payment rate) to induce providers to prescribe Covered Drugs to their patients; and

(f)    Each defendant has directly controlled the use and distribution of free samples of its Covered Drugs to providers.

431.    Each defendant has directly or indirectly controlled the ability of providers to unlawfully seek reimbursement from the Medicaid Program for free samples;

432.    Each defendant has relied upon its employees and agents to promote the AWP Schemes alleged herein through the U.S. mails, through interstate wire facilities, and through direct contacts with providers; and

433.    Each defendant has controlled and participated in the affairs of its respective Publisher Enterprise by using a fraudulent scheme to manufacture, market and sell its Covered Drugs through the use of unlawful inducements to providers.

434.    Each of the Publisher Enterprises identified in ¶ 341 of this Amended Complaint had a hierarchical decision-making structure headed by the respective Defendant Drug Manufacturer.  Each of the distribution enterprises also had a consensual decision-making structure because, as described above, each defendant knew it was part of the AWP scheme and the providers played an active role in the affairs of the enterprise.  In violation of Section 1962(d) of RICO, each of the Defendants and each of the providers that were members of the Distribution Enterprises conspired to conduct the affairs of such enterprises through the pattern of racketeering activity alleged herein.  The conspiratorial agreement between the Defendants and the providers and their overt acts are described in this Complaint.

**Pattern of Racketeering Activity**

435.    Each of the Defendants has conducted and participated in the affairs of its respective Publisher Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their AWP Scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).  Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Defendants intended to defraud Nassau County and other Medicaid payors, the foreseeable and intended victims of the AWP Scheme.

436.    The Defendants' fraudulent and unlawful AWP Scheme consisted, in part, of deliberately overstating the AWPs for their Covered Drugs, thereby creating a "spread" based on the inflated figure in order to induce providers to prescribe their Covered Drugs to their patients and causing the Medicaid program to pay an artificially-inflated rate of reimbursement for the

Covered Drugs. The Defendants' AWP Scheme also consisted of providing free samples of the drugs to providers, instructing (or urging) such providers to bill the Medicaid program for these free samples, and providing the providers with other unlawful financial incentives, including kickbacks and bribes, to induce use of the Covered Drugs.

437.    The AWP Scheme was calculated and intentionally crafted so as to ensure that the Medicaid Program would be over-billed for the Covered Drugs. In designing and implementing the AWP Scheme, the Defendants were at all cognizant of the fact that the entire Medicaid Program and all patients for whom the Covered Drugs are prescribed rely upon the honesty of the Defendants in setting the AWP as reported in the RedBook and similar publications. Thus, Plaintiff was an intended target and victim of the Defendants' AWP Scheme.

438.    By intentionally and artificially inflating the AWP and thereby affording the providers with unlawful financial inducements to use the Covered Drugs, and by subsequently failing to disclose such practices to the patients from whom reimbursement was sought through the U.S. mails or interstate wire facilities, the Defendants engaged in fraudulent, and unlawful conduct constituting a pattern of racketeering activity.

439.    The Defendants' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Nassau County and all Medicaid payors. Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff. Each of the Defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Distribution Enterprise and the Medicaid Enterprise. Damages Proximately Caused by the Defendants' AWP Scheme

440.    The Defendants' violations of federal law and their pattern of racketeering activity have directly, proximately and foreseeably caused Nassau County to be injured in its business or property because Nassau County has paid many millions of dollars in inflated reimbursements or other payments for Covered Drugs.

441.    Defendants sent billing statements through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their AWP Scheme.  As required by federal and state Medicaid law, plaintiff has made inflated reimbursement payments for Covered Drugs based on and/or in reliance on reported and false AWPs.

442.    Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiff for three times the damages that Plaintiff has sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

### VIOLATION OF FEDERAL MEDICAID STATUTE, 42 U.S.C. § 1396r-8 FAILURE TO REPORT BEST PRICE

443.    The County of Nassau realleges and incorporates the preceding paragraphs as if fully set forth herein.

444.    Each of the Defendant pharmaceutical companies is a manufacturer of a Covered Drug.

445.    Pursuant to 42 U.S.C. § 1396r-8, each of the Defendant pharmaceutical companies entered into a rebate agreement with the Medicaid Program under which the Medicaid Program would receive rebates determined in part by "best price," which is defined as "the lowest price available from the manufacturer."

446.    In particular, as part of the rebate agreement, each Defendant agreed that:

(a)    It would determine its best price, taking into account discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, in any quarter and would make quarterly rebates where necessary to bring the price down to the actual lowest price offered to any commercial entity;

(b)    It would determine its best price based upon its average manufacturer's price, calculated as "net Sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase requirements)" and that it would include in that calculation cash discounts and all other price reductions "which reduce the actual price paid;" and

(c)    It would not take into account nominal prices, defined as prices that are less than 10 percent of the average manufacturer's price in that quarter, so long as the sale of a product at a nominal price was not contingent on any other sale.

447.    In keeping with their artificial price inflation scheme, each Defendant did not report the actual "best price" or "average manufacturer's price," but instead (i) reported higher prices and (ii) excluded discounts, free samples and other inducements offered to physicians that resulted in lower prices than the prices reported to the Medicaid Program.

448.    Each of the Defendants thereby violated 42 U.S.C. § 1396r-8 in that they submitted untrue, incomplete, inaccurate, and misleading information used to determine the amount of reimbursement under the Medicaid program.  More specifically, each Defendant made claims or caused claims to be made which had the effect of the Medicaid Program not receiving rebates based upon accurately reported "best price" information, and the Defendants knew that the claims were rendered false, in whole or in part, by two methods: falsely reporting the prices paid by commercial entities for its products, and not accounting for the discounts and other

inducements offered to commercial entities.  Further, acting with the intent to defraud and in order to obtain authorization to qualify as a provider and to provide specific goods, each Defendant made or caused to be made false statements promising that it would comply with the mandates of 42 U.S.C. § 1396r-8.

449.    Defendants knew, or by virtue of their position, authority or responsibility should have known, of the falsity of their claims, statements or representations.

450.    Defendants had the authority or responsibility to make such claims, statements and representations, exercised that authority and, as a direct or indirect result, the false statement was made, resulting in a claim for an item when Defendants knew or had reason to know that they were not entitled under applicable statutes, regulations, rules, or policies to Medicaid payment or for the amount of payment requested or claimed.

451.    As a result of the Defendants' violations of 42 U.S.C. § 1396r-8, Nassau County paid substantially higher prices for reimbursement of the Covered Drugs than it should have, and the Medicaid Program was deprived of its appropriate rebate as a result of Defendants' inaccurate reporting of best price.

## COUNT III

### VIOLATION OF N.Y.  SOCIAL SERVICES LAW § 367-a(7)(d)
### FAILURE TO REPORT BEST PRICE

452.    The County of Nassau realleges and incorporates the preceding paragraphs as if fully set forth herein.

453.    Each of the Defendant pharmaceutical companies is a manufacturer of a Covered Drug.

454.    Pursuant to 42 U.S.C. § 1396r-8, each of the Defendant pharmaceutical companies entered into a rebate agreement with the Medicaid Program under which the

Medicaid Program would receive rebates determined in part by "best price," which is defined as "the lowest price available from the manufacturer."

455.    42 U.S.C. § 1396r-8 is incorporated by New York State's Medicaid Statute.  *See* New York Social Services Law § 367-a(7)(d).  New York law expressly provides that each of the Defendants who have executed a rebate agreement are to be paid pursuant to that agreement.

456.    After execution of its agreement, each Defendant was required to report its "best price" in each quarter to the Medicaid Program.

457.    In keeping with their artificial price inflation scheme, each Defendant did not report the actual "best price" or "average manufacturer's price," but instead (i) reported higher prices and (ii) excluded discounts, free samples and other inducements offered to physicians that resulted in lower prices than the prices reported to the Medicaid Program.

458.    Each of the Defendants thereby violated N.Y. Soc. Serv. Law § 367-a(7)(d) in that they submitted untrue, incomplete, inaccurate, and misleading information used to determine the amount of reimbursement under the Medicaid program.  More specifically, each Defendant made claims or caused claims to be made which had the effect of the Medicaid Program not receiving rebates based upon accurately reported "best price" information, and the Defendants knew that the claims were rendered false, in whole or in part, by two methods: falsely reporting the prices paid by commercial entities for its products, and not accounting for the discounts and other inducements offered to commercial entities.  Further, acting with the intent to defraud and in order to obtain authorization to qualify as a provider and to provide specific goods, each Defendant made or caused to be made false statements while promising that it would comply with the mandates of N.Y. Soc. Serv. Law § 367-a(7)(d).

459.    Defendants knew, or by virtue of their position, authority or responsibility should have known, of the falsity of their claims, statements or representations.

460.    Defendants had the authority or responsibility to make such claims, statements and representations, exercised that authority and, as a direct or indirect result, the false statement was made, resulting in a claim for an item when Defendants knew or had reason to know that they were not entitled under applicable statutes, regulations, rules, or policies to Medicaid payment or for the amount of payment requested or claimed.

461.    As a result of the Defendants' violations of 42 U.S.C. § 1396r-8 and New York Social Services Law § 367 *et seq.*, Nassau County paid substantially higher prices for reimbursement of the Covered Drugs than it should have, and the Medicaid Program was deprived of its appropriate rebate as a result of Defendants' inaccurate reporting of best price.

### COUNT IV

### VIOLATION OF NEW YORK DEPARTMENT OF HEALTH REGULATIONS 18 N.Y.C.RR § 515.2(b,)(4) and (5)

462.    The County of Nassau realleges and incorporates the preceding paragraphs as if fully set forth herein.

463.    The Regulations of the New York Department of Health 18 N.Y.C.R.R. § 515.2(b)(4) provide that "[c]onversion of a medical assurance payment, or any part of such payment, to a use or benefit other than for the use and benefit intended by the medical assistance program," is an "unacceptable practice" within the New York Medicaid Program.

464.    The Regulations of the New York Department of Health, 18 N.Y.C.R.R. § 515.2(b)(5) provide that, "[u]nless the discount or reduction in price is disclosed to the client and the department and reflected in a claim," an "Unacceptable Practice" within the New York Medicaid Program is committed by "offering or paying either directly or indirectly any payment

(including any kickback, bribe, . . . rebate or discount), whether in cash or in kind, in return for purchasing, . . . ordering or recommending any medical care, services or supplies for which payment is claimed under the program."

465.    By engaging in the acts and practices described above, Defendants have engaged in and continue to engage in Unacceptable Practices within the New York Medicaid Program as defined at 18 N.Y.C.R.R § 515.2(b)(4) and (5).

## COUNT V

## VIOLATION OF NEW YORK SOCIAL SERVICES LAW § 145-b
## OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS

466.    The County of Nassau realleges and incorporates the preceding paragraphs as if fully set forth herein.

467.    New York Social Services Law § 145-b provides that "[i]t shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for . . . supplies furnished . . . pursuant to" the Medicaid Program.

468.    By engaging in the acts and practices described above, Defendants have knowingly made false statements and representations or engaged in a fraudulent scheme on behalf of themselves and others, resulting in the overpayment of public funds for Defendants' prescription drugs covered by the New York Medicaid Program in violation of Social Services Law § 145-b.

469.    Specifically, Defendants conduct violated NY Soc. Serv. § 145-b because Defendants, and each of them, by means of their false statements and representations and deliberate concealment of material facts attempted to obtain and did in fact obtain payment from

public funds for supplies furnished pursuant to this chapter.  Defendants made false "statements or representations" under § 145-b(1)(b) because they gave "a [false] report of data which serves as the basis for a claim or a rate of payment."

470.    Defendants have "attempted to obtain and did obtain payment from public funds for supplies" under § 145-b(1)(c) because they obtained a portion of public funds from which payment was made, and because "public funds [we]re used to reimburse . . . an entity from which payment was obtained."

471.    In the alternative, to the extent the court finds Defendants did not obtain payment by virtue of the indirect manner in which they received the public funds that their false statements procure, Defendants remain liable because they made a false statement or representation "on behalf of others . . . to obtain payment from public funds"

## COUNT VI

## BREACH OF CONTRACT

472.    The County of Nassau realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

473.    As required by 42 U.S.C. § 1396r-8, each Defendant entered into a Rebate Agreement with the Secretary of Health and Human Services ("HHS").  In that agreement, each agreed to comply with Section 1396r-8, and hence:

(a)    Agreed to report its best price, inclusive of cash discounts, free goods contingent upon any purchase requirements, volume discounts and rebates, in any quarter and to make rebates where necessary;

(b)    Agreed that it would determine its best price based upon its average manufacturer's price, calculated as "net Sales divided by numbers of units sold, excluding free goods (i.e., drugs or any other items given away, but not contingent on any purchase

requirements)" and that it would include in that calculation cash discounts and all other price reductions "which reduce the actual price paid;" and

(c)     Agreed that the best price would not take into account nominal prices, defined as prices that are less than 10 percent of the average manufacturer's price in that quarter, so long as the sale of product at a nominal price was not contingent on any other sale.

474.    New York Social Services Law § 367-a(7)(d) expressly states that any defendant was has entered into such rebate agreement with HHS, is to be reimbursed pursuant to 42 U.S.C. § 1396r-8.

475.    Nassau County, like any Medicaid payor, was an intended third-party beneficiary of these rebate agreements.

476.    After execution of the rebate agreements, Defendants reported their average manufacturer's price in each quarter to the Medicaid Program.

477.    In keeping with their artificial inflation of the AWPs, Defendants did not report the actual "best price," for, but not limited to, the drugs identified herein but a significantly greater price that, among other things, excluded discounts and other inducements offered to physicians.

478.    Defendants have therefore breached their rebate agreements and caused massive foreseeable damage to the County of Nassau.

## COUNT VII

### UNFAIR TRADE PRACTICES
### (Violations of N.Y. Genl. Bus. Law & 349 *et seq.*)

479.    The County of Nassau realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

480.    As set forth in particularity herein and in Exhibit A, Defendants herein have intentionally and wrongfully inflated the reporting of Average Wholesale Prices for the Covered Drugs.

481.    As alleged herein, this AWP scheme was designed to increase Defendants' sales for their drugs, control the market and decrease consumer choice.

482.    Defendants' intentional wrongful acts caused direct damage to tax paying consumers and Nassau County by wrongfully increasing their Medicaid burden.

483.    The Defendants' intentional misconduct has damaged the public and Nassau County taxpayers.

484.    New York's Medicaid Statute expressly states, *inter alia*, that "[m]edical assistance for needy persons is hereby declared to be a matter of public concern and a necessity in promoting the public health and welfare.".  *See* Social Services Law § 363.  Defendants' deceptive acts, as described herein, are in direct contravention of this statutorily articulated public policy.  Defendants' practices were consumer-oriented and continue to have a broad impact on consumers and the taxpaying public.

485.    The County is required by State Law to balance its budget.  Every dollar spent on Medicaid, is a dollar that cannot be spent elsewhere.

486.    Defendants' conduct as alleged in this Complaint constitutes deceptive acts or practices in that:

(a)    Defendants have failed to disclose material facts in the conduct of trade or commerce in that they have not disclosed that the AWP does not reflect the true average wholesale price of the drug products they sell, and that the "best prices" they report are not the

actual "best prices" offered to other commercial entities, but are instead inflated in order to drive up the prices paid for medications by Nassau County;

(b)    Defendants have made false or misleading statements of facts concerning the price of goods in that they have lied about the true AWP and "best prices" paid for their medications in order to drive up the prices paid by Nassau County;

(c)    Defendants have knowingly made false representations in a transaction by representing that the AWP is an accurate reflection of the average wholesale price paid for their drugs, and that their reported "best prices" are in fact the "best prices" offered to a commercial entity for their drugs; and

(d)    Defendants have violated state and federal statutes and regulations relating to the sale or lease of goods including, without limitation, the "best price" requirement of the Medicaid statute, the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, the Racketeer Influenced and Corrupt Organizations Act (RICO), particularly 18 U.S.C. § 1962(c) and (d), and New York's Social Services Law, § 367-a, and § 145-b and 18 N.Y.C.R.R. 515.2(b)(4) and (5).  These statutory and regulatory violations serve, at minimum, as predicates for the violation of New York's Gen. Bus. Law § 349.

487.    The wrongful conduct alleged in this Complaint occurs and continues to occur in the ordinary course of Defendants' business and has caused great harm to Nassau County and the consumers who live there.  Nassau County has suffered actual damages because it has had to overpay millions of dollars in Medicaid pharmacy costs as a direct and proximate result of Defendants' deceptive practices.

## COUNT VIII

## FRAUD

488.    The County of Nassau realleges and incorporates the preceding paragraphs as if fully set forth herein.

489.    As detailed in this Complaint and Exhibit A, Defendants have engaged in actual fraudulent reporting of AWPs and have acted intentionally and with actual malice.

490.    Defendants have made false representations with knowledge of their falsity, have concealed material facts with the purpose of overcharging Nassau County and Nassau County rightfully has relied upon such misrepresentations.  Direct, proximate and foreseeable injury has resulted as a result of such reliance.

491.    Defendants also had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Nassau County participants, and deliberately proceeded to act in conscious or intentional disregard of, or with indifference to, the high probability of this injury.

492.    New York's Social Service Law § 366-b expressly provides that "any person who, with intent to defraud, presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise, or who knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise, or knowingly submits false information for the purpose of obtaining authorization of furnishing services or merchandise under this title, shall be guilty of a class A misdemeanor . . . ".

493.    Defendants' knowing and intentional submission of inflated AWPs to publishers for the express purpose of effectuating the AWP scheme alleged herein constitutes an intentional fraud pursuant to common law and New York Social Services Law § 366-b.

## COUNT IX

## UNJUST ENRICHMENT

494.    The County of Nassau realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.  To the extent the court determines there is no contractual relationship between Nassau County and the Defendants, as a direct and proximate result of the unlawful conduct described above, Defendants have been and will continue to be unjustly enriched.

495.    Defendants have benefited from their unlawful acts through the increased sale of Covered Drugs with the greatest spread.  It would be inequitable for Defendants to retain any of their ill-gotten gains earned as a result of the scheme alleged herein, which gains would not exist but for the overpayments made by Nassau County.

496.    Defendants have also benefited from their unlawful acts in a number of other ways.  For example, Defendants have been "saved from expense" when they fraudulently underpaid Best Prices rebates to the State of New York and consequently Nassau County.  It would be inequitable for Defendants to retain these and other ill-gotten gains earned as a result of their failure to report best prices.

497.    Nassau County is entitled to an accounting and the establishment of a constructive trust consisting of all overcharges paid by Nassau County for Covered Drugs.

## X.    PRAYER FOR RELIEF

WHEREFORE, plaintiff the County of Nassau prays for judgment against all Defendants as follows:

498.    Awarding plaintiff actual, statutory, treble and all other available damages for Defendants' violation of 18 U.S.C. § 1962(c);

499.    Adjudging and decreeing that Defendants have engaged in the intentional fraudulent conduct alleged herein in violation of N.Y. Soc. Serv. Law §§ 367-a(7)(d), 366-b and 42 U.S.C. § 1396r-8 and 18 N.Y.C.R.R. § 515.2(b)(4) and (5);

500.    Awarding Nassau County actual, statutory, treble and all other available money damages, including interest, for Defendants' violation of N.Y. Gen. Bus. Law § 349 in an amount to be determined at trial;

501.    Awarding Nassau County actual, statutory, treble and all other available money damages, including interest, for Defendants' violation of N.Y. Soc. Serv. Law § 145-b in an amount to be determined at trial;

502.    Awarding Nassau County actual and compensatory damages in an amount to be determined at trial, with interest, for Defendants' breach of contract;

503.    Awarding Nassau County actual and punitive damages in an amount to be determined at trial, with interest, for Defendants' intentional fraud;

504.    Ordering Defendants each to prepare an accounting to determine the amounts Defendants have illegally profited at Nassau County's expense, and disgorgement to Nassau County of such monies, with interest;

505.    Imposing a constructive trust and ordering Defendants to pay restitution to Nassau County in the amount Nassau County has been overcharged for Covered Drugs, with interest;

506.    Awarding plaintiff the costs of the suit, including costs, reasonable attorneys' and experts' fees pursuant to 18 U.S.C. § 1964(c), N.Y. Gen. Bus. Law § 349 and N.Y. Soc. Serv. Law § 145-b;

507.    Such other further and different relief as the Court deems just and proper.

Dated: March 17, 2005
        New York, New York

**LORNA B. GOODMAN,**
**Nassau County Attorney, by**

**MOULTON & GANS, P.C.**

/s/ Nancy Freeman Gans

By:    _____
        Nancy Freeman Gans, BBO # 184540

        33 Broad Street, Suite 1100
        Boston, Massachusetts 02109-4216
        Telephone: 617-369-7979
        Facsimile: 617-369-7980

**MILBERG WEISS BERSHAD**
**    & SCHULMAN LLP**

        Melvyn I. Weiss
        Michael Buchman
        One Pennsylvania Plaza
        New York, New York 10119-0165
        Telephone: (212) 594-5300
        Facsimile:  (212) 868-1229

        *Special Counsel for the*
        *County of Nassau*

## CERTIFICATE OF SERVICE

I, Michael Buchman, hereby certify that a true copy of the within document will be served upon the attorneys of record for each party on or about March 17, 2005 by service upon the registered agents.

/s/ Michael M. Buchman
_____

Michael M. Buchman

Exhibit A
Representative Drugs and Estimated Spreads

| Manufacturer | Drug | Reported 2004 Average Wholesale Price | Reported 2004 AWP - 12% | Duane Reade | Walgreens | CVS | Rite Aid | Pathmark | Average Retail Price | Estimated True Wholesale Price | Difference Between AWP -12% & Wholesale | Percent Markup from Wholesale | Total Amount Paid in 2004 | Nassau County Share in 2004 | Nassau County Overcharge |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abbot Labs | NORVIR 100 MG SOFTGEL CAP | $10.28 | $9.05 | $12.19 | $10.78 | $11.23 | $10.44 | $10.82 | $11.09 | $8.10 | $0.95 | 11.7% | $546,286.38 | $131,970.91 | $15,471.11 |
| Agouron | VIRACEPT TAB 250MG | $2.52 | $2.22 | $2.53 | $2.68 | $2.67 | $2.86 | $2.43 | $2.63 | $1.92 | $0.30 | 15.5% | $421,096.32 | $100,992.74 | $15,606.03 |
| Amgen | EPOGEN VIAL 10,000 U/ML | $134.59 | $118.44 | $161.00 | $139.99 | $148.99 | $150.00 | $141.69 | $148.33 | $108.28 | $10.16 | 9.4% | $11,110.82 | $2,715.74 | $254.69 |
| Astrazeneca | PRILOSEC CAP 20MG | $4.61 | $4.06 | $4.67 | $4.48 | $4.73 | $4.83 | $4.81 | $4.70 | $3.43 | $0.63 | 18.3% | $19,974.86 | $4,728.08 | $863.68 |
| Aventis | ALLEGRA 180MG TABLET | $2.44 | $2.15 | $2.60 | $2.86 | $2.81 | $2.98 | $2.77 | $2.80 | $2.05 | $0.10 | 5.0% | $62,220.84 | $11,716.62 | $582.06 |
| Barr | WARFARIN SODIUM TAB 5MG | $0.64 | $0.56 | $0.60 | $0.62 | $0.59 | $0.61 | $0.48 | $0.58 | $0.42 | $0.14 | 32.4% | $33,194.00 | $8,097.00 | $2,623.35 |
| Baxter | GAMMAGARD | $1,009.30 | $888.18 | | $699.99 | $880.00 | $1,270.99 | | $950.33 | $693.74 | $194.45 | 28.0% | $13,587.63 | $2,899.69 | $812.74 |
| Bayer | CIPRO TAB 500MG | $5.93 | $5.22 | $6.40 | $6.27 | $6.40 | $6.80 | $6.40 | $6.45 | $4.71 | $0.50 | 10.7% | $30,426.82 | $6,578.95 | $703.57 |
| Berlex | BETASERON VIAL 0.3MG | $93.52 | $82.30 | $116.23 | $97.93 | $92.80 | $97.67 | $97.47 | $100.42 | $73.31 | $8.99 | 12.3% | $123,806.56 | $28,360.06 | $3,478.51 |
| Biogen | AVONEX ADMIN PACK 30MCG VL | $319.78 | $281.41 | $372.25 | $332.50 | $332.75 | $338.75 | $313.00 | $337.85 | $246.63 | $34.78 | 14.1% | $544,387.00 | $132,858.00 | $18,733.52 |
| Boehringer | FLOMAX 0.4MG CAPSULE SA | $1.99 | $1.75 | $2.14 | $2.29 | $2.27 | $2.52 | $2.13 | $2.27 | $1.66 | $0.09 | 5.7% | $324,969.15 | $72,652.99 | $4,125.67 |
| Bristol-Meyers Squibb | PLAVIX TAB 75MG | $4.37 | $3.84 | $4.75 | $4.58 | $4.70 | $4.77 | $4.81 | $4.72 | $3.45 | $0.40 | 11.5% | $1,568,592.00 | $389,294.00 | $44,897.38 |
| Chiron | TOBI 60MG/ML SOLUTION | $54.45 | $47.92 | | $54.46 | $61.96 | $59.07 | $60.79 | $59.07 | $43.12 | $4.79 | 11.1% | $134,012.26 | $25,068.22 | $2,786.71 |
| Eli Lilly | ZYPREXA 5MG | $6.56 | $5.78 | $7.03 | $7.55 | $6.83 | $7.43 | $7.38 | $7.25 | $5.29 | $0.49 | 9.2% | $959,467.56 | $187,478.02 | $17,232.94 |
| Forest | LEXAPRO 10 MG TABLET | $2.22 | $1.95 | $2.49 | | $2.53 | $2.62 | $2.49 | $2.53 | $1.85 | $0.10 | 5.7% | $310,473 | $66,103 | $3,749.93 |
| Fujisawa | PROGRAF CAP 1MG | $3.82 | $3.36 | $4.65 | $4.19 | $4.33 | $4.39 | $4.31 | $4.37 | $3.19 | $0.17 | 5.3% | $229,584.21 | $57,304.29 | $3,017.19 |
| Genentech | PULMOZYME SOL 1 MG/ML | $20.15 | $17.73 | $19.73 | $21.05 | | $22.07 | $22.40 | $21.31 | $15.56 | $2.18 | 14.0% | $155,374.00 | $36,725.00 | $5,137.56 |
| Genzyme | RENAGEL TAB 800MG | $1.42 | $1.25 | | $1.61 | $1.63 | $1.57 | $1.60 | $1.17 | $0.08 | 6.9% | $438,772.84 | $114,722.63 | $7,868.18 |
| GlaxoSmithKline | FLOVENT INHALER 110MCG | $6.29 | $5.54 | $7.41 | $8.45 | $6.74 | $5.31 | $7.73 | $7.13 | $5.20 | $0.33 | 6.4% | $123,944.98 | $26,655.70 | $1,705.98 |
| Immunex (Amgen) | ENBREL 25MG KIT | $164.50 | $144.76 | $166.25 | $181.25 | $177.50 | $185.25 | $158.50 | $173.75 | $126.84 | $17.92 | 14.1% | $486,482.66 | $116,491.58 | $16,460.59 |
| Ivax | CLOZAPINE 100MG TABLET | $3.33 | $2.93 | $6.03 | $3.07 | $2.98 | $3.53 | $2.78 | $3.68 | $2.68 | $0.25 | 9.1% | $596,506.10 | $82,563.04 | $7,549.63 |
| Johnson & Johnson Defendants | DURAGESIC 100 MCG/HR PATCH | $56.97 | $50.13 | $68.99 | $60.00 | $61.80 | $51.00 | $62.26 | $60.81 | $44.39 | $5.74 | 12.9% | $593,187.83 | $145,439.86 | $18,814.66 |
| Ortho Mcneil And Ortho Biotech | PROCRIT 40,000 UNITS/ML VIA | $534.24 | $470.13 | 685.25 | 545.75 | $605.00 | $632.75 | $585.75 | $610.90 | $445.96 | $24.17 | 5.42% | $1,273,454.22 | $311,240.74 | $16,871.57 |
| Key | K-DUR TAB SA 20MEQ | $0.71 | $0.62 | $0.71 | $0.62 | $0.83 | $0.83 | $0.76 | $0.75 | $0.55 | $0.07 | 13.3% | $359.36 | $84.83 | $11.32 |
| Medimmune | SYNAGIS VIAL 100MG | $1,478.82 | $1,301.36 | $1,595.89 | $1,282.39 | | $1,530.00 | $1,266.49 | $1,418.69 | $1,035.65 | $265.72 | 25.7% | $724,288.21 | $156,489.51 | $40,150.59 |
| Merck | ZOCOR TAB 20MG | $4.60 | $4.04 | $5.00 | $4.94 | $4.97 | $5.17 | $4.66 | $4.95 | $3.61 | $0.43 | 12.0% | $807,857.00 | $195,933.00 | $23,545.04 |
| Mylan | NIFEDIPINE ER TAB SA 90MG | $2.56 | $2.25 | $2.60 | $2.81 | | $2.58 | $3.15 | $2.78 | $2.03 | $0.22 | 10.9% | $125,419.11 | $29,826.91 | $3,244.31 |
| Novartis | LAMISIL 250 MG TABLET | $9.43 | $8.30 | $9.71 | $9.60 | $11.20 | $10.98 | $11.34 | $10.57 | $7.71 | $0.59 | 7.6% | $202,723 | $50,546.48 | $3,835.10 |

Exhibit A
Representative Drugs and Estimated Spreads

| Manufacturer | Drug | Reported 2004 Average Wholesale Price | Reported 2004 AWP -12% | Duane Reade | Walgreens | CVS | Rite Aid | Pathmark | Average Retail Price | Estimated True Wholesale Price | Difference Between AWP -12% & Wholesale | Percent Markup from Wholesale | Total Amount Paid in 2004 | Nassau County Share in 2004 | Nassau County Overcharge |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| The Pfizer Defendants | LIPITOR TAB 10MG | $2.60 | $2.29 | $2.84 | $2.91 | $2.90 | $2.83 | $2.86 | $2.87 | $2.09 | $0.20 | 9.5% | $1,006,630.33 | $241,477.93 | $22,908.72 |
| | LIPITOR TAB 20MG | $3.60 | $3.17 | $4.00 | $3.99 | $3.97 | $4.07 | $3.89 | $3.98 | $2.91 | $0.26 | 9.0% | $951,520.68 | $222,799.00 | $19,986.61 |
| | NEURONTIN TAB 300MG | $1.55 | $1.37 | $1.60 | $1.59 | $1.62 | $1.58 | $1.71 | $1.62 | $1.18 | $0.18 | 15.6% | $626,382.85 | $136,045.14 | $21,160.16 |
| | CELEBREX CAP 200MG | $2.99 | $2.63 | $3.40 | $3.48 | $3.47 | $3.40 | $3.35 | $3.42 | $2.50 | $0.13 | 5.4% | $152,508.00 | $38,777.00 | $2,096.28 |
| Pharmacia | DETROL LA 4 MG CAPSULE SA | $3.18 | $2.79 | $3.41 | $3.39 | $3.61 | $4.00 | $3.60 | $3.60 | $2.63 | $0.17 | 6.3% | $145,014 | $32,659 | $2,054.57 |
| Purdue | OXYCONTIN 80MG TABLET SA | $9.82 | $8.64 | $14.46 | $10.62 | | $11.20 | $10.99 | $11.82 | $8.63 | $0.01 | 0.2% | $231,730.28 | $56,186.38 | $92.98 |
| Reliant Pharm | AXID CAP 150MG | $3.15 | $2.77 | $3.44 | $3.19 | $3.41 | $3.63 | $3.54 | $3.44 | $2.51 | $0.26 | 10.2% | $1,306.02 | $309.63 | $31.70 |
| Sanofi-Synthelab INC | AMBIEN 10MG TABLET | $3.07 | $2.70 | $3.21 | $3.32 | $3.47 | $3.46 | $3.87 | $3.47 | $2.53 | $0.17 | 6.8% | $874,030.00 | $210,129.00 | $14,236.27 |
| Schering-Plough | CLARINEX 5MG TABLET | $2.46 | $2.16 | $2.46 | $2.45 | $2.67 | $2.65 | $2.68 | $2.58 | $1.88 | $0.28 | 14.9% | $27,827.00 | $4,960.00 | $736.66 |
| Serono | SEROSTIM 6MG VIAL | $252.00 | $221.76 | $276.86 | $250.71 | $257.14 | $257.14 | $242.71 | $256.91 | $187.55 | $34.21 | 18.2% | $148,766.20 | $36,275 | $6,617.37 |
| Takeda | ACTOS TAB 30MG | $5.57 | $4.90 | $6.48 | $6.28 | $6.07 | $6.48 | $6.37 | $6.34 | $4.62 | $0.28 | 6.0% | $255,293.00 | $61,377.00 | $3,708.15 |
| Tap | LUPRON DEPOT 22.5 MG 3MO KI | $2,055.64 | $1,808.96 | $1,805.99 | $1,930.19 | $2,177 | $2,119.00 | $1,980 | $2,002.44 | $1,461.78 | $347.18 | 23.8% | $54,391.08 | $14,761.15 | $3,506 |
| Warrick | ISOSORBIDE MN 30MG TAB SA | $1.12 | $0.99 | $1.36 | $0.95 | $1.02 | $1.22 | $0.59 | $1.03 | $0.75 | $0.24 | 31.3% | $69,472.61 | $17,346.79 | $5,435.84 |
| Wyeth | PROTONIX TAB 40MG | $3.67 | $3.23 | $4.36 | $4.31 | $3.97 | $4.27 | $4.17 | $4.22 | $3.08 | $0.15 | 5.0% | $1,363,100.37 | $317,718.94 | $15,944.03 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| Abbott Laboratories | ACETYLCYSTEINE 10% VIAL | $0 | $0 | $0 | $0 | 0 | 0 |
| | ACETYLCYSTEINE 20% VIAL | $10 | $5 | $2 | $2 | 30 | 1 |
| | ACTIQ 200MCG LOZENGE | $660 | $350 | $155 | $155 | 90 | 1 |
| | A-HYDROCORT 100 MG UNIVIAL | $36 | $18 | $9 | $9 | 5 | 5 |
| | A-METHAPRED 1,000 MG UNIVIA | $291 | $149 | $71 | $71 | 19 | 5 |
| | BACTERIOSTATIC SALINE VIAL | $34 | $18 | $8 | $8 | 500 | 1 |
| | BACTERIOSTATIC SALINE VIAL | $14 | $9 | $5 | $0 | 61 | 3 |
| | BACTERIOSTATIC WATER VIAL | $4 | $2 | $1 | $1 | 30 | 1 |
| | BIAXIN 125 MG/5 ML SUSPENSI | $4,689 | $2,429 | $1,150 | $1,110 | 11,950 | 113 |
| | BIAXIN 125 MG/5 ML SUSPENSI | $525 | $270 | $128 | $128 | 1,200 | 15 |
| | BIAXIN 250 MG TABLET | $18,730 | $10,420 | $5,300 | $3,010 | 4,387 | 154 |
| | BIAXIN 250 MG/5 ML SUSPENSI | $15,670 | $8,255 | $4,163 | $3,252 | 22,730 | 187 |
| | BIAXIN 250 MG/5 ML SUSPENSI | $1,696 | $892 | $432 | $372 | 2,150 | 25 |
| | BIAXIN 500 MG TABLET | $113,315 | $56,742 | $29,323 | $27,250 | 26,773 | 937 |
| | BIAXIN XL 500 MG TABLET SA | $3,368 | $1,712 | $888 | $767 | 766 | 49 |
| | BIAXIN XL 500 MG TABLET SA | $47,304 | $23,756 | $12,435 | $11,113 | 10,643 | 595 |
| | CALCIJEX 1 MCG/ML AMPUL | $340 | $180 | $80 | $80 | 25 | 1 |
| | CIMETIDINE 150 MG/ML VIAL | $5 | $3 | $1 | $1 | 2 | 1 |
| | CIMETIDINE 150 MG/ML VIAL | $9 | $0 | $5 | $5 | 4 | 2 |
| | COLCHICINE 0.6 MG TABLET | $1,088 | $558 | $265 | $265 | 3,390 | 56 |
| | CYLERT 18.75 MG TABLET | $272 | $138 | $67 | $67 | 240 | 8 |
| | DEFEROXAMINE 500 MG VIAL | $2,425 | $1,212 | $606 | $606 | 160 | 2 |
| | DEPAKENE 250 MG CAPSULE | $7,381 | $3,778 | $2,110 | $1,494 | 3,790 | 25 |
| | DEPAKENE 250 MG/5 ML SYRUP | $19,328 | $9,998 | $5,304 | $4,026 | 48,230 | 62 |
| | DEPAKOTE 125 MG SPRINKLE CA | $180,457 | $90,843 | $64,050 | $25,565 | 341,230 | 1,520 |
| | DEPAKOTE 125 MG TABLET EC | $25,066 | $12,264 | $8,043 | $4,759 | 42,600 | 560 |
| | DEPAKOTE 250 MG TABLET EC | $333,373 | $170,787 | $104,682 | $57,904 | 307,674 | 3,369 |
| | DEPAKOTE 250 MG TABLET EC | $134,767 | $68,775 | $48,652 | $17,340 | 122,192 | 1,373 |
| | DEPAKOTE 500 MG TABLET EC | $722,231 | $372,340 | $232,664 | $117,228 | 362,420 | 4,613 |
| | DEPAKOTE 500 MG TABLET EC | $296,911 | $150,793 | $111,760 | $34,357 | 147,727 | 1,759 |
| | DEPAKOTE ER 250 MG TAB SA | $65,751 | $33,358 | $22,081 | $10,312 | 57,894 | 940 |
| | DEPAKOTE ER 500 MG TAB SA | $517,677 | $263,821 | $166,664 | $87,192 | 269,066 | 3,880 |
| | DEPAKOTE ER 500 MG TAB SA | $5,812 | $3,005 | $1,979 | $828 | 2,912 | 58 |
| | DEXTROSE 5%/WATER IV SOLN. | $53 | $28 | $13 | $13 | 3,200 | 2 |
| | DEXTROSE 5%/WATER IV SOLN. | $32 | $16 | $8 | $8 | 700 | 2 |
| | DEXTROSE 5%/WATER IV SOLN. | $5 | $3 | $1 | $1 | 250 | 1 |
| | DEXTROSE 5%/WATER IV SOLN. | $0 | $0 | $0 | $0 | 0 | 0 |
| | DEXTROSE 5%/WATER IV SOLN. | $22 | $0 | $11 | $11 | 850 | 2 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | DEXTROSE 5%-1/2NS IV SOLN. | $69 | $35 | $17 | $17 | 25,000 | 4 |
| | DEXTROSE 5%-1/4NS IV SOLN. | $31 | $16 | $8 | $8 | 15,000 | 2 |
| | DIAZEPAM 5 MG/ML VIAL | $12 | $6 | $6 | $0 | 20 | 2 |
| | DILAUDID 2 MG TABLET | $298 | $154 | $72 | $72 | 630 | 5 |
| | DILAUDID 2 MG/ML AMPUL | $27 | $13 | $7 | $7 | 20 | 1 |
| | DILAUDID 4 MG TABLET | $3,139 | $1,608 | $766 | $766 | 4,260 | 23 |
| | DILAUDID 4 MG TABLET | $1,637 | $819 | $409 | $409 | 2,320 | 7 |
| | DILAUDID 4 MG/ML AMPUL | $3,439 | $1,752 | $844 | $844 | 2,210 | 19 |
| | E.E.S. 200 MG/5 ML SUSPENSI | $84 | $43 | $23 | $18 | 870 | 14 |
| | E.E.S. 400 FILMTAB | $53 | $27 | $15 | $11 | 168 | 6 |
| | EPINEPHRINE 1 MG/ML AMPUL | $60 | $30 | $16 | $14 | 51 | 15 |
| | ERYDERM 2% TOP SOLUTION | $0 | $0 | $0 | $0 | 0 | 0 |
| | ERYPED 100 MG/2.5 ML DROPS | $71 | $37 | $19 | $15 | 400 | 6 |
| | ERYPED 400 MG/5 ML GRANULES | $75 | $39 | $18 | $18 | 500 | 4 |
| | ERY-TAB 250 MG TABLET EC | $120 | $58 | $34 | $29 | 389 | 12 |
| | ERY-TAB 250 MG TABLET EC | $32 | $16 | $8 | $8 | 108 | 4 |
| | ERY-TAB 333 MG TABLET EC | $666 | $331 | $185 | $151 | 1,703 | 47 |
| | ERY-TAB 333 MG TABLET EC | $11 | $6 | $3 | $3 | 30 | 1 |
| | ERY-TAB 500 MG TABLET EC | $84 | $44 | $22 | $18 | 167 | 7 |
| | ERYTHROCIN 250 MG FILMTAB | $358 | $184 | $89 | $85 | 1,801 | 39 |
| | ERYTHROCIN 250 MG FILMTAB | $20 | $10 | $6 | $4 | 88 | 3 |
| | ERYTHROCIN 500 MG FILMTAB | $283 | $146 | $71 | $66 | 824 | 34 |
| | ERYTHROMYCIN 200 MG/5 ML SU | $1,466 | $762 | $401 | $303 | 22,536 | 165 |
| | ERYTHROMYCIN 250 MG CAP EC | $673 | $348 | $167 | $158 | 2,116 | 66 |
| | ERYTHROMYCIN 250 MG CAP EC | $12 | $6 | $3 | $3 | 40 | 1 |
| | ERYTHROMYCIN 250 MG FILMTAB | $869 | $446 | $216 | $207 | 4,096 | 119 |
| | ERYTHROMYCIN 250 MG FILMTAB | $41 | $21 | $12 | $8 | 157 | 6 |
| | ERYTHROMYCIN 400 MG/5 ML SU | $312 | $153 | $93 | $67 | 3,075 | 26 |
| | ERYTHROMYCIN 500 MG FILMTAB | $1,165 | $584 | $329 | $251 | 3,123 | 153 |
| | ERYTHROMYCIN ES 400 MG TAB | $246 | $129 | $61 | $56 | 933 | 22 |
| | ERYTHROMYCIN/SULFISOX SUSP | $213 | $111 | $51 | $51 | 1,500 | 15 |
| | ERYTHROMYCIN/SULFISOX SUSP | $331 | $176 | $85 | $70 | 2,700 | 14 |
| | ERYTHROMYCIN/SULFISOX SUSP | $156 | $88 | $43 | $25 | 1,400 | 7 |
| | FUROSEMIDE 10 MG/ML SYRINGE | $54 | $27 | $13 | $13 | 40 | 1 |
| | GENGRAF 100 MG CAPSULE | $11,164 | $5,287 | $2,939 | $2,939 | 5,550 | 58 |
| | GENGRAF 100 MG/ML SOLUTION | $1,362 | $689 | $336 | $336 | 250 | 5 |
| | GENGRAF 25 MG CAPSULE | $5,741 | $2,834 | $1,453 | $1,453 | 8,880 | 58 |
| | GENTAMICIN 40 MG/ML VIAL | $317 | $165 | $76 | $76 | 986 | 22 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | HEPARIN LOCK FLUSH 100 UNIT | $117 | $62 | $28 | $28 | 270 | 9 |
| | HEPARIN NA 5,000 UNIT/ML SY | $620 | $315 | $152 | $152 | 620 | 12 |
| | HEPARIN NA 5,000 UNIT/ML SY | $67 | $36 | $16 | $16 | 60 | 1 |
| | HUMIRA 40 MG/0.8 ML SYRINGE | $233,630 | $117,886 | $59,749 | $55,994 | 380 | 190 |
| | HYDROMORPHONE 4 MG/ML SYRIN | $132 | $66 | $33 | $33 | 130 | 2 |
| | HYTRIN 10 MG CAPSULE | $722 | $371 | $175 | $175 | 360 | 12 |
| | KALETRA ORAL SOLUTION | $34,297 | $17,588 | $8,354 | $8,354 | 17,670 | 68 |
| | KALETRA SOFTGEL | $616,399 | $313,061 | $153,479 | $149,859 | 178,762 | 985 |
| | KETOROLAC 30 MG/ML CARPUJEC | $37 | $19 | $9 | $9 | 6 | 3 |
| | KETOROLAC 30 MG/ML VIAL | $7 | $4 | $2 | $2 | 2 | 1 |
| | K-LOR 20 MEQ PACKET | $522 | $266 | $128 | $128 | 360 | 3 |
| | K-TAB 10 MEQ TABLET SA | $460 | $238 | $111 | $111 | 930 | 6 |
| | K-TAB 10 MEQ TABLET SA | $651 | $288 | $278 | $85 | 1,252 | 23 |
| | K-TAB 10 MEQ TABLET SA | $180 | $93 | $86 | $0 | 360 | 6 |
| | LIDOCAINE 2%/EPI 1:100,000 | $5 | $3 | $1 | $1 | 20 | 1 |
| | LIDOCAINE HCL 1% VIAL | $15 | $7 | $4 | $4 | 80 | 3 |
| | LIDOCAINE HCL 1% VIAL | $1 | $0 | $0 | $0 | 30 | 1 |
| | LORAZEPAM 2 MG/ML VIAL | $39 | $7 | $16 | $16 | 40 | 2 |
| | LORAZEPAM 2 MG/ML VIAL | $71 | $37 | $34 | $0 | 16 | 4 |
| | LORAZEPAM 2 MG/ML VIAL | $28 | $15 | $13 | $0 | 10 | 1 |
| | MAGNESIUM SULFATE 50% VIAL | $9 | $5 | $2 | $2 | 44 | 2 |
| | MANNITOL 25% VIAL | $9 | $5 | $2 | $2 | 150 | 1 |
| | MARCAINE 0.5% VIAL | $371 | $186 | $93 | $93 | 1,800 | 36 |
| | MAVIK 1 MG TABLET | $763 | $374 | $194 | $194 | 720 | 24 |
| | MAVIK 2 MG TABLET | $372 | $190 | $91 | $91 | 360 | 12 |
| | MAVIK 4 MG TABLET | $1,550 | $796 | $473 | $281 | 1,500 | 30 |
| | METRONIDAZOLE 500 MG/100 ML | $143 | $73 | $35 | $35 | 3,680 | 12 |
| | MORPHINE 8 MG/ML SYRINGE | $195 | $103 | $46 | $46 | 300 | 1 |
| | MORPHINE 8 MG/ML SYRINGE | $3,380 | $1,740 | $820 | $820 | 3,450 | 11 |
| | NALOXONE 0.4 MG/ML AMPUL | $15 | $8 | $4 | $4 | 10 | 1 |
| | NORVIR 100 MG SOFTGEL CAP | $546,286 | $278,345 | $135,971 | $131,971 | 58,431 | 980 |
| | NORVIR 80 MG/ML SOLUTION | $25,759 | $13,383 | $6,188 | $6,188 | 3,900 | 19 |
| | OMNICEF 125 MG/5 ML SUSP | $64,263 | $32,938 | $16,517 | $14,808 | 96,080 | 845 |
| | OMNICEF 125 MG/5 ML SUSP | $39,452 | $20,262 | $10,263 | $8,927 | 53,540 | 838 |
| | OMNICEF 250 MG/5 ML SUSPENS | $5,672 | $2,829 | $1,523 | $1,319 | 4,320 | 40 |
| | OMNICEF 250 MG/5 ML SUSPENS | $6,562 | $3,247 | $1,780 | $1,535 | 4,780 | 74 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | OMNICEF 300 MG CAPSULE | $43,434 | $21,673 | $12,261 | $9,500 | 10,195 | 645 |
| | OMNICEF 300 MG OMNI-PAC CAP | $2,635 | $1,342 | $723 | $570 | 608 | 43 |
| | PACLITAXEL 300 MG/50 ML VIA | $56,383 | $28,967 | $13,708 | $13,708 | 1,850 | 37 |
| | PCE 333 MG DISPERTAB | $36 | $19 | $8 | $8 | 20 | 2 |
| | PCE 500 MG DISPERTAB | $135 | $70 | $33 | $33 | 60 | 3 |
| | PEDIAFLOR DROPS | $85 | $44 | $21 | $21 | 250 | 5 |
| | PEGANONE 250 MG TABLET | $1,754 | $909 | $615 | $230 | 2,490 | 15 |
| | POTASSIUM CL 2 MEQ/ML AMPUL | $14 | $7 | $3 | $3 | 120 | 2 |
| | POTASSIUM CL 2 MEQ/ML IV SO | $107 | $56 | $25 | $25 | 2,750 | 11 |
| | SANTYL OINTMENT | $87 | $44 | $21 | $21 | 45 | 3 |
| | SANTYL OINTMENT | $2,341 | $1,182 | $580 | $580 | 1,320 | 41 |
| | SODIUM BICARB 8.4% ABBOJECT | $98 | $51 | $23 | $23 | 1,500 | 5 |
| | SODIUM BICARB 8.4% VIAL | $200 | $103 | $57 | $40 | 8,480 | 22 |
| | SODIUM CHLORIDE 0.9% IRRIG. | $141 | $72 | $36 | $33 | 23,111 | 33 |
| | SODIUM CHLORIDE 0.9% IRRIG. | $0 | $0 | $0 | $0 | 0 | 0 |
| | SODIUM CHLORIDE 0.9% IRRIG. | $325 | $167 | $79 | $79 | 135,000 | 46 |
| | SODIUM CHLORIDE 0.9% IRRIG. | $13 | $7 | $3 | $3 | 2,300 | 3 |
| | SODIUM CHLORIDE 0.9% IRRIG. | $26 | $13 | $6 | $6 | 6,000 | 3 |
| | SODIUM CHLORIDE 0.9% IRRIG. | $14 | $8 | $3 | $3 | 3,000 | 3 |
| | SODIUM CHLORIDE 0.9% SOLN | $0 | $0 | $0 | $0 | 0 | 0 |
| | SODIUM CHLORIDE 0.9% SOLN | $363 | $188 | $87 | $87 | 23,000 | 10 |
| | SODIUM CHLORIDE 0.9% SOLN | $90 | $46 | $22 | $22 | 1,550 | 4 |
| | SODIUM CHLORIDE 0.9% SOLN | $130 | $69 | $30 | $30 | 4,200 | 3 |
| | SODIUM CHLORIDE 0.9% SOLN | $140 | $71 | $35 | $35 | 24,000 | 11 |
| | SODIUM CHLORIDE 0.9% SOLN | $4 | $2 | $1 | $1 | 150 | 2 |
| | SODIUM CHLORIDE 0.9% SOLN | $678 | $345 | $166 | $166 | 50,300 | 22 |
| | SODIUM CHLORIDE 0.9% SYRNGE | $21 | $11 | $5 | $5 | 50 | 1 |
| | SODIUM CHLORIDE 0.9% SYRNGE | $913 | $456 | $228 | $228 | 1,300 | 4 |
| | SODIUM CHLORIDE 0.9% VIAL | $95 | $45 | $25 | $25 | 1,240 | 54 |
| | SODIUM CHLORIDE 0.9% VIAL | $15 | $7 | $4 | $4 | 800 | 4 |
| | STERILE WATER,IRRIGATION | $456 | $235 | $112 | $110 | 179,000 | 37 |
| | STERILE WATER,IRRIGATION | $54 | $29 | $13 | $13 | 12,000 | 2 |
| | SYNTHROID 100 MCG TABLET | $29,717 | $15,007 | $7,824 | $6,887 | 58,593 | 1,455 |
| | SYNTHROID 100 MCG TABLET | $5,638 | $2,895 | $2,033 | $710 | 12,232 | 292 |
| | SYNTHROID 112 MCG TABLET | $12,136 | $6,283 | $3,197 | $2,656 | 20,802 | 522 |
| | SYNTHROID 112 MCG TABLET | $465 | $239 | $113 | $113 | 960 | 30 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | SYNTHROID 125 MCG TABLET | $20,337 | $10,271 | $5,604 | $4,462 | 34,688 | 823 |
| | SYNTHROID 125 MCG TABLET | $534 | $274 | $158 | $102 | 1,041 | 27 |
| | SYNTHROID 137 MCG TABLET | $4,704 | $2,410 | $1,334 | $960 | 7,440 | 163 |
| | SYNTHROID 150 MCG TABLET | $15,068 | $7,766 | $3,833 | $3,468 | 25,222 | 599 |
| | SYNTHROID 150 MCG TABLET | $307 | $156 | $75 | $75 | 570 | 19 |
| | SYNTHROID 175 MCG TABLET | $10,751 | $5,509 | $2,884 | $2,358 | 14,877 | 387 |
| | SYNTHROID 175 MCG TABLET | $60 | $30 | $15 | $15 | 225 | 5 |
| | SYNTHROID 200 MCG TABLET | $10,159 | $5,180 | $2,656 | $2,323 | 14,353 | 339 |
| | SYNTHROID 200 MCG TABLET | $166 | $84 | $41 | $41 | 270 | 7 |
| | SYNTHROID 25 MCG TABLET | $19,561 | $9,732 | $5,177 | $4,652 | 47,534 | 1,219 |
| | SYNTHROID 25 MCG TABLET | $643 | $304 | $173 | $166 | 1,840 | 41 |
| | SYNTHROID 300 MCG TABLET | $1,786 | $918 | $455 | $413 | 1,860 | 49 |
| | SYNTHROID 50 MCG TABLET | $36,018 | $18,021 | $9,434 | $8,563 | 78,465 | 1,922 |
| | SYNTHROID 50 MCG TABLET | $5,049 | $2,560 | $2,006 | $483 | 12,108 | 328 |
| | SYNTHROID 75 MCG TABLET | $30,904 | $15,646 | $8,196 | $7,063 | 62,541 | 1,476 |
| | SYNTHROID 75 MCG TABLET | $1,261 | $648 | $331 | $282 | 3,060 | 61 |
| | SYNTHROID 88 MCG TABLET | $11,830 | $5,964 | $3,438 | $2,428 | 23,180 | 543 |
| | SYNTHROID 88 MCG TABLET | $415 | $211 | $151 | $53 | 855 | 27 |
| | TARKA 2/180 MG TABLET SA | $4,973 | $2,547 | $1,213 | $1,213 | 2,580 | 74 |
| | TARKA 2/240 MG TABLET SA | $707 | $362 | $172 | $172 | 360 | 12 |
| | TARKA 4/240 MG TABLET SA | $7,396 | $3,495 | $2,069 | $1,832 | 3,890 | 102 |
| | TOBRAMYCIN 40 MG/ML VIAL | $2,886 | $1,479 | $704 | $704 | 1,550 | 20 |
| | TRANXENE SD 11.25 MG TAB SA | $5,411 | $2,821 | $2,301 | $289 | 945 | 13 |
| | TRICOR 145 MG TABLET | $1,039 | $519 | $331 | $188 | 330 | 9 |
| | TRICOR 160 MG TABLET | $153,311 | $75,244 | $43,551 | $34,516 | 49,949 | 1,325 |
| | TRICOR 48 MG TABLET | $34 | $17 | $9 | $9 | 30 | 1 |
| | TRICOR 54 MG TABLET | $28,618 | $14,217 | $8,054 | $6,347 | 27,100 | 657 |
| | VANCOMYCIN 1 GM ADD-VAN VIA | $1,849 | $892 | $479 | $479 | 175 | 25 |
| | VANCOMYCIN 1 GM VIAL | $877 | $450 | $213 | $213 | 105 | 10 |
| | VANCOMYCIN 5 GM VIAL | $294 | $156 | $69 | $69 | 8 | 1 |
| | VICODIN 5/500 TABLET | $1,308 | $675 | $317 | $317 | 2,160 | 18 |
| | VICODIN ES TABLET | $3,765 | $1,933 | $916 | $916 | 5,540 | 52 |
| | VICODIN HP TABLET | $879 | $450 | $214 | $214 | 1,500 | 20 |
| | VICODIN HP TABLET | $722 | $370 | $176 | $176 | 1,280 | 11 |
| | VICOPROFEN 200/7.5 TABLET | $953 | $500 | $226 | $226 | 764 | 16 |
| | VI-DAYLIN/F 0.25 MG/ML DROP | $17 | $9 | $4 | $4 | 50 | 1 |
| | VITAMIN K 10 MG/ML AMPUL | $9 | $5 | $2 | $2 | 1 | 1 |
| | WATER FOR INJECTION FLIPTOP | $815 | $405 | $207 | $202 | 14,981 | 119 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | WATER FOR INJECTION FLIPTOP | $252 | $129 | $64 | $60 | 5,260 | 11 |
| | WATER FOR INJECTION FLIPTOP | $13 | $6 | $3 | $3 | 6 | 3 |
| | WATER FOR INJECTION FLIPTOP | $104 | $53 | $25 | $25 | 4,600 | 10 |
| | ZEMPLAR 5 MCG/ML VIAL | $1,240 | $657 | $292 | $292 | 48 | 2 |
| Agouron Pharmaceuticals, Inc. | RESCRIPTOR 200 MG TABLET | $8,419 | $4,309 | $2,055 | $2,055 | 5,400 | 30 |
| | VIRACEPT 250 MG TABLET | $421,096 | $216,281 | $103,822 | $100,993 | 188,979 | 653 |
| | VIRACEPT 625 MG TABLET | $129,535 | $64,317 | $32,609 | $32,609 | 23,548 | 197 |
| Amgen USA | ARANESP 100 MCG/0.5 ML SYR | $3,714 | $1,857 | $928 | $928 | 4 | 2 |
| | ARANESP 100 MCG/ML VIAL | $8,257 | $4,180 | $2,038 | $2,038 | 18 | 6 |
| | ARANESP 150 MCG/0.3 ML SYRI | $3,354 | $1,677 | $838 | $838 | 4 | 2 |
| | ARANESP 200 MCG/0.4 ML SYR | $153,223 | $76,312 | $38,455 | $38,455 | 91 | 57 |
| | ARANESP 200 MCG/ML VIAL | $78,049 | $40,320 | $18,864 | $18,864 | 87 | 30 |
| | ARANESP 25 MCG/ML VIAL | $2,669 | $920 | $874 | $874 | 24 | 6 |
| | ARANESP 300 MCG/0.6 ML SYR | $5,585 | $2,793 | $1,396 | $1,396 | 2 | 1 |
| | ARANESP 300 MCG/ML VIAL | $2,793 | $1,397 | $698 | $698 | 2 | 1 |
| | ARANESP 40 MCG/0.4 ML SYRIN | $740 | $370 | $185 | $185 | 2 | 1 |
| | ARANESP 40 MCG/ML VIAL | $2,191 | $743 | $724 | $724 | 12 | 4 |
| | ARANESP 60 MCG/0.3 ML SYRIN | $2,260 | $1,148 | $556 | $556 | 3 | 3 |
| | ARANESP 60 MCG/0.3 ML SYRIN | $12,035 | $6,274 | $2,881 | $2,881 | 16 | 14 |
| | ARANESP 60 MCG/ML VIAL | $9,861 | $4,438 | $2,711 | $2,711 | 36 | 12 |
| | EPOGEN 10,000 UNITS/ML VIAL | $11,111 | $5,679 | $2,716 | $2,716 | 90 | 12 |
| | EPOGEN 10,000 UNITS/ML VIAL | $86,135 | $44,742 | $20,696 | $20,696 | 697 | 106 |
| | EPOGEN 10,000 UNITS/ML VIAL | $743 | $386 | $178 | $178 | 6 | 2 |
| | EPOGEN 10,000 UNITS/ML VIAL | $20,269 | $7,982 | $6,144 | $6,144 | 164 | 30 |
| | EPOGEN 2,000 UNITS/ML VIAL | $2,171 | $1,125 | $523 | $523 | 89 | 14 |
| | EPOGEN 20,000 UNITS/ML VIAL | $90 | $45 | $22 | $22 | 8 | 1 |
| | EPOGEN 20,000 UNITS/ML VIAL | $51,649 | $26,555 | $12,547 | $12,547 | 256 | 48 |
| | EPOGEN 3,000 UNITS/ML VIAL | $374 | $198 | $88 | $88 | 10 | 1 |
| | EPOGEN 3,000 UNITS/ML VIAL | $3,801 | $1,988 | $906 | $906 | 102 | 15 |
| | EPOGEN 4,000 UNITS/ML VIAL | $6,849 | $3,531 | $1,659 | $1,659 | 139 | 9 |
| | EPOGEN 40,000 UNITS/ML VIAL | $4,944 | $2,472 | $1,236 | $1,236 | 10 | 1 |
| | EPOGEN 40,000 UNITS/ML VIAL | $115,798 | $60,548 | $27,625 | $27,625 | 227 | 45 |
| | KINERET 100 MG/0.67 ML SYR | $7,161 | $3,756 | $1,702 | $1,702 | 122 | 7 |
| | KINERET 100 MG/0.67 ML SYR | $1,209 | $605 | $302 | $302 | 19 | 1 |
| | NEUPOGEN 300 MCG/0.5 ML SYR | $149,752 | $74,410 | $37,671 | $37,671 | 382 | 77 |
| | NEUPOGEN 300 MCG/ML VIAL | $18,677 | $9,479 | $4,599 | $4,599 | 98 | 16 |
| | NEUPOGEN 300 MCG/ML VIAL | $59,995 | $27,448 | $16,274 | $16,274 | 313 | 33 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | NEUPOGEN 480 MCG/0.8 ML SYR | $159,124 | $78,691 | $40,217 | $40,217 | 393 | 43 |
| | NEUPOGEN 480 MCG/1.6 ML VIA | $7,892 | $3,946 | $1,973 | $1,973 | 41 | 6 |
| | NEUPOGEN 480 MCG/1.6 ML VIA | $22,594 | $11,569 | $5,513 | $5,513 | 117 | 8 |
| | SENSIPAR 30 MG TABLET | $45,831 | $20,601 | $12,615 | $12,615 | 5,130 | 158 |
| | SENSIPAR 60 MG TABLET | $17,076 | $7,472 | $4,802 | $4,802 | 960 | 31 |
| | SENSIPAR 90 MG TABLET | $10,380 | $4,393 | $2,993 | $2,993 | 390 | 13 |
| Amgen/Immunex | ENBREL 25 MG KIT | $486,483 | $241,262 | $128,729 | $116,492 | 3,174 | 400 |
| | ENBREL 50 MG/ML SYRINGE | $1,258 | $629 | $472 | $157 | 4 | 1 |
| | ENBREL 50 MG/ML SYRINGE | $9,059 | $4,530 | $2,265 | $2,265 | 28 | 8 |
| | LEUKINE 500 MCG/ML VIAL | $7,695 | $3,932 | $1,882 | $1,882 | 27 | 3 |
| | NOVANTRONE 2 MG/ML VIAL | $5,450 | $2,725 | $1,362 | $1,362 | 40 | 3 |
| | RENAGEL 400 MG TABLET | $8,604 | $4,382 | $2,111 | $2,111 | 13,140 | 47 |
| | RENAGEL 403 MG CAPSULE | $4,922 | $2,602 | $1,445 | $874 | 7,358 | 21 |
| | RENAGEL 800 MG TABLET | $438,773 | $208,096 | $115,954 | $114,723 | 341,727 | 1,237 |
| Astrazeneca L.P. | ACCOLATE 10 MG TABLET | $1,205 | $615 | $295 | $295 | 950 | 18 |
| | ACCOLATE 20 MG TABLET | $30,487 | $15,686 | $7,922 | $6,878 | 24,530 | 382 |
| | ARIMIDEX 1 MG TABLET | $119,259 | $60,101 | $31,451 | $27,706 | 17,235 | 401 |
| | ATACAND 16 MG TABLET | $31,161 | $15,190 | $8,071 | $7,900 | 21,357 | 534 |
| | ATACAND 16 MG TABLET | $1,386 | $652 | $367 | $367 | 960 | 22 |
| | ATACAND 32 MG TABLET | $32,744 | $16,572 | $8,308 | $7,864 | 16,760 | 447 |
| | ATACAND 32 MG TABLET | $5,320 | $2,628 | $1,346 | $1,346 | 2,730 | 63 |
| | ATACAND 4 MG TABLET | $1,063 | $544 | $280 | $238 | 720 | 20 |
| | ATACAND 8 MG TABLET | $5,950 | $3,023 | $1,505 | $1,422 | 4,080 | 105 |
| | ATACAND HCT 16/12.5 MG TAB | $12,013 | $5,978 | $3,017 | $3,017 | 6,115 | 163 |
| | ATACAND HCT 32/12.5 MG TAB | $36,652 | $18,245 | $9,743 | $8,664 | 18,384 | 489 |
| | CASODEX 50 MG TABLET | $18,018 | $9,209 | $4,404 | $4,404 | 1,357 | 46 |
| | CASODEX 50 MG TABLET | $78,543 | $38,093 | $20,414 | $20,035 | 6,151 | 161 |
| | CEFOTAN 1 GM VIAL | $243 | $128 | $57 | $57 | 20 | 1 |
| | CRESTOR 10 MG TABLET | $119,707 | $56,806 | $34,327 | $28,574 | 49,070 | 1,373 |
| | CRESTOR 20 MG TABLET | $18,166 | $9,085 | $4,883 | $4,198 | 7,359 | 216 |
| | CRESTOR 40 MG TABLET | $7,211 | $3,677 | $1,932 | $1,601 | 2,940 | 81 |
| | CRESTOR 5 MG TABLET | $9,054 | $4,560 | $2,247 | $2,247 | 3,660 | 98 |
| | EMLA CREAM | $2,567 | $1,336 | $616 | $616 | 1,590 | 41 |
| | EMLA CREAM W/TEGADERM | $0 | $0 | $0 | $0 | 0 | 0 |
| | ENTOCORT EC 3 MG CAPSULE | $5,611 | $2,889 | $1,361 | $1,361 | 2,460 | 28 |
| | FOSCAVIR 24 MG/ML INFUS BTT | $459 | $243 | $108 | $108 | 1,500 | 3 |
| | FOSCAVIR 24 MG/ML INFUS BTT | $758 | $379 | $189 | $189 | 2,500 | 3 |
| | IRESSA 250 MG TABLET | $57,315 | $29,388 | $13,964 | $13,964 | 960 | 32 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | LEXXEL 5-5 MG TABLET SA | $2,290 | $1,063 | $613 | $613 | 1,510 | 35 |
| | LEXXEL 5-5 MG TABLET SA | $92 | $48 | $22 | $22 | 60 | 1 |
| | MERREM 1 GM VIAL | $15,759 | $8,159 | $3,800 | $3,800 | 303 | 14 |
| | MERREM 500 MG VIAL | $632 | $333 | $150 | $150 | 24 | 2 |
| | NEXIUM 20 MG CAPSULE | $114,790 | $57,801 | $28,890 | $28,099 | 26,900 | 824 |
| | NEXIUM 20 MG CAPSULE | $6,608 | $3,384 | $1,810 | $1,414 | 1,538 | 39 |
| | NEXIUM 40 MG CAPSULE | $1,525,302 | $758,093 | $402,223 | $364,986 | 355,730 | 10,837 |
| | NEXIUM 40 MG CAPSULE | $115,347 | $58,267 | $34,653 | $22,427 | 26,961 | 800 |
| | NEXIUM 40 MG CAPSULE | $18,944 | $9,175 | $6,525 | $3,244 | 4,455 | 138 |
| | PLENDIL 10 MG TABLET SA | $1,246 | $637 | $305 | $305 | 630 | 19 |
| | PLENDIL 10 MG TABLET SA | $27,762 | $13,210 | $7,309 | $7,242 | 12,870 | 326 |
| | PLENDIL 2.5 MG TABLET SA | $166 | $88 | $39 | $39 | 140 | 5 |
| | PLENDIL 2.5 MG TABLET SA | $4,778 | $2,242 | $1,280 | $1,256 | 3,965 | 81 |
| | PLENDIL 5 MG TABLET SA | $1,328 | $687 | $320 | $320 | 1,240 | 29 |
| | PLENDIL 5 MG TABLET SA | $16,779 | $7,868 | $4,698 | $4,212 | 13,754 | 320 |
| | PRILOSEC 10 MG CAPSULE DR | $780 | $340 | $246 | $194 | 270 | 9 |
| | PRILOSEC 10 MG CAPSULE DR | $1,911 | $982 | $464 | $464 | 510 | 17 |
| | PRILOSEC 20 MG CAPSULE DR | $19,975 | $10,330 | $4,917 | $4,728 | 6,078 | 154 |
| | PRILOSEC 20 MG CAPSULE DR | $3,607 | $1,850 | $1,569 | $187 | 1,001 | 37 |
| | PRILOSEC 40 MG CAPSULE DR | $124,307 | $61,790 | $32,986 | $29,531 | 21,118 | 627 |
| | PRILOSEC 40 MG CAPSULE DR | $8,047 | $4,110 | $3,225 | $712 | 1,364 | 40 |
| | PULMICORT 0.25 MG/2 ML RESP | $295,031 | $151,831 | $76,841 | $66,359 | 135,366 | 1,650 |
| | PULMICORT 0.5 MG/2 ML RESPU | $342,049 | $176,319 | $90,332 | $75,397 | 159,650 | 1,760 |
| | PULMICORT 200 MCG TURBUHALE | $80,226 | $41,732 | $20,171 | $18,323 | 579 | 547 |
| | RHINOCORT AQUA NASAL SPRAY | $128,024 | $64,655 | $35,875 | $27,493 | 16,315 | 1,802 |
| | RHINOCORT NASAL INHALER | $1,510 | $795 | $702 | $13 | 245 | 26 |
| | SEROQUEL 100 MG TABLET | $737,304 | $374,002 | $223,671 | $139,631 | 258,650 | 4,389 |
| | SEROQUEL 200 MG TABLET | $1,021,792 | $521,733 | $329,807 | $170,252 | 193,443 | 2,871 |
| | SEROQUEL 25 MG TABLET | $930,778 | $472,481 | $256,510 | $201,787 | 584,806 | 8,438 |
| | SEROQUEL 300 MG TABLET | $365,066 | $186,628 | $112,304 | $66,135 | 54,917 | 1,120 |
| | SULAR 10 MG TABLET SA | $789 | $406 | $191 | $191 | 616 | 15 |
| | SULAR 20 MG TABLET SA | $3,132 | $1,620 | $756 | $756 | 2,580 | 69 |
| | SULAR 30 MG TABLET SA | $654 | $338 | $158 | $158 | 420 | 14 |
| | SULAR 40 MG TABLET SA | $716 | $257 | $229 | $229 | 480 | 16 |
| | TAMOXIFEN 10 MG TABLET | $633 | $335 | $224 | $74 | 360 | 6 |
| | TAMOXIFEN 20 MG TABLET | $1,113 | $575 | $269 | $269 | 360 | 4 |
| | TENORMIN 50 MG TABLET | $1,593 | $821 | $386 | $386 | 1,320 | 14 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | TOPROL XL 100 MG TABLET SA | $195,379 | $97,383 | $50,540 | $47,457 | 169,933 | 4,245 |
| | TOPROL XL 200 MG TABLET SA | $70,560 | $35,644 | $18,128 | $16,788 | 39,457 | 1,006 |
| | TOPROL XL 25 MG TABLET SA | $71,405 | $34,913 | $19,204 | $17,288 | 91,209 | 2,283 |
| | TOPROL XL 50 MG TABLET SA | $182,383 | $88,773 | $47,972 | $45,639 | 234,439 | 5,691 |
| | ZESTRIL 10 MG TABLET | $816 | $420 | $198 | $198 | 760 | 12 |
| | ZESTRIL 2.5 MG TABLET | $42 | $22 | $10 | $10 | 60 | 1 |
| | ZESTRIL 5 MG TABLET | $495 | $254 | $121 | $121 | 510 | 13 |
| | ZOLADEX 10.8 MG IMPLANT SYR | $27,277 | $14,152 | $6,563 | $6,563 | 22 | 22 |
| | ZOLADEX 3.6 MG IMPLANT SYRN | $2,485 | $1,255 | $615 | $615 | 6 | 2 |
| | ZOMIG 2.5 MG TABLET | $7,191 | $3,661 | $2,159 | $1,370 | 457 | 44 |
| | ZOMIG 5 MG NASAL SPRAY | $839 | $355 | $242 | $242 | 36 | 6 |
| | ZOMIG 5 MG TABLET | $12,247 | $6,323 | $2,962 | $2,962 | 691 | 73 |
| | ZOMIG ZMT 2.5MG TABLET | $565 | $296 | $134 | $134 | 36 | 5 |
| | ZOMIG ZMT 5MG TABLET | $2,038 | $1,039 | $499 | $499 | 115 | 12 |
| Aventis Pasteur Inc. | FLUZONE 2004-05 SYRINGE | $525 | $262 | $143 | $119 | 17 | 33 |
| | FLUZONE 2004-05 VIAL | $115 | $57 | $32 | $26 | 5 | 9 |
| | FLUZONE PEDI 2004-05 SYRING | $0 | $0 | $0 | $0 | 0 | 0 |
| | TETANUS TOXOID ADSORBED VL | $461 | $231 | $222 | $9 | 14 | 13 |
| Aventis Pharmaceuticals | ALLEGRA 180 MG TABLET | $62,221 | $31,666 | $18,838 | $11,717 | 26,980 | 794 |
| | ALLEGRA 180 MG TABLET | $4,832 | $2,445 | $2,270 | $117 | 2,040 | 68 |
| | ALLEGRA 30 MG TABLET | $1,987 | $1,020 | $686 | $281 | 3,240 | 52 |
| | ALLEGRA 60 MG TABLET | $18,165 | $9,447 | $5,995 | $2,723 | 13,980 | 241 |
| | ALLEGRA 60 MG TABLET | $1,921 | $985 | $778 | $158 | 1,430 | 23 |
| | ALLEGRA-D TABLET SA | $20,090 | $10,262 | $5,420 | $4,408 | 14,877 | 247 |
| | ALLEGRA-D TABLET SA | $758 | $391 | $348 | $19 | 540 | 14 |
| | AMARYL 1 MG TABLET | $9,205 | $4,345 | $2,535 | $2,325 | 22,866 | 505 |
| | AMARYL 2 MG TABLET | $39,331 | $19,364 | $10,691 | $9,276 | 63,901 | 1,317 |
| | AMARYL 4 MG TABLET | $110,889 | $54,868 | $28,964 | $27,057 | 98,750 | 1,767 |
| | ANZEMET 100 MG TABLET | $13,375 | $6,889 | $3,243 | $3,243 | 199 | 28 |
| | ANZEMET 100 MG TABLET | $2,219 | $1,110 | $555 | $555 | 33 | 2 |
| | ANZEMET 20 MG/ML VIAL | $3,485 | $1,710 | $888 | $888 | 270 | 29 |
| | ARAVA 10 MG TABLET | $6,040 | $3,110 | $1,465 | $1,465 | 510 | 13 |
| | ARAVA 20 MG TABLET | $62,313 | $31,815 | $15,249 | $15,249 | 5,279 | 164 |
| | AZMACORT INHALER | $43,057 | $21,713 | $11,422 | $9,922 | 11,320 | 502 |
| | BENTYL 10 MG CAPSULE | $68 | $36 | $16 | $16 | 190 | 6 |
| | BENTYL 10 MG/5 ML SYRUP | $719 | $368 | $186 | $165 | 8,060 | 45 |
| | BENZAMYCIN GEL | $12,100 | $6,300 | $4,286 | $1,514 | 4,562 | 104 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | BENZAMYCINPAK GEL | $17,478 | $8,565 | $5,810 | $3,103 | 14,172 | 238 |
| | CARAC CREAM | $1,720 | $900 | $451 | $369 | 540 | 18 |
| | CARAFATE 1 GM TABLET | $328 | $174 | $77 | $77 | 360 | 3 |
| | CARAFATE 1 GM TABLET | $129 | $64 | $32 | $32 | 120 | 1 |
| | CARAFATE 1 GM/10 ML SUSP | $12,438 | $6,333 | $3,638 | $2,467 | 128,325 | 203 |
| | CARDIZEM 60 MG TABLET | $920 | $475 | $223 | $223 | 1,200 | 10 |
| | CARDIZEM CD 120 MG CAP SA | $197 | $100 | $49 | $49 | 150 | 5 |
| | CARDIZEM CD 180 MG CAP SA | $198 | $99 | $49 | $49 | 120 | 4 |
| | CARDIZEM CD 240 MG CAP SA | $733 | $376 | $178 | $178 | 330 | 11 |
| | CARDIZEM CD 240 MG CAP SA | $337 | $179 | $79 | $79 | 150 | 5 |
| | CARDIZEM CD 300 MG CAP SA | $1,029 | $530 | $250 | $250 | 360 | 12 |
| | CARDIZEM CD 360 MG CAP SA | $12,658 | $6,132 | $3,263 | $3,263 | 4,060 | 94 |
| | COPAXONE 20 MG INJECTION KI | $311,000 | $159,684 | $75,658 | $75,658 | 269 | 269 |
| | DDAVP 0.01% NASAL SPRAY | $6,439 | $3,348 | $1,822 | $1,269 | 260 | 51 |
| | DDAVP 0.01% SOLUTION | $3,477 | $1,797 | $840 | $840 | 105 | 34 |
| | DDAVP 0.1 MG TABLET | $18,632 | $9,543 | $5,075 | $4,014 | 7,858 | 99 |
| | DDAVP 0.2 MG TABLET | $98,919 | $50,244 | $31,814 | $16,860 | 29,527 | 544 |
| | DERMATOP 0.1% CREAM | $4,862 | $2,561 | $1,317 | $984 | 3,300 | 142 |
| | DERMATOP 0.1% CREAM | $8,043 | $4,123 | $2,195 | $1,725 | 9,285 | 156 |
| | DERMATOP 0.1% OINTMENT | $441 | $223 | $126 | $92 | 315 | 13 |
| | DERMATOP 0.1% OINTMENT | $1,641 | $837 | $499 | $305 | 1,980 | 33 |
| | DIABETA 1.25 MG TABLET | $10 | $5 | $2 | $2 | 30 | 1 |
| | DIABETA 5 MG TABLET | $407 | $213 | $97 | $97 | 520 | 6 |
| | DRITHOCREME HP 1% CREAM | $0 | $0 | $0 | $0 | 0 | 0 |
| | HIPREX 1 GM TABLET | $4,870 | $2,537 | $1,458 | $875 | 3,510 | 58 |
| | INTAL INHALER | $4,720 | $2,463 | $1,191 | $1,066 | 804 | 46 |
| | INTAL INHALER | $894 | $457 | $234 | $203 | 148 | 16 |
| | KETEK 400 MG TABLET | $4,639 | $2,176 | $1,312 | $1,151 | 887 | 72 |
| | KETEK PAK 400 MG TABLET | $9,199 | $4,413 | $2,534 | $2,252 | 1,742 | 176 |
| | LANTUS 100 UNITS/ML VIAL | $198,487 | $100,844 | $49,620 | $48,023 | 35,835 | 2,319 |
| | LASIX 40 MG TABLET | $1,180 | $606 | $287 | $287 | 3,660 | 76 |
| | LASIX 80 MG TABLET | $260 | $133 | $64 | $64 | 540 | 6 |
| | LASIX 80 MG TABLET | $86 | $45 | $20 | $20 | 180 | 2 |
| | LOVENOX 100 MG PREFILLED SY | $89,118 | $44,337 | $22,390 | $22,390 | 1,442 | 62 |
| | LOVENOX 120 MG PREFILLED SY | $6,181 | $3,113 | $1,534 | $1,534 | 66 | 7 |
| | LOVENOX 150 MG PREFILLED SY | $4,107 | $2,106 | $1,000 | $1,000 | 160 | 9 |
| | LOVENOX 30 MG PREFILLED SYR | $15,395 | $7,829 | $3,783 | $3,783 | 267 | 35 |
| | LOVENOX 300 MG VIAL | $2,431 | $1,232 | $600 | $600 | 39 | 7 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | LOVENOX 40 MG PREFILLED SYR | $40,558 | $20,456 | $10,051 | $10,051 | 717 | 115 |
| | LOVENOX 60 MG PREFILLED SYR | $89,235 | $46,145 | $22,055 | $21,036 | 1,531 | 117 |
| | LOVENOX 80 MG PREFILLED SYR | $38,181 | $19,818 | $9,226 | $9,136 | 631 | 43 |
| | NASACORT AQ NASAL SPRAY | $178,905 | $90,160 | $49,710 | $39,036 | 44,774 | 2,591 |
| | NASACORT NASAL INHALER | $92 | $46 | $23 | $23 | 17 | 1 |
| | NORITATE 1% CREAM | $3,079 | $1,620 | $1,068 | $390 | 1,980 | 57 |
| | NORITATE 1% CREAM | $5,477 | $2,769 | $2,253 | $455 | 3,810 | 64 |
| | NORPRAMIN 25 MG TABLET | $437 | $229 | $104 | $104 | 540 | 6 |
| | NORPRAMIN 75 MG TABLET | $294 | $147 | $74 | $74 | 150 | 5 |
| | PENLAC 8% SOLUTION | $264 | $136 | $80 | $48 | 14 | 3 |
| | PENLAC 8% SOLUTION | $164,388 | $81,319 | $47,047 | $36,021 | 8,887 | 1,325 |
| | PSORCON 0.05% OINTMENT | $1,636 | $844 | $396 | $396 | 780 | 13 |
| | PSORCON E 0.05% CREAM | $116 | $60 | $56 | $0 | 45 | 3 |
| | PSORCON E 0.05% CREAM | $0 | $0 | $0 | $0 | 0 | 0 |
| | PSORCON E 0.05% CREAM | $1,530 | $799 | $452 | $279 | 960 | 16 |
| | PSORCON E 0.05% OINTMENT | $37 | $19 | $9 | $9 | 15 | 1 |
| | PSORCON E 0.05% OINTMENT | $100 | $53 | $23 | $23 | 60 | 2 |
| | PSORCON E 0.05% OINTMENT | $952 | $490 | $255 | $207 | 600 | 10 |
| | RILUTEK 50 MG TABLET | $53,597 | $27,538 | $13,030 | $13,030 | 3,862 | 65 |
| | TAXOTERE 20 MG/0.5 ML VIAL | $16,594 | $6,850 | $4,872 | $4,872 | 27 | 17 |
| | TAXOTERE 80 MG/2 ML VIAL | $33,274 | $10,464 | $11,405 | $11,405 | 50 | 14 |
| | TILADE INHALER | $186 | $98 | $44 | $44 | 49 | 1 |
| | VANAMIDE 40% CREAM | $1,562 | $815 | $382 | $365 | 2,890 | 34 |
| | VANAMIDE 40% CREAM | $10,827 | $5,362 | $3,466 | $1,999 | 26,467 | 133 |
| Barr Laboratories, Inc. | ACETAMINOPHEN/COD #2 TABLET | $292 | $140 | $78 | $73 | 840 | 38 |
| | ACETAMINOPHEN/COD #2 TABLET | $12 | $6 | $3 | $3 | 50 | 1 |
| | ACETAMINOPHEN/COD #3 TABLET | $507 | $257 | $125 | $125 | 1,862 | 39 |
| | ACETAMINOPHEN/COD #3 TABLET | $1,758 | $754 | $508 | $495 | 5,986 | 112 |
| | ACETAMINOPHEN/COD #3 TABLET | $3,706 | $1,939 | $887 | $880 | 13,260 | 225 |
| | ACETAMINOPHEN/COD #4 TABLET | $142 | $73 | $35 | $35 | 348 | 7 |
| | ACETAMINOPHEN/COD #4 TABLET | $609 | $322 | $143 | $143 | 1,880 | 19 |
| | ACETOHEXAMIDE 250 MG TABLET | $558 | $288 | $269 | $0 | 1,890 | 21 |
| | ACETOHEXAMIDE 500 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | AMILORIDE HCL/HCTZ 5/50 TAB | $197 | $57 | $70 | $70 | 1,110 | 30 |
| | AMILORIDE HCL/HCTZ 5/50 TAB | $88 | $46 | $43 | $0 | 376 | 14 |
| | AMIODARONE HCL 200 MG TABLE | $3,463 | $1,792 | $914 | $757 | 1,920 | 53 |
| | AMIODARONE HCL 200 MG TABLE | $2,265 | $1,164 | $551 | $551 | 1,360 | 26 |
| | AMPHETAMINE SALTS 10 MG TAB | $8,801 | $4,441 | $2,555 | $1,805 | 7,028 | 100 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | AMPHETAMINE SALTS 12.5 MG T | $1,180 | $605 | $287 | $287 | 900 | 13 |
| | AMPHETAMINE SALTS 15 MG TAB | $1,023 | $543 | $255 | $226 | 780 | 12 |
| | AMPHETAMINE SALTS 20 MG TAB | $6,360 | $3,178 | $1,851 | $1,332 | 4,998 | 91 |
| | AMPHETAMINE SALTS 30 MG TAB | $1,933 | $1,005 | $478 | $450 | 1,560 | 17 |
| | AMPHETAMINE SALTS 5 MG TAB | $4,447 | $2,309 | $1,131 | $1,006 | 3,424 | 90 |
| | AMPHETAMINE SALTS 7.5 MG TA | $564 | $301 | $139 | $124 | 420 | 8 |
| | APRI 28 DAY TABLET | $2,645 | $2,318 | $203 | $124 | 2,549 | 78 |
| | APRI TABLET | $713 | $642 | $53 | $18 | 714 | 25 |
| | ARANELLE 28 TABLET | $36 | $32 | $2 | $2 | 28 | 1 |
| | AVIANE-28 TABLET | $12,932 | $11,370 | $848 | $715 | 11,620 | 314 |
| | AVIANE-28 TABLET | $113 | $102 | $6 | $6 | 112 | 2 |
| | CAMILA TABLET | $7,408 | $6,332 | $567 | $508 | 6,022 | 165 |
| | CEFADROXIL 500 MG CAPSULE | $69 | $36 | $16 | $16 | 24 | 2 |
| | CENESTIN 0.3 MG TABLET | $586 | $434 | $93 | $59 | 606 | 20 |
| | CENESTIN 0.625 MG TABLET | $287 | $218 | $40 | $30 | 277 | 10 |
| | CENESTIN 1.25 MG TABLET | $447 | $402 | $22 | $22 | 360 | 12 |
| | CHLORDIAZEPOXIDE 10 MG CAP | $394 | $205 | $95 | $95 | 2,651 | 36 |
| | CHLORDIAZEPOXIDE 10 MG CAP | $91 | $47 | $22 | $22 | 420 | 12 |
| | CHLORDIAZEPOXIDE 25 MG CAP | $959 | $488 | $270 | $201 | 2,925 | 52 |
| | CHLORDIAZEPOXIDE 5 MG CAP | $228 | $118 | $55 | $55 | 1,410 | 15 |
| | CHLORZOXAZONE 500 MG TABLET | $466 | $239 | $119 | $108 | 2,930 | 38 |
| | CHLORZOXAZONE 500 MG TABLET | $13 | $7 | $3 | $3 | 40 | 2 |
| | CIPROFLOXACIN 10% SUSP | $1,394 | $721 | $444 | $229 | 1,300 | 12 |
| | CIPROFLOXACIN 5% SUSP | $3,255 | $1,684 | $800 | $771 | 3,276 | 26 |
| | CIPROFLOXACIN HCL 250 MG TA | $4,954 | $2,421 | $1,317 | $1,215 | 1,347 | 95 |
| | CIPROFLOXACIN HCL 250 MG TA | $19,379 | $10,027 | $4,833 | $4,518 | 4,155 | 278 |
| | CIPROFLOXACIN HCL 500 MG TA | $23,762 | $11,285 | $6,349 | $6,129 | 5,337 | 324 |
| | CIPROFLOXACIN HCL 500 MG TA | $112,255 | $56,320 | $29,685 | $26,250 | 20,656 | 1,187 |
| | CIPROFLOXACIN HCL 750 MG TA | $795 | $398 | $199 | $199 | 198 | 8 |
| | CIPROFLOXACIN HCL 750 MG TA | $5,596 | $2,889 | $1,478 | $1,229 | 995 | 42 |
| | CLARAVIS 10 MG CAPSULE | $0 | $0 | $0 | $0 | 0 | 0 |
| | CLARAVIS 20 MG CAPSULE | $700 | $364 | $168 | $168 | 90 | 3 |
| | CLARAVIS 40 MG CAPSULE | $8,658 | $4,431 | $2,114 | $2,114 | 990 | 17 |
| | CRYSELLE-28 TABLET | $953 | $858 | $59 | $36 | 896 | 28 |
| | CRYSELLE-28 TABLET | $85 | $77 | $9 | $0 | 84 | 1 |
| | D-AMPHETAMINE 10 MG CAP SA | $997 | $516 | $246 | $235 | 1,110 | 14 |
| | D-AMPHETAMINE 15 MG CAP SA | $2,619 | $1,379 | $713 | $526 | 2,250 | 40 |
| | D-AMPHETAMINE 5 MG CAP SA | $2,312 | $1,189 | $561 | $561 | 3,050 | 34 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | DANAZOL 200 MG CAPSULE | $2,674 | $1,402 | $636 | $636 | 720 | 6 |
| | DANAZOL 200 MG CAPSULE | $5,002 | $2,562 | $1,220 | $1,220 | 1,170 | 10 |
| | DEXTROAMPHETAMINE 10 MG TAB | $929 | $476 | $274 | $179 | 1,830 | 23 |
| | DEXTROAMPHETAMINE 5 MG TAB | $3,086 | $1,587 | $750 | $750 | 11,468 | 71 |
| | DIAMOX SEQUELS 500 MG CAP S | $4,957 | $2,514 | $1,221 | $1,221 | 3,210 | 65 |
| | DIAZEPAM 10 MG TABLET | $669 | $343 | $163 | $163 | 3,637 | 47 |
| | DIAZEPAM 10 MG TABLET | $1,181 | $605 | $416 | $160 | 4,023 | 163 |
| | DIAZEPAM 2 MG TABLET | $123 | $64 | $30 | $30 | 1,530 | 13 |
| | DIAZEPAM 2 MG TABLET | $768 | $396 | $355 | $17 | 8,438 | 92 |
| | DIAZEPAM 5 MG TABLET | $421 | $216 | $135 | $71 | 3,111 | 44 |
| | DIAZEPAM 5 MG TABLET | $976 | $502 | $348 | $125 | 6,533 | 113 |
| | DIGOXIN 125 MCG TABLET | $2,149 | $1,117 | $516 | $516 | 8,271 | 222 |
| | DIGOXIN 125 MCG TABLET | $3,038 | $1,577 | $781 | $681 | 12,673 | 321 |
| | DIGOXIN 250 MCG TABLET | $690 | $321 | $184 | $184 | 2,580 | 70 |
| | DIGOXIN 250 MCG TABLET | $2,350 | $1,213 | $666 | $471 | 9,452 | 254 |
| | DIPHENHYDRAMINE 50 MG CAPS | $8,390 | $4,295 | $2,235 | $1,860 | 39,524 | 833 |
| | DIPHENHYDRAMINE 50 MG CAPS | $2,573 | $1,327 | $683 | $564 | 19,516 | 370 |
| | DIPYRIDAMOLE 25 MG TABLET | $3,269 | $1,687 | $791 | $791 | 11,480 | 116 |
| | DIPYRIDAMOLE 25 MG TABLET | $127 | $66 | $30 | $30 | 450 | 3 |
| | DIPYRIDAMOLE 25 MG TABLET | $737 | $381 | $178 | $178 | 2,210 | 29 |
| | DIPYRIDAMOLE 50 MG TABLET | $1,962 | $1,002 | $549 | $411 | 4,510 | 50 |
| | DIPYRIDAMOLE 50 MG TABLET | $1,721 | $884 | $500 | $337 | 3,825 | 43 |
| | DIPYRIDAMOLE 75 MG TABLET | $1,258 | $613 | $323 | $323 | 3,060 | 32 |
| | DIPYRIDAMOLE 75 MG TABLET | $653 | $288 | $183 | $183 | 960 | 16 |
| | ENPRESSE-28 TABLET | $706 | $635 | $37 | $34 | 728 | 18 |
| | ERRIN TABLET | $4,805 | $4,082 | $387 | $336 | 4,620 | 131 |
| | ERYTHROMYCIN 200 MG/5 ML GR | $11 | $6 | $3 | $3 | 100 | 1 |
| | ERYTHROMYCIN 200 MG/5 ML GR | $13 | $7 | $3 | $3 | 150 | 1 |
| | ERYTHROMYCIN 250 MG CAP EC | $88 | $37 | $26 | $26 | 261 | 9 |
| | ERYTHROMYCIN 250 MG CAP EC | $30 | $16 | $7 | $7 | 94 | 3 |
| | ERYTHROMYCIN/SULFISOX SUSP | $356 | $183 | $86 | $86 | 2,650 | 15 |
| | ERYTHROMYCIN/SULFISOX SUSP | $510 | $251 | $137 | $122 | 3,650 | 23 |
| | ERYTHROMYCIN/SULFISOX SUSP | $283 | $146 | $68 | $68 | 2,200 | 11 |
| | ESTRADIOL 0.5 MG TABLET | $351 | $217 | $67 | $67 | 1,340 | 25 |
| | ESTRADIOL 1 MG TABLET | $234 | $146 | $44 | $44 | 785 | 17 |
| | ESTRADIOL 1 MG TABLET | $22 | $12 | $5 | $5 | 90 | 1 |
| | ESTRADIOL 2 MG TABLET | $197 | $177 | $10 | $10 | 526 | 8 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | ESTRADIOL 2 MG TABLET | $27 | $25 | $1 | $1 | 60 | 2 |
| | ESTROPIPATE 0.625(0.75 MG) | $126 | $65 | $31 | $31 | 360 | 6 |
| | ETHAMBUTOL HCL 400 MG TABLE | $6,519 | $3,350 | $1,625 | $1,544 | 4,070 | 57 |
| | FLUCONAZOLE 150 MG TABLET | $130 | $49 | $41 | $41 | 8 | 8 |
| | FLUDROCORTISONE 0.1 MG TAB | $3,570 | $1,542 | $1,032 | $995 | 5,235 | 86 |
| | FLUOXETINE 20 MG CAPSULE | $40,843 | $21,017 | $10,822 | $9,004 | 77,597 | 1,608 |
| | FLUTAMIDE 125 MG CAPSULE | $2,119 | $1,080 | $604 | $436 | 1,200 | 10 |
| | FLUVOXAMINE MAL 100 MG TAB | $3,877 | $2,007 | $1,124 | $746 | 2,253 | 36 |
| | FLUVOXAMINE MALEATE 25 MG T | $1,560 | $998 | $531 | $31 | 783 | 9 |
| | FLUVOXAMINE MALEATE 50 MG T | $1,598 | $823 | $712 | $62 | 840 | 16 |
| | HYDROXYUREA 500 MG CAPSULE | $8,690 | $4,212 | $2,445 | $2,032 | 7,365 | 121 |
| | HYDROXYZINE PAM 100 MG CAP | $7,851 | $4,033 | $2,090 | $1,727 | 13,505 | 307 |
| | HYDROXYZINE PAM 25 MG CAP | $2,136 | $1,090 | $566 | $481 | 13,351 | 210 |
| | HYDROXYZINE PAM 25 MG CAP | $197 | $100 | $48 | $48 | 1,400 | 16 |
| | HYDROXYZINE PAM 50 MG CAP | $3,756 | $1,932 | $968 | $855 | 20,944 | 363 |
| | HYDROXYZINE PAM 50 MG CAP | $432 | $224 | $117 | $91 | 2,799 | 33 |
| | ISONIAZID 100 MG TABLET | $62 | $10 | $36 | $15 | 405 | 6 |
| | ISONIAZID 300 MG TABLET | $36 | $11 | $13 | $13 | 150 | 5 |
| | ISONIAZID 300 MG TABLET | $3,948 | $1,679 | $1,278 | $992 | 18,035 | 521 |
| | ISONIAZID 300 MG TABLET | $594 | $234 | $190 | $170 | 2,888 | 75 |
| | JUNEL 1/20 TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | JUNEL FE 1.5/30 TABLET | $1,238 | $1,114 | $68 | $56 | 1,260 | 39 |
| | JUNEL FE 1/20 TABLET | $1,320 | $1,188 | $67 | $65 | 1,428 | 31 |
| | KARIVA 28 DAY TABLET | $3,398 | $3,028 | $203 | $166 | 3,164 | 102 |
| | LESSINA-28 TABLET | $1,780 | $1,602 | $113 | $65 | 1,624 | 47 |
| | LEUCOVORIN CALCIUM 25 MG TA | $8,244 | $4,255 | $1,994 | $1,994 | 392 | 14 |
| | LEUCOVORIN CALCIUM 5 MG TAB | $4,066 | $2,164 | $1,214 | $688 | 1,850 | 66 |
| | LEUCOVORIN CALCIUM 5 MG TAB | $946 | $491 | $227 | $227 | 438 | 11 |
| | LITHIUM ER 300 MG TABLET | $4,413 | $2,272 | $1,807 | $335 | 10,047 | 118 |
| | MEDROXYPROGESTERONE 10 MG T | $1,064 | $907 | $80 | $78 | 1,574 | 118 |
| | MEDROXYPROGESTERONE 10 MG T | $202 | $158 | $24 | $20 | 245 | 25 |
| | MEDROXYPROGESTERONE 2.5 MG | $312 | $210 | $51 | $51 | 960 | 26 |
| | MEDROXYPROGESTERONE 2.5 MG | $150 | $126 | $18 | $5 | 407 | 15 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | MEDROXYPROGESTERONE 5 MG TA | $98 | $66 | $16 | $16 | 162 | 11 |
| | MEDROXYPROGESTERONE 5 MG TA | $170 | $90 | $80 | $0 | 365 | 13 |
| | MEFLOQUINE HCL 250 MG TABLE | $525 | $207 | $159 | $159 | 56 | 6 |
| | MEGESTROL 20 MG TABLET | $399 | $204 | $97 | $97 | 900 | 21 |
| | MEGESTROL 40 MG TABLET | $4,367 | $2,254 | $1,097 | $1,016 | 5,949 | 89 |
| | MEPERIDINE 100 MG TABLET | $267 | $133 | $67 | $67 | 250 | 2 |
| | MEPERIDINE 50 MG TABLET | $764 | $395 | $198 | $170 | 1,126 | 37 |
| | METFORMIN HCL 1,000 MG TABL | $167 | $86 | $41 | $41 | 240 | 2 |
| | METFORMIN HCL 500 MG TABLET | $121 | $63 | $29 | $29 | 210 | 7 |
| | METFORMIN HCL 750 MG ER TAB | $561 | $280 | $140 | $140 | 540 | 5 |
| | METFORMIN HCL 850 MG TABLET | $332 | $171 | $80 | $80 | 510 | 9 |
| | METHOTREXATE 2.5 MG TABLET | $7,713 | $3,758 | $1,977 | $1,977 | 5,458 | 197 |
| | METHOTREXATE 2.5 MG TABLET | $197 | $101 | $48 | $48 | 136 | 6 |
| | METHOTREXATE 2.5 MG TABLET | $78 | $41 | $18 | $18 | 48 | 4 |
| | METHYLPREDNISOLONE 4 MG TAB | $924 | $466 | $241 | $217 | 2,568 | 51 |
| | METHYLPREDNISOLONE 4 MG TAB | $3,121 | $1,550 | $798 | $773 | 6,394 | 305 |
| | METHYLPREDNISOLONE 4 MG TAB | $1,960 | $968 | $527 | $465 | 4,011 | 191 |
| | NALTREXONE 50 MG TABLET | $3,901 | $2,009 | $977 | $914 | 925 | 38 |
| | NALTREXONE 50 MG TABLET | $1,298 | $671 | $516 | $111 | 390 | 13 |
| | NORETHINDRONE 5 MG TABLET | $1,464 | $1,318 | $90 | $57 | 915 | 29 |
| | NORTREL 1/35 TABLET | $122 | $109 | $6 | $6 | 126 | 6 |
| | NORTREL 1/35 TABLET | $792 | $713 | $40 | $40 | 812 | 17 |
| | NORTREL 7/7/7-28 TABLET | $2,162 | $1,923 | $147 | $91 | 1,988 | 64 |
| | OXYCODONE W/APAP 5/325 TAB | $8 | $4 | $2 | $2 | 30 | 1 |
| | OXYCODONE W/APAP 5/500 CAP | $117 | $59 | $29 | $29 | 450 | 5 |
| | PLAN B 0.75 MG TABLET | $2,794 | $2,514 | $152 | $127 | 217 | 110 |
| | PROCHLORPERAZINE 10 MG TAB | $1,591 | $815 | $405 | $371 | 2,340 | 54 |
| | PROCHLORPERAZINE 10 MG TAB | $31 | $16 | $10 | $5 | 42 | 2 |
| | PROCHLORPERAZINE 10 MG TAB | $1,092 | $571 | $261 | $261 | 1,617 | 38 |
| | PROCHLORPERAZINE 10 MG TAB | $13 | $7 | $3 | $3 | 15 | 1 |
| | PROCHLORPERAZINE 5 MG TABLE | $119 | $53 | $33 | $33 | 219 | 7 |
| | PROCHLORPERAZINE 5 MG TABLE | $206 | $101 | $53 | $53 | 405 | 10 |
| | SPRINTEC 28 DAY TABLET | $5,640 | $4,941 | $470 | $229 | 5,460 | 126 |
| | SYSTEM GENERATED from CLAIM | $8,466 | $4,388 | $2,288 | $1,790 | 3,778 | 128 |
| | SYSTEM GENERATED from CLAIM | $7,531 | $3,899 | $1,985 | $1,647 | 3,261 | 110 |
| | SYSTEM GENERATED from CLAIM | $6,037 | $5,226 | $561 | $250 | 4,823 | 53 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | TAMOXIFEN 10 MG TABLET | $5,646 | $2,342 | $1,652 | $1,652 | 3,640 | 54 |
| | TAMOXIFEN 10 MG TABLET | $1,386 | $720 | $333 | $333 | 900 | 7 |
| | TAMOXIFEN 20 MG TABLET | $8,671 | $4,477 | $2,097 | $2,097 | 2,920 | 62 |
| | TAMOXIFEN 20 MG TABLET | $6,591 | $3,392 | $1,599 | $1,599 | 2,695 | 79 |
| | TETRACYCLINE 250 MG CAPSULE | $164 | $84 | $57 | $23 | 1,390 | 22 |
| | TETRACYCLINE 250 MG CAPSULE | $96 | $49 | $28 | $19 | 710 | 14 |
| | TETRACYCLINE 500 MG CAPSULE | $104 | $49 | $27 | $27 | 569 | 12 |
| | TETRACYCLINE 500 MG CAPSULE | $56 | $29 | $15 | $12 | 315 | 6 |
| | TRAZODONE 100 MG TABLET | $1,390 | $711 | $379 | $299 | 7,393 | 130 |
| | TRAZODONE 100 MG TABLET | $27 | $14 | $6 | $6 | 135 | 3 |
| | TRAZODONE 150 MG TABLET | $6,360 | $3,267 | $1,573 | $1,520 | 15,123 | 367 |
| | TRAZODONE 150 MG TABLET | $156 | $83 | $46 | $27 | 495 | 6 |
| | TRAZODONE 300 MG TABLET | $10,319 | $5,285 | $2,842 | $2,192 | 2,754 | 80 |
| | TRAZODONE 50 MG TABLET | $838 | $431 | $245 | $162 | 4,795 | 109 |
| | TRAZODONE 50 MG TABLET | $333 | $170 | $91 | $72 | 1,849 | 44 |
| | TREXALL 10 MG TABLET | $414 | $213 | $101 | $101 | 31 | 3 |
| | TREXALL 15 MG TABLET | $182 | $91 | $45 | $45 | 9 | 2 |
| | TREXALL 7.5 MG TABLET | $80 | $40 | $20 | $20 | 8 | 1 |
| | TRIAMTERENE/HCTZ 37.5/25 CP | $14 | $7 | $3 | $3 | 30 | 1 |
| | TRIAMTERENE/HCTZ 37.5/25 CP | $10,946 | $5,455 | $2,831 | $2,660 | 25,761 | 686 |
| | TRIAMTERENE/HCTZ 37.5/25 CP | $24 | $12 | $6 | $6 | 60 | 1 |
| | TRIAMTERENE/HCTZ 37.5/25 CP | $100 | $53 | $24 | $24 | 240 | 6 |
| | TRIAMTERENE/HCTZ 37.5/25 CP | $83 | $44 | $20 | $20 | 180 | 6 |
| | TRIAMTERENE/HCTZ 37.5/25 TB | $113 | $59 | $27 | $27 | 405 | 9 |
| | TRIAMTERENE/HCTZ 37.5/25 TB | $1,229 | $638 | $295 | $295 | 3,979 | 114 |
| | TRIAMTERENE/HCTZ 75/50 TAB | $87 | $45 | $21 | $21 | 510 | 15 |
| | TRI-SPRINTEC TABLET | $20,336 | $17,896 | $1,360 | $1,080 | 16,184 | 474 |
| | VELIVET 28 DAY TABLET | $1,167 | $963 | $102 | $102 | 1,008 | 34 |
| | WARFARIN SODIUM 1 MG TABLET | $16,967 | $8,433 | $4,312 | $4,223 | 31,422 | 562 |
| | WARFARIN SODIUM 1 MG TABLET | $10 | $5 | $2 | $2 | 30 | 1 |
| | WARFARIN SODIUM 10 MG TABLE | $4,952 | $2,479 | $1,341 | $1,132 | 5,290 | 175 |
| | WARFARIN SODIUM 2 MG TABLET | $16,822 | $8,278 | $4,319 | $4,226 | 30,204 | 615 |
| | WARFARIN SODIUM 2.5 MG TAB | $19,547 | $9,826 | $4,918 | $4,803 | 33,045 | 749 |
| | WARFARIN SODIUM 2.5 MG TAB | $201 | $103 | $63 | $35 | 318 | 6 |
| | WARFARIN SODIUM 3 MG TABLET | $12,250 | $5,973 | $3,228 | $3,050 | 20,943 | 521 |
| | WARFARIN SODIUM 4 MG TABLET | $9,372 | $4,759 | $2,386 | $2,227 | 15,423 | 402 |
| | WARFARIN SODIUM 4 MG TABLET | $26 | $14 | $6 | $6 | 30 | 2 |
| | WARFARIN SODIUM 5 MG TABLET | $33,021 | $16,714 | $8,228 | $8,079 | 55,217 | 1,428 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | WARFARIN SODIUM 5 MG TABLET | $173 | $87 | $68 | $19 | 271 | 5 |
| | WARFARIN SODIUM 6 MG TABLET | $4,161 | $2,108 | $1,088 | $965 | 4,701 | 143 |
| | WARFARIN SODIUM 7.5 MG TAB | $8,468 | $4,237 | $2,177 | $2,054 | 9,484 | 285 |
| Baxter Healthcare | CYCLOPHOSPHAMIDE 500 MG VIA | $240 | $120 | $60 | $60 | 12 | 4 |
| | FAMOTIDINE 10 MG/ML VIAL | $23 | $12 | $5 | $5 | 28 | 2 |
| | GAMMAGARD S/D 10 GM VL W/ST | $13,588 | $7,157 | $3,531 | $2,900 | 23 | 5 |
| | RECOMBINATE 220-400 UNIT VL | $5,750 | $2,909 | $1,420 | $1,420 | 555 | 4 |
| | RECOMBINATE 801-1,240 UNITS | $65,712 | $34,135 | $15,789 | $15,789 | 6,347 | 6 |
| | TRANSDERM-SCOP 1.5 MG/72HR | $1,462 | $746 | $716 | $0 | 372 | 19 |
| | BACTOCILL 2 GM/ISO-OSM DEX | $72 | $36 | $18 | $18 | 120 | 3 |
| | D5-1/2NS/KCL 20 MEQ/L IV SO | $325 | $133 | $96 | $96 | 20,000 | 8 |
| | DEXTROSE 5%/WATER IV SOLN. | $57 | $22 | $18 | $18 | 4,800 | 4 |
| | DEXTROSE 5%/WATER IV SOLN. | $45 | $23 | $11 | $11 | 5,500 | 4 |
| | DEXTROSE 5%/WATER IV SOLN. | $49 | $25 | $12 | $12 | 12,000 | 6 |
| | DEXTROSE 5%/WATER IV SOLN. | $154 | $80 | $37 | $37 | 4,650 | 7 |
| | DEXTROSE 5%/WATER IV SOLN. | $123 | $48 | $37 | $37 | 2,900 | 7 |
| | DEXTROSE 5%-1/2NS IV SOLN. | $17 | $9 | $4 | $4 | 4,000 | 1 |
| | DEXTROSE 5%-1/2NS IV SOLN. | $186 | $96 | $45 | $45 | 65,500 | 13 |
| | DEXTROSE 5%-MULTI-PACK | $487 | $249 | $119 | $119 | 30,600 | 18 |
| | DEXTROSE 5%-NS IV SOLUTION | $254 | $127 | $64 | $64 | 103,000 | 15 |
| | HEPARIN LOCK FLUSH 10 UNITS | $97 | $49 | $24 | $24 | 89 | 11 |
| | IRRIGATING SOLUTION G | $56 | $30 | $13 | $13 | 3,000 | 3 |
| | LACTATED RINGERS INJECTION | $92 | $46 | $46 | $0 | 6,250 | 6 |
| | METRONIDAZOLE 500 MG/0.1L B | $373 | $198 | $88 | $88 | 2,700 | 2 |
| | SODIUM CHLORIDE 0.45% SOLN | $296 | $148 | $74 | $74 | 29,000 | 4 |
| | SODIUM CHLORIDE 0.9% IRRIG. | $3,493 | $1,772 | $1,272 | $450 | 92,500 | 17 |
| | SODIUM CHLORIDE 0.9% IRRIG. | $794 | $413 | $252 | $129 | 36,000 | 20 |
| | SODIUM CHLORIDE 0.9% IRRIG. | $3,806 | $1,953 | $1,046 | $807 | 337,330 | 162 |
| | SODIUM CHLORIDE 0.9% SOLN | $17 | $0 | $9 | $9 | 1,500 | 1 |
| | SODIUM CHLORIDE 0.9% SOLN | $55 | $28 | $13 | $13 | 6,500 | 5 |
| | SODIUM CHLORIDE 0.9% SOLN | $83 | $44 | $20 | $20 | 15,900 | 9 |
| | SODIUM CHLORIDE 0.9% SOLN | $544 | $279 | $133 | $133 | 207,000 | 42 |
| | SODIUM CHLORIDE 0.9% SOLN | $188 | $100 | $44 | $44 | 4,950 | 7 |
| | SODIUM CHLORIDE 0.9% SOLN | $226 | $0 | $113 | $113 | 14,400 | 8 |
| | SODIUM CHLORIDE 0.9% SOLN | $0 | $0 | $0 | $0 | 0 | 0 |
| | SODIUM CHLORIDE 0.9% SOLN | $501 | $254 | $123 | $123 | 26,800 | 33 |
| | SODIUM CHLORIDE 0.9% SOLN | $774 | $403 | $185 | $185 | 49,000 | 25 |
| | SODIUM CHLORIDE 0.9% SOLN. | $103 | $53 | $25 | $25 | 1,550 | 4 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | SODIUM CHLORIDE 0.9% SOLN. | $1,490 | $709 | $391 | $391 | 50,000 | 29 |
| | SODIUM CHLORIDE 0.9% SYRNGE | $1,209 | $623 | $293 | $293 | 2,080 | 19 |
| | SODIUM CHLORIDE 0.9% SYRNGE | $0 | $0 | $0 | $0 | 0 | 0 |
| | STERILE WATER,IRRIGATION | $23 | $11 | $6 | $6 | 1,000 | 1 |
| | STERILE WATER,IRRIGATION | $966 | $495 | $235 | $235 | 195,060 | 26 |
| | VANCOCIN HCL 1G/200 ML BAG | $10,575 | $5,473 | $2,551 | $2,551 | 66,400 | 30 |
| | VANCOCIN HCL 500 MG/100 ML | $1,436 | $749 | $344 | $344 | 15,400 | 11 |
| Bayer Corp. Pharmaceutical Div. | ADALAT CC 60 MG TABLET | $1,617 | $826 | $396 | $396 | 660 | 11 |
| | ADALAT CC 90 MG TABLET | $2,088 | $1,080 | $504 | $504 | 720 | 24 |
| | AVELOX 400 MG TABLET | $54,963 | $27,417 | $14,380 | $13,166 | 5,897 | 708 |
| | AVELOX ABC PACK 400 MG TAB | $1,519 | $683 | $418 | $418 | 165 | 34 |
| | BILTRICIDE 600 MG TABLET | $33 | $16 | $8 | $8 | 3 | 1 |
| | CIPRO 10% SUSPENSION | $1,057 | $549 | $254 | $254 | 1,000 | 10 |
| | CIPRO 100 MG TABLET | $402 | $208 | $103 | $92 | 108 | 12 |
| | CIPRO 250 MG TABLET | $6,050 | $3,127 | $1,540 | $1,383 | 1,322 | 101 |
| | CIPRO 5% SUSPENSION | $1,913 | $983 | $465 | $465 | 1,893 | 18 |
| | CIPRO 500 MG TABLET | $30,427 | $15,419 | $8,428 | $6,579 | 5,713 | 328 |
| | CIPRO 750 MG TABLET | $2,051 | $1,053 | $575 | $423 | 366 | 19 |
| | CIPRO I.V. 10 MG/ML VIAL | $0 | $0 | $0 | $0 | 0 | 0 |
| | CIPRO XR 1,000 MG TABLET | $10,848 | $5,460 | $2,804 | $2,584 | 1,252 | 148 |
| | CIPRO XR 1,000 MG TABLET | $461 | $241 | $125 | $95 | 51 | 7 |
| | CIPRO XR 500 MG TABLET | $14,463 | $7,035 | $3,775 | $3,654 | 1,823 | 291 |
| | CIPRO XR 500 MG TABLET | $2,528 | $1,326 | $700 | $502 | 315 | 52 |
| | GAMIMUNE N 10% VIAL | $55,725 | $28,804 | $13,461 | $13,461 | 8,750 | 15 |
| | GAMIMUNE N 10% VIAL | $12,909 | $6,835 | $3,037 | $3,037 | 1,950 | 3 |
| | GAMIMUNE N 10% VIAL | $7,053 | $3,734 | $1,659 | $1,659 | 1,100 | 3 |
| | GAMUNEX 10% VIAL | $0 | $0 | $0 | $0 | 0 | 0 |
| | GAMUNEX 10% VIAL | $219,463 | $113,294 | $53,085 | $53,085 | 24,650 | 42 |
| | LEVITRA 10 MG TABLET | $7,540 | $3,829 | $1,946 | $1,764 | 810 | 138 |
| | LEVITRA 2.5 MG TABLET | $226 | $113 | $57 | $57 | 24 | 4 |
| | LEVITRA 20 MG TABLET | $8,909 | $4,296 | $2,350 | $2,263 | 953 | 160 |
| | LEVITRA 5 MG TABLET | $528 | $242 | $143 | $143 | 57 | 10 |
| | PRECOSE 100 MG TABLET | $2,914 | $1,484 | $755 | $675 | 3,390 | 35 |
| | PRECOSE 25 MG TABLET | $7,379 | $3,671 | $2,003 | $1,706 | 11,152 | 129 |
| | PRECOSE 50 MG TABLET | $10,423 | $5,354 | $2,583 | $2,486 | 14,900 | 173 |
| | TRIDESILON 0.05% CREAM | $0 | $0 | $0 | $0 | 0 | 0 |
| Berlex Laboratories, Inc. | BETAPACE AF 120 MG TABLET | $619 | $328 | $146 | $146 | 180 | 1 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | BETAPACE AF 160 MG TABLET | $2,326 | $1,216 | $555 | $555 | 540 | 5 |
| | BETAPACE AF 80 MG TABLET | $1,327 | $682 | $323 | $323 | 510 | 11 |
| | BETASERON 0.3 MG VIAL | $68,054 | $35,254 | $18,050 | $14,750 | 885 | 59 |
| | BETASERON 0.3 MG VIAL | $123,807 | $63,273 | $32,174 | $28,360 | 1,575 | 105 |
| | CLIMARA 0.025 MG/DAY PATCH | $419 | $377 | $21 | $21 | 48 | 12 |
| | CLIMARA 0.0375 MG/DAY PATCH | $238 | $126 | $56 | $56 | 28 | 4 |
| | CLIMARA 0.075 MG/DAY PATCH | $176 | $158 | $9 | $9 | 20 | 3 |
| | CLIMARA PRO PATCH | $0 | $0 | $0 | $0 | 0 | 0 |
| | FINACEA 15% GEL | $13,675 | $6,947 | $4,444 | $2,285 | 9,210 | 291 |
| | FLUDARA 50 MG VIAL | $2,027 | $1,013 | $507 | $507 | 6 | 2 |
| | LEUKINE 500 MCG/ML VIAL | $2,854 | $1,427 | $714 | $714 | 10 | 1 |
| | LEVLEN 28 TABLET | $1,196 | $1,076 | $111 | $9 | 1,008 | 34 |
| | LEVLITE-28 TABLET | $392 | $353 | $20 | $20 | 308 | 11 |
| | MENOSTAR 14 MCG/DAY PATCH | $179 | $89 | $45 | $45 | 16 | 4 |
| | YASMIN 28 TABLET | $26,191 | $23,307 | $1,510 | $1,374 | 20,364 | 598 |
| Biogen, Inc. | AVONEX ADMIN PACK 30 MCG SY | $502,743 | $245,978 | $134,691 | $122,074 | 1,820 | 455 |
| | AVONEX ADMIN PACK 30 MCG VL | $41,644 | $19,097 | $11,762 | $10,784 | 152 | 38 |
| Boehringer Ingelheim Pharmaceuticals | AGGRENOX CAPSULE SA | $32,382 | $16,662 | $7,860 | $7,860 | 16,308 | 259 |
| | ALUPENT 650 MCG INHALER COM | $2,156 | $1,116 | $520 | $520 | 924 | 53 |
| | ATROVENT 0.02% SOLUTION | $2,102 | $1,070 | $516 | $516 | 1,625 | 4 |
| | ATROVENT 0.03% SPRAY | $871 | $450 | $211 | $211 | 480 | 13 |
| | ATROVENT INHALER | $67,047 | $33,795 | $17,335 | $15,916 | 17,154 | 1,013 |
| | CATAPRES 0.1 MG TABLET | $1,692 | $866 | $413 | $413 | 2,055 | 24 |
| | CATAPRES-TTS 1 PATCH | $12,050 | $6,000 | $3,054 | $2,997 | 889 | 191 |
| | CATAPRES-TTS 2 PATCH | $40,962 | $20,991 | $10,375 | $9,597 | 1,834 | 350 |
| | CATAPRES-TTS 3 PATCH | $56,602 | $29,094 | $13,754 | $13,754 | 1,804 | 355 |
| | COMBIVENT INHALER | $285,416 | $143,909 | $73,472 | $68,034 | 68,847 | 4,038 |
| | FLOMAX 0.4 MG CAPSULE SA | $324,969 | $161,099 | $91,217 | $72,653 | 174,292 | 4,023 |
| | MICARDIS 20 MG TABLET | $560 | $286 | $137 | $137 | 366 | 10 |
| | MICARDIS 40 MG TABLET | $6,859 | $2,916 | $1,971 | $1,971 | 4,438 | 136 |
| | MICARDIS 40 MG TABLET | $227 | $113 | $57 | $57 | 148 | 3 |
| | MICARDIS 80 MG TABLET | $13,369 | $6,385 | $3,574 | $3,410 | 8,102 | 230 |
| | MICARDIS HCT 40/12.5 MG TAB | $2,938 | $1,165 | $959 | $814 | 1,774 | 39 |
| | MICARDIS HCT 40/12.5 MG TAB | $50 | $25 | $12 | $12 | 30 | 1 |
| | MICARDIS HCT 80/12.5 MG TAB | $7,733 | $3,855 | $2,004 | $1,874 | 4,246 | 141 |
| | MICARDIS HCT 80/12.5 MG TAB | $109 | $55 | $27 | $27 | 60 | 2 |
| | MICARDIS HCT 80/25 MG TABLE | $620 | $310 | $155 | $155 | 297 | 12 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | MIRAPEX 0.125 MG TABLET | $8,093 | $4,096 | $2,255 | $1,741 | 8,167 | 78 |
| | MIRAPEX 0.25 MG TABLET | $6,332 | $2,664 | $1,834 | $1,834 | 5,220 | 56 |
| | MIRAPEX 0.5 MG TABLET | $15,689 | $7,983 | $3,853 | $3,853 | 7,380 | 64 |
| | MIRAPEX 1 MG TABLET | $2,359 | $1,179 | $590 | $590 | 1,110 | 9 |
| | MIRAPEX 1.5 MG TABLET | $835 | $425 | $205 | $205 | 390 | 5 |
| | MOBIC 15 MG TABLET | $45,724 | $22,205 | $12,754 | $10,765 | 12,705 | 376 |
| | MOBIC 7.5 MG TABLET | $108,597 | $53,670 | $28,453 | $26,473 | 40,516 | 1,004 |
| | PERSANTINE 50 MG TABLET | $48 | $25 | $11 | $11 | 60 | 1 |
| | SERENTIL 10 MG TABLET | $75 | $40 | $18 | $18 | 90 | 1 |
| | SERENTIL 100 MG TABLET | $1,632 | $843 | $586 | $203 | 1,080 | 12 |
| | SERENTIL 25 MG TABLET | $1,342 | $710 | $449 | $183 | 1,198 | 18 |
| | SERENTIL 25 MG/ML ORAL CONC | $138 | $73 | $65 | $0 | 236 | 2 |
| | SPIRIVA 18 MCG CP-HANDIHALE | $0 | $0 | $0 | $0 | 0 | 0 |
| | SPIRIVA 18 MCG CP-HANDIHALE | $52,832 | $26,000 | $13,848 | $12,984 | 14,852 | 497 |
| | VIRAMUNE 200 MG TABLET | $12,598 | $6,538 | $3,030 | $3,030 | 2,402 | 44 |
| | VIRAMUNE 200 MG TABLET | $180,773 | $92,970 | $43,902 | $43,902 | 29,144 | 493 |
| | VIRAMUNE 50 MG/5 ML SUSP | $12,623 | $6,480 | $3,071 | $3,071 | 37,380 | 35 |
| Bristol-Myers Squibb Company | AVALIDE 150-12.5 MG TABLET | $37,140 | $18,409 | $9,550 | $9,181 | 19,550 | 483 |
| | AVALIDE 150-12.5 MG TABLET | $10,207 | $5,217 | $2,728 | $2,262 | 5,340 | 149 |
| | AVALIDE 300-12.5 MG TABLET | $51,330 | $25,803 | $12,809 | $12,718 | 25,232 | 692 |
| | AVALIDE 300-12.5 MG TABLET | $12,906 | $6,548 | $3,179 | $3,179 | 6,370 | 181 |
| | AVAPRO 150 MG TABLET | $994 | $503 | $339 | $152 | 630 | 17 |
| | AVAPRO 150 MG TABLET | $46,980 | $23,841 | $11,777 | $11,362 | 30,255 | 747 |
| | AVAPRO 150 MG TABLET | $33,706 | $17,197 | $8,914 | $7,595 | 21,687 | 527 |
| | AVAPRO 300 MG TABLET | $115 | $57 | $29 | $29 | 60 | 2 |
| | AVAPRO 300 MG TABLET | $33,465 | $15,663 | $9,457 | $8,346 | 17,930 | 475 |
| | AVAPRO 300 MG TABLET | $27,544 | $13,786 | $7,267 | $6,491 | 14,805 | 388 |
| | AVAPRO 75 MG TABLET | $3,641 | $1,873 | $1,035 | $733 | 2,474 | 50 |
| | AVAPRO 75 MG TABLET | $2,206 | $834 | $867 | $505 | 1,470 | 40 |
| | BUSPAR 10 MG TABLET | $1,462 | $750 | $356 | $356 | 1,020 | 13 |
| | BUSPAR 15 MG TABLET | $4,479 | $2,311 | $1,084 | $1,084 | 2,400 | 23 |
| | BUSPAR 30 MG TABLET | $2,862 | $1,468 | $697 | $697 | 750 | 18 |
| | BUSPAR 5 MG TABLET | $49 | $25 | $12 | $12 | 120 | 4 |
| | CAFCIT 20 MG/ML ORAL SOLN | $1,246 | $623 | $311 | $311 | 90 | 1 |
| | CEFZIL 125 MG/5 ML SUSPENSI | $367 | $190 | $88 | $88 | 850 | 10 |
| | CEFZIL 125 MG/5 ML SUSPENSI | $526 | $275 | $142 | $110 | 1,200 | 15 |
| | CEFZIL 125 MG/5 ML SUSPENSI | $11,543 | $5,971 | $3,118 | $2,454 | 27,000 | 261 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | CEFZIL 250 MG TABLET | $17,009 | $8,858 | $4,529 | $3,622 | 3,977 | 203 |
| | CEFZIL 250 MG/5 ML SUSPENSI | $2,053 | $1,063 | $523 | $467 | 2,650 | 32 |
| | CEFZIL 250 MG/5 ML SUSPENSI | $5,597 | $2,974 | $1,499 | $1,125 | 7,475 | 81 |
| | CEFZIL 250 MG/5 ML SUSPENSI | $49,877 | $26,056 | $12,747 | $11,074 | 71,050 | 632 |
| | CEFZIL 500 MG TABLET | $19,151 | $10,027 | $4,973 | $4,152 | 2,202 | 122 |
| | CEFZIL 500 MG TABLET | $7,219 | $3,771 | $1,985 | $1,464 | 845 | 47 |
| | DESYREL 150 MG TABLET | $6,626 | $3,415 | $1,606 | $1,606 | 2,286 | 17 |
| | DURICEF 250 MG/5 ML ORAL SU | $2,598 | $1,294 | $755 | $550 | 5,400 | 50 |
| | DURICEF 250 MG/5 ML ORAL SU | $262 | $137 | $62 | $62 | 600 | 8 |
| | DURICEF 500 MG/5 ML ORAL SU | $100 | $50 | $25 | $25 | 150 | 1 |
| | DURICEF 500 MG/5 ML ORAL SU | $2,061 | $1,092 | $520 | $449 | 3,100 | 31 |
| | GLUCOPHAGE 500 MG TABLET | $1,522 | $786 | $368 | $368 | 1,930 | 32 |
| | GLUCOPHAGE 850 MG TABLET | $1,741 | $908 | $417 | $417 | 1,530 | 14 |
| | GLUCOPHAGE XR 500 MG TAB SA | $40,951 | $20,426 | $10,520 | $10,005 | 51,630 | 594 |
| | GLUCOPHAGE XR 750 MG TAB SA | $10,965 | $5,626 | $2,831 | $2,508 | 9,240 | 114 |
| | GLUCOVANCE 1.25/250 MG TAB | $12,011 | $6,142 | $2,988 | $2,881 | 13,740 | 251 |
| | GLUCOVANCE 2.5/500 MG TAB | $46,503 | $23,958 | $12,569 | $9,976 | 45,278 | 603 |
| | GLUCOVANCE 5/500 MG TAB | $109,173 | $53,957 | $27,914 | $27,302 | 106,968 | 1,265 |
| | KLOTRIX 10 MEQ TABLET SA | $8 | $4 | $2 | $2 | 30 | 1 |
| | K-LYTE TABLET EFF | $248 | $124 | $62 | $62 | 180 | 6 |
| | METAGLIP 2.5/250 MG TABLET | $343 | $177 | $83 | $83 | 420 | 7 |
| | METAGLIP 2.5/500 MG TABLET | $1,360 | $187 | $587 | $587 | 1,410 | 23 |
| | METAGLIP 5/500 MG TABLET | $8,692 | $4,110 | $2,291 | $2,291 | 9,040 | 109 |
| | MONOPRIL 10 MG TABLET | $9,006 | $4,572 | $2,254 | $2,180 | 7,145 | 182 |
| | MONOPRIL 10 MG TABLET | $773 | $406 | $358 | $9 | 600 | 10 |
| | MONOPRIL 20 MG TABLET | $10,233 | $5,096 | $2,634 | $2,503 | 8,205 | 173 |
| | MONOPRIL 20 MG TABLET | $237 | $124 | $75 | $37 | 300 | 10 |
| | MONOPRIL 40 MG TABLET | $10,139 | $5,198 | $2,635 | $2,305 | 8,476 | 200 |
| | MONOPRIL HCT 10/12.5 MG TAB | $3,221 | $1,663 | $779 | $779 | 2,490 | 72 |
| | MONOPRIL HCT 20/12.5 MG TAB | $5,173 | $2,662 | $1,256 | $1,256 | 4,070 | 95 |
| | MUCOMYST 20% VIAL | $60 | $31 | $14 | $14 | 60 | 3 |
| | MUCOMYST 20% VIAL | $390 | $69 | $161 | $161 | 720 | 5 |
| | MUCOMYST-10 VIAL | $58 | $30 | $14 | $14 | 60 | 2 |
| | MUCOMYST-10 VIAL | $341 | $32 | $155 | $155 | 660 | 3 |
| | MUCOMYST-10 VIAL | $2,638 | $1,371 | $633 | $633 | 2,304 | 6 |
| | POLY-VI-FLOR 0.25 MG TAB CH | $172 | $89 | $41 | $41 | 840 | 12 |
| | POLY-VI-FLOR 0.25 MG/ML DRP | $304 | $157 | $77 | $70 | 960 | 20 |
| | POLY-VI-FLOR 0.5 MG TABLET | $308 | $163 | $76 | $69 | 1,580 | 18 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | POLY-VI-FLOR 0.5 MG/ML DROP | $102 | $52 | $29 | $21 | 330 | 6 |
| | POLY-VI-FLOR 1 MG TABLET | $488 | $251 | $122 | $115 | 2,448 | 37 |
| | POLY-VI-FLOR/IRON 0.25 MG T | $722 | $374 | $177 | $171 | 3,226 | 58 |
| | POLY-VI-FLOR/IRON 0.25 MG/M | $154 | $80 | $41 | $33 | 500 | 10 |
| | SERZONE 100 MG TABLET | $479 | $254 | $113 | $113 | 300 | 4 |
| | SERZONE 150 MG TABLET | $3,526 | $1,851 | $850 | $825 | 2,140 | 32 |
| | SERZONE 200 MG TABLET | $4,758 | $2,475 | $1,412 | $872 | 2,820 | 43 |
| | SERZONE 250 MG TABLET | $1,138 | $600 | $395 | $144 | 660 | 15 |
| | SERZONE 50 MG TABLET | $1,427 | $756 | $336 | $336 | 921 | 8 |
| | STADOL NS 10 MG/ML SPRAY | $12,455 | $6,595 | $2,930 | $2,930 | 326 | 26 |
| | TRI-VI-FLOR 0.25 MG/ML DROP | $51 | $27 | $15 | $10 | 160 | 4 |
| | VIDEX 100 MG TABLET CHEWABL | $2,749 | $1,413 | $668 | $668 | 1,260 | 15 |
| | VIDEX 200 MG TABLET CHEWABL | $656 | $335 | $160 | $160 | 150 | 4 |
| | VIDEX 4 GM PEDIATRIC SOLN | $726 | $384 | $171 | $171 | 1,800 | 3 |
| | VIDEX 50 MG TABLET CHEWABLE | $201 | $101 | $50 | $50 | 180 | 3 |
| | VIDEX EC 125 MG CAP SA | $2,590 | $1,326 | $632 | $632 | 817 | 28 |
| | VIDEX EC 200 MG CAP SA | $8,373 | $4,309 | $2,032 | $2,032 | 1,678 | 57 |
| | VIDEX EC 250 MG CAP SA | $60,962 | $31,440 | $14,858 | $14,664 | 9,629 | 327 |
| | VIDEX EC 400 MG CAP SA | $82,523 | $42,361 | $20,942 | $19,220 | 8,397 | 280 |
| Bristol-Myers Squibb/Sanofi Partnership | PLAVIX 75 MG TABLET | $739,583 | $370,195 | $186,472 | $182,915 | 186,118 | 4,952 |
| | PLAVIX 75 MG TABLET | $59,205 | $30,168 | $18,039 | $10,998 | 14,746 | 407 |
| | PLAVIX 75 MG TABLET | $829,009 | $413,120 | $209,509 | $206,379 | 206,106 | 5,639 |
| Dista Products Co. Div. of Eli Lilly & Co. | PROZAC 10 MG PULVULE | $2,269 | $1,156 | $556 | $556 | 630 | 13 |
| | PROZAC 20 MG PULVULE | $8,323 | $4,272 | $2,977 | $1,074 | 2,280 | 39 |
| | PROZAC 20 MG PULVULE | $4,211 | $2,153 | $1,029 | $1,029 | 1,200 | 24 |
| | PROZAC 40 MG PULVULE | $8,486 | $4,395 | $2,759 | $1,333 | 1,200 | 31 |
| Eli Lilly and Company | CECLOR 250 MG PULVULE | $45 | $24 | $10 | $10 | 21 | 1 |
| | CIALIS 10 MG TABLET | $3,931 | $1,988 | $987 | $956 | 397 | 68 |
| | CIALIS 20 MG TABLET | $6,680 | $3,404 | $1,653 | $1,623 | 685 | 116 |
| | CIALIS 5 MG TABLET | $179 | $91 | $44 | $44 | 18 | 3 |
| | CYMBALTA 20 MG CAPSULE | $3,954 | $1,977 | $1,053 | $923 | 1,377 | 38 |
| | CYMBALTA 30 MG CAPSULE | $11,939 | $5,969 | $3,062 | $2,908 | 3,845 | 99 |
| | CYMBALTA 60 MG CAPSULE | $6,341 | $3,074 | $1,634 | $1,634 | 1,964 | 66 |
| | DARVOCET-N 100 TABLET | $6,356 | $3,273 | $1,541 | $1,541 | 6,420 | 54 |
| | DARVOCET-N 50 TABLET | $537 | $280 | $128 | $128 | 965 | 16 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | DARVON 65 MG PULVULE | $1,222 | $628 | $297 | $297 | 1,980 | 11 |
| | DARVON-N 100 MG TABLET | $1,396 | $717 | $339 | $339 | 1,478 | 20 |
| | EVISTA 60 MG TABLET | $55,307 | $27,642 | $17,889 | $9,776 | 21,349 | 574 |
| | EVISTA 60 MG TABLET | $110,021 | $55,523 | $27,708 | $26,789 | 42,773 | 1,145 |
| | FORTEO 750 MCG/3 ML PEN | $31,059 | $15,887 | $7,860 | $7,312 | 165 | 57 |
| | GEMZAR 1 GRAM VIAL | $25,700 | $13,031 | $6,335 | $6,335 | 42 | 13 |
| | GEMZAR 200 MG VIAL | $11,133 | $5,631 | $2,751 | $2,751 | 91 | 12 |
| | GLUCAGON 1 MG EMERGENCY KIT | $17,695 | $9,104 | $4,448 | $4,143 | 233 | 143 |
| | GLUCAGON 1 MG KIT | $422 | $215 | $103 | $103 | 6 | 4 |
| | HUMALOG 100 UNITS/ML CARTRI | $0 | $0 | $0 | $0 | 0 | 0 |
| | HUMALOG 100 UNITS/ML CARTRI | $4,048 | $2,067 | $991 | $991 | 495 | 11 |
| | HUMALOG 100 UNITS/ML PEN | $24,787 | $12,765 | $6,072 | $5,951 | 3,125 | 156 |
| | HUMALOG 100 UNITS/ML VIAL | $92,412 | $46,739 | $23,894 | $21,779 | 14,880 | 806 |
| | HUMALOG MIX 75/25 PEN | $32,064 | $15,182 | $8,441 | $8,441 | 4,050 | 144 |
| | HUMALOG MIX 75/25 VIAL | $37,769 | $19,435 | $9,440 | $8,894 | 6,116 | 256 |
| | HUMATROPE 12 MG CARTRIDGE | $52,382 | $31,086 | $16,070 | $5,226 | 104 | 26 |
| | HUMATROPE 24 MG CARTRIDGE | $76,579 | $48,374 | $25,868 | $2,337 | 76 | 20 |
| | HUMATROPE 5 MG VIAL | $10,914 | $5,581 | $2,666 | $2,666 | 46 | 8 |
| | HUMATROPE 5 MG VIAL | $71,382 | $36,749 | $17,317 | $17,317 | 303 | 14 |
| | HUMATROPE 6 MG CARTRIDGE | $7,782 | $3,891 | $1,946 | $1,946 | 27 | 5 |
| | HUMULIN R 500 UNITS/ML VIAL | $393 | $202 | $95 | $95 | 40 | 2 |
| | PROZAC 10 MG TABLET | $3,613 | $1,859 | $877 | $877 | 1,020 | 16 |
| | PROZAC WEEKLY 90 MG CAPSULE | $46,729 | $23,454 | $13,925 | $9,349 | 2,148 | 361 |
| | SARAFEM 10 MG PULVULE | $302 | $154 | $74 | $74 | 224 | 6 |
| | SARAFEM 20 MG PULVULE | $4,633 | $2,408 | $1,113 | $1,113 | 2,412 | 56 |
| | STRATTERA 10 MG CAPSULE | $21,813 | $11,337 | $6,310 | $4,165 | 7,981 | 180 |
| | STRATTERA 18 MG CAPSULE | $17,988 | $9,480 | $4,712 | $3,796 | 6,028 | 177 |
| | STRATTERA 25 MG CAPSULE | $51,529 | $26,937 | $13,908 | $10,685 | 17,464 | 387 |
| | STRATTERA 40 MG CAPSULE | $107,158 | $55,794 | $28,870 | $22,495 | 36,162 | 864 |
| | STRATTERA 60 MG CAPSULE | $30,014 | $15,533 | $8,316 | $6,165 | 10,020 | 339 |
| | SYMBYAX 12-25 MG CAPSULE | $22,657 | $11,495 | $6,990 | $4,172 | 2,025 | 59 |
| | SYMBYAX 12-50 MG CAPSULE | $12,440 | $6,269 | $3,086 | $3,086 | 1,110 | 37 |
| | SYMBYAX 6-25 MG CAPSULE | $40,666 | $20,738 | $10,836 | $9,092 | 5,494 | 159 |
| | SYMBYAX 6-50 MG CAPSULE | $2,922 | $1,474 | $724 | $724 | 390 | 13 |
| | VANCOCIN HCL 125 MG PULVULE | $4,038 | $2,073 | $983 | $983 | 570 | 13 |
| | VANCOCIN HCL 250 MG PULVULE | $26,606 | $13,673 | $6,467 | $6,467 | 2,106 | 41 |
| | ZYPREXA 10 MG TABLET | $166,894 | $85,546 | $60,546 | $20,802 | 17,969 | 461 |
| | ZYPREXA 10 MG TABLET | $1,960,031 | $1,002,824 | $600,754 | $356,453 | 212,671 | 4,912 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | ZYPREXA 15 MG TABLET | $12,935 | $6,687 | $3,901 | $2,346 | 930 | 26 |
| | ZYPREXA 15 MG TABLET | $1,099,261 | $561,369 | $330,667 | $207,225 | 79,553 | 2,229 |
| | ZYPREXA 2.5 MG TABLET | $338,928 | $172,706 | $98,170 | $68,052 | 65,402 | 1,857 |
| | ZYPREXA 2.5 MG TABLET | $650,635 | $334,487 | $176,187 | $139,962 | 128,663 | 3,554 |
| | ZYPREXA 20 MG TABLET | $5,084 | $2,542 | $1,271 | $1,271 | 270 | 9 |
| | ZYPREXA 20 MG TABLET | $1,419,288 | $726,078 | $432,805 | $260,404 | 76,950 | 2,267 |
| | ZYPREXA 5 MG TABLET | $296,348 | $150,314 | $88,489 | $57,546 | 48,690 | 1,446 |
| | ZYPREXA 5 MG TABLET | $959,468 | $492,273 | $279,717 | $187,478 | 159,930 | 4,090 |
| | ZYPREXA 7.5 MG TABLET | $313,970 | $161,272 | $91,280 | $61,417 | 42,326 | 1,260 |
| | ZYPREXA ZYDIS 10MG TABLET | $298,560 | $152,902 | $87,595 | $58,064 | 29,949 | 726 |
| | ZYPREXA ZYDIS 15MG TAB | $245,571 | $126,252 | $77,341 | $41,978 | 17,031 | 492 |
| | ZYPREXA ZYDIS 20MG TAB | $215,734 | $110,853 | $65,992 | $38,889 | 11,769 | 380 |
| | ZYPREXA ZYDIS 5MG TABLET | $230,493 | $118,645 | $61,862 | $49,986 | 33,790 | 914 |
| Fujisawa Healthcare, Inc. | AMBISOME 50 MG VIAL | $1,556 | $778 | $389 | $389 | 9 | 1 |
| | ARISTOCORT A 0.1% CREAM | $63 | $32 | $16 | $16 | 75 | 3 |
| | ARISTOCORT A 0.1% CREAM | $1,121 | $577 | $305 | $239 | 2,160 | 18 |
| | ARISTOCORT A 0.1% OINTMENT | $0 | $0 | $0 | $0 | 0 | 0 |
| | ARISTOCORT A 0.5% CREAM | $370 | $187 | $100 | $83 | 165 | 6 |
| | CYCLOCORT 0.1% CREAM | $61 | $31 | $22 | $7 | 60 | 2 |
| | CYCLOCORT 0.1% CREAM | $146 | $73 | $49 | $24 | 180 | 3 |
| | CYCLOCORT 0.1% LOTION | $449 | $230 | $132 | $87 | 600 | 10 |
| | CYCLOCORT 0.1% OINTMENT | $0 | $0 | $0 | $0 | 0 | 0 |
| | PROGRAF 0.5 MG CAPSULE | $6,040 | $2,817 | $1,611 | $1,611 | 5,164 | 96 |
| | PROGRAF 1 MG CAPSULE | $229,584 | $111,938 | $60,342 | $57,304 | 84,966 | 548 |
| | PROGRAF 5 MG CAPSULE | $98,833 | $45,449 | $26,692 | $26,692 | 6,492 | 87 |
| | PROTOPIC 0.03% OINTMENT | $15,398 | $7,673 | $4,117 | $3,608 | 8,500 | 85 |
| | PROTOPIC 0.03% OINTMENT | $12,086 | $6,049 | $3,268 | $2,769 | 6,000 | 181 |
| | PROTOPIC 0.03% OINTMENT | $18,596 | $9,616 | $4,672 | $4,308 | 9,420 | 156 |
| | PROTOPIC 0.1% OINTMENT | $35,195 | $17,943 | $9,888 | $7,364 | 18,420 | 183 |
| | PROTOPIC 0.1% OINTMENT | $21,119 | $10,849 | $6,102 | $4,168 | 10,170 | 298 |
| | PROTOPIC 0.1% OINTMENT | $37,316 | $19,052 | $9,944 | $8,320 | 18,070 | 293 |
| Genentech Inc. | CATHFLO ACTIVASE 2 MG VIAL | $417 | $213 | $102 | $102 | 6 | 3 |
| | NUTROPIN 10 MG VIAL | $10,765 | $5,383 | $2,691 | $2,691 | 81 | 5 |
| | NUTROPIN 5 MG VIAL | $37,071 | $19,057 | $9,007 | $9,007 | 180 | 7 |
| | NUTROPIN AQ 5 MG/ML VIAL | $21,088 | $12,807 | $6,528 | $1,753 | 92 | 10 |
| | NUTROPIN AQ PEN CARTRIDGE | $67,225 | $36,582 | $18,080 | $12,562 | 282 | 29 |
| | PROTROPIN 10 MG VIAL | $19,556 | $8,875 | $5,341 | $5,341 | 42 | 4 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | PULMOZYME 1 MG/ML AMPUL | $9,553 | $5,058 | $2,247 | $2,247 | 540 | 4 |
| | PULMOZYME 1 MG/ML AMPUL | $145,821 | $75,186 | $36,157 | $34,478 | 8,235 | 79 |
| | RAPTIVA 125 MG KIT | $4,937 | $2,468 | $1,234 | $1,234 | 16 | 4 |
| | RITUXAN 10 MG/ML VIAL | $57,487 | $28,935 | $14,276 | $14,276 | 1,220 | 16 |
| | RITUXAN 10 MG/ML VIAL | $40,343 | $20,514 | $9,914 | $9,914 | 850 | 8 |
| | TARCEVA 150 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| GlaxoSmithKline | ACLOVATE 0.05% CREAM | $3,216 | $1,667 | $980 | $569 | 2,265 | 102 |
| | ACLOVATE 0.05% CREAM | $7,599 | $3,891 | $2,304 | $1,404 | 8,025 | 174 |
| | ACLOVATE 0.05% CREAM | $2,627 | $1,322 | $954 | $351 | 2,940 | 48 |
| | ACLOVATE 0.05% OINTMENT | $931 | $482 | $247 | $203 | 660 | 31 |
| | ACLOVATE 0.05% OINTMENT | $896 | $473 | $239 | $183 | 945 | 21 |
| | ACLOVATE 0.05% OINTMENT | $1,709 | $873 | $445 | $391 | 1,920 | 32 |
| | ADVAIR 100/50 DISKUS | $229,520 | $115,908 | $61,366 | $52,246 | 120,241 | 1,903 |
| | ADVAIR 250/50 DISKUS | $628,655 | $313,088 | $168,974 | $146,592 | 261,516 | 4,037 |
| | ADVAIR 250/50 DISKUS | $704 | $356 | $344 | $5 | 224 | 8 |
| | ADVAIR 500/50 DISKUS | $418,553 | $213,099 | $106,559 | $98,895 | 127,080 | 1,937 |
| | AGENERASE 150 MG CAPSULE | $24,853 | $12,772 | $6,040 | $6,040 | 17,640 | 58 |
| | AGENERASE 50 MG CAPSULE | $61 | $32 | $14 | $14 | 120 | 2 |
| | ALBENZA 200 MG TABLET | $168 | $89 | $40 | $40 | 120 | 2 |
| | ALKERAN 2 MG TABLET | $1,118 | $573 | $272 | $272 | 444 | 14 |
| | AMERGE 1 MG TABLET | $333 | $176 | $78 | $78 | 18 | 1 |
| | AMERGE 2.5 MG TABLET | $9,682 | $4,963 | $2,742 | $1,978 | 503 | 54 |
| | APHTHASOL 5% PASTE | $22 | $12 | $10 | $0 | 5 | 1 |
| | AVANDAMET 1 MG/500 MG TABLE | $3,066 | $1,187 | $939 | $939 | 2,850 | 50 |
| | AVANDAMET 2 MG/1,000 MG TAB | $15,893 | $6,667 | $5,092 | $4,133 | 7,480 | 114 |
| | AVANDAMET 2 MG/500 MG TABLE | $42,257 | $19,509 | $11,627 | $11,122 | 26,598 | 335 |
| | AVANDAMET 2 MG/500 MG TABLE | $2,787 | $1,331 | $806 | $650 | 1,750 | 26 |
| | AVANDAMET 4 MG/1,000 MG TAB | $30,474 | $14,823 | $7,969 | $7,683 | 9,630 | 163 |
| | AVANDAMET 4 MG/500 MG TABLE | $27,883 | $12,992 | $7,446 | $7,446 | 10,800 | 191 |
| | AVANDAMET 4 MG/500 MG TABLE | $9,564 | $4,842 | $2,474 | $2,249 | 3,712 | 75 |
| | AVODART 0.5 MG CAPSULE | $7,802 | $3,856 | $2,013 | $1,933 | 3,030 | 101 |
| | AVODART 0.5 MG SOFTGEL | $11,522 | $5,575 | $3,518 | $2,429 | 4,682 | 158 |
| | BECONASE 42 MCG INHALER | $0 | $0 | $0 | $0 | 0 | 0 |
| | BECONASE AQ 0.042% SPRAY | $17,289 | $8,819 | $5,275 | $3,194 | 6,675 | 264 |
| | CEFTIN 125 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | CEFTIN 125 MG/5 ML ORAL SUS | $3,256 | $1,685 | $881 | $690 | 7,200 | 66 |
| | CEFTIN 125 MG/5 ML ORAL SUS | $342 | $171 | $98 | $73 | 700 | 7 |
| | CEFTIN 250 MG/5 ML ORAL SUS | $583 | $295 | $153 | $135 | 850 | 13 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | CEFTIN 250 MG/5 ML ORAL SUS | $13,706 | $7,147 | $3,622 | $2,937 | 18,760 | 142 |
| | CEFTIN 250 MG/5 ML ORAL SUS | $2,130 | $1,100 | $594 | $436 | 2,900 | 21 |
| | CEFTIN 250 MG/5 ML ORAL SUS | $103 | $51 | $26 | $26 | 150 | 1 |
| | COMBIVIR TABLET | $900,450 | $459,906 | $220,999 | $219,545 | 86,002 | 1,456 |
| | COMPAZINE 5 MG/5 ML SYRUP | $0 | $0 | $0 | $0 | 0 | 0 |
| | COREG 12.5 MG TABLET | $118,307 | $56,024 | $31,722 | $30,561 | 71,699 | 980 |
| | COREG 25 MG TABLET | $94,887 | $47,991 | $23,502 | $23,394 | 57,649 | 850 |
| | COREG 3.125 MG TABLET | $88,600 | $42,279 | $23,573 | $22,748 | 53,764 | 793 |
| | COREG 3.125 MG TABLET | $946 | $490 | $228 | $228 | 600 | 10 |
| | COREG 6.25 MG TABLET | $111,095 | $55,057 | $28,622 | $27,416 | 67,156 | 988 |
| | CUTIVATE 0.005% OINTMENT | $408 | $232 | $153 | $24 | 255 | 13 |
| | CUTIVATE 0.005% OINTMENT | $2,246 | $1,146 | $692 | $408 | 1,860 | 51 |
| | CUTIVATE 0.005% OINTMENT | $2,807 | $1,476 | $856 | $475 | 3,000 | 46 |
| | CUTIVATE 0.05% CREAM | $1,710 | $880 | $500 | $330 | 1,065 | 55 |
| | CUTIVATE 0.05% CREAM | $5,115 | $2,678 | $1,328 | $1,109 | 4,230 | 126 |
| | CUTIVATE 0.05% CREAM | $9,044 | $4,685 | $2,587 | $1,772 | 9,750 | 161 |
| | DARAPRIM 25 MG TABLET | $1,208 | $623 | $292 | $292 | 2,031 | 44 |
| | DENAVIR 1% CREAM | $26 | $14 | $12 | $0 | 2 | 1 |
| | DEXEDRINE SPANSULE 15 MG | $1,876 | $962 | $457 | $457 | 1,260 | 15 |
| | DYAZIDE 37.5/25 CAPSULE | $969 | $505 | $232 | $232 | 1,710 | 29 |
| | DYAZIDE 37.5/25 CAPSULE | $57 | $28 | $14 | $14 | 100 | 1 |
| | EMGEL 2% TOPICAL GEL | $0 | $0 | $0 | $0 | 0 | 0 |
| | EPIVIR 10 MG/ML ORAL SOLN | $11,603 | $5,904 | $2,849 | $2,849 | 35,170 | 84 |
| | EPIVIR 150 MG TABLET | $243,008 | $125,224 | $59,089 | $58,696 | 50,066 | 918 |
| | EPIVIR 300 MG TABLET | $214,132 | $107,998 | $53,067 | $53,067 | 22,018 | 736 |
| | EPIVIR HBV 100 MG TABLET | $9,733 | $5,014 | $2,359 | $2,359 | 1,640 | 53 |
| | EPZICOM TABLET | $35,068 | $17,534 | $8,767 | $8,767 | 1,544 | 52 |
| | ESKALITH 300 MG CAPSULE | $452 | $230 | $111 | $111 | 2,280 | 6 |
| | ESKALITH CR 450 MG TABLET S | $10,691 | $5,542 | $3,143 | $2,006 | 17,757 | 287 |
| | FAMVIR 125 MG TABLET | $118 | $62 | $28 | $28 | 38 | 2 |
| | FLONASE 0.05% NASAL SPRAY | $355,696 | $180,166 | $97,638 | $77,892 | 88,119 | 5,227 |
| | FLOVENT 110 MCG INHALER | $123,945 | $62,933 | $34,356 | $26,656 | 20,369 | 1,459 |
| | FLOVENT 220 MCG INHALER | $98,712 | $49,834 | $25,516 | $23,363 | 10,459 | 728 |
| | FLOVENT 220 MCG INHALER | $0 | $0 | $0 | $0 | 0 | 0 |
| | FLOVENT 44 MCG INHALER | $43,713 | $22,693 | $11,963 | $9,058 | 9,390 | 700 |
| | FLOVENT 44 MCG INHALER | $75 | $0 | $38 | $38 | 13 | 1 |
| | FLOVENT 50 MCG ROTADISK | $91 | $46 | $23 | $23 | 120 | 2 |
| | FORTAZ 1 GM VIAL | $857 | $420 | $219 | $219 | 68 | 4 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | FORTAZ 1 GM VIAL | $16 | $8 | $4 | $4 | 1 | 1 |
| | FORTAZ 2 GM VIAL | $755 | $0 | $377 | $377 | 30 | 1 |
| | HYCAMTIN 4 MG VIAL | $21,075 | $11,159 | $4,958 | $4,958 | 26 | 14 |
| | IMITREX 100 MG TABLET | $27,078 | $14,014 | $6,932 | $6,132 | 1,643 | 107 |
| | IMITREX 100 MG TABLET | $26,148 | $13,358 | $6,847 | $5,943 | 1,553 | 174 |
| | IMITREX 20 MG NASAL SPRAY | $10,927 | $5,625 | $2,718 | $2,583 | 461 | 76 |
| | IMITREX 25 MG TABLET | $25,043 | $12,402 | $6,528 | $6,113 | 1,377 | 73 |
| | IMITREX 25 MG TABLET | $21,205 | $10,835 | $5,413 | $4,957 | 1,142 | 71 |
| | IMITREX 5 MG NASAL SPRAY | $855 | $444 | $205 | $205 | 36 | 6 |
| | IMITREX 50 MG TABLET | $43,932 | $22,814 | $12,003 | $9,115 | 2,688 | 162 |
| | IMITREX 50 MG TABLET | $29,890 | $14,563 | $7,996 | $7,331 | 1,805 | 161 |
| | IMITREX 6 MG/0.5 ML KIT REF | $18,761 | $9,647 | $4,557 | $4,557 | 166 | 44 |
| | IMITREX 6 MG/0.5 ML SYRNG K | $15,957 | $8,124 | $3,917 | $3,917 | 133 | 43 |
| | IMITREX 6 MG/0.5 ML VIAL | $27,619 | $14,249 | $6,685 | $6,685 | 356 | 48 |
| | LAMICTAL 100 MG TABLET | $379,845 | $192,693 | $130,732 | $56,420 | 123,678 | 1,733 |
| | LAMICTAL 150 MG TABLET | $65,135 | $33,722 | $22,359 | $9,053 | 20,743 | 375 |
| | LAMICTAL 200 MG TABLET | $94,407 | $48,403 | $29,734 | $16,269 | 29,542 | 483 |
| | LAMICTAL 25 MG DISPER TABLE | $13,048 | $6,631 | $4,116 | $2,301 | 4,940 | 37 |
| | LAMICTAL 25 MG TABLET | $379,756 | $195,312 | $124,009 | $60,435 | 132,194 | 1,390 |
| | LAMICTAL 5 MG DISPER TABLET | $15,493 | $7,940 | $4,179 | $3,374 | 5,675 | 54 |
| | LANOXICAPS 0.2 MG CAPSULE | $191 | $99 | $46 | $46 | 570 | 13 |
| | LANOXIN 0.25 MG/ML AMPUL | $0 | $0 | $0 | $0 | 0 | 0 |
| | LANOXIN 125 MCG TABLET | $3,603 | $1,847 | $878 | $878 | 14,180 | 333 |
| | LANOXIN 125 MCG TABLET | $1,523 | $782 | $396 | $344 | 6,226 | 186 |
| | LANOXIN 250 MCG TABLET | $2,252 | $1,161 | $557 | $533 | 8,395 | 199 |
| | LANOXIN 250 MCG TABLET | $677 | $350 | $163 | $163 | 2,955 | 86 |
| | LANOXIN 50 MCG/ML ELIXIR | $1,192 | $594 | $299 | $299 | 1,965 | 32 |
| | LEUKERAN 2 MG TABLET | $151 | $78 | $36 | $36 | 80 | 3 |
| | LEXIVA 700 MG TABLET | $175,201 | $87,178 | $45,617 | $42,406 | 18,994 | 287 |
| | LOTRONEX 1 MG TABLET | $10,138 | $5,245 | $2,447 | $2,447 | 1,620 | 28 |
| | MALARONE 250-100 MG TABLET | $1,181 | $607 | $287 | $287 | 260 | 5 |
| | MALARONE 250-100 MG TABLET | $337 | $179 | $79 | $79 | 72 | 3 |
| | MALARONE 62.5-25 MG PED TAB | $62 | $33 | $15 | $15 | 35 | 1 |
| | MEPRON 750 MG/5 ML SUSPENSI | $239,060 | $123,736 | $58,986 | $56,338 | 74,120 | 253 |
| | OXISTAT 1% CREAM | $727 | $378 | $201 | $148 | 450 | 24 |
| | OXISTAT 1% CREAM | $7,219 | $3,642 | $1,971 | $1,606 | 5,490 | 169 |
| | OXISTAT 1% CREAM | $4,619 | $2,341 | $1,350 | $927 | 4,800 | 80 |
| | OXISTAT 1% LOTION | $1,232 | $641 | $342 | $250 | 930 | 31 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | PARNATE 10 MG TABLET | $4,025 | $2,060 | $1,058 | $907 | 5,574 | 40 |
| | PURINETHOL 50 MG TABLET | $6,067 | $3,180 | $1,539 | $1,348 | 1,650 | 39 |
| | RELENZA 5 MG DISKHALER | $55 | $28 | $14 | $14 | 20 | 1 |
| | REQUIP 0.25 MG TABLET | $5,007 | $2,557 | $1,225 | $1,225 | 3,931 | 43 |
| | REQUIP 0.5 MG TABLET | $9,846 | $5,040 | $2,403 | $2,403 | 7,730 | 88 |
| | REQUIP 1 MG TABLET | $4,143 | $1,978 | $1,083 | $1,083 | 3,270 | 29 |
| | REQUIP 2 MG TABLET | $3,921 | $2,004 | $1,303 | $614 | 2,970 | 25 |
| | REQUIP 3 MG TABLET | $1,014 | $537 | $239 | $239 | 470 | 5 |
| | REQUIP 4 MG TABLET | $3,527 | $1,797 | $865 | $865 | 1,640 | 16 |
| | RETROVIR 10 MG/ML SYRUP | $5,965 | $3,093 | $1,441 | $1,432 | 30,924 | 45 |
| | RETROVIR 100 MG CAPSULE | $11,642 | $5,946 | $2,992 | $2,704 | 6,118 | 58 |
| | RETROVIR 300 MG TABLET | $33,302 | $17,075 | $8,171 | $8,056 | 5,861 | 105 |
| | SEREVENT 21 MCG INHALER | $84 | $45 | $20 | $20 | 13 | 1 |
| | SEREVENT 21 MCG INHLR REFIL | $0 | $0 | $0 | $0 | 0 | 0 |
| | SEREVENT DISKUS 50 MCG | $69,279 | $35,430 | $18,579 | $15,270 | 46,850 | 713 |
| | TEMOVATE 0.05% OINTMENT | $338 | $177 | $81 | $81 | 240 | 4 |
| | THIOGUANINE TABLOID 40 MG T | $2,218 | $1,139 | $539 | $539 | 457 | 24 |
| | THORAZINE 100 MG SUPPOSITOR | $0 | $0 | $0 | $0 | 0 | 0 |
| | THORAZINE 100 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | TRIZIVIR TABLET | $720,603 | $368,781 | $178,018 | $173,804 | 42,746 | 720 |
| | TRIZIVIR TABLET | $1,026 | $513 | $257 | $257 | 60 | 1 |
| | VALTREX 1 GM CAPLET | $722 | $379 | $177 | $166 | 140 | 8 |
| | VALTREX 1 GM CAPLET | $79,680 | $40,682 | $19,972 | $19,026 | 10,316 | 442 |
| | VALTREX 500 MG CAPLET | $8,831 | $4,549 | $2,217 | $2,065 | 2,466 | 93 |
| | VALTREX 500 MG CAPLET | $66,993 | $34,274 | $16,709 | $16,009 | 15,630 | 545 |
| | VENTOLIN HFA 90 MCG INHALER | $859 | $424 | $217 | $217 | 450 | 15 |
| | WELLBUTRIN SR 100 MG TAB SA | $30,177 | $15,812 | $8,913 | $5,452 | 16,503 | 309 |
| | WELLBUTRIN SR 150 MG TAB SA | $91,198 | $47,840 | $24,284 | $19,074 | 46,544 | 930 |
| | WELLBUTRIN SR 200 MG TAB SA | $80,992 | $41,783 | $21,301 | $17,908 | 22,539 | 525 |
| | WELLBUTRIN XL 150 MG TABLET | $148,997 | $75,355 | $39,521 | $34,122 | 53,786 | 1,344 |
| | WELLBUTRIN XL 300 MG TABLET | $175,441 | $88,880 | $46,756 | $39,805 | 48,031 | 1,555 |
| | ZANTAC 15 MG/ML SYRUP | $65,750 | $33,916 | $18,586 | $13,249 | 150,390 | 739 |
| | ZANTAC 150 MG GRANULES | $294 | $156 | $69 | $69 | 180 | 1 |
| | ZANTAC 150 MG TABLET | $5,428 | $2,791 | $1,318 | $1,318 | 2,730 | 32 |
| | ZANTAC 25 EFFERDOSE TABLET | $514 | $257 | $128 | $128 | 300 | 5 |
| | ZANTAC 25 MG/ML VIAL | $68 | $36 | $16 | $16 | 32 | 8 |
| | ZANTAC 25 MG/ML VIAL | $12 | $6 | $3 | $3 | 6 | 1 |
| | ZIAGEN 20 MG/ML SOLUTION | $5,987 | $3,067 | $1,460 | $1,460 | 13,800 | 24 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | ZIAGEN 300 MG TABLET | $159,523 | $81,971 | $38,776 | $38,776 | 24,512 | 420 |
| | ZOFRAN 2 MG/ML VIAL | $4,135 | $1,431 | $1,352 | $1,352 | 580 | 13 |
| | ZOFRAN 2 MG/ML VIAL | $1,668 | $849 | $409 | $409 | 162 | 18 |
| | ZOFRAN 32 MG/50 ML BAG | $1,013 | $507 | $253 | $253 | 450 | 3 |
| | ZOFRAN 4 MG TABLET | $42,321 | $21,500 | $10,410 | $10,410 | 2,195 | 57 |
| | ZOFRAN 4 MG TABLET | $2,319 | $1,179 | $585 | $555 | 114 | 38 |
| | ZOFRAN 4 MG/5 ML ORAL SOLN | $3,295 | $1,674 | $810 | $810 | 850 | 8 |
| | ZOFRAN 8 MG TABLET | $264,169 | $134,293 | $65,085 | $64,791 | 8,220 | 212 |
| | ZOFRAN 8 MG TABLET | $9,746 | $4,493 | $2,635 | $2,618 | 299 | 101 |
| | ZOFRAN ODT 4MG TABLET | $19,962 | $10,211 | $4,875 | $4,875 | 1,098 | 28 |
| | ZOFRAN ODT 8MG TABLET | $30,396 | $14,444 | $7,976 | $7,976 | 983 | 42 |
| | ZOVIRAX 5% OINTMENT | $306 | $159 | $73 | $73 | 36 | 12 |
| | ZOVIRAX 5% OINTMENT | $5,630 | $2,675 | $1,607 | $1,347 | 1,050 | 65 |
| | ZYBAN 150 MG TABLET SA | $2,917 | $1,508 | $704 | $704 | 1,500 | 28 |
| | ZYBAN 150 MG TABLET SA | $5,206 | $2,724 | $1,241 | $1,241 | 2,684 | 48 |
| Greenstone Ltd. - Pfizer, Inc. | ALPRAZOLAM 0.25 MG TABLET | $2,100 | $1,087 | $514 | $499 | 17,277 | 231 |
| | ALPRAZOLAM 0.25 MG TABLET | $882 | $438 | $224 | $219 | 6,933 | 103 |
| | ALPRAZOLAM 0.25 MG TABLET | $678 | $343 | $172 | $163 | 5,616 | 74 |
| | ALPRAZOLAM 0.5 MG TABLET | $2,012 | $1,031 | $498 | $483 | 15,796 | 206 |
| | ALPRAZOLAM 0.5 MG TABLET | $1,428 | $724 | $356 | $348 | 11,307 | 142 |
| | ALPRAZOLAM 0.5 MG TABLET | $1,092 | $559 | $288 | $244 | 9,386 | 97 |
| | ALPRAZOLAM 1 MG TABLET | $3,472 | $1,782 | $858 | $832 | 26,257 | 255 |
| | ALPRAZOLAM 1 MG TABLET | $2,764 | $1,408 | $741 | $614 | 19,992 | 221 |
| | ALPRAZOLAM 1 MG TABLET | $608 | $311 | $148 | $148 | 4,629 | 44 |
| | ALPRAZOLAM 2 MG TABLET | $5,799 | $2,976 | $1,412 | $1,412 | 26,139 | 275 |
| | ALPRAZOLAM 2 MG TABLET | $2,823 | $1,450 | $689 | $684 | 12,981 | 124 |
| | CLINDAMYCIN HCL 150 MG CAPS | $9,097 | $4,410 | $2,470 | $2,217 | 8,813 | 250 |
| | CLINDAMYCIN HCL 300 MG CAPS | $2,601 | $1,290 | $655 | $655 | 702 | 31 |
| | CLINDAMYCIN HCL 300 MG CAPS | $8,201 | $4,202 | $2,242 | $1,757 | 2,399 | 95 |
| | CLINDAMYCIN PH 1% GEL | $1,630 | $837 | $540 | $254 | 1,530 | 50 |
| | CLINDAMYCIN PH 1% GEL | $4,012 | $1,932 | $1,270 | $810 | 4,680 | 78 |
| | CLINDAMYCIN PH 1% SOLUTION | $285 | $134 | $82 | $68 | 840 | 25 |
| | CLINDAMYCIN PH 1% SOLUTION | $3,380 | $1,629 | $1,132 | $619 | 12,270 | 199 |
| | CLINDAMYCIN PHOS 1% PLEDGET | $1,679 | $838 | $431 | $410 | 2,280 | 38 |
| | CLINDAMYCIN PHOS TOP LOTION | $4,885 | $2,549 | $1,227 | $1,108 | 6,840 | 113 |
| | FLUCONAZOLE 10 MG/ML SUSP | $193 | $97 | $48 | $48 | 212 | 4 |
| | FLUCONAZOLE 100 MG TABLET | $7,218 | $3,609 | $1,804 | $1,804 | 982 | 54 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | FLUCONAZOLE 150 MG TABLET | $3,580 | $1,748 | $963 | $868 | 245 | 172 |
| | FLUCONAZOLE 200 MG TABLET | $7,670 | $3,835 | $2,211 | $1,624 | 628 | 28 |
| | FLUCONAZOLE 40 MG/ML SUSP | $0 | $0 | $0 | $0 | 0 | 0 |
| | FLUCONAZOLE 50 MG TABLET | $475 | $19 | $228 | $228 | 97 | 4 |
| | FLURBIPROFEN 100 MG TABLET | $175 | $87 | $47 | $40 | 445 | 7 |
| | GABAPENTIN 100 MG CAPSULE | $1,326 | $663 | $346 | $317 | 2,696 | 29 |
| | GABAPENTIN 300 MG CAPSULE | $6,502 | $3,199 | $1,782 | $1,521 | 5,752 | 65 |
| | GABAPENTIN 400 MG CAPSULE | $2,314 | $1,157 | $600 | $557 | 1,690 | 14 |
| | GLYBURIDE 1.25 MG TABLET | $1,080 | $547 | $289 | $245 | 3,990 | 65 |
| | GLYBURIDE 2.5 MG TABLET | $7,701 | $3,869 | $1,966 | $1,865 | 19,015 | 329 |
| | GLYBURIDE 5 MG TABLET | $8,059 | $4,089 | $2,086 | $1,883 | 15,620 | 194 |
| | GLYBURIDE 5 MG TABLET | $2,113 | $915 | $599 | $599 | 3,390 | 56 |
| | GLYBURIDE 5 MG TABLET | $38,834 | $18,779 | $10,144 | $9,911 | 75,637 | 887 |
| | GLYBURIDE MICRO 3 MG TABLET | $57 | $29 | $14 | $14 | 150 | 2 |
| | GLYBURIDE MICRO 6 MG TABLET | $2,697 | $1,298 | $699 | $699 | 3,010 | 46 |
| | IBUPROFEN 400 MG TABLET | $1,017 | $485 | $270 | $261 | 8,470 | 140 |
| | IBUPROFEN 400 MG TABLET | $1,583 | $772 | $439 | $372 | 12,177 | 227 |
| | IBUPROFEN 600 MG TABLET | $1,607 | $809 | $409 | $389 | 11,867 | 216 |
| | IBUPROFEN 600 MG TABLET | $2,246 | $1,130 | $622 | $494 | 16,155 | 308 |
| | IBUPROFEN 800 MG TABLET | $259 | $121 | $69 | $69 | 1,459 | 24 |
| | IBUPROFEN 800 MG TABLET | $1,096 | $554 | $289 | $253 | 5,500 | 120 |
| | MEDROXYPROGESTERONE 10 MG T | $1,742 | $823 | $498 | $421 | 2,567 | 199 |
| | MEDROXYPROGESTERONE 10 MG T | $365 | $328 | $18 | $18 | 690 | 23 |
| | MEDROXYPROGESTERONE 2.5 MG | $252 | $130 | $84 | $38 | 816 | 20 |
| | MEDROXYPROGESTERONE 2.5 MG | $88 | $46 | $21 | $21 | 280 | 7 |
| | MEDROXYPROGESTERONE 5 MG TA | $875 | $439 | $247 | $189 | 2,072 | 64 |
| | METHYLPREDNISOLONE 4 MG TAB | $2,944 | $1,445 | $767 | $731 | 6,055 | 289 |
| | METHYLPREDNISOLONE 4 MG TAB | $912 | $381 | $271 | $260 | 2,504 | 47 |
| | MISOPROSTOL 100 MCG TABLET | $322 | $168 | $77 | $77 | 420 | 4 |
| | MISOPROSTOL 100 MCG TABLET | $719 | $370 | $174 | $174 | 960 | 8 |
| | OXAPROZIN 600 MG CAPLET | $1,026 | $521 | $253 | $253 | 1,410 | 18 |
| | SPIRONOLACT/HCTZ 25/25 TAB | $242 | $125 | $58 | $58 | 510 | 16 |
| | SPIRONOLACTONE 100 MG TABLE | $2,266 | $1,175 | $848 | $243 | 1,920 | 29 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | SPIRONOLACTONE 25 MG TABLET | $2,849 | $1,400 | $813 | $635 | 7,477 | 154 |
| | SPIRONOLACTONE 25 MG TABLET | $5,903 | $2,998 | $1,463 | $1,442 | 15,627 | 296 |
| | SPIRONOLACTONE 50 MG TABLET | $4,191 | $2,144 | $1,060 | $987 | 5,417 | 95 |
| | SULFASALAZINE 500 MG TABLET | $1,408 | $729 | $339 | $339 | 7,374 | 61 |
| | SULFASALAZINE 500 MG TABLET | $321 | $165 | $78 | $78 | 1,950 | 4 |
| | SYSTEM GENERATED from CLAIM | $160 | $80 | $40 | $40 | 390 | 6 |
| | SYSTEM GENERATED from CLAIM | $234 | $117 | $58 | $58 | 540 | 12 |
| | SYSTEM GENERATED from CLAIM | $1,202 | $579 | $318 | $306 | 1,590 | 31 |
| | TRIAZOLAM 0.125 MG TABLET | $6 | $3 | $3 | $0 | 3 | 1 |
| | TRIAZOLAM 0.25 MG TABLET | $724 | $373 | $178 | $173 | 994 | 31 |
| | TRIAZOLAM 0.25 MG TABLET | $2,152 | $1,105 | $524 | $523 | 2,952 | 88 |
| Ivax Labs Inc. | NASAREL 29 MCG-0.025% SPRAY | $2,360 | $1,165 | $811 | $385 | 1,175 | 47 |
| | QVAR 40 MCG INHALER | $1,468 | $748 | $360 | $360 | 209 | 24 |
| | QVAR 80 MCG INHALER | $3,907 | $1,974 | $978 | $955 | 449 | 56 |
| Ivax Pharmaceuticals, Inc. | ACYCLOVIR 200 MG CAPSULE | $37 | $20 | $9 | $9 | 160 | 3 |
| | ACYCLOVIR 200 MG CAPSULE | $168 | $87 | $40 | $40 | 870 | 8 |
| | ACYCLOVIR 400 MG TABLET | $375 | $181 | $97 | $97 | 686 | 17 |
| | ACYCLOVIR 400 MG TABLET | $94 | $48 | $23 | $23 | 180 | 3 |
| | ACYCLOVIR 800 MG TABLET | $579 | $292 | $143 | $143 | 610 | 11 |
| | ALBUTEROL 0.83 MG/ML SOLUTI | $27,522 | $14,186 | $7,163 | $6,174 | 159,619 | 1,055 |
| | ALBUTEROL 0.83 MG/ML SOLUTI | $102 | $51 | $26 | $26 | 660 | 3 |
| | ALBUTEROL 90 MCG INHALER | $78,458 | $40,201 | $20,222 | $18,035 | 71,338 | 3,624 |
| | AMOX TR-K CLV 200-28.5 TAB | $49 | $25 | $12 | $12 | 30 | 1 |
| | AMOX TR-K CLV 200-28.5/5 SU | $20 | $10 | $5 | $5 | 50 | 1 |
| | AMOX TR-K CLV 200-28.5/5 SU | $943 | $479 | $250 | $214 | 2,700 | 25 |
| | AMOX TR-K CLV 200-28.5/5 SU | $119 | $59 | $30 | $30 | 375 | 3 |
| | AMOX TR-K CLV 400-57 TAB CH | $472 | $246 | $124 | $103 | 150 | 7 |
| | AMOX TR-K CLV 400-57/5 SUSP | $68 | $34 | $17 | $17 | 100 | 2 |
| | AMOX TR-K CLV 400-57/5 SUSP | $5,585 | $2,858 | $1,455 | $1,272 | 9,000 | 79 |
| | AMOX TR-K CLV 400-57/5 SUSP | $730 | $366 | $204 | $160 | 1,275 | 13 |
| | AMOX TR-K CLV 500-125 MG TA | $4,925 | $2,519 | $1,614 | $792 | 1,414 | 68 |
| | AMOX TR-K CLV 600-42.9/5 SU | $3,742 | $1,793 | $1,027 | $922 | 8,500 | 68 |
| | AMOX TR-K CLV 600-42.9/5 SU | $926 | $445 | $250 | $231 | 1,925 | 24 |
| | AMOX TR-K CLV 600-42.9/5 SU | $1,101 | $539 | $317 | $245 | 2,675 | 12 |
| | AMOX TR-K CLV 875-125 MG TA | $21,184 | $10,083 | $6,203 | $4,898 | 4,625 | 240 |
| | AMOXICILLIN 125 MG/5 ML SUS | $38 | $19 | $9 | $9 | 750 | 5 |
| | AMOXICILLIN 250 MG/5 ML SUS | $7 | $4 | $2 | $2 | 100 | 1 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | AMOXICILLIN 250 MG/5 ML SUS | $315 | $158 | $78 | $78 | 5,600 | 35 |
| | AMOXICILLIN 400 MG TAB CHEW | $41 | $20 | $10 | $10 | 60 | 3 |
| | AMOXICILLIN 400 MG/5 ML SUS | $139 | $69 | $35 | $35 | 1,025 | 12 |
| | AMOXICILLIN 400 MG/5 ML SUS | $27 | $14 | $7 | $7 | 225 | 2 |
| | AMOXICILLIN 500 MG CAPSULE | $94 | $47 | $24 | $24 | 286 | 13 |
| | AMOXICILLIN 875 MG TABLET | $34 | $17 | $9 | $9 | 34 | 2 |
| | AMOXICILLIN 875 MG TABLET | $20 | $10 | $5 | $5 | 20 | 1 |
| | ASPIRIN/CODEINE 325/60 TAB | $0 | $0 | $0 | $0 | 0 | 0 |
| | BACLOFEN 10 MG TABLET | $23,483 | $12,111 | $5,743 | $5,629 | 56,455 | 408 |
| | BACLOFEN 10 MG TABLET | $11,550 | $5,902 | $4,652 | $997 | 26,434 | 178 |
| | BACLOFEN 20 MG TABLET | $25,801 | $13,263 | $7,946 | $4,592 | 31,986 | 263 |
| | BENAZEPRIL HCL 10 MG TABLET | $364 | $120 | $122 | $122 | 370 | 7 |
| | BENAZEPRIL HCL 20 MG TABLET | $122 | $61 | $31 | $31 | 120 | 4 |
| | BENAZEPRIL HCL 40 MG TABLET | $87 | $46 | $20 | $20 | 90 | 1 |
| | BUMETANIDE 0.5 MG TABLET | $112 | $57 | $27 | $27 | 420 | 9 |
| | BUMETANIDE 1 MG TABLET | $332 | $171 | $81 | $81 | 783 | 28 |
| | BUMETANIDE 2 MG TABLET | $560 | $291 | $134 | $134 | 1,076 | 13 |
| | BUSPIRONE HCL 10 MG TABLET | $216 | $112 | $56 | $49 | 690 | 7 |
| | BUSPIRONE HCL 10 MG TABLET | $3,171 | $1,642 | $1,289 | $240 | 7,495 | 81 |
| | BUSPIRONE HCL 15 MG TABLET | $899 | $468 | $393 | $38 | 1,750 | 26 |
| | BUSPIRONE HCL 5 MG TABLET | $89 | $45 | $22 | $22 | 240 | 4 |
| | BUSPIRONE HCL 5 MG TABLET | $267 | $135 | $120 | $12 | 748 | 10 |
| | CEFACLOR 125 MG/5 ML SUSPEN | $71 | $37 | $23 | $11 | 450 | 5 |
| | CEFACLOR 125 MG/5 ML SUSPEN | $992 | $517 | $248 | $228 | 7,100 | 47 |
| | CEFACLOR 250 MG CAPSULE | $250 | $134 | $66 | $49 | 299 | 12 |
| | CEFACLOR 250 MG/5 ML SUSPEN | $99 | $52 | $23 | $23 | 300 | 2 |
| | CEFACLOR 250 MG/5 ML SUSPEN | $701 | $358 | $171 | $171 | 2,400 | 14 |
| | CEFACLOR 375 MG/5 ML SUSPEN | $72 | $38 | $17 | $17 | 150 | 1 |
| | CEFACLOR 375 MG/5 ML SUSPEN | $176 | $93 | $41 | $41 | 400 | 2 |
| | CEFACLOR 500 MG CAPSULE | $736 | $385 | $203 | $148 | 498 | 22 |
| | CEFACLOR ER 500 MG TABLET S | $0 | $0 | $0 | $0 | 0 | 0 |
| | CEFADROXIL 1 GM TABLET | $469 | $248 | $122 | $99 | 71 | 6 |
| | CEFADROXIL 500 MG CAPSULE | $272 | $138 | $67 | $67 | 104 | 7 |
| | CEFADROXIL 500 MG CAPSULE | $2,136 | $1,083 | $620 | $433 | 846 | 41 |
| | CEFADROXIL 500 MG CAPSULE | $20,784 | $10,461 | $6,136 | $4,187 | 7,733 | 438 |
| | CEPHALEXIN 250 MG CAPSULE | $49 | $27 | $14 | $8 | 136 | 5 |
| | CEPHALEXIN 250 MG CAPSULE | $51 | $26 | $15 | $9 | 118 | 5 |
| | CEPHALEXIN 500 MG CAPSULE | $1,600 | $824 | $409 | $367 | 2,741 | 91 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | CEPHALEXIN 500 MG CAPSULE | $3,756 | $1,877 | $1,100 | $779 | 6,350 | 227 |
| | CIMETIDINE 300 MG TABLET | $109 | $55 | $27 | $27 | 610 | 7 |
| | CIMETIDINE 400 MG TABLET | $91 | $47 | $22 | $22 | 450 | 5 |
| | CIMETIDINE 800 MG TABLET | $21 | $11 | $5 | $5 | 60 | 1 |
| | CIMETIDINE 800 MG TABLET | $58 | $31 | $14 | $14 | 180 | 2 |
| | CIPROFLOXACIN HCL 250 MG TA | $1,031 | $515 | $288 | $227 | 295 | 14 |
| | CIPROFLOXACIN HCL 500 MG TA | $219 | $109 | $55 | $55 | 45 | 3 |
| | CIPROFLOXACIN HCL 500 MG TA | $4,643 | $2,208 | $1,270 | $1,165 | 1,136 | 73 |
| | CITALOPRAM HBR 10 MG TABLET | $63 | $31 | $16 | $16 | 30 | 1 |
| | CITALOPRAM HBR 20 MG TABLET | $504 | $252 | $126 | $126 | 240 | 4 |
| | CITALOPRAM HBR 40 MG TABLET | $204 | $102 | $51 | $51 | 90 | 3 |
| | CLOZAPINE 100 MG TABLET | $596,506 | $305,926 | $208,017 | $82,563 | 202,757 | 3,777 |
| | CLOZAPINE 100 MG TABLET | $210,800 | $108,723 | $68,642 | $33,435 | 73,418 | 1,372 |
| | CLOZAPINE 25 MG TABLET | $50,193 | $25,339 | $17,388 | $7,466 | 39,912 | 1,245 |
| | CLOZAPINE 25 MG TABLET | $22,385 | $11,504 | $7,738 | $3,143 | 18,418 | 548 |
| | COL-PROBENECID TABLET | $243 | $126 | $59 | $59 | 300 | 6 |
| | CROMOLYN NEBULIZER SOLUTION | $986 | $503 | $263 | $220 | 2,580 | 16 |
| | CYPROHEPTADINE 4 MG TABLET | $2,609 | $1,243 | $703 | $663 | 6,423 | 106 |
| | CYPROHEPTADINE 4 MG TABLET | $1,274 | $662 | $355 | $257 | 2,930 | 59 |
| | DIAZEPAM 10 MG TABLET | $428 | $221 | $112 | $96 | 2,269 | 32 |
| | DIAZEPAM 10 MG TABLET | $2,227 | $1,147 | $552 | $528 | 12,669 | 134 |
| | DIAZEPAM 10 MG TABLET | $94 | $50 | $22 | $22 | 504 | 5 |
| | DIAZEPAM 2 MG TABLET | $70 | $35 | $17 | $17 | 810 | 8 |
| | DIAZEPAM 2 MG TABLET | $465 | $239 | $117 | $109 | 5,047 | 56 |
| | DIAZEPAM 5 MG TABLET | $350 | $177 | $87 | $87 | 2,678 | 36 |
| | DIAZEPAM 5 MG TABLET | $2,620 | $1,341 | $651 | $628 | 20,298 | 259 |
| | DIAZEPAM 5 MG TABLET | $262 | $136 | $80 | $46 | 1,335 | 37 |
| | DIPHENOXYLATE/ATROPINE TAB | $616 | $289 | $164 | $164 | 1,524 | 28 |
| | DIPHENOXYLATE/ATROPINE TAB | $1,474 | $760 | $357 | $357 | 3,751 | 59 |
| | DOXAZOSIN MESYLATE 1 MG TAB | $104 | $54 | $25 | $25 | 180 | 3 |
| | DOXAZOSIN MESYLATE 2 MG TAB | $1,060 | $548 | $320 | $192 | 1,470 | 45 |
| | DOXAZOSIN MESYLATE 4 MG TAB | $1,726 | $894 | $489 | $343 | 2,475 | 68 |
| | DOXAZOSIN MESYLATE 8 MG TAB | $753 | $252 | $298 | $203 | 1,000 | 23 |
| | DOXYCYCLINE 100 MG CAPSULE | $1,039 | $533 | $264 | $242 | 3,259 | 145 |
| | DOXYCYCLINE 100 MG TABLET | $209 | $110 | $54 | $45 | 665 | 29 |
| | DOXYCYCLINE 100 MG TABLET | $119 | $62 | $29 | $29 | 450 | 14 |
| | DOXYCYCLINE 50 MG CAPSULE | $119 | $61 | $30 | $28 | 594 | 13 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | ENALAPRIL MALEATE 10 MG TAB | $8,195 | $4,186 | $2,005 | $2,005 | 10,595 | 224 |
| | ENALAPRIL MALEATE 10 MG TAB | $1,830 | $786 | $656 | $388 | 2,261 | 64 |
| | ENALAPRIL MALEATE 2.5 MG TA | $3,210 | $1,511 | $860 | $839 | 7,514 | 176 |
| | ENALAPRIL MALEATE 2.5 MG TA | $1,048 | $538 | $360 | $150 | 2,820 | 32 |
| | ENALAPRIL MALEATE 20 MG TAB | $17,709 | $8,624 | $4,809 | $4,277 | 17,737 | 372 |
| | ENALAPRIL MALEATE 20 MG TAB | $1,038 | $519 | $275 | $244 | 1,030 | 23 |
| | ENALAPRIL MALEATE 5 MG TAB | $6,632 | $3,145 | $1,807 | $1,680 | 10,282 | 235 |
| | ENALAPRIL MALEATE 5 MG TAB | $9,478 | $4,779 | $3,373 | $1,326 | 14,394 | 365 |
| | ERGOLOID MESYL 1 MG TAB SL | $150 | $75 | $38 | $38 | 180 | 1 |
| | ERYTHROMYCIN 2% PLEDGETS | $23 | $12 | $11 | $0 | 60 | 1 |
| | ESTAZOLAM 1 MG TABLET | $107 | $55 | $26 | $26 | 150 | 4 |
| | ESTAZOLAM 2 MG TABLET | $320 | $164 | $78 | $78 | 420 | 11 |
| | FAMOTIDINE 20 MG TABLET | $10,743 | $5,384 | $3,228 | $2,131 | 16,999 | 317 |
| | FAMOTIDINE 20 MG TABLET | $2,663 | $1,305 | $679 | $679 | 4,220 | 73 |
| | FAMOTIDINE 20 MG TABLET | $371 | $186 | $92 | $92 | 546 | 17 |
| | FAMOTIDINE 40 MG TABLET | $660 | $342 | $159 | $159 | 598 | 15 |
| | FLUCONAZOLE 100 MG TABLET | $1,107 | $554 | $277 | $277 | 169 | 7 |
| | FLUCONAZOLE 100 MG TABLET | $224 | $112 | $112 | $0 | 30 | 1 |
| | FLUCONAZOLE 150 MG TABLET | $302 | $138 | $105 | $58 | 20 | 16 |
| | FLUCONAZOLE 200 MG TABLET | $1,086 | $543 | $271 | $271 | 90 | 2 |
| | FLUOXETINE HCL 10 MG CAPSUL | $1,148 | $581 | $416 | $152 | 1,655 | 40 |
| | FLUOXETINE HCL 10 MG CAPSUL | $287 | $147 | $134 | $6 | 390 | 13 |
| | FLUOXETINE HCL 10 MG CAPSUL | $353 | $184 | $127 | $42 | 517 | 12 |
| | FLUOXETINE HCL 10 MG TABLET | $842 | $422 | $346 | $74 | 1,215 | 25 |
| | FLUOXETINE HCL 10 MG TABLET | $246 | $126 | $60 | $60 | 360 | 12 |
| | FLUOXETINE HCL 20 MG CAPSUL | $3,820 | $1,977 | $1,502 | $341 | 7,139 | 178 |
| | FLUOXETINE HCL 20 MG CAPSUL | $438 | $225 | $170 | $43 | 838 | 25 |
| | FLUOXETINE HCL 20 MG CAPSUL | $878 | $457 | $216 | $205 | 1,495 | 36 |
| | FLUVOXAMINE MAL 100 MG TAB | $19,043 | $9,663 | $7,052 | $2,327 | 8,340 | 125 |
| | FLUVOXAMINE MALEATE 25 MG T | $4,345 | $2,268 | $1,097 | $979 | 2,325 | 14 |
| | FLUVOXAMINE MALEATE 50 MG T | $20,971 | $10,828 | $7,424 | $2,719 | 9,462 | 114 |
| | FUROSEMIDE 20 MG TABLET | $2,018 | $1,028 | $514 | $476 | 12,997 | 319 |
| | FUROSEMIDE 20 MG TABLET | $6,655 | $3,366 | $1,740 | $1,549 | 44,164 | 1,025 |
| | FUROSEMIDE 40 MG TABLET | $312 | $155 | $78 | $78 | 1,800 | 48 |
| | FUROSEMIDE 40 MG TABLET | $144 | $76 | $38 | $30 | 870 | 22 |
| | FUROSEMIDE 40 MG TABLET | $14,637 | $7,401 | $3,773 | $3,463 | 96,052 | 2,142 |
| | GABAPENTIN 100 MG TABLET | $1,278 | $555 | $361 | $361 | 2,613 | 25 |
| | GABAPENTIN 100 MG TABLET | $1,288 | $623 | $348 | $318 | 2,730 | 27 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | GABAPENTIN 300 MG TABLET | $4,578 | $2,235 | $1,239 | $1,104 | 3,940 | 46 |
| | GABAPENTIN 300 MG TABLET | $4,937 | $2,468 | $1,234 | $1,234 | 4,507 | 55 |
| | GABAPENTIN 400 MG TABLET | $2,684 | $1,342 | $764 | $578 | 1,935 | 21 |
| | GLIPIZIDE 10 MG TABLET | $2,038 | $984 | $534 | $520 | 12,195 | 205 |
| | GLIPIZIDE 10 MG TABLET | $534 | $257 | $139 | $139 | 3,374 | 49 |
| | GLIPIZIDE 5 MG TABLET | $1,296 | $582 | $357 | $357 | 9,218 | 158 |
| | GLIPIZIDE 5 MG TABLET | $316 | $155 | $83 | $78 | 1,970 | 43 |
| | GLYBURIDE-METFORMIN 2.5/500 | $15,049 | $7,385 | $4,131 | $3,533 | 16,226 | 202 |
| | GLYBURIDE-METFORMIN 5/500 M | $41,085 | $18,409 | $11,754 | $10,922 | 44,658 | 510 |
| | GLYBURIDE-METFORMIN 5/500 M | $53 | $27 | $13 | $13 | 60 | 1 |
| | GLYBURID-METFORMIN 1.25/250 | $2,996 | $1,406 | $795 | $795 | 3,760 | 56 |
| | HYDROCHLOROTHIAZIDE 25 MG T | $633 | $304 | $168 | $161 | 3,988 | 102 |
| | HYDROCHLOROTHIAZIDE 25 MG T | $20,727 | $10,133 | $5,469 | $5,125 | 115,603 | 3,248 |
| | HYDROCHLOROTHIAZIDE 50 MG T | $367 | $178 | $102 | $87 | 1,710 | 47 |
| | HYDROCHLOROTHIAZIDE 50 MG T | $2,905 | $1,492 | $730 | $684 | 13,018 | 369 |
| | HYDROCHLOROTHIAZIDE 50 MG T | $35 | $18 | $9 | $9 | 134 | 5 |
| | HYDROXYZINE PAM 25 MG CAP | $883 | $454 | $250 | $180 | 5,327 | 91 |
| | HYDROXYZINE PAM 25 MG CAP | $819 | $422 | $259 | $138 | 4,789 | 87 |
| | HYDROXYZINE PAM 50 MG CAP | $4,022 | $2,068 | $1,130 | $823 | 24,072 | 354 |
| | IBUPROFEN 800 MG TABLET | $390 | $175 | $109 | $107 | 1,956 | 42 |
| | INDAPAMIDE 1.25 MG TABLET | $194 | $100 | $47 | $47 | 870 | 25 |
| | INDAPAMIDE 1.25 MG TABLET | $65 | $33 | $16 | $16 | 150 | 11 |
| | INDAPAMIDE 2.5 MG TABLET | $431 | $218 | $106 | $106 | 2,200 | 45 |
| | INDAPAMIDE 2.5 MG TABLET | $109 | $55 | $27 | $27 | 570 | 11 |
| | INDOMETHACIN 25 MG CAPSULE | $604 | $286 | $159 | $159 | 1,734 | 35 |
| | INDOMETHACIN 25 MG CAPSULE | $119 | $60 | $32 | $26 | 276 | 9 |
| | INDOMETHACIN 50 MG CAPSULE | $2,118 | $1,074 | $527 | $517 | 3,839 | 76 |
| | INDOMETHACIN 50 MG CAPSULE | $109 | $49 | $30 | $30 | 157 | 5 |
| | IPRATROPIUM BR 0.02% SOLN | $7,489 | $3,777 | $1,917 | $1,795 | 30,185 | 138 |
| | IPRATROPIUM BR 0.02% SOLN | $333 | $174 | $79 | $79 | 1,360 | 7 |
| | ISOSORBIDE MN 30 MG TAB SA | $413 | $216 | $98 | $98 | 330 | 8 |
| | LABETALOL HCL 100 MG TABLET | $2,526 | $1,191 | $753 | $582 | 9,144 | 131 |
| | LABETALOL HCL 100 MG TABLET | $148 | $76 | $36 | $36 | 510 | 9 |
| | LABETALOL HCL 200 MG TABLET | $3,696 | $1,898 | $899 | $899 | 9,060 | 107 |
| | LABETALOL HCL 200 MG TABLET | $853 | $442 | $351 | $59 | 1,995 | 31 |
| | LABETALOL HCL 300 MG TABLET | $2,445 | $1,259 | $593 | $593 | 4,330 | 51 |
| | LISINOPRIL 10 MG TABLET | $1,231 | $633 | $299 | $299 | 1,840 | 47 |
| | LISINOPRIL 10 MG TABLET | $1,240 | $625 | $507 | $108 | 1,695 | 51 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | LISINOPRIL 2.5 MG TABLET | $237 | $122 | $103 | $11 | 450 | 15 |
| | LISINOPRIL 2.5 MG TABLET | $63 | $33 | $15 | $15 | 120 | 4 |
| | LISINOPRIL 20 MG TABLET | $2,554 | $1,288 | $723 | $544 | 3,870 | 81 |
| | LISINOPRIL 20 MG TABLET | $293 | $149 | $126 | $18 | 395 | 9 |
| | LISINOPRIL 30 MG TABLET | $302 | $157 | $73 | $73 | 330 | 10 |
| | LISINOPRIL 40 MG TABLET | $1,969 | $1,000 | $484 | $484 | 2,010 | 48 |
| | LISINOPRIL 40 MG TABLET | $372 | $192 | $180 | $0 | 360 | 8 |
| | LISINOPRIL 5 MG TABLET | $694 | $360 | $167 | $167 | 1,160 | 15 |
| | LISINOPRIL 5 MG TABLET | $393 | $66 | $163 | $163 | 630 | 9 |
| | LISINOPRIL-HCTZ 10/12.5 TAB | $438 | $225 | $107 | $107 | 570 | 17 |
| | LISINOPRIL-HCTZ 10/12.5 TAB | $519 | $267 | $178 | $74 | 660 | 22 |
| | LISINOPRIL-HCTZ 20/12.5 TAB | $1,173 | $605 | $284 | $284 | 1,530 | 25 |
| | LISINOPRIL-HCTZ 20/12.5 TAB | $97 | $50 | $24 | $24 | 120 | 3 |
| | LISINOPRIL-HCTZ 20/25 TAB | $797 | $407 | $195 | $195 | 1,000 | 22 |
| | METFORMIN HCL 1,000 MG TABL | $15,562 | $7,668 | $4,116 | $3,779 | 14,414 | 215 |
| | METFORMIN HCL 500 MG TABLET | $10,668 | $5,065 | $2,956 | $2,647 | 22,664 | 325 |
| | METFORMIN HCL 500 MG TABLET | $78 | $39 | $19 | $19 | 180 | 3 |
| | METFORMIN HCL 850 MG TABLET | $3,682 | $1,907 | $887 | $887 | 6,230 | 94 |
| | METFORMIN HCL ER 500 MG TAB | $76,899 | $37,764 | $20,130 | $19,006 | 114,692 | 1,227 |
| | METHYLDOPA 250 MG TABLET | $624 | $321 | $161 | $142 | 2,504 | 28 |
| | METHYLDOPA 250 MG TABLET | $351 | $181 | $85 | $85 | 960 | 10 |
| | METHYLDOPA 500 MG TABLET | $2,379 | $1,213 | $583 | $583 | 4,140 | 40 |
| | METHYLDOPA 500 MG TABLET | $114 | $60 | $27 | $27 | 180 | 2 |
| | METRONIDAZOLE 250 MG TABLET | $50 | $26 | $12 | $12 | 178 | 8 |
| | METRONIDAZOLE 500 MG TABLET | $599 | $299 | $155 | $146 | 1,243 | 76 |
| | MISOPROSTOL 100 MCG TABLET | $1,259 | $646 | $307 | $307 | 1,666 | 16 |
| | MISOPROSTOL 100 MCG TABLET | $827 | $426 | $401 | $0 | 1,080 | 12 |
| | MISOPROSTOL 200 MCG TABLET | $1,083 | $543 | $270 | $270 | 972 | 19 |
| | MISOPROSTOL 200 MCG TABLET | $584 | $301 | $142 | $142 | 540 | 6 |
| | NABUMETONE 750 MG TABLET | $251 | $126 | $83 | $43 | 180 | 3 |
| | NADOLOL 120 MG TABLET | $1,474 | $763 | $652 | $60 | 900 | 30 |
| | NADOLOL 20 MG TABLET | $1,071 | $552 | $345 | $173 | 1,980 | 36 |
| | NADOLOL 40 MG TABLET | $247 | $126 | $60 | $60 | 510 | 7 |
| | NEFAZODONE HCL 100 MG TABLE | $456 | $240 | $108 | $108 | 330 | 8 |
| | NEFAZODONE HCL 200 MG TABLE | $1,998 | $1,037 | $480 | $480 | 1,470 | 23 |
| | NEFAZODONE HCL 250 MG TABLE | $270 | $140 | $65 | $65 | 180 | 3 |
| | NEFAZODONE HCL 50 MG TABLET | $44 | $22 | $11 | $11 | 30 | 1 |
| | NEFAZODONE HCL 50 MG TABLET | $347 | $182 | $134 | $31 | 240 | 7 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | NITROFURANTOIN MCR 100 MG C | $7,743 | $3,901 | $2,349 | $1,492 | 4,641 | 169 |
| | NITROFURANTOIN MCR 50 MG CA | $14,956 | $7,683 | $4,465 | $2,809 | 14,599 | 334 |
| | NITROFURANTOIN MCR 50 MG CA | $1,598 | $824 | $773 | $0 | 1,450 | 49 |
| | NIZATIDINE 150 MG CAPSULE | $25,780 | $13,261 | $8,641 | $3,878 | 13,803 | 244 |
| | NIZATIDINE 150 MG CAPSULE | $351 | $186 | $83 | $83 | 180 | 5 |
| | NIZATIDINE 300 MG CAPSULE | $1,669 | $877 | $396 | $396 | 450 | 5 |
| | OXAZEPAM 10 MG CAPSULE | $1,003 | $517 | $243 | $243 | 1,710 | 19 |
| | OXAZEPAM 15 MG CAPSULE | $617 | $319 | $149 | $149 | 795 | 10 |
| | OXAZEPAM 30 MG CAPSULE | $1,502 | $771 | $365 | $365 | 1,170 | 13 |
| | PERGOLIDE MESYL 1 MG TAB | $632 | $316 | $158 | $158 | 180 | 1 |
| | PERPHENAZINE 16 MG TABLET | $949 | $500 | $225 | $225 | 660 | 8 |
| | PERPHENAZINE 2 MG TABLET | $25 | $13 | $6 | $6 | 60 | 1 |
| | PERPHENAZINE 4 MG TABLET | $2,958 | $1,520 | $941 | $496 | 6,155 | 54 |
| | PERPHENAZINE 8 MG TABLET | $3,049 | $1,578 | $882 | $589 | 3,710 | 47 |
| | PHENYTOIN SOD 100 MG CAPSUL | $41 | $21 | $10 | $10 | 150 | 2 |
| | PINDOLOL 10 MG TABLET | $2,559 | $1,327 | $1,169 | $64 | 2,999 | 45 |
| | PINDOLOL 5 MG TABLET | $1,282 | $659 | $481 | $142 | 1,925 | 37 |
| | PRAZOSIN 1 MG CAPSULE | $624 | $323 | $150 | $150 | 1,540 | 22 |
| | PRAZOSIN 1 MG CAPSULE | $280 | $143 | $69 | $69 | 1,080 | 6 |
| | PRAZOSIN 2 MG CAPSULE | $802 | $411 | $195 | $195 | 1,770 | 16 |
| | PROBENECID 500 MG TABLET | $26 | $13 | $13 | $0 | 30 | 1 |
| | PROCHLORPERAZINE 10 MG TAB | $570 | $281 | $144 | $144 | 850 | 17 |
| | PROCHLORPERAZINE 5 MG TABLE | $94 | $49 | $23 | $23 | 180 | 5 |
| | PROPOXY-N/APAP 100-650 TAB | $1,137 | $584 | $280 | $273 | 4,381 | 84 |
| | PROPOXY-N/APAP 100-650 TAB | $1,082 | $526 | $289 | $267 | 4,273 | 74 |
| | PROPOXY-N/APAP 100-650 TAB | $251 | $127 | $62 | $62 | 1,016 | 18 |
| | PROPOXYPHENE HCL 65 MG CAP | $38 | $19 | $9 | $9 | 90 | 2 |
| | QUININE SULFATE 260 MG TAB | $3,839 | $1,978 | $930 | $930 | 5,802 | 134 |
| | QUININE SULFATE 260 MG TAB | $43 | $23 | $10 | $10 | 60 | 2 |
| | QUININE SULFATE 325 MG CAP | $615 | $246 | $184 | $184 | 930 | 25 |
| | QUININE SULFATE 325 MG CAP | $245 | $125 | $60 | $60 | 360 | 11 |
| | RANITIDINE 150 MG TABLET | $2,636 | $1,227 | $729 | $681 | 6,645 | 101 |
| | RANITIDINE 150 MG TABLET | $24 | $12 | $6 | $6 | 60 | 1 |
| | RANITIDINE 300 MG TABLET | $60 | $30 | $15 | $15 | 150 | 3 |
| | TAMOXIFEN 10 MG TABLET | $1,422 | $749 | $500 | $173 | 840 | 14 |
| | TAMOXIFEN 10 MG TABLET | $511 | $271 | $241 | $0 | 300 | 3 |
| | TAMOXIFEN 20 MG TABLET | $5,468 | $2,735 | $1,657 | $1,077 | 2,005 | 49 |
| | TETRACYCLINE 250 MG CAPSULE | $99 | $51 | $40 | $8 | 690 | 14 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | TETRACYCLINE 250 MG CAPSULE | $377 | $192 | $98 | $87 | 2,784 | 56 |
| | TETRACYCLINE 500 MG CAPSULE | $443 | $227 | $135 | $81 | 2,291 | 51 |
| | TETRACYCLINE 500 MG CAPSULE | $490 | $220 | $135 | $135 | 2,661 | 53 |
| | TOLAZAMIDE 500 MG TABLET | $336 | $168 | $84 | $84 | 270 | 2 |
| | TRAMADOL HCL 50 MG TABLET | $575 | $294 | $247 | $34 | 1,570 | 21 |
| | TRAMADOL HCL 50 MG TABLET | $31 | $16 | $7 | $7 | 74 | 2 |
| | TRIAMTERENE/HCTZ 50/25 CAP | $43 | $21 | $11 | $11 | 90 | 3 |
| | VERAPAMIL 120 MG TABLET SA | $5,316 | $2,751 | $1,337 | $1,228 | 6,471 | 119 |
| | VERAPAMIL 180 MG TABLET SA | $5,233 | $2,683 | $1,275 | $1,275 | 9,410 | 194 |
| | VERAPAMIL 180 MG TABLET SA | $1,197 | $614 | $387 | $195 | 2,130 | 45 |
| | VERAPAMIL 240 MG TABLET SA | $4,230 | $2,179 | $1,026 | $1,026 | 8,139 | 169 |
| | VERAPAMIL 240 MG TABLET SA | $7,247 | $3,640 | $1,978 | $1,629 | 13,444 | 336 |
| Janssen Pharmaceutica Products, L.P. | DURAGESIC 100 MCG/HR PATCH | $593,188 | $302,308 | $145,440 | $145,440 | 11,789 | 662 |
| | DURAGESIC 25 MCG/HR PATCH | $68,729 | $35,226 | $16,916 | $16,587 | 4,915 | 471 |
| | DURAGESIC 50 MCG/HR PATCH | $94,147 | $47,903 | $23,187 | $23,058 | 3,695 | 365 |
| | DURAGESIC 75 MCG/HR PATCH | $147,015 | $75,665 | $35,675 | $35,675 | 3,811 | 318 |
| | REMINYL 12 MG TABLET | $10,242 | $5,253 | $2,494 | $2,494 | 4,254 | 77 |
| | REMINYL 4 MG TABLET | $27,904 | $13,598 | $7,711 | $6,596 | 11,559 | 192 |
| | REMINYL 4 MG/ML ORAL SOL | $2,720 | $1,399 | $661 | $661 | 2,140 | 19 |
| | REMINYL 8 MG TABLET | $19,072 | $9,785 | $5,585 | $3,701 | 8,098 | 140 |
| | RISPERDAL 0.25 MG TABLET | $258,862 | $133,433 | $73,686 | $51,743 | 89,792 | 1,783 |
| | RISPERDAL 0.25 MG TABLET | $69,484 | $35,308 | $19,819 | $14,357 | 24,170 | 565 |
| | RISPERDAL 0.5 MG TABLET | $407,106 | $210,137 | $121,125 | $75,844 | 134,163 | 2,484 |
| | RISPERDAL 0.5 MG TABLET | $234,855 | $119,498 | $77,712 | $37,644 | 79,261 | 1,655 |
| | RISPERDAL 0.5 M-TAB | $3,464 | $1,752 | $926 | $786 | 1,020 | 26 |
| | RISPERDAL 0.5 M-TAB | $3,843 | $1,933 | $955 | $955 | 1,140 | 21 |
| | RISPERDAL 1 MG TABLET | $634,354 | $324,460 | $192,488 | $117,406 | 199,641 | 3,686 |
| | RISPERDAL 1 MG TABLET | $281,959 | $144,547 | $93,995 | $43,416 | 87,976 | 1,801 |
| | RISPERDAL 1 MG/ML SOLUTION | $126,215 | $64,919 | $37,768 | $23,528 | 35,861 | 578 |
| | RISPERDAL 1MG M-TAB | $6,735 | $3,474 | $2,296 | $965 | 1,722 | 36 |
| | RISPERDAL 1MG M-TAB | $2,715 | $1,375 | $670 | $670 | 690 | 12 |
| | RISPERDAL 2 MG TABLET | $908,413 | $466,306 | $282,967 | $159,140 | 180,242 | 3,459 |
| | RISPERDAL 2 MG TABLET | $344,159 | $175,580 | $117,396 | $51,183 | 68,866 | 1,371 |
| | RISPERDAL 2MG M-TAB | $30,784 | $15,698 | $10,963 | $4,122 | 4,921 | 79 |
| | RISPERDAL 3 MG TABLET | $882,605 | $452,671 | $264,377 | $165,558 | 143,734 | 2,876 |
| | RISPERDAL 3 MG TABLET | $283,709 | $145,665 | $96,183 | $41,861 | 46,580 | 920 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | RISPERDAL 4 MG TABLET | $516,742 | $265,479 | $160,351 | $90,912 | 64,366 | 1,339 |
| | SPORANOX 10 MG/ML SOLUTION | $10,237 | $5,269 | $2,484 | $2,484 | 12,060 | 28 |
| | SPORANOX 100 MG CAPSULE | $1,278 | $639 | $319 | $319 | 150 | 2 |
| | SPORANOX 100 MG CAPSULE | $35,129 | $14,889 | $10,352 | $9,888 | 4,127 | 75 |
| | SPORANOX 100 MG CAPSULE | $6,356 | $3,144 | $1,983 | $1,229 | 700 | 25 |
| McNeil Consumer Healthcare (Johnson & Johnson) | FLEXERIL 10 MG TABLET | $349 | $185 | $82 | $82 | 270 | 3 |
| | FLEXERIL 5 MG TABLET | $26,596 | $12,868 | $7,003 | $6,725 | 22,274 | 485 |
| McNeil Pharmaceutical | HALDOL DECANOATE 100 AMPUL | $668 | $350 | $183 | $134 | 10 | 4 |
| | HALDOL DECANOATE 50 AMPUL | $39 | $20 | $9 | $9 | 8 | 2 |
| | LEVAQUIN 25 MG/ML VIAL | $161 | $80 | $40 | $40 | 80 | 1 |
| | LEVAQUIN 250 MG TABLET | $210 | $105 | $52 | $52 | 24 | 3 |
| | LEVAQUIN 250 MG TABLET | $74,941 | $37,481 | $20,013 | $17,447 | 8,684 | 1,148 |
| | LEVAQUIN 500 MG TABLET | $477,217 | $238,674 | $128,921 | $109,622 | 48,671 | 5,514 |
| | LEVAQUIN 500 MG/100 ML D5W | $1,462 | $742 | $360 | $360 | 3,600 | 5 |
| | LEVAQUIN 750 MG LEVA-PAK TA | $6,002 | $3,050 | $1,628 | $1,324 | 320 | 64 |
| | LEVAQUIN 750 MG TABLET | $9,461 | $4,800 | $2,517 | $2,144 | 488 | 65 |
| | LEVAQUIN 750 MG TABLET | $9,004 | $4,466 | $2,515 | $2,023 | 593 | 71 |
| | PANCREASE CAPSULE EC | $94 | $50 | $22 | $22 | 180 | 1 |
| | PANCREASE CAPSULE EC | $97 | $51 | $46 | $0 | 180 | 2 |
| | PANCREASE MT 10 CAPSULE EC | $1,132 | $488 | $322 | $322 | 1,080 | 9 |
| | PANCREASE MT 16 CAPSULE EC | $7,912 | $3,956 | $1,978 | $1,978 | 4,770 | 6 |
| | PANCREASE MT 4 CAPSULE EC | $427 | $220 | $104 | $104 | 1,030 | 6 |
| | REGRANEX 0.01% GEL | $81,456 | $41,507 | $20,214 | $19,734 | 2,610 | 159 |
| | TOPAMAX 100 MG TABLET | $569,366 | $292,425 | $181,991 | $94,949 | 147,647 | 2,154 |
| | TOPAMAX 15 MG SPRINKLE CAP | $5,719 | $2,952 | $1,394 | $1,372 | 4,307 | 54 |
| | TOPAMAX 200 MG TABLET | $99,496 | $51,391 | $32,240 | $15,865 | 21,724 | 423 |
| | TOPAMAX 25 MG SPRINKLE CAP | $33,298 | $17,053 | $10,648 | $5,597 | 20,536 | 124 |
| | TOPAMAX 25 MG TABLET | $307,821 | $156,852 | $98,144 | $52,826 | 210,360 | 2,047 |
| | TOPAMAX 50 MG TABLET | $21,849 | $11,213 | $5,917 | $4,719 | 6,951 | 106 |
| | TYLENOL W/CODEINE #4 TABLET | $21 | $10 | $5 | $5 | 20 | 1 |
| | TYLENOL W/CODEINE #4 TABLET | $234 | $117 | $59 | $59 | 480 | 5 |
| | ULTRACET TABLET | $184,290 | $92,918 | $46,582 | $44,790 | 191,302 | 2,530 |
| | ULTRAM 50 MG TABLET | $1,933 | $995 | $469 | $469 | 1,800 | 22 |
| Medimmune, Inc. | CYTOGAM 2.5 GM VIAL | $86 | $46 | $20 | $20 | 6 | 2 |
| | SYNAGIS 100 MG VIAL | $724,288 | $375,865 | $191,934 | $156,490 | 598 | 500 |
| | SYNAGIS 50 MG VIAL | $130,869 | $67,630 | $34,756 | $28,483 | 202 | 202 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| Merck and Company | CANCIDAS IV 50 MG VIAL | $12,496 | $6,389 | $3,053 | $3,053 | 36 | 5 |
| | COGENTIN 1 MG/ML AMPUL | $0 | $0 | $0 | $0 | 0 | 0 |
| | COSMEGEN 0.5 MG VIAL | $81 | $41 | $20 | $20 | 5 | 5 |
| | COSOPT EYE DROPS | $4,075 | $2,095 | $1,009 | $971 | 505 | 81 |
| | COSOPT EYE DROPS | $3,313 | $1,624 | $844 | $844 | 416 | 41 |
| | COSOPT EYE DROPS | $59,225 | $29,121 | $15,265 | $14,839 | 6,275 | 1,139 |
| | COSOPT EYE DROPS | $129,065 | $63,542 | $33,629 | $31,894 | 13,920 | 1,376 |
| | COZAAR 100 MG TABLET | $60,099 | $28,922 | $15,870 | $15,306 | 28,765 | 755 |
| | COZAAR 100 MG TABLET | $16,651 | $7,837 | $4,407 | $4,407 | 8,010 | 198 |
| | COZAAR 100 MG TABLET | $18,628 | $9,441 | $4,668 | $4,519 | 8,934 | 227 |
| | COZAAR 25 MG TABLET | $27,494 | $13,376 | $7,458 | $6,660 | 17,876 | 421 |
| | COZAAR 25 MG TABLET | $13,654 | $6,931 | $3,458 | $3,264 | 8,880 | 237 |
| | COZAAR 50 MG TABLET | $80,893 | $39,477 | $20,776 | $20,640 | 52,964 | 1,210 |
| | COZAAR 50 MG TABLET | $53,242 | $26,252 | $13,568 | $13,422 | 34,885 | 763 |
| | COZAAR 50 MG TABLET | $56,499 | $28,023 | $15,054 | $13,423 | 37,433 | 880 |
| | COZAAR 50 MG TABLET | $1,255 | $639 | $522 | $95 | 780 | 26 |
| | CRIXIVAN 400 MG CAPSULE | $5,992 | $3,064 | $1,633 | $1,296 | 2,160 | 18 |
| | CRIXIVAN 400 MG CAPSULE | $10,813 | $5,572 | $2,620 | $2,620 | 3,900 | 23 |
| | CRIXIVAN 400 MG CAPSULE | $85,447 | $44,004 | $20,721 | $20,721 | 30,900 | 207 |
| | CUPRIMINE 250 MG CAPSULE | $1,259 | $648 | $305 | $305 | 1,220 | 11 |
| | DECADRON 0.5 MG TABLET | $12 | $6 | $3 | $3 | 15 | 1 |
| | DEMSER 250 MG CAPSULE | $572 | $294 | $139 | $139 | 360 | 4 |
| | DIURIL 250 MG/5 ML ORAL SUS | $61 | $31 | $28 | $2 | 810 | 7 |
| | EDECRIN 25 MG TABLET | $271 | $143 | $64 | $64 | 780 | 10 |
| | FOSAMAX 10 MG TABLET | $31,068 | $15,536 | $7,878 | $7,654 | 13,119 | 343 |
| | FOSAMAX 10 MG TABLET | $16,881 | $8,637 | $4,467 | $3,777 | 6,940 | 183 |
| | FOSAMAX 40 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | FOSAMAX 5 MG TABLET | $12,029 | $5,724 | $3,314 | $2,991 | 5,010 | 163 |
| | FOSAMAX 5 MG TABLET | $2,972 | $1,526 | $947 | $499 | 1,199 | 34 |
| | FOSAMAX 70 MG ORAL SOLUTION | $1,892 | $953 | $470 | $470 | 7,504 | 26 |
| | FOSAMAX 70 MG TABLET | $826,782 | $405,352 | $229,816 | $191,615 | 48,559 | 9,159 |
| | HYDROCORTONE 10 MG TABLET | $142 | $74 | $34 | $34 | 480 | 8 |
| | HYZAAR 100-25 TABLET | $70,760 | $34,753 | $18,290 | $17,717 | 33,925 | 907 |
| | HYZAAR 100-25 TABLET | $9,594 | $4,904 | $2,345 | $2,345 | 4,620 | 104 |
| | HYZAAR 100-25 TABLET | $11,640 | $5,547 | $3,155 | $2,939 | 5,610 | 162 |
| | HYZAAR 50-12.5 TABLET | $46,825 | $22,555 | $12,135 | $12,135 | 30,439 | 741 |
| | HYZAAR 50-12.5 TABLET | $11,084 | $5,351 | $3,078 | $2,655 | 7,270 | 166 |
| | HYZAAR 50-12.5 TABLET | $18,452 | $8,848 | $4,887 | $4,718 | 12,030 | 285 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | HYZAAR 50-12.5 TABLET | $236 | $0 | $118 | $118 | 150 | 5 |
| | INVANZ 1 GM VIAL | $2,977 | $1,502 | $738 | $738 | 64 | 8 |
| | MAXALT 10 MG TABLET | $10,423 | $5,374 | $2,645 | $2,405 | 624 | 40 |
| | MAXALT 10 MG TABLET | $1,475 | $738 | $444 | $294 | 89 | 5 |
| | MAXALT 5 MG TABLET | $808 | $422 | $205 | $181 | 48 | 6 |
| | MAXALT MLT 10MG TABLET | $13,890 | $7,162 | $3,390 | $3,339 | 828 | 82 |
| | MAXALT MLT 5MG TABLET | $1,891 | $966 | $462 | $462 | 114 | 5 |
| | MEPHYTON 5 MG TABLET | $719 | $368 | $177 | $173 | 1,050 | 49 |
| | MEVACOR 20 MG TABLET | $144 | $76 | $34 | $34 | 60 | 2 |
| | MEVACOR 40 MG TABLET | $1,362 | $703 | $330 | $330 | 330 | 11 |
| | MUSTARGEN 10 MG VIAL | $164 | $87 | $39 | $39 | 14 | 4 |
| | NOROXIN 400 MG TABLET | $161 | $55 | $53 | $53 | 44 | 2 |
| | NOROXIN 400 MG TABLET | $1,248 | $645 | $302 | $302 | 350 | 12 |
| | PEPCID 20 MG TABLET | $655 | $337 | $159 | $159 | 360 | 6 |
| | PEPCID 40 MG/5 ML ORAL SUSP | $4,983 | $2,722 | $1,427 | $834 | 4,050 | 42 |
| | PNEUMOVAX 23 SYRINGE | $1,964 | $1,034 | $492 | $437 | 43 | 84 |
| | PNEUMOVAX 23 VIAL | $192 | $100 | $46 | $46 | 5 | 4 |
| | PNEUMOVAX 23 VIAL | $1,026 | $517 | $347 | $162 | 22 | 36 |
| | PRIMAXIN I.M. 500 MG VIAL | $1,190 | $595 | $297 | $297 | 40 | 3 |
| | PRIMAXIN I.V. 500 MG VIAL | $11,385 | $5,871 | $2,757 | $2,757 | 392 | 17 |
| | PRINZIDE 10/12.5 TABLET | $103 | $55 | $24 | $24 | 90 | 3 |
| | PROSCAR 5 MG TABLET | $59,863 | $29,293 | $15,793 | $14,777 | 22,625 | 567 |
| | PROSCAR 5 MG TABLET | $66,648 | $33,386 | $17,525 | $15,738 | 25,096 | 672 |
| | SINGULAIR 10 MG TABLET | $468,896 | $236,954 | $121,869 | $110,073 | 162,690 | 4,733 |
| | SINGULAIR 10 MG TABLET | $236,587 | $120,054 | $69,155 | $47,377 | 83,302 | 2,385 |
| | SINGULAIR 4 MG TABLET CHEW | $177,121 | $90,978 | $43,790 | $42,353 | 60,735 | 1,877 |
| | SINGULAIR 4 MG TABLET CHEW | $9,668 | $5,016 | $2,372 | $2,280 | 3,321 | 96 |
| | SINGULAIR 5 MG TABLET CHEW | $273,531 | $142,414 | $72,704 | $58,413 | 94,183 | 2,848 |
| | SINGULAIR 5 MG TABLET CHEW | $51,410 | $26,910 | $13,411 | $11,089 | 17,880 | 517 |
| | STROMECTOL 3 MG TABLET | $994 | $515 | $276 | $204 | 182 | 30 |
| | STROMECTOL 6 MG TABLET | $30 | $16 | $7 | $7 | 3 | 1 |
| | SYPRINE 250 MG CAPSULE | $0 | $0 | $0 | $0 | 0 | 0 |
| | SYSTEM GENERATED from CLAIM | $746 | $373 | $187 | $187 | 45 | 4 |
| | SYSTEM GENERATED from CLAIM | $17,537 | $8,987 | $4,471 | $4,079 | 6,140 | 184 |
| | SYSTEM GENERATED from CLAIM | $6,160 | $3,170 | $1,495 | $1,495 | 65 | 22 |
| | TIMOLIDE 10/25 TABLET | $247 | $127 | $60 | $60 | 300 | 10 |
| | TIMOPTIC 0.5% OCUDOSE DROP | $1,399 | $720 | $339 | $339 | 720 | 12 |
| | TIMOPTIC 0.5% OCUM PLUS DRP | $470 | $241 | $115 | $115 | 120 | 12 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | TIMOPTIC-XE 0.25% EYE SOLN | $81 | $41 | $20 | $20 | 15 | 2 |
| | TIMOPTIC-XE 0.5% EYE SOLN | $161 | $82 | $39 | $39 | 25 | 3 |
| | TRUSOPT 2% EYE DROPS | $693 | $312 | $197 | $185 | 140 | 28 |
| | TRUSOPT 2% EYE DROPS | $2,718 | $1,128 | $800 | $789 | 570 | 57 |
| | TRUSOPT 2% EYE DROPS | $4,423 | $2,195 | $1,128 | $1,101 | 810 | 152 |
| | TRUSOPT 2% EYE DROPS | $10,360 | $4,606 | $2,959 | $2,795 | 1,941 | 191 |
| | VIOXX 12.5 MG TABLET | $8,371 | $4,256 | $2,079 | $2,036 | 3,000 | 80 |
| | VIOXX 12.5 MG TABLET | $42,874 | $21,082 | $12,380 | $9,412 | 15,342 | 440 |
| | VIOXX 12.5 MG TABLET | $261 | $130 | $109 | $22 | 90 | 3 |
| | VIOXX 12.5 MG/5 ML ORAL SUS | $163 | $83 | $40 | $40 | 195 | 2 |
| | VIOXX 25 MG TABLET | $67,972 | $33,061 | $17,762 | $17,149 | 24,286 | 727 |
| | VIOXX 25 MG TABLET | $470,430 | $236,337 | $124,245 | $109,847 | 168,304 | 4,923 |
| | VIOXX 25 MG TABLET | $6,510 | $3,348 | $1,841 | $1,321 | 2,318 | 67 |
| | VIOXX 25 MG/5 ML ORAL SUSP | $15 | $8 | $4 | $4 | 15 | 1 |
| | VIOXX 50 MG TABLET | $1,358 | $622 | $374 | $362 | 299 | 60 |
| | VIOXX 50 MG TABLET | $7,985 | $3,974 | $2,270 | $1,741 | 1,774 | 356 |
| | ZOCOR 10 MG TABLET | $74,797 | $37,120 | $19,419 | $18,258 | 30,499 | 760 |
| | ZOCOR 10 MG TABLET | $45,242 | $22,733 | $14,181 | $8,328 | 18,392 | 503 |
| | ZOCOR 10 MG TABLET | $5,911 | $2,890 | $1,965 | $1,056 | 2,362 | 72 |
| | ZOCOR 10 MG TABLET | $7,691 | $3,962 | $3,204 | $525 | 3,352 | 119 |
| | ZOCOR 20 MG TABLET | $570,059 | $278,869 | $152,426 | $138,765 | 134,550 | 3,510 |
| | ZOCOR 20 MG TABLET | $237,798 | $116,909 | $63,720 | $57,168 | 56,990 | 1,511 |
| | ZOCOR 20 MG TABLET | $34,209 | $17,191 | $9,678 | $7,340 | 8,174 | 245 |
| | ZOCOR 20 MG TABLET | $72,705 | $37,414 | $30,399 | $4,891 | 17,739 | 552 |
| | ZOCOR 40 MG TABLET | $348,788 | $168,872 | $93,176 | $86,740 | 82,277 | 2,169 |
| | ZOCOR 40 MG TABLET | $142,173 | $71,600 | $37,339 | $33,234 | 33,393 | 871 |
| | ZOCOR 40 MG TABLET | $39,182 | $20,265 | $11,232 | $7,684 | 9,330 | 272 |
| | ZOCOR 40 MG TABLET | $21,985 | $11,158 | $9,067 | $1,760 | 5,557 | 180 |
| | ZOCOR 5 MG TABLET | $7,616 | $3,922 | $1,847 | $1,847 | 4,141 | 104 |
| | ZOCOR 5 MG TABLET | $3,634 | $1,868 | $1,170 | $595 | 2,079 | 67 |
| | ZOCOR 5 MG TABLET | $233 | $123 | $84 | $26 | 120 | 6 |
| | ZOCOR 80 MG TABLET | $57,196 | $29,266 | $14,272 | $13,658 | 13,489 | 379 |
| | ZOCOR 80 MG TABLET | $27,098 | $13,960 | $8,360 | $4,778 | 6,744 | 189 |
| Mylan Pharmaceuticals, Inc. | ACEBUTOLOL 200 MG CAPSULE | $510 | $263 | $124 | $124 | 930 | 20 |
| | ACEBUTOLOL 400 MG CAPSULE | $1,050 | $541 | $255 | $255 | 1,440 | 20 |
| | ACYCLOVIR 200 MG CAPSULE | $109 | $58 | $26 | $26 | 530 | 7 |
| | ACYCLOVIR 400 MG TABLET | $311 | $159 | $76 | $76 | 600 | 10 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | ACYCLOVIR 800 MG TABLET | $148 | $77 | $36 | $36 | 150 | 4 |
| | ALBUTEROL SULFATE 2 MG TAB | $1,009 | $517 | $251 | $241 | 3,792 | 56 |
| | ALBUTEROL SULFATE 2 MG TAB | $69 | $35 | $17 | $17 | 240 | 3 |
| | ALBUTEROL SULFATE 4 MG TAB | $1,036 | $530 | $277 | $230 | 4,000 | 63 |
| | ALBUTEROL SULFATE 4 MG TAB | $541 | $280 | $262 | $0 | 2,085 | 27 |
| | ALLOPURINOL 100 MG TABLET | $3,415 | $1,698 | $864 | $853 | 21,904 | 411 |
| | ALLOPURINOL 100 MG TABLET | $171 | $87 | $42 | $42 | 1,170 | 18 |
| | ALLOPURINOL 300 MG TABLET | $1,298 | $667 | $385 | $246 | 4,840 | 123 |
| | ALLOPURINOL 300 MG TABLET | $2,331 | $1,185 | $588 | $559 | 8,736 | 215 |
| | ALPRAZOLAM 0.25 MG TABLET | $242 | $124 | $63 | $55 | 1,812 | 29 |
| | ALPRAZOLAM 0.25 MG TABLET | $5,298 | $2,650 | $1,339 | $1,309 | 42,051 | 604 |
| | ALPRAZOLAM 0.5 MG TABLET | $720 | $370 | $175 | $175 | 5,937 | 68 |
| | ALPRAZOLAM 0.5 MG TABLET | $7,972 | $4,088 | $1,947 | $1,937 | 64,786 | 767 |
| | ALPRAZOLAM 1 MG TABLET | $3,175 | $1,653 | $829 | $693 | 23,002 | 253 |
| | ALPRAZOLAM 1 MG TABLET | $3,914 | $2,000 | $982 | $931 | 28,147 | 316 |
| | ALPRAZOLAM 2 MG TABLET | $7,401 | $3,798 | $1,801 | $1,801 | 33,837 | 335 |
| | AMILORIDE HCL/HCTZ 5/50 TAB | $126 | $64 | $31 | $31 | 960 | 15 |
| | AMITRIP/PERPHEN 10-2 TABLET | $347 | $178 | $84 | $84 | 2,820 | 33 |
| | AMITRIP/PERPHEN 10-2 TABLET | $97 | $51 | $47 | $0 | 810 | 9 |
| | AMITRIP/PERPHEN 10-4 TABLET | $45 | $24 | $10 | $10 | 135 | 2 |
| | AMITRIP/PERPHEN 25-2 TABLET | $729 | $375 | $177 | $177 | 5,078 | 64 |
| | AMITRIP/PERPHEN 25-2 TABLET | $78 | $40 | $19 | $19 | 330 | 11 |
| | AMITRIP/PERPHEN 25-4 TABLET | $200 | $103 | $48 | $48 | 600 | 6 |
| | AMITRIP/PERPHEN 50-4 TABLET | $663 | $344 | $319 | $0 | 960 | 8 |
| | AMITRIPTYLINE HCL 10 MG TAB | $3,580 | $1,785 | $914 | $881 | 21,751 | 502 |
| | AMITRIPTYLINE HCL 10 MG TAB | $42 | $22 | $10 | $10 | 330 | 5 |
| | AMITRIPTYLINE HCL 100 MG TA | $3,029 | $1,554 | $737 | $737 | 10,984 | 307 |
| | AMITRIPTYLINE HCL 150 MG TA | $998 | $512 | $243 | $243 | 2,860 | 71 |
| | AMITRIPTYLINE HCL 25 MG TAB | $3,647 | $1,867 | $898 | $882 | 23,866 | 464 |
| | AMITRIPTYLINE HCL 25 MG TAB | $2,284 | $1,146 | $570 | $568 | 16,091 | 274 |
| | AMITRIPTYLINE HCL 50 MG TAB | $2,894 | $1,454 | $728 | $713 | 17,911 | 378 |
| | AMITRIPTYLINE HCL 50 MG TAB | $726 | $376 | $175 | $175 | 4,135 | 100 |
| | AMITRIPTYLINE HCL 75 MG TAB | $1,009 | $510 | $249 | $249 | 3,948 | 99 |
| | ATENOLOL 100 MG TABLET | $9,599 | $4,734 | $2,501 | $2,364 | 34,767 | 895 |
| | ATENOLOL 100 MG TABLET | $21 | $11 | $5 | $5 | 90 | 1 |
| | ATENOLOL 25 MG TABLET | $7,319 | $3,721 | $1,849 | $1,749 | 29,117 | 652 |
| | ATENOLOL 25 MG TABLET | $18,837 | $9,264 | $4,928 | $4,644 | 73,913 | 1,710 |
| | ATENOLOL 50 MG TABLET | $8,057 | $4,024 | $2,082 | $1,951 | 42,906 | 1,024 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | ATENOLOL 50 MG TABLET | $16,389 | $7,886 | $4,519 | $3,984 | 86,462 | 2,050 |
| | ATENOLOL/CHLORTHAL 100/25 | $1,871 | $840 | $540 | $492 | 4,994 | 144 |
| | ATENOLOL/CHLORTHAL 50/25 TB | $2,379 | $1,173 | $613 | $593 | 8,455 | 214 |
| | AZATHIOPRINE 50 MG TABLET | $455 | $241 | $107 | $107 | 420 | 5 |
| | BENAZEPRIL HCL 10 MG TABLET | $2,438 | $1,238 | $670 | $530 | 2,490 | 59 |
| | BENAZEPRIL HCL 20 MG TABLET | $963 | $486 | $239 | $239 | 990 | 22 |
| | BENAZEPRIL HCL 40 MG TABLET | $1,406 | $706 | $350 | $350 | 1,560 | 28 |
| | BENAZEPRIL HCL 5 MG TABLET | $29 | $15 | $7 | $7 | 30 | 1 |
| | BENAZEPRIL-HCTZ 10/12.5 TAB | $299 | $61 | $119 | $119 | 300 | 7 |
| | BENAZEPRIL-HCTZ 20/12.5 TAB | $613 | $310 | $151 | $151 | 630 | 15 |
| | BENAZEPRIL-HCTZ 20/25MG TAB | $225 | $65 | $80 | $80 | 230 | 3 |
| | BISOPROLOL/HCTZ 10/6.25 TAB | $3,534 | $1,725 | $905 | $905 | 3,660 | 79 |
| | BISOPROLOL/HCTZ 2.5/6.25 TB | $3,581 | $1,852 | $864 | $864 | 3,970 | 79 |
| | BISOPROLOL/HCTZ 5/6.25 TAB | $5,023 | $2,422 | $1,350 | $1,252 | 5,240 | 146 |
| | BROMOCRIPTINE 2.5 MG TABLET | $114 | $0 | $57 | $57 | 60 | 1 |
| | BUMETANIDE 0.5 MG TABLET | $146 | $76 | $35 | $35 | 510 | 14 |
| | BUMETANIDE 1 MG TABLET | $1,046 | $538 | $254 | $254 | 2,730 | 75 |
| | BUMETANIDE 2 MG TABLET | $399 | $204 | $97 | $97 | 750 | 17 |
| | BUPROPION HCL 100 MG TABLET | $1,821 | $943 | $482 | $397 | 2,066 | 27 |
| | BUPROPION HCL 75 MG TABLET | $3,600 | $1,857 | $1,059 | $685 | 5,169 | 79 |
| | BUSPIRONE HCL 10 MG TABLET | $12,169 | $6,159 | $3,626 | $2,384 | 27,079 | 332 |
| | BUSPIRONE HCL 15 MG TABLET | $4,912 | $2,496 | $1,255 | $1,161 | 9,560 | 155 |
| | BUSPIRONE HCL 15 MG TABLET | $27,473 | $14,088 | $7,435 | $5,950 | 54,397 | 752 |
| | BUSPIRONE HCL 30 MG TABLET | $70,145 | $36,071 | $21,394 | $12,681 | 21,945 | 346 |
| | BUSPIRONE HCL 5 MG TABLET | $3,624 | $1,864 | $885 | $875 | 10,976 | 152 |
| | BUTORPHANOL 10 MG/ML SPRAY | $4,738 | $2,428 | $1,155 | $1,155 | 173 | 60 |
| | CAPTOPRIL 100 MG TABLET | $289 | $148 | $70 | $70 | 1,290 | 14 |
| | CAPTOPRIL 12.5 MG TABLET | $822 | $418 | $202 | $202 | 8,905 | 121 |
| | CAPTOPRIL 12.5 MG TABLET | $15 | $8 | $4 | $4 | 630 | 7 |
| | CAPTOPRIL 25 MG TABLET | $1,430 | $641 | $394 | $394 | 14,850 | 189 |
| | CAPTOPRIL 25 MG TABLET | $108 | $56 | $26 | $26 | 1,170 | 14 |
| | CAPTOPRIL 50 MG TABLET | $1,843 | $899 | $472 | $472 | 13,780 | 162 |
| | CAPTOPRIL 50 MG TABLET | $190 | $97 | $46 | $46 | 1,410 | 18 |
| | CAPTOPRIL/HCTZ 25/15 TABLET | $129 | $61 | $63 | $6 | 300 | 13 |
| | CAPTOPRIL/HCTZ 25/25 TABLET | $559 | $289 | $135 | $135 | 1,560 | 47 |
| | CAPTOPRIL/HCTZ 50/15 TABLET | $750 | $116 | $317 | $317 | 600 | 9 |
| | CAPTOPRIL/HCTZ 50/25 TABLET | $182 | $95 | $44 | $44 | 390 | 9 |
| | CARBIDOPA/LEVO 25/100 TB SA | $7,246 | $3,553 | $1,987 | $1,705 | 8,593 | 106 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | CARBIDOPA/LEVO 50/200 TB SA | $47,337 | $23,094 | $13,772 | $10,470 | 29,528 | 325 |
| | CEFACLOR 125 MG/5 ML SUSPEN | $251 | $131 | $70 | $50 | 1,800 | 12 |
| | CEFACLOR 125 MG/5 ML SUSPEN | $334 | $174 | $93 | $67 | 2,100 | 23 |
| | CEFACLOR 187 MG/5 ML SUSPEN | $18 | $10 | $4 | $4 | 100 | 1 |
| | CEFACLOR 250 MG CAPSULE | $36 | $18 | $9 | $9 | 42 | 2 |
| | CEFACLOR 250 MG/5 ML SUSPEN | $121 | $64 | $45 | $12 | 375 | 2 |
| | CEFACLOR 250 MG/5 ML SUSPEN | $27 | $14 | $6 | $6 | 75 | 1 |
| | CEFACLOR 500 MG CAPSULE | $148 | $76 | $36 | $36 | 102 | 4 |
| | CHLOROTHIAZIDE 250 MG TABLE | $56 | $28 | $14 | $14 | 240 | 6 |
| | CHLOROTHIAZIDE 500 MG TABLE | $87 | $45 | $21 | $21 | 240 | 8 |
| | CHLORPROPAMIDE 100 MG TABLE | $70 | $36 | $17 | $17 | 295 | 4 |
| | CHLORPROPAMIDE 250 MG TABLE | $546 | $175 | $185 | $185 | 1,200 | 18 |
| | CHLORTHALIDONE 25 MG TABLET | $767 | $372 | $197 | $197 | 2,759 | 86 |
| | CHLORTHALIDONE 25 MG TABLET | $127 | $65 | $31 | $31 | 480 | 8 |
| | CHLORTHALIDONE 50 MG TABLET | $110 | $57 | $26 | $26 | 540 | 9 |
| | CIMETIDINE 300 MG TABLET | $51 | $17 | $17 | $17 | 232 | 5 |
| | CIMETIDINE 400 MG TABLET | $151 | $78 | $36 | $36 | 720 | 10 |
| | CIMETIDINE 400 MG TABLET | $127 | $65 | $31 | $31 | 690 | 8 |
| | CIMETIDINE 800 MG TABLET | $21 | $11 | $5 | $5 | 60 | 1 |
| | CLOMIPRAMINE 25 MG CAPSULE | $2,466 | $1,265 | $600 | $600 | 6,555 | 64 |
| | CLOMIPRAMINE 50 MG CAPSULE | $6,781 | $3,495 | $2,070 | $1,216 | 12,871 | 136 |
| | CLOMIPRAMINE 75 MG CAPSULE | $1,366 | $701 | $338 | $326 | 2,020 | 41 |
| | CLONAZEPAM 0.5 MG TABLET | $2,250 | $1,157 | $845 | $248 | 7,278 | 103 |
| | CLONAZEPAM 0.5 MG TABLET | $996 | $511 | $242 | $242 | 3,322 | 40 |
| | CLONAZEPAM 1 MG TABLET | $1,546 | $793 | $376 | $376 | 4,710 | 53 |
| | CLONAZEPAM 1 MG TABLET | $1,698 | $876 | $479 | $342 | 4,927 | 65 |
| | CLONAZEPAM 2 MG TABLET | $748 | $387 | $181 | $181 | 1,698 | 19 |
| | CLONIDINE HCL 0.1 MG TABLET | $7,765 | $3,999 | $1,979 | $1,786 | 46,043 | 783 |
| | CLONIDINE HCL 0.1 MG TABLET | $8,460 | $4,291 | $2,212 | $1,958 | 51,701 | 809 |
| | CLONIDINE HCL 0.2 MG TABLET | $8,434 | $4,298 | $2,070 | $2,066 | 44,637 | 585 |
| | CLONIDINE HCL 0.2 MG TABLET | $1,799 | $907 | $459 | $433 | 9,480 | 137 |
| | CLONIDINE HCL 0.3 MG TABLET | $8,275 | $4,170 | $2,066 | $2,039 | 36,522 | 422 |
| | CLORAZEPATE 3.75 MG TABLET | $1,203 | $617 | $293 | $293 | 1,375 | 15 |
| | CLORAZEPATE 3.75 MG TABLET | $2,801 | $1,441 | $1,360 | $0 | 3,285 | 13 |
| | CLORAZEPATE 7.5 MG TABLET | $423 | $224 | $100 | $100 | 390 | 4 |
| | CLORAZEPATE 7.5 MG TABLET | $107 | $55 | $26 | $26 | 90 | 3 |
| | CLOZAPINE 100 MG TABLET | $76,913 | $39,542 | $24,408 | $12,963 | 25,226 | 486 |
| | CLOZAPINE 100 MG TABLET | $4,758 | $2,443 | $1,157 | $1,157 | 1,596 | 46 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | CLOZAPINE 25 MG TABLET | $7,016 | $3,589 | $1,822 | $1,605 | 5,482 | 164 |
| | CYCLOBENZAPRINE 10 MG TABLE | $2,535 | $1,269 | $635 | $630 | 7,219 | 141 |
| | CYCLOBENZAPRINE 10 MG TABLE | $11,309 | $5,673 | $2,896 | $2,740 | 31,294 | 657 |
| | CYSTAGON 150 MG CAPSULE | $205 | $106 | $50 | $50 | 2,880 | 8 |
| | CYSTAGON 50 MG CAPSULE | $125 | $64 | $30 | $30 | 960 | 8 |
| | DIAZEPAM 10 MG TABLET | $6,186 | $3,195 | $1,536 | $1,455 | 33,753 | 405 |
| | DIAZEPAM 10 MG TABLET | $2,722 | $1,406 | $680 | $636 | 14,044 | 190 |
| | DIAZEPAM 2 MG TABLET | $738 | $385 | $198 | $155 | 7,432 | 94 |
| | DIAZEPAM 2 MG TABLET | $113 | $59 | $31 | $23 | 1,192 | 14 |
| | DIAZEPAM 5 MG TABLET | $1,602 | $835 | $403 | $364 | 10,810 | 184 |
| | DIAZEPAM 5 MG TABLET | $3,863 | $1,966 | $958 | $940 | 27,082 | 427 |
| | DICLOFENAC POT 50 MG TABLET | $3,922 | $1,857 | $1,038 | $1,028 | 4,181 | 75 |
| | DICLOFENAC SOD 100 MG TAB S | $133 | $66 | $33 | $33 | 50 | 2 |
| | DICYCLOMINE 10 MG CAPSULE | $910 | $466 | $227 | $218 | 4,933 | 73 |
| | DICYCLOMINE 10 MG CAPSULE | $23 | $12 | $5 | $5 | 120 | 2 |
| | DICYCLOMINE 20 MG TABLET | $1,260 | $636 | $327 | $297 | 7,416 | 91 |
| | DICYCLOMINE 20 MG TABLET | $6 | $3 | $1 | $1 | 10 | 1 |
| | DILTIAZEM 120 MG TABLET | $367 | $190 | $88 | $88 | 1,230 | 19 |
| | DILTIAZEM 30 MG TABLET | $955 | $494 | $231 | $231 | 6,732 | 67 |
| | DILTIAZEM 30 MG TABLET | $134 | $69 | $65 | $0 | 960 | 8 |
| | DILTIAZEM 60 MG TABLET | $820 | $372 | $224 | $224 | 5,740 | 66 |
| | DILTIAZEM 60 MG TABLET | $464 | $238 | $113 | $113 | 3,060 | 30 |
| | DILTIAZEM 90 MG TABLET | $656 | $339 | $159 | $159 | 2,250 | 34 |
| | DILTIAZEM ER 120 MG CAP SA | $2,150 | $1,105 | $523 | $523 | 2,460 | 50 |
| | DILTIAZEM ER 120 MG CAP SA | $84 | $43 | $20 | $20 | 90 | 3 |
| | DILTIAZEM ER 120 MG CAP SA | $1,449 | $736 | $357 | $357 | 1,410 | 21 |
| | DILTIAZEM ER 180 MG CAP SA | $2,206 | $1,136 | $535 | $535 | 2,170 | 43 |
| | DILTIAZEM ER 240 MG CAP SA | $1,929 | $992 | $468 | $468 | 1,740 | 51 |
| | DILTIAZEM ER 240 MG CAP SA | $0 | $0 | $0 | $0 | 0 | 0 |
| | DILTIAZEM ER 60 MG CAP SA | $1,151 | $592 | $280 | $280 | 1,650 | 24 |
| | DILTIAZEM ER 90 MG CAP SA | $794 | $407 | $193 | $193 | 1,010 | 23 |
| | DIPHENOXYLATE/ATROPINE TAB | $1,721 | $894 | $413 | $413 | 4,024 | 68 |
| | DIPHENOXYLATE/ATROPINE TAB | $11,913 | $6,105 | $2,960 | $2,848 | 31,746 | 302 |
| | DOXAZOSIN MESYLATE 4 MG TAB | $92 | $46 | $23 | $23 | 120 | 4 |
| | DOXEPIN 10 MG CAPSULE | $636 | $327 | $154 | $154 | 4,045 | 62 |
| | DOXEPIN 10 MG CAPSULE | $9 | $5 | $2 | $2 | 50 | 1 |
| | DOXEPIN 100 MG CAPSULE | $2,333 | $1,192 | $641 | $500 | 5,250 | 85 |
| | DOXEPIN 100 MG CAPSULE | $85 | $45 | $20 | $20 | 150 | 5 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | DOXEPIN 25 MG CAPSULE | $983 | $495 | $244 | $244 | 4,225 | 54 |
| | DOXEPIN 25 MG CAPSULE | $123 | $64 | $30 | $30 | 480 | 8 |
| | DOXEPIN 50 MG CAPSULE | $575 | $296 | $139 | $139 | 2,700 | 41 |
| | DOXEPIN 50 MG CAPSULE | $193 | $99 | $47 | $47 | 1,020 | 10 |
| | DOXEPIN 75 MG CAPSULE | $11 | $6 | $3 | $3 | 30 | 1 |
| | ENALAPRIL MALEATE 10 MG TAB | $38,585 | $19,156 | $9,999 | $9,431 | 51,547 | 955 |
| | ENALAPRIL MALEATE 10 MG TAB | $2,320 | $1,188 | $566 | $566 | 3,014 | 72 |
| | ENALAPRIL MALEATE 2.5 MG TA | $8,448 | $4,193 | $2,198 | $2,057 | 20,325 | 436 |
| | ENALAPRIL MALEATE 2.5 MG TA | $416 | $214 | $135 | $66 | 870 | 29 |
| | ENALAPRIL MALEATE 20 MG TAB | $47,345 | $23,231 | $12,071 | $12,043 | 48,191 | 875 |
| | ENALAPRIL MALEATE 20 MG TAB | $1,638 | $847 | $395 | $395 | 1,604 | 38 |
| | ENALAPRIL MALEATE 5 MG TAB | $30,394 | $14,508 | $8,137 | $7,749 | 48,233 | 997 |
| | ENALAPRIL MALEATE 5 MG TAB | $168 | $84 | $68 | $16 | 240 | 8 |
| | ENALAPRIL/HCTZ 10-25MG TAB | $15,291 | $7,717 | $3,952 | $3,622 | 14,584 | 332 |
| | ENALAPRIL/HCTZ 5-12.5MG TAB | $1,877 | $952 | $462 | $462 | 2,000 | 49 |
| | ERYTHROMYCIN ES 400 MG TAB | $41 | $21 | $10 | $10 | 100 | 4 |
| | ERYTHROMYCIN ST 250 MG TAB | $8 | $4 | $2 | $2 | 20 | 1 |
| | ERYTHROMYCIN ST 250 MG TAB | $48 | $25 | $20 | $2 | 134 | 6 |
| | ERYTHROMYCIN ST 500 MG TAB | $47 | $24 | $12 | $12 | 84 | 6 |
| | ESTRADIOL 0.05 MG/DAY PATCH | $1,426 | $739 | $344 | $344 | 224 | 39 |
| | ESTRADIOL 0.1 MG/DAY PATCH | $80 | $41 | $20 | $20 | 12 | 3 |
| | ESTRADIOL 0.5 MG TABLET | $157 | $122 | $18 | $18 | 600 | 11 |
| | ESTRADIOL 1 MG TABLET | $30 | $27 | $2 | $2 | 110 | 2 |
| | ESTRADIOL 2 MG TABLET | $238 | $214 | $12 | $12 | 541 | 16 |
| | ESTROPIPATE 0.625(0.75 MG) | $77 | $39 | $19 | $19 | 180 | 6 |
| | ETODOLAC 200 MG CAPSULE | $14 | $7 | $3 | $3 | 20 | 1 |
| | ETODOLAC 400 MG TABLET | $149 | $76 | $36 | $36 | 380 | 3 |
| | ETODOLAC 500 MG TABLET | $85 | $44 | $20 | $20 | 90 | 2 |
| | ETOPOSIDE 50 MG CAPSULE | $2,314 | $421 | $946 | $946 | 55 | 2 |
| | FAMOTIDINE 20 MG TABLET | $23,829 | $11,843 | $6,579 | $5,407 | 37,280 | 730 |
| | FAMOTIDINE 40 MG TABLET | $3,269 | $1,612 | $895 | $762 | 3,426 | 68 |
| | FAMOTIDINE 40 MG TABLET | $547 | $247 | $178 | $121 | 420 | 11 |
| | FLECAINIDE ACETATE 100 MG T | $1,858 | $959 | $449 | $449 | 780 | 13 |
| | FLECAINIDE ACETATE 50 MG TA | $885 | $459 | $213 | $213 | 600 | 10 |
| | FLUOXETINE 10 MG CAPSULE | $973 | $496 | $260 | $218 | 1,650 | 32 |
| | FLUOXETINE 20 MG CAPSULE | $653 | $326 | $163 | $163 | 1,880 | 38 |
| | FLUPHENAZINE 1 MG TABLET | $1,418 | $733 | $383 | $301 | 4,910 | 67 |
| | FLUPHENAZINE 1 MG TABLET | $363 | $189 | $173 | $0 | 1,440 | 8 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | FLUPHENAZINE 10 MG TABLET | $9,560 | $4,909 | $3,133 | $1,518 | 16,573 | 250 |
| | FLUPHENAZINE 2.5 MG TABLET | $1,351 | $697 | $349 | $305 | 3,852 | 71 |
| | FLUPHENAZINE 2.5 MG TABLET | $115 | $59 | $57 | $0 | 270 | 9 |
| | FLUPHENAZINE 5 MG TABLET | $7,518 | $3,842 | $1,971 | $1,705 | 17,231 | 313 |
| | FLUPHENAZINE 5 MG TABLET | $180 | $94 | $86 | $0 | 420 | 7 |
| | FLURAZEPAM 15 MG CAPSULE | $271 | $140 | $66 | $66 | 1,580 | 26 |
| | FLURAZEPAM 30 MG CAPSULE | $467 | $239 | $142 | $87 | 1,991 | 53 |
| | FLURAZEPAM 30 MG CAPSULE | $8 | $4 | $2 | $2 | 30 | 1 |
| | FLURBIPROFEN 100 MG TABLET | $373 | $180 | $126 | $68 | 837 | 21 |
| | FLURBIPROFEN 50 MG TABLET | $77 | $39 | $19 | $19 | 120 | 1 |
| | FLUVOXAMINE MAL 100 MG TAB | $59,920 | $30,804 | $17,038 | $12,077 | 26,953 | 430 |
| | FLUVOXAMINE MALEATE 25 MG T | $4,004 | $2,070 | $1,263 | $671 | 1,901 | 50 |
| | FLUVOXAMINE MALEATE 50 MG T | $44,353 | $22,731 | $12,833 | $8,790 | 20,641 | 285 |
| | FUROSEMIDE 20 MG TABLET | $5,462 | $2,813 | $1,336 | $1,313 | 34,185 | 860 |
| | FUROSEMIDE 20 MG TABLET | $11,226 | $5,453 | $2,974 | $2,800 | 73,084 | 1,733 |
| | FUROSEMIDE 40 MG TABLET | $5,743 | $2,949 | $1,427 | $1,367 | 36,480 | 859 |
| | FUROSEMIDE 40 MG TABLET | $27,689 | $13,836 | $7,007 | $6,846 | 184,025 | 4,055 |
| | FUROSEMIDE 80 MG TABLET | $4,694 | $2,406 | $1,147 | $1,142 | 24,114 | 530 |
| | FUROSEMIDE 80 MG TABLET | $1,322 | $681 | $323 | $318 | 7,475 | 131 |
| | GLIPIZIDE 10 MG TABLET | $5,873 | $2,953 | $1,515 | $1,404 | 36,330 | 559 |
| | GLIPIZIDE 10 MG TABLET | $2,207 | $1,070 | $568 | $568 | 13,594 | 211 |
| | GLIPIZIDE 5 MG TABLET | $5,625 | $2,762 | $1,448 | $1,415 | 40,175 | 679 |
| | GLIPIZIDE 5 MG TABLET | $1,972 | $860 | $576 | $535 | 13,768 | 238 |
| | GLYBURIDE MICRO 1.5 MG TAB | $226 | $110 | $58 | $58 | 690 | 12 |
| | GLYBURIDE MICRO 3 MG TABLET | $1,381 | $711 | $340 | $330 | 3,950 | 31 |
| | GUANFACINE 1 MG TABLET | $6,590 | $3,412 | $1,800 | $1,378 | 11,104 | 170 |
| | GUANFACINE 2 MG TABLET | $731 | $375 | $190 | $166 | 915 | 16 |
| | HALOPERIDOL 0.5 MG TABLET | $1,399 | $717 | $378 | $304 | 5,630 | 84 |
| | HALOPERIDOL 0.5 MG TABLET | $796 | $409 | $299 | $87 | 3,180 | 49 |
| | HALOPERIDOL 1 MG TABLET | $4,246 | $2,189 | $1,134 | $923 | 13,419 | 201 |
| | HALOPERIDOL 1 MG TABLET | $3,339 | $1,714 | $1,224 | $401 | 9,000 | 139 |
| | HALOPERIDOL 2 MG TABLET | $5,180 | $2,678 | $1,415 | $1,087 | 13,437 | 244 |
| | HALOPERIDOL 2 MG TABLET | $3,290 | $1,691 | $1,198 | $402 | 6,796 | 100 |
| | HALOPERIDOL 5 MG TABLET | $18,723 | $9,622 | $5,726 | $3,374 | 34,057 | 611 |
| | HALOPERIDOL 5 MG TABLET | $17,366 | $8,924 | $5,727 | $2,715 | 23,371 | 366 |
| | HYDROCHLOROTHIAZIDE 12.5 MG | $40,517 | $19,478 | $11,174 | $9,866 | 83,210 | 2,382 |
| | HYDROXYCHLOROQUINE 200 MG T | $657 | $337 | $160 | $160 | 720 | 10 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | INDAPAMIDE 1.25 MG TABLET | $717 | $369 | $175 | $173 | 3,575 | 85 |
| | INDAPAMIDE 2.5 MG TABLET | $967 | $494 | $237 | $237 | 4,590 | 109 |
| | INDOMETHACIN 25 MG CAPSULE | $3,561 | $1,812 | $894 | $855 | 10,890 | 143 |
| | INDOMETHACIN 25 MG CAPSULE | $30 | $15 | $10 | $5 | 66 | 3 |
| | INDOMETHACIN 50 MG CAPSULE | $1,383 | $713 | $336 | $334 | 2,675 | 64 |
| | INDOMETHACIN 50 MG CAPSULE | $879 | $439 | $220 | $220 | 1,902 | 46 |
| | KETOCONAZOLE 200 MG TABLET | $32 | $16 | $8 | $8 | 10 | 1 |
| | KETOPROFEN 200 MG CAPSULE S | $1,498 | $754 | $372 | $372 | 600 | 16 |
| | KETOPROFEN 50 MG CAPSULE | $34 | $17 | $9 | $9 | 60 | 1 |
| | KETOPROFEN 75 MG CAPSULE | $235 | $122 | $57 | $57 | 480 | 10 |
| | KETOROLAC 10 MG TABLET | $1,092 | $566 | $272 | $253 | 1,184 | 68 |
| | LEVOTHYROXINE 100 MCG TABLE | $464 | $224 | $150 | $90 | 1,270 | 31 |
| | LEVOTHYROXINE 112 MCG TABLE | $1,770 | $915 | $805 | $49 | 4,116 | 120 |
| | LEVOTHYROXINE 125 MCG TABLE | $157 | $78 | $46 | $33 | 390 | 9 |
| | LEVOTHYROXINE 150 MCG TABLE | $360 | $182 | $89 | $89 | 830 | 23 |
| | LEVOTHYROXINE 175 MCG TABLE | $374 | $170 | $161 | $43 | 780 | 24 |
| | LEVOTHYROXINE 200 MCG TABLE | $62 | $23 | $19 | $19 | 210 | 3 |
| | LEVOTHYROXINE 25 MCG TAB | $187 | $83 | $52 | $52 | 585 | 16 |
| | LEVOTHYROXINE 50 MCG TABLET | $1,479 | $726 | $592 | $161 | 4,193 | 120 |
| | LEVOTHYROXINE 75 MCG TABLET | $497 | $250 | $144 | $102 | 1,400 | 34 |
| | LEVOTHYROXINE 88 MCG TABLET | $1,954 | $1,015 | $715 | $224 | 5,106 | 137 |
| | LISINOPRIL 10 MG TABLET | $7,127 | $3,606 | $2,016 | $1,505 | 10,502 | 286 |
| | LISINOPRIL 2.5 MG TABLET | $728 | $373 | $177 | $177 | 1,510 | 36 |
| | LISINOPRIL 20 MG TABLET | $6,289 | $3,194 | $1,661 | $1,434 | 8,720 | 201 |
| | LISINOPRIL 20 MG TABLET | $240 | $121 | $72 | $48 | 330 | 7 |
| | LISINOPRIL 30 MG TABLET | $518 | $266 | $126 | $126 | 540 | 7 |
| | LISINOPRIL 40 MG TABLET | $6,105 | $3,122 | $1,499 | $1,484 | 5,920 | 147 |
| | LISINOPRIL 5 MG TABLET | $2,658 | $1,260 | $699 | $699 | 3,890 | 105 |
| | LISINOPRIL 5 MG TABLET | $606 | $307 | $150 | $150 | 870 | 26 |
| | LISINOPRIL-HCTZ 10/12.5 TAB | $905 | $464 | $221 | $221 | 1,200 | 30 |
| | LISINOPRIL-HCTZ 20/12.5 TAB | $2,629 | $1,348 | $718 | $563 | 3,430 | 71 |
| | LISINOPRIL-HCTZ 20/25 TAB | $1,155 | $594 | $281 | $281 | 1,440 | 37 |
| | LOPERAMIDE 2 MG CAPSULE | $12,013 | $6,126 | $3,123 | $2,764 | 21,271 | 384 |
| | LOPERAMIDE 2 MG CAPSULE | $3,566 | $1,832 | $924 | $810 | 5,859 | 90 |
| | LORAZEPAM 0.5 MG TABLET | $11,017 | $5,701 | $3,371 | $1,945 | 22,541 | 306 |
| | LORAZEPAM 0.5 MG TABLET | $22,530 | $11,512 | $6,371 | $4,647 | 46,191 | 597 |
| | LORAZEPAM 1 MG TABLET | $28,227 | $14,731 | $7,746 | $5,750 | 45,693 | 520 |
| | LORAZEPAM 1 MG TABLET | $19,800 | $9,988 | $5,739 | $4,073 | 31,325 | 446 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | LORAZEPAM 1 MG TABLET | $14,956 | $7,689 | $4,957 | $2,310 | 23,793 | 302 |
| | LORAZEPAM 2 MG TABLET | $12,568 | $6,473 | $3,344 | $2,751 | 20,134 | 244 |
| | LORAZEPAM 2 MG TABLET | $1,785 | $917 | $728 | $140 | 2,840 | 37 |
| | LOVASTATIN 10 MG TABLET | $934 | $416 | $289 | $229 | 1,059 | 36 |
| | LOVASTATIN 20 MG TABLET | $14,722 | $7,317 | $3,825 | $3,580 | 12,341 | 351 |
| | LOVASTATIN 40 MG TABLET | $20,104 | $10,022 | $5,374 | $4,707 | 8,424 | 211 |
| | MAPROTILINE 25 MG TABLET | $50 | $25 | $12 | $12 | 120 | 4 |
| | MAPROTILINE 50 MG TABLET | $302 | $0 | $151 | $151 | 400 | 10 |
| | MECLOFENAMATE 100 MG CAPSUL | $296 | $155 | $70 | $70 | 220 | 3 |
| | MECLOFENAMATE 50 MG CAPSULE | $0 | $0 | $0 | $0 | 0 | 0 |
| | | | | | | | |
| | METFORMIN HCL 1,000 MG TABL | $42,123 | $21,429 | $12,467 | $8,227 | 36,842 | 575 |
| | METFORMIN HCL 500 MG TABLET | $33,954 | $16,985 | $9,216 | $7,753 | 67,969 | 913 |
| | METFORMIN HCL 500 MG TABLET | $1,131 | $543 | $294 | $294 | 2,590 | 30 |
| | METFORMIN HCL 850 MG TABLET | $9,844 | $4,956 | $2,701 | $2,187 | 14,800 | 208 |
| | METHADONE HCL 10 MG TABLET | $212 | $112 | $50 | $50 | 1,560 | 3 |
| | METHADONE HCL 5 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | METHOTREXATE 2.5 MG TABLET | $8,403 | $4,148 | $2,180 | $2,075 | 5,811 | 252 |
| | METHYLDOPA 250 MG TABLET | $1,897 | $971 | $490 | $435 | 7,972 | 88 |
| | METHYLDOPA 250 MG TABLET | $125 | $63 | $47 | $14 | 330 | 6 |
| | METHYLDOPA 500 MG TABLET | $1,999 | $1,027 | $486 | $486 | 5,130 | 61 |
| | METHYLDOPA 500 MG TABLET | $526 | $273 | $127 | $127 | 870 | 11 |
| | METHYLDOPA/HCTZ 250-15 TAB | $338 | $174 | $82 | $82 | 720 | 4 |
| | METHYLDOPA/HCTZ 250-25 TAB | $519 | $267 | $126 | $126 | 990 | 16 |
| | METOLAZONE 2.5 MG TABLET | $605 | $306 | $149 | $149 | 480 | 18 |
| | METOPROLOL 100 MG TABLET | $6,371 | $3,183 | $1,634 | $1,553 | 41,673 | 664 |
| | METOPROLOL 100 MG TABLET | $50 | $25 | $18 | $7 | 540 | 5 |
| | METOPROLOL 25 MG TABLET | $3,350 | $1,489 | $945 | $916 | 12,582 | 209 |
| | METOPROLOL 50 MG TABLET | $5,849 | $2,893 | $1,556 | $1,400 | 40,759 | 724 |
| | METOPROLOL 50 MG TABLET | $15,330 | $7,443 | $4,019 | $3,868 | 108,402 | 1,876 |
| | METOPROLOL-HCTZ 100/25MG TA | $98 | $49 | $24 | $24 | 60 | 2 |
| | METOPROLOL-HCTZ 50/25MG TAB | $252 | $126 | $63 | $63 | 240 | 6 |
| | MIDODRINE HCL 10 MG TABLET | $4,487 | $2,315 | $1,086 | $1,086 | 1,040 | 14 |
| | MIDODRINE HCL 2.5 MG TABLET | $1,014 | $515 | $249 | $249 | 930 | 13 |
| | MIDODRINE HCL 5 MG TABLET | $8,689 | $4,476 | $3,610 | $603 | 4,554 | 46 |
| | MIRTAZAPINE 15 MG TABLET | $3,285 | $1,710 | $787 | $787 | 1,327 | 43 |
| | MIRTAZAPINE 30 MG TABLET | $4,449 | $2,292 | $1,098 | $1,059 | 1,769 | 58 |
| | MIRTAZAPINE 45 MG TABLET | $7,617 | $3,902 | $1,872 | $1,844 | 3,029 | 104 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | NADOLOL 20 MG TABLET | $762 | $389 | $205 | $167 | 1,431 | 34 |
| | NADOLOL 40 MG TABLET | $2,637 | $1,261 | $734 | $642 | 5,154 | 103 |
| | NADOLOL 80 MG TABLET | $505 | $260 | $123 | $123 | 580 | 10 |
| | NAPROXEN 250 MG TABLET | $393 | $201 | $104 | $88 | 1,876 | 45 |
| | NAPROXEN 250 MG TABLET | $33 | $17 | $10 | $7 | 194 | 3 |
| | NAPROXEN 375 MG TABLET | $117 | $60 | $28 | $28 | 478 | 12 |
| | NAPROXEN 375 MG TABLET | $677 | $325 | $180 | $171 | 2,725 | 70 |
| | NAPROXEN 500 MG TABLET | $539 | $268 | $171 | $99 | 2,024 | 42 |
| | NAPROXEN 500 MG TABLET | $4,469 | $2,065 | $1,239 | $1,165 | 16,133 | 359 |
| | NEFAZODONE HCL 200 MG TABLE | $266 | $138 | $64 | $64 | 180 | 3 |
| | NICARDIPINE 20 MG CAPSULE | $162 | $85 | $38 | $38 | 420 | 5 |
| | NICARDIPINE 30 MG CAPSULE | $180 | $15 | $82 | $82 | 400 | 4 |
| | NIFEDIPINE ER 30 MG TABLET | $24,895 | $12,776 | $6,098 | $6,022 | 20,170 | 533 |
| | NIFEDIPINE ER 30 MG TABLET | $9,766 | $4,828 | $2,630 | $2,308 | 7,853 | 219 |
| | NIFEDIPINE ER 60 MG TABLET | $47,042 | $23,730 | $11,999 | $11,313 | 22,559 | 568 |
| | NIFEDIPINE ER 60 MG TABLET | $16,955 | $8,397 | $4,508 | $4,050 | 8,166 | 208 |
| | NIFEDIPINE ER 90 MG TABLET | $125,419 | $64,075 | $31,518 | $29,827 | 53,831 | 1,407 |
| | NITROFURANTOIN MCR 100 MG C | $25 | $13 | $6 | $6 | 20 | 1 |
| | NITROFURANTOIN MCR 50 MG CA | $327 | $163 | $82 | $82 | 330 | 6 |
| | NITROFURANTOIN-MACRO 100 MG | $23,269 | $11,216 | $6,306 | $5,747 | 11,758 | 654 |
| | NITROGLYCERIN 0.1 MG/HR PTC | $7,636 | $3,939 | $1,848 | $1,848 | 5,160 | 157 |
| | NITROGLYCERIN 0.2 MG/HR PTC | $31,658 | $16,096 | $7,781 | $7,781 | 21,870 | 659 |
| | NITROGLYCERIN 0.4 MG/HR PTC | $26,769 | $13,676 | $6,546 | $6,546 | 15,930 | 462 |
| | NITROGLYCERIN 0.6 MG/HR PTC | $1,707 | $877 | $415 | $415 | 900 | 30 |
| | NIZATIDINE 150 MG CAPSULE | $55,171 | $28,067 | $14,097 | $13,006 | 31,241 | 556 |
| | NIZATIDINE 300 MG CAPSULE | $5,087 | $2,274 | $1,406 | $1,406 | 1,370 | 33 |
| | NORTRIPTYLINE HCL 10 MG CAP | $571 | $293 | $143 | $135 | 3,170 | 55 |
| | NORTRIPTYLINE HCL 25 MG CAP | $718 | $372 | $173 | $173 | 3,409 | 53 |
| | NORTRIPTYLINE HCL 50 MG CAP | $605 | $312 | $154 | $140 | 2,314 | 46 |
| | NORTRIPTYLINE HCL 75 MG CAP | $286 | $147 | $110 | $30 | 810 | 24 |
| | OMEPRAZOLE 10 MG CAPSULE DR | $12,394 | $6,225 | $3,084 | $3,084 | 3,735 | 87 |
| | OMEPRAZOLE 20 MG CAPSULE DR | $16,039 | $7,629 | $4,205 | $4,205 | 4,408 | 131 |
| | OMEPRAZOLE 20 MG CAPSULE DR | $216,025 | $108,514 | $54,969 | $52,542 | 58,390 | 1,726 |
| | ORPHENADRINE 100 MG TAB SA | $2,406 | $1,143 | $631 | $631 | 1,250 | 28 |
| | ORPHENADRINE COMP FORTE TAB | $45 | $23 | $11 | $11 | 40 | 1 |
| | ORPHENADRINE COMP TABLET | $18 | $9 | $9 | $0 | 20 | 1 |
| | OXAPROZIN 600 MG TABLET | $45 | $24 | $11 | $11 | 60 | 1 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | PENTOXIFYLLINE 400 MG TAB S | $6,171 | $2,993 | $1,589 | $1,589 | 17,575 | 168 |
| | PENTOXIFYLLINE 400 MG TAB S | $23 | $12 | $5 | $5 | 60 | 1 |
| | PHENYTOIN SOD EXT 100 MG CA | $27,572 | $13,816 | $7,470 | $6,285 | 97,657 | 912 |
| | PHENYTOIN SOD EXT 100 MG CA | $46,692 | $23,675 | $14,072 | $8,946 | 163,664 | 1,551 |
| | PINDOLOL 10 MG TABLET | $382 | $196 | $93 | $93 | 450 | 8 |
| | PINDOLOL 5 MG TABLET | $2,423 | $1,242 | $802 | $379 | 4,679 | 83 |
| | PIROXICAM 10 MG CAPSULE | $38 | $19 | $9 | $9 | 240 | 4 |
| | PIROXICAM 20 MG CAPSULE | $345 | $166 | $89 | $89 | 1,467 | 42 |
| | PIROXICAM 20 MG CAPSULE | $16 | $8 | $4 | $4 | 60 | 2 |
| | PRAZOSIN 1 MG CAPSULE | $292 | $129 | $81 | $81 | 1,260 | 12 |
| | PRAZOSIN 2 MG CAPSULE | $1,980 | $1,018 | $481 | $481 | 5,120 | 52 |
| | PRAZOSIN 5 MG CAPSULE | $132 | $68 | $32 | $32 | 240 | 7 |
| | PROBENECID 500 MG TABLET | $1,950 | $1,007 | $544 | $400 | 2,525 | 40 |
| | PROCHLORPERAZINE 10 MG TAB | $5,417 | $2,695 | $1,390 | $1,332 | 7,905 | 203 |
| | PROCHLORPERAZINE 5 MG TABLE | $1,101 | $555 | $280 | $266 | 2,226 | 48 |
| | PROPOXY-N/APAP 100-650 TAB | $837 | $393 | $230 | $214 | 3,385 | 55 |
| | PROPOXY-N/APAP 100-650 TAB | $866 | $449 | $210 | $207 | 3,790 | 44 |
| | PROPOXY-N/APAP 100-650 TAB | $300 | $159 | $83 | $58 | 1,240 | 17 |
| | PROPOXYPHENE COMP-65 CAP | $0 | $0 | $0 | $0 | 0 | 0 |
| | PROPOXYPHENE HCL 65 MG CAP | $125 | $66 | $29 | $29 | 385 | 3 |
| | PROPOXYPHENE HCL 65 MG CAP | $22 | $11 | $5 | $5 | 60 | 1 |
| | PROPOXYPHENE/APAP 65/650 TB | $58 | $30 | $14 | $14 | 270 | 3 |
| | PROPRANOLOL 10 MG TABLET | $203 | $101 | $75 | $28 | 1,650 | 25 |
| | PROPRANOLOL 10 MG TABLET | $1,546 | $785 | $408 | $353 | 13,557 | 181 |
| | PROPRANOLOL 20 MG TABLET | $353 | $180 | $87 | $87 | 2,697 | 39 |
| | PROPRANOLOL 20 MG TABLET | $1,755 | $867 | $494 | $394 | 14,043 | 180 |
| | PROPRANOLOL 40 MG TABLET | $556 | $285 | $237 | $34 | 3,960 | 50 |
| | PROPRANOLOL 40 MG TABLET | $661 | $337 | $173 | $151 | 3,975 | 79 |
| | PROPRANOLOL 80 MG TABLET | $56 | $0 | $28 | $28 | 240 | 7 |
| | PROPRANOLOL 80 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | PROPRANOLOL/HCTZ 40/25 TAB | $130 | $67 | $32 | $32 | 665 | 17 |
| | SELEGILINE HCL 5 MG CAPSULE | $1,804 | $917 | $443 | $443 | 1,190 | 24 |
| | SELEGILINE HCL 5 MG TABLET | $306 | $161 | $105 | $40 | 370 | 8 |
| | SOTALOL 160 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | SOTALOL 80 MG TABLET | $218 | $109 | $55 | $55 | 120 | 1 |
| | SPIRONOLACT/HCTZ 25/25 TAB | $991 | $508 | $275 | $207 | 2,320 | 69 |
| | SPIRONOLACT/HCTZ 25/25 TAB | $179 | $92 | $87 | $0 | 360 | 12 |
| | SPIRONOLACTONE 100 MG TABLE | $887 | $458 | $214 | $214 | 744 | 23 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | SPIRONOLACTONE 25 MG TABLET | $9,303 | $4,538 | $2,408 | $2,357 | 22,997 | 590 |
| | SPIRONOLACTONE 25 MG TABLET | $3,034 | $1,489 | $801 | $744 | 8,049 | 150 |
| | SPIRONOLACTONE 50 MG TABLET | $842 | $445 | $198 | $198 | 1,094 | 21 |
| | SULINDAC 150 MG TABLET | $96 | $50 | $23 | $23 | 240 | 4 |
| | TAMOXIFEN 10 MG TABLET | $4,299 | $2,220 | $1,153 | $926 | 3,240 | 50 |
| | TAMOXIFEN 20 MG TABLET | $224 | $112 | $56 | $56 | 90 | 3 |
| | TAMOXIFEN 20 MG TABLET | $21,103 | $10,414 | $5,345 | $5,345 | 7,850 | 201 |
| | TEMAZEPAM 15 MG CAPSULE | $1,433 | $735 | $353 | $345 | 5,752 | 149 |
| | TEMAZEPAM 15 MG CAPSULE | $17 | $9 | $5 | $3 | 61 | 2 |
| | TEMAZEPAM 30 MG CAPSULE | $3,361 | $1,729 | $876 | $757 | 10,939 | 329 |
| | TEMAZEPAM 30 MG CAPSULE | $197 | $99 | $61 | $36 | 462 | 27 |
| | TERAZOSIN 1 MG CAPSULE | $2,740 | $1,315 | $713 | $713 | 2,328 | 66 |
| | TERAZOSIN 10 MG CAPSULE | $3,492 | $1,799 | $846 | $846 | 2,910 | 69 |
| | TERAZOSIN 2 MG CAPSULE | $5,655 | $2,742 | $1,456 | $1,456 | 4,526 | 103 |
| | TERAZOSIN 5 MG CAPSULE | $8,745 | $4,103 | $2,544 | $2,098 | 8,017 | 177 |
| | TETRACYCLINE 250 MG CAPSULE | $47 | $25 | $13 | $10 | 333 | 7 |
| | TETRACYCLINE 500 MG CAPSULE | $51 | $27 | $12 | $12 | 320 | 5 |
| | TETRACYCLINE 500 MG CAPSULE | $7 | $4 | $3 | $0 | 28 | 1 |
| | THIORIDAZINE 10 MG TABLET | $426 | $212 | $107 | $107 | 1,474 | 24 |
| | THIORIDAZINE 10 MG TABLET | $133 | $68 | $32 | $32 | 360 | 12 |
| | THIORIDAZINE 100 MG TABLET | $2,368 | $1,218 | $575 | $575 | 5,400 | 73 |
| | THIORIDAZINE 25 MG TABLET | $1,905 | $975 | $782 | $148 | 6,810 | 74 |
| | THIORIDAZINE 50 MG TABLET | $1,042 | $533 | $254 | $254 | 3,160 | 47 |
| | THIOTHIXENE 10 MG CAPSULE | $2,548 | $1,311 | $716 | $521 | 5,488 | 71 |
| | THIOTHIXENE 2 MG CAPSULE | $800 | $412 | $226 | $162 | 3,360 | 39 |
| | THIOTHIXENE 5 MG CAPSULE | $5,446 | $2,809 | $1,873 | $763 | 16,118 | 151 |
| | THIOTHIXENE 5 MG CAPSULE | $27 | $14 | $6 | $6 | 60 | 2 |
| | TIMOLOL MALEATE 10 MG TABLE | $91 | $47 | $22 | $22 | 240 | 3 |
| | TIZANIDINE HCL 2 MG TABLET | $3,204 | $1,645 | $779 | $779 | 4,050 | 12 |
| | TIZANIDINE HCL 4 MG TABLET | $1,302 | $670 | $316 | $316 | 1,320 | 18 |
| | TOLAZAMIDE 500 MG TABLET | $248 | $131 | $58 | $58 | 210 | 5 |
| | TOLBUTAMIDE 500 MG TABLET | $48 | $25 | $11 | $11 | 180 | 1 |
| | TOLMETIN SODIUM 400 MG CAP | $301 | $158 | $71 | $71 | 215 | 3 |
| | TRAMADOL HCL 50 MG TABLET | $1,615 | $799 | $408 | $408 | 4,486 | 57 |
| | TRAMADOL HCL 50 MG TABLET | $306 | $153 | $76 | $76 | 830 | 12 |
| | TRIAMTERENE/HCTZ 37.5/25 CP | $7,397 | $3,748 | $1,835 | $1,815 | 18,367 | 500 |
| | TRIAMTERENE/HCTZ 37.5/25 CP | $12,834 | $6,220 | $3,375 | $3,238 | 31,673 | 853 |
| | TRIAMTERENE/HCTZ 37.5/25 TB | $1,680 | $868 | $406 | $406 | 5,341 | 163 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | TRIAMTERENE/HCTZ 37.5/25 TB | $579 | $297 | $173 | $109 | 1,900 | 52 |
| | TRIAMTERENE/HCTZ 75/50 TAB | $329 | $169 | $80 | $80 | 2,130 | 55 |
| | TRIAMTERENE/HCTZ 75/50 TAB | $316 | $162 | $94 | $60 | 1,675 | 66 |
| | TRIFLUOPERAZINE 1 MG TABLET | $1,152 | $593 | $491 | $68 | 2,310 | 37 |
| | TRIFLUOPERAZINE 10 MG TABLE | $3,805 | $1,952 | $986 | $867 | 4,540 | 73 |
| | TRIFLUOPERAZINE 2 MG TABLET | $3,425 | $1,760 | $933 | $733 | 7,472 | 129 |
| | TRIFLUOPERAZINE 5 MG TABLET | $4,013 | $2,059 | $1,031 | $923 | 7,305 | 122 |
| | VERAPAMIL 120 MG CAP PELLET | $1,114 | $579 | $268 | $268 | 1,260 | 22 |
| | VERAPAMIL 120 MG TABLET | $339 | $174 | $82 | $82 | 1,724 | 35 |
| | VERAPAMIL 120 MG TABLET SA | $11,924 | $6,033 | $2,946 | $2,946 | 13,600 | 296 |
| | VERAPAMIL 180 MG CAP PELLET | $2,748 | $1,416 | $766 | $566 | 2,889 | 62 |
| | VERAPAMIL 180 MG TABLET SA | $5,092 | $2,334 | $1,379 | $1,379 | 9,230 | 186 |
| | VERAPAMIL 180 MG TABLET SA | $237 | $121 | $58 | $58 | 450 | 7 |
| | VERAPAMIL 240 MG CAP PELLET | $6,154 | $2,991 | $1,582 | $1,582 | 5,850 | 158 |
| | VERAPAMIL 240 MG TABLET SA | $9,397 | $4,757 | $2,375 | $2,264 | 18,090 | 409 |
| | VERAPAMIL 240 MG TABLET SA | $7,994 | $4,044 | $1,975 | $1,975 | 15,085 | 347 |
| | VERAPAMIL 80 MG TABLET | $515 | $241 | $137 | $137 | 3,945 | 54 |
| Novartis Consumer Health Inc. | DENAVIR 1% CREAM | $4,122 | $2,169 | $1,149 | $803 | 237 | 134 |
| | TRANSDERM-SCOP 1.5 MG/72HR | $4,765 | $2,333 | $1,777 | $656 | 756 | 122 |
| Novartis Opthalmics | FLUOR-OP 0.1% EYE DROPS | $13 | $7 | $3 | $3 | 5 | 1 |
| | HOMATROPINE 5% EYE DROPS | $322 | $168 | $77 | $77 | 100 | 20 |
| | LIVOSTIN 0.05% EYE DROPS | $4,707 | $2,416 | $1,252 | $1,040 | 480 | 83 |
| | LIVOSTIN 0.05% EYE DROPS | $2,964 | $1,485 | $810 | $669 | 400 | 41 |
| | OCUPRESS 1% EYE DROPS | $61 | $32 | $14 | $14 | 10 | 1 |
| | OCUPRESS 1% EYE DROPS | $241 | $125 | $116 | $0 | 60 | 6 |
| | OCUPRESS 1% EYE DROPS | $868 | $451 | $208 | $208 | 180 | 12 |
| | PILOCAR 0.5% EYE DROPS | $76 | $39 | $18 | $18 | 75 | 5 |
| | PILOCAR 4% EYE DROPS | $150 | $76 | $37 | $37 | 165 | 11 |
| | PILOCAR 4% EYE DROPS | $0 | $0 | $0 | $0 | 0 | 0 |
| | RESCULA 0.15% EYE DROPS | $3,432 | $1,780 | $872 | $780 | 365 | 63 |
| | VOLTAREN 0.1% EYE DROPS | $975 | $486 | $317 | $173 | 69 | 27 |
| | VOLTAREN 0.1% EYE DROPS | $10,953 | $5,001 | $3,001 | $2,951 | 978 | 196 |
| | ZADITOR 0.025% EYE DROPS | $44,388 | $22,174 | $12,112 | $10,102 | 3,977 | 749 |
| Novartis Pharmaceuticals | ANAFRANIL 50 MG CAPSULE | $530 | $265 | $265 | $0 | 120 | 2 |
| | AREDIA 30 MG VIAL | $992 | $511 | $241 | $241 | 4 | 2 |
| | AREDIA 90 MG VIAL | $11,818 | $5,996 | $2,911 | $2,911 | 16 | 16 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | CAFERGOT TABLET | $891 | $469 | $225 | $197 | 725 | 17 |
| | CLOZARIL 100 MG TABLET | $823,789 | $424,770 | $265,574 | $133,445 | 209,697 | 3,726 |
| | CLOZARIL 25 MG TABLET | $68,859 | $35,487 | $21,870 | $11,502 | 42,611 | 1,333 |
| | COMBIPATCH 0.05/0.14 MG PTC | $785 | $403 | $191 | $191 | 168 | 20 |
| | COMTAN 200 MG TABLET | $17,090 | $8,505 | $4,293 | $4,293 | 9,500 | 102 |
| | DENAVIR 1% CREAM | $1,337 | $654 | $381 | $302 | 80 | 45 |
| | DESFERAL 2 GRAM VIAL | $17,114 | $8,679 | $4,217 | $4,217 | 332 | 11 |
| | DESFERAL MESYLATE 500 MG VL | $130,923 | $66,454 | $32,234 | $32,234 | 7,721 | 63 |
| | DIOVAN 160 MG CAPSULE | $2,836 | $1,464 | $686 | $686 | 2,025 | 58 |
| | DIOVAN 160 MG TABLET | $65,990 | $33,633 | $16,682 | $15,675 | 38,902 | 960 |
| | DIOVAN 160 MG TABLET | $82,120 | $39,019 | $21,986 | $21,116 | 48,213 | 1,143 |
| | DIOVAN 320 MG TABLET | $19,556 | $9,969 | $4,794 | $4,794 | 9,112 | 261 |
| | DIOVAN 320 MG TABLET | $25,174 | $12,180 | $6,538 | $6,456 | 11,714 | 354 |
| | DIOVAN 40 MG TABLET | $5,679 | $2,783 | $1,739 | $1,157 | 4,300 | 93 |
| | DIOVAN 80 MG CAPSULE | $516 | $272 | $122 | $122 | 390 | 11 |
| | DIOVAN 80 MG TABLET | $66,540 | $33,389 | $17,363 | $15,787 | 41,969 | 1,047 |
| | DIOVAN 80 MG TABLET | $76,787 | $37,375 | $20,296 | $19,116 | 48,236 | 1,259 |
| | DIOVAN HCT 160/12.5 MG TAB | $51,336 | $25,763 | $13,071 | $12,502 | 28,047 | 736 |
| | DIOVAN HCT 160/12.5 MG TAB | $53,919 | $26,323 | $14,303 | $13,294 | 28,965 | 742 |
| | DIOVAN HCT 160/25 MG TABLET | $29,696 | $14,836 | $7,696 | $7,164 | 14,220 | 359 |
| | DIOVAN HCT 160/25 MG TABLET | $31,055 | $15,026 | $8,321 | $7,708 | 14,670 | 411 |
| | DIOVAN HCT 80/12.5 MG TABLE | $26,697 | $13,130 | $6,871 | $6,696 | 15,668 | 424 |
| | DIOVAN HCT 80/12.5 MG TABLE | $33,873 | $16,039 | $9,142 | $8,693 | 19,722 | 511 |
| | DYNACIRC 5 MG CAPSULE | $155 | $82 | $36 | $36 | 100 | 1 |
| | ELIDEL 1% CREAM | $1,682 | $887 | $432 | $364 | 975 | 36 |
| | ELIDEL 1% CREAM | $104,065 | $53,488 | $28,526 | $22,052 | 58,232 | 1,848 |
| | ELIDEL 1% CREAM | $134,451 | $69,249 | $35,115 | $30,088 | 77,510 | 1,291 |
| | ELIDEL 1% CREAM | $194,513 | $99,325 | $57,776 | $37,412 | 120,152 | 1,196 |
| | ESTRADERM 0.05 MG PATCH | $298 | $184 | $57 | $57 | 64 | 8 |
| | ESTRADERM 0.05 MG PATCH | $107 | $83 | $12 | $12 | 24 | 3 |
| | ESTRADERM 0.1 MG PATCH | $277 | $143 | $67 | $67 | 56 | 7 |
| | EXELON 1.5 MG CAPSULE | $38,921 | $19,420 | $10,236 | $9,264 | 16,026 | 243 |
| | EXELON 2 MG/ML ORAL SOLUTIO | $2,378 | $1,232 | $573 | $573 | 2,400 | 20 |
| | EXELON 3 MG CAPSULE | $34,832 | $17,896 | $8,722 | $8,214 | 14,738 | 226 |
| | EXELON 4.5 MG CAPSULE | $14,747 | $7,596 | $3,695 | $3,455 | 6,020 | 86 |
| | EXELON 6 MG CAPSULE | $22,315 | $11,470 | $6,711 | $4,134 | 9,304 | 146 |
| | FAMVIR 125 MG TABLET | $1,120 | $579 | $270 | $270 | 306 | 13 |
| | FAMVIR 250 MG TABLET | $2,416 | $1,216 | $614 | $586 | 773 | 26 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | FAMVIR 500 MG TABLET | $32,279 | $16,220 | $8,863 | $7,196 | 4,533 | 127 |
| | FEMARA 2.5 MG TABLET | $40,047 | $20,021 | $10,356 | $9,671 | 5,290 | 139 |
| | FIORICET TABLET | $2,839 | $1,479 | $680 | $680 | 2,850 | 23 |
| | FIORICET W/CODEINE CAPSULE | $1,511 | $794 | $358 | $358 | 720 | 7 |
| | FIORINAL CAPSULE | $2,014 | $1,030 | $550 | $435 | 1,980 | 21 |
| | FOCALIN 10 MG TABLET | $2,404 | $1,265 | $631 | $508 | 2,442 | 30 |
| | FOCALIN 2.5 MG TABLET | $1,142 | $590 | $369 | $183 | 2,295 | 34 |
| | FOCALIN 5 MG TABLET | $2,783 | $1,499 | $731 | $554 | 4,095 | 44 |
| | FORADIL AEROLIZER 12 MCG CA | $4,888 | $2,453 | $1,218 | $1,218 | 3,900 | 59 |
| | GLEEVEC 100 MG TABLET | $50,047 | $25,824 | $12,112 | $12,112 | 2,520 | 16 |
| | GLEEVEC 400 MG TABLET | $55,068 | $28,023 | $13,523 | $13,523 | 690 | 21 |
| | LAMISIL 1% SOLUTION | $2,194 | $1,100 | $630 | $464 | 1,038 | 36 |
| | LAMISIL 250 MG TABLET | $16,133 | $7,945 | $5,330 | $2,857 | 1,816 | 70 |
| | LAMISIL 250 MG TABLET | $202,723 | $96,863 | $55,314 | $50,546 | 22,015 | 775 |
| | LESCOL 20 MG CAPSULE | $6,048 | $2,956 | $1,546 | $1,546 | 3,530 | 101 |
| | LESCOL 20 MG CAPSULE | $840 | $435 | $203 | $203 | 460 | 12 |
| | LESCOL 40 MG CAPSULE | $6,286 | $3,178 | $1,581 | $1,527 | 3,610 | 94 |
| | LESCOL 40 MG CAPSULE | $5,405 | $2,800 | $1,302 | $1,302 | 2,960 | 84 |
| | LESCOL XL 80 MG TABLET SA | $25,489 | $13,074 | $6,670 | $5,745 | 11,040 | 286 |
| | LESCOL XL 80 MG TABLET SA | $42,618 | $21,164 | $11,057 | $10,398 | 18,330 | 505 |
| | LOPRESSOR 100 MG TABLET | $1,884 | $974 | $455 | $455 | 1,320 | 16 |
| | LOPRESSOR 50 MG TABLET | $1,884 | $972 | $456 | $456 | 1,980 | 17 |
| | LOPRESSOR HCT 100/25 TABLET | $1,973 | $962 | $505 | $505 | 1,140 | 29 |
| | LOPRESSOR HCT 100/50 TABLET | $940 | $486 | $227 | $227 | 510 | 17 |
| | LOPRESSOR HCT 50/25 TABLET | $1,527 | $780 | $395 | $353 | 1,335 | 33 |
| | LOTENSIN 10 MG TABLET | $4,760 | $2,470 | $1,214 | $1,076 | 4,440 | 95 |
| | LOTENSIN 10 MG TABLET | $18 | $9 | $4 | $4 | 90 | 1 |
| | LOTENSIN 20 MG TABLET | $4,350 | $2,269 | $1,041 | $1,041 | 4,070 | 88 |
| | LOTENSIN 20 MG TABLET | $749 | $393 | $178 | $178 | 690 | 21 |
| | LOTENSIN 40 MG TABLET | $3,908 | $1,981 | $963 | $963 | 3,680 | 65 |
| | LOTENSIN 5 MG TABLET | $633 | $332 | $151 | $151 | 600 | 9 |
| | LOTENSIN HCT 10/12.5 TABLET | $1,222 | $562 | $330 | $330 | 1,140 | 32 |
| | LOTENSIN HCT 20/12.5 TABLET | $1,051 | $544 | $253 | $253 | 990 | 19 |
| | LOTENSIN HCT 20/25 TABLET | $65 | $34 | $15 | $15 | 60 | 2 |
| | LOTREL 10/20 MG CAPSULE | $71,372 | $34,251 | $18,969 | $18,152 | 27,793 | 742 |
| | LOTREL 2.5/10 MG CAPSULE | $4,282 | $2,184 | $1,049 | $1,049 | 2,075 | 42 |
| | LOTREL 5/10 MG CAPSULE | $54,498 | $26,378 | $14,416 | $13,704 | 26,050 | 644 |
| | LOTREL 5/20 MG CAPSULE | $99,248 | $49,943 | $24,853 | $24,452 | 45,197 | 995 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | METHERGINE 0.2 MG TABLET | $2,270 | $1,968 | $158 | $144 | 1,881 | 218 |
| | METHERGINE 0.2 MG/ML AMPUL | $0 | $0 | $0 | $0 | 0 | 0 |
| | MIACALCIN 200 UNIT/ML VIAL | $2,879 | $1,495 | $692 | $692 | 156 | 7 |
| | MIACALCIN 200 UNITS NASAL S | $84,627 | $42,248 | $24,839 | $17,541 | 3,888 | 890 |
| | MIACALCIN 200 UNITS NASAL S | $21,995 | $11,321 | $5,608 | $5,066 | 1,248 | 285 |
| | MIGRANAL 4 MG/ML NASAL SPRA | $478 | $253 | $113 | $113 | 16 | 3 |
| | MYFORTIC 180 MG TABLET | $308 | $154 | $77 | $77 | 120 | 1 |
| | NEORAL 100 MG GELATN CAPSUL | $55,448 | $26,578 | $14,462 | $14,408 | 14,393 | 201 |
| | NEORAL 100 MG/ML SOLUTION | $8,058 | $4,175 | $1,942 | $1,942 | 2,100 | 22 |
| | NEORAL 25 MG GELATIN CAPSUL | $28,207 | $14,290 | $7,030 | $6,887 | 27,750 | 213 |
| | PAMELOR 25 MG CAPSULE | $113 | $60 | $27 | $27 | 30 | 1 |
| | PARLODEL 2.5 MG TABLET | $336 | $178 | $79 | $79 | 120 | 4 |
| | PARLODEL 2.5 MG TABLET | $1,259 | $629 | $315 | $315 | 420 | 4 |
| | PARLODEL 5 MG CAPSULE | $3,472 | $1,790 | $841 | $841 | 780 | 18 |
| | PARLODEL 5 MG CAPSULE | $6,545 | $3,346 | $3,068 | $132 | 1,380 | 22 |
| | RESTORIL 7.5 MG CAPSULE | $66 | $35 | $16 | $16 | 30 | 1 |
| | RITALIN 10 MG TABLET | $2,432 | $1,252 | $590 | $590 | 3,441 | 32 |
| | RITALIN 20 MG TABLET | $3,211 | $1,641 | $785 | $785 | 3,240 | 22 |
| | RITALIN 5 MG TABLET | $118 | $70 | $36 | $13 | 210 | 5 |
| | RITALIN LA 20MG CAPSULE | $12,248 | $6,476 | $3,107 | $2,665 | 5,348 | 139 |
| | RITALIN LA 30MG CAPSULE | $9,063 | $4,726 | $2,387 | $1,950 | 4,070 | 109 |
| | RITALIN LA 40MG CAPSULE | $9,755 | $5,096 | $2,433 | $2,226 | 4,055 | 102 |
| | RITALIN-SR 20 MG TABLET SA | $1,490 | $763 | $363 | $363 | 930 | 30 |
| | SANDIMMUNE 100 MG CAPSULE | $18,775 | $9,684 | $4,545 | $4,545 | 3,480 | 42 |
| | SANDIMMUNE 100 MG/ML SOLN | $687 | $344 | $172 | $172 | 115 | 3 |
| | SANDIMMUNE 25 MG CAPSULE | $7,805 | $4,013 | $1,896 | $1,896 | 5,070 | 37 |
| | SANDOSTATIN 0.05 MG/ML AMPU | $126 | $79 | $24 | $24 | 14 | 1 |
| | SANDOSTATIN 0.1 MG/ML AMPUL | $1,025 | $543 | $241 | $241 | 60 | 1 |
| | SANDOSTATIN 1 MG/ML VIAL | $925 | $490 | $218 | $218 | 5 | 1 |
| | SANDOSTATIN LAR 10 MG KIT | $0 | $0 | $0 | $0 | 0 | 0 |
| | SANDOSTATIN LAR 20 MG KIT | $7,284 | $3,642 | $1,821 | $1,821 | 4 | 3 |
| | SANDOSTATIN LAR 20 MG KIT | $53,018 | $27,423 | $12,797 | $12,797 | 29 | 21 |
| | SANDOSTATIN LAR 30 MG KIT | $24,444 | $12,436 | $6,004 | $6,004 | 10 | 10 |
| | STALEVO 100 TABLET | $23,097 | $9,207 | $6,945 | $6,945 | 11,850 | 99 |
| | STALEVO 150 TABLET | $9,007 | $4,028 | $2,489 | $2,489 | 4,610 | 36 |
| | STALEVO 50 TABLET | $9,734 | $5,026 | $2,489 | $2,219 | 4,996 | 42 |
| | STARLIX 120 MG TABLET | $49,640 | $24,751 | $12,711 | $12,178 | 45,363 | 447 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | STARLIX 60 MG TABLET | $3,588 | $1,798 | $895 | $895 | 3,360 | 34 |
| | SYSTEM GENERATED from CLAIM | $5,002 | $2,660 | $1,346 | $996 | 2,097 | 62 |
| | TEGRETOL 100 MG TABLET CHEW | $13,824 | $7,123 | $4,811 | $1,889 | 50,897 | 253 |
| | TEGRETOL 100 MG/5 ML SUSP | $12,507 | $6,365 | $4,208 | $1,934 | 175,030 | 204 |
| | TEGRETOL 200 MG TABLET | $60,152 | $30,940 | $20,869 | $8,344 | 104,569 | 715 |
| | TEGRETOL 200 MG TABLET | $16,005 | $8,252 | $6,949 | $804 | 30,523 | 216 |
| | TEGRETOL XR 100 MG TABLET S | $6,475 | $3,395 | $2,265 | $815 | 23,454 | 251 |
| | TEGRETOL XR 200 MG TABLET S | $29,723 | $14,859 | $9,188 | $5,677 | 51,859 | 513 |
| | TEGRETOL XR 400 MG TABLET S | $58,688 | $29,457 | $20,930 | $8,301 | 52,299 | 647 |
| | TOFRANIL-PM 150 MG CAPSULE | $393 | $208 | $93 | $93 | 90 | 1 |
| | TOFRANIL-PM 75 MG CAPSULE | $0 | $0 | $0 | $0 | 0 | 0 |
| | TRILEPTAL 150 MG TABLET | $50,022 | $25,769 | $15,355 | $8,897 | 49,098 | 643 |
| | TRILEPTAL 300 MG TABLET | $247,521 | $125,665 | $83,617 | $38,238 | 133,469 | 1,485 |
| | TRILEPTAL 300 MG/5 ML SUSP | $20,460 | $10,504 | $5,294 | $4,662 | 60,575 | 138 |
| | TRILEPTAL 600 MG TABLET | $171,233 | $86,414 | $51,960 | $32,859 | 49,929 | 658 |
| | VIVELLE-DOT 0.0375 MG PATCH | $415 | $213 | $101 | $101 | 104 | 13 |
| | VIVELLE-DOT 0.05 MG PATCH | $474 | $244 | $115 | $115 | 104 | 13 |
| | VIVELLE-DOT 0.1 MG PATCH | $402 | $208 | $97 | $97 | 88 | 11 |
| | VOLTAREN 75 MG TABLET EC | $1,602 | $824 | $389 | $389 | 720 | 12 |
| | ZELNORM 2 MG TABLET | $8,707 | $4,451 | $3,187 | $1,068 | 3,386 | 44 |
| | ZELNORM 6 MG TABLET | $62,677 | $32,039 | $16,345 | $14,292 | 24,596 | 431 |
| | ZOMETA 4 MG VIAL | $836 | $418 | $209 | $209 | 1 | 1 |
| | ZOMETA 4 MG/5 ML VIAL | $48,200 | $24,729 | $11,943 | $11,528 | 274 | 58 |
| Organon Inc. | CYCLESSA 28 DAY TABLET | $2,685 | $2,157 | $282 | $246 | 2,100 | 75 |
| | MIRCETTE 28 DAY TABLET | $253 | $227 | $13 | $13 | 196 | 5 |
| | NUVARING VAGINAL RING | $10,072 | $8,890 | $605 | $577 | 259 | 240 |
| | REMERON 15 MG TABLET | $4,455 | $2,298 | $1,079 | $1,079 | 1,519 | 50 |
| | REMERON 15MG SOLTAB | $5,046 | $2,621 | $1,229 | $1,195 | 2,063 | 70 |
| | REMERON 30 MG TABLET | $1,810 | $946 | $432 | $432 | 604 | 20 |
| | REMERON 30MG SOLTAB | $6,595 | $3,423 | $1,691 | $1,480 | 2,610 | 88 |
| | REMERON 45 MG TABLET | $1,290 | $669 | $311 | $311 | 420 | 14 |
| | REMERON 45MG SOLTAB | $8,025 | $4,154 | $2,143 | $1,728 | 2,996 | 101 |
| Organon Sanofi-Synthelabo L.L.C. | ARIXTRA 2.5 MG SYRINGE | $40 | $20 | $10 | $10 | 1 | 1 |
| Ortho Biotech Inc. | PROCRIT 10,000 UNITS/ML VIA | $365,010 | $182,637 | $91,755 | $90,618 | 3,011 | 609 |
| | PROCRIT 10,000 UNITS/ML VIA | $164,436 | $84,008 | $40,214 | $40,214 | 1,362 | 235 |
| | PROCRIT 10,000 UNITS/ML VIA | $4,420 | $2,252 | $2,168 | $0 | 36 | 6 |
| | PROCRIT 10,000 UNITS/ML VIA | $133,822 | $68,594 | $34,778 | $30,450 | 1,158 | 140 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | PROCRIT 2,000 UNITS/ML VIAL | $6,156 | $2,711 | $1,958 | $1,487 | 244 | 48 |
| | PROCRIT 2,000 UNITS/ML VIAL | $216 | $114 | $101 | $0 | 9 | 1 |
| | PROCRIT 20,000 UNITS/ML VIA | $456,966 | $233,047 | $116,342 | $107,577 | 1,870 | 412 |
| | PROCRIT 3,000 UNITS/ML VIAL | $19,974 | $10,331 | $4,822 | $4,822 | 546 | 74 |
| | PROCRIT 3,000 UNITS/ML VIAL | $1,480 | $784 | $348 | $348 | 42 | 4 |
| | PROCRIT 4,000 UNITS/ML VIAL | $47,195 | $24,211 | $11,492 | $11,492 | 958 | 142 |
| | PROCRIT 4,000 UNITS/ML VIAL | $1,282 | $679 | $302 | $302 | 27 | 3 |
| | PROCRIT 40,000 UNITS/ML VIA | $1,273,454 | $638,866 | $323,347 | $311,241 | 2,683 | 691 |
| Ortho Pharmaceutical Corporation | AXERT 12.5 MG TABLET | $953 | $483 | $248 | $223 | 57 | 10 |
| | AXERT 6.25 MG TABLET | $403 | $210 | $96 | $96 | 24 | 4 |
| | CENTANY 2% OINTMENT | $4,585 | $2,372 | $1,178 | $1,036 | 2,130 | 120 |
| | CENTANY 2% OINTMENT | $8,662 | $4,500 | $2,511 | $1,650 | 4,972 | 162 |
| | DERMATOP 0.1% CREAM | $198 | $104 | $47 | $47 | 135 | 5 |
| | DERMATOP 0.1% CREAM | $1,141 | $593 | $274 | $274 | 1,320 | 20 |
| | DERMATOP 0.1% OINTMENT | $42 | $22 | $10 | $10 | 30 | 1 |
| | DERMATOP 0.1% OINTMENT | $492 | $252 | $143 | $97 | 600 | 10 |
| | ERTACZO 2% CREAM | $2,959 | $1,441 | $780 | $738 | 2,070 | 68 |
| | FLOXIN 200 MG TABLET | $170 | $90 | $48 | $32 | 32 | 5 |
| | FLOXIN 300 MG TABLET | $173 | $92 | $41 | $41 | 30 | 2 |
| | FLOXIN 400 MG TABLET | $666 | $348 | $191 | $127 | 108 | 5 |
| | GRIFULVIN V 125 MG/5 ML SUS | $55,280 | $28,137 | $14,000 | $13,144 | 165,189 | 580 |
| | GRIFULVIN V 500 MG TABLET | $5,690 | $2,963 | $1,574 | $1,153 | 2,906 | 82 |
| | MICRONOR TABLET | $278 | $250 | $16 | $12 | 168 | 4 |
| | MONISTAT-DERM 2% CREAM | $102 | $53 | $25 | $25 | 88 | 3 |
| | MONISTAT-DERM 2% CREAM | $21 | $11 | $5 | $5 | 15 | 1 |
| | MONISTAT-DERM 2% CREAM | $119 | $61 | $29 | $29 | 170 | 2 |
| | ORTHO EVRA PATCH | $1,139 | $930 | $109 | $100 | 75 | 75 |
| | ORTHO EVRA PATCH | $114,174 | $97,059 | $9,106 | $8,009 | 8,851 | 2,518 |
| | ORTHO MICRONOR TABLET | $2,513 | $2,262 | $141 | $111 | 1,428 | 45 |
| | ORTHO TRI-CYCLEN 28 TABLET | $19,546 | $16,507 | $1,642 | $1,398 | 13,356 | 407 |
| | ORTHO TRI-CYCLEN LO TABLET | $69 | $62 | $3 | $3 | 56 | 2 |
| | ORTHO TRI-CYCLEN LO TABLET | $54,404 | $46,852 | $4,279 | $3,272 | 39,480 | 1,137 |
| | ORTHO-CYCLEN 28 TABLET | $1,885 | $1,696 | $130 | $58 | 1,316 | 33 |
| | ORTHO-NOVUM 7/7/7-28 TABLET | $1,302 | $1,157 | $121 | $24 | 1,008 | 32 |
| | ORTHO-PREFEST TABLET | $259 | $137 | $122 | $0 | 240 | 7 |
| | SPECTAZOLE 1% CREAM | $342 | $177 | $113 | $52 | 300 | 9 |
| | SPECTAZOLE 1% CREAM | $21 | $10 | $5 | $5 | 15 | 1 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | SPECTAZOLE 1% CREAM | $2,275 | $1,118 | $764 | $393 | 2,805 | 33 |
| | TERAZOL 3 80 MG SUPPOSITORY | $9,346 | $4,558 | $2,524 | $2,265 | 663 | 221 |
| | TERAZOL 3 CREAM | $7,925 | $4,093 | $1,986 | $1,845 | 3,810 | 194 |
| | TERAZOL 7 CREAM | $32,562 | $15,816 | $8,684 | $8,062 | 34,883 | 772 |
| Pfizer, Inc. | ACTIVELLA TABLET | $1,336 | $689 | $323 | $323 | 1,148 | 19 |
| | ACTIVELLA TABLET | $134 | $71 | $32 | $32 | 112 | 4 |
| | ALDACTAZIDE 50/50 TABLET | $129 | $67 | $31 | $31 | 100 | 4 |
| | ALDACTONE 25 MG TABLET | $43 | $23 | $10 | $10 | 60 | 2 |
| | ALDACTONE 50 MG TABLET | $96 | $51 | $23 | $23 | 90 | 1 |
| | AMBIEN 10 MG TABLET | $2,362 | $1,223 | $606 | $533 | 994 | 38 |
| | AMBIEN 5 MG TABLET | $4,125 | $2,097 | $1,082 | $947 | 2,119 | 74 |
| | AROMASIN 25 MG TABLET | $14,948 | $7,672 | $3,638 | $3,638 | 2,035 | 68 |
| | ARTHROTEC 50 TABLET EC | $15,995 | $7,747 | $4,124 | $4,124 | 9,001 | 132 |
| | ARTHROTEC 50 TABLET EC | $1,574 | $803 | $552 | $219 | 970 | 21 |
| | ARTHROTEC 75 TABLET EC | $23,248 | $11,260 | $6,027 | $5,960 | 13,067 | 237 |
| | AXERT 12.5 MG TABLET | $2,409 | $1,145 | $656 | $608 | 144 | 24 |
| | BEXTRA 10 MG TABLET | $376,919 | $187,859 | $97,700 | $91,360 | 128,308 | 3,348 |
| | BEXTRA 10 MG TABLET | $7,093 | $3,522 | $2,754 | $817 | 2,397 | 61 |
| | BEXTRA 20 MG TABLET | $60,956 | $30,752 | $16,372 | $13,832 | 19,837 | 1,659 |
| | BEXTRA 20 MG TABLET | $346 | $173 | $152 | $21 | 112 | 8 |
| | CADUET 10 MG/10 MG TABLET | $584 | $292 | $146 | $146 | 180 | 6 |
| | CADUET 10 MG/20 MG TABLET | $3,664 | $1,832 | $916 | $916 | 840 | 24 |
| | CADUET 10 MG/40 MG TABLET | $1,314 | $657 | $329 | $329 | 300 | 10 |
| | CADUET 10 MG/80 MG TABLET | $393 | $204 | $94 | $94 | 90 | 3 |
| | CADUET 5 MG/10 MG TABLET | $4,001 | $2,004 | $999 | $999 | 1,250 | 34 |
| | CADUET 5 MG/20 MG TABLET | $3,542 | $1,578 | $982 | $982 | 810 | 22 |
| | CADUET 5 MG/40 MG TABLET | $1,304 | $652 | $326 | $326 | 300 | 7 |
| | CALAN SR 120 MG CAPLET SA | $1,557 | $804 | $376 | $376 | 1,110 | 23 |
| | CALAN SR 180 MG CAPLET SA | $705 | $362 | $172 | $172 | 390 | 12 |
| | CALAN SR 240 MG CAPLET SA | $1,464 | $753 | $355 | $355 | 730 | 8 |
| | CAMPTOSAR 20 MG/ML VIAL | $21,995 | $8,330 | $6,832 | $6,832 | 159 | 14 |
| | CAMPTOSAR 20 MG/ML VIAL | $7,015 | $2,200 | $2,408 | $2,408 | 50 | 10 |
| | CAVERJECT 10 MCG VIAL | $0 | $0 | $0 | $0 | 0 | 0 |
| | CAVERJECT 10 MCG VIAL | $124 | $66 | $29 | $29 | 6 | 1 |
| | CAVERJECT 20 MCG KIT | $177 | $89 | $44 | $44 | 6 | 1 |
| | CAVERJECT 20 MCG VIAL | $334 | $172 | $81 | $81 | 12 | 2 |
| | CAVERJECT 20 MCG VIAL | $166 | $88 | $39 | $39 | 6 | 1 |
| | CAVERJECT 40 MCG VIAL | $0 | $0 | $0 | $0 | 0 | 0 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | CAVERJECT IMPULSE 10 MCG KI | $1,411 | $727 | $342 | $342 | 61 | 12 |
| | CAVERJECT IMPULSE 20 MCG KI | $5,060 | $2,598 | $1,275 | $1,186 | 200 | 35 |
| | CELEBREX 100 MG CAPSULE | $140,605 | $66,718 | $37,881 | $36,006 | 82,636 | 1,706 |
| | CELEBREX 100 MG CAPSULE | $11,903 | $6,101 | $3,032 | $2,771 | 7,008 | 132 |
| | CELEBREX 200 MG CAPSULE | $1,126,142 | $556,720 | $292,031 | $277,391 | 407,038 | 9,557 |
| | CELEBREX 200 MG CAPSULE | $32,934 | $15,950 | $12,253 | $4,731 | 11,727 | 338 |
| | CELEBREX 400 MG CAPSULE | $3,007 | $976 | $1,015 | $1,015 | 731 | 19 |
| | CLEOCIN 100 MG VAGINAL OVUL | $4,347 | $2,082 | $1,167 | $1,098 | 276 | 92 |
| | CLEOCIN 2% VAGINAL CREAM | $4,897 | $2,399 | $1,281 | $1,216 | 3,910 | 96 |
| | CLEOCIN 75 MG/5 ML GRANULES | $4,277 | $2,224 | $1,169 | $884 | 17,864 | 75 |
| | CLEOCIN PHOS 150 MG/ML VIAL | $282 | $141 | $70 | $70 | 360 | 3 |
| | CLEOCIN PHOS 150 MG/ML VIAL | $4 | $2 | $1 | $1 | 2 | 1 |
| | COLESTID 1 GM TABLET | $1,539 | $795 | $372 | $372 | 2,730 | 19 |
| | COLESTID FLAVORED GRANULES | $124 | $62 | $31 | $31 | 60 | 1 |
| | COLESTID GRANULES PACKET | $214 | $110 | $52 | $52 | 120 | 2 |
| | CORTEF 10 MG TABLET | $753 | $386 | $184 | $184 | 1,920 | 18 |
| | CORTEF 20 MG TABLET | $633 | $324 | $154 | $154 | 6,000 | 10 |
| | CORTEF 5 MG TABLET | $1,652 | $848 | $402 | $402 | 6,910 | 74 |
| | COVERA-HS 180 MG TABLET SA | $1,357 | $719 | $319 | $319 | 920 | 23 |
| | COVERA-HS 240 MG TABLET SA | $1,008 | $488 | $260 | $260 | 490 | 10 |
| | CYTOTEC 100 MCG TABLET | $485 | $252 | $116 | $116 | 540 | 6 |
| | CYTOTEC 200 MCG TABLET | $930 | $479 | $226 | $226 | 720 | 4 |
| | DELTASONE 10 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | DELTASONE 10 MG TABLET | $97 | $51 | $23 | $23 | 1,087 | 22 |
| | DELTASONE 2.5 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | DELTASONE 5 MG TABLET | $16 | $8 | $4 | $4 | 150 | 4 |
| | DELTASONE 50 MG TABLET | $5 | $2 | $1 | $1 | 5 | 1 |
| | DEPO-ESTRADIOL 5 MG/ML VIAL | $58 | $52 | $4 | $1 | 10 | 2 |
| | DEPO-MEDROL 40 MG/ML VIAL | $25 | $13 | $6 | $6 | 5 | 1 |
| | DEPO-MEDROL 40 MG/ML VIAL | $180 | $90 | $45 | $45 | 40 | 4 |
| | DEPO-MEDROL 40 MG/ML VIAL | $53 | $28 | $12 | $12 | 10 | 2 |
| | DEPO-MEDROL 40 MG/ML VIAL | $50 | $26 | $12 | $12 | 7 | 3 |
| | DEPO-MEDROL 80 MG/ML VIAL | $182 | $70 | $56 | $56 | 20 | 4 |
| | DEPO-MEDROL 80 MG/ML VIAL | $23 | $12 | $6 | $6 | 2 | 1 |
| | DEPO-PROVERA 150 MG/ML SYRN | $1,636 | $1,404 | $119 | $113 | 31 | 31 |
| | DEPO-PROVERA 150 MG/ML SYRN | $1,161 | $1,045 | $61 | $55 | 22 | 22 |
| | DEPO-PROVERA 150 MG/ML SYRN | $53 | $48 | $3 | $3 | 1 | 1 |
| | DEPO-PROVERA 150 MG/ML SYRN | $17,098 | $14,870 | $1,161 | $1,067 | 300 | 300 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | DEPO-PROVERA 150 MG/ML VIAL | $26,380 | $22,569 | $1,985 | $1,825 | 483 | 479 |
| | DEPO-PROVERA 150 MG/ML VIAL | $276 | $248 | $14 | $14 | 5 | 5 |
| | DEPO-PROVERA 400 MG/ML VIAL | $423 | $381 | $21 | $21 | 10 | 1 |
| | DEPO-TESTOSTERONE 100 MG/ML | $160 | $80 | $40 | $40 | 30 | 3 |
| | DEPO-TESTOSTERONE 200 MG/ML | $749 | $383 | $183 | $183 | 68 | 17 |
| | DEPO-TESTOSTERONE 200 MG/ML | $1,346 | $697 | $324 | $324 | 230 | 11 |
| | DETROL 1 MG TABLET | $6,551 | $3,367 | $1,592 | $1,592 | 3,928 | 76 |
| | DETROL 2 MG TABLET | $23,478 | $11,920 | $6,793 | $4,764 | 13,672 | 280 |
| | DETROL 2 MG TABLET | $2,081 | $1,068 | $1,008 | $4 | 1,320 | 21 |
| | DETROL LA 2 MG CAPSULE SA | $26,514 | $13,590 | $6,968 | $5,955 | 9,231 | 251 |
| | DETROL LA 2 MG CAPSULE SA | $6,807 | $3,517 | $1,912 | $1,377 | 2,370 | 70 |
| | DETROL LA 2 MG CAPSULE SA | $774 | $402 | $186 | $186 | 270 | 9 |
| | DETROL LA 4 MG CAPSULE SA | $145,014 | $73,379 | $38,976 | $32,659 | 49,583 | 1,324 |
| | DETROL LA 4 MG CAPSULE SA | $40,758 | $21,026 | $13,803 | $5,929 | 13,799 | 393 |
| | DETROL LA 4 MG CAPSULE SA | $8,170 | $4,106 | $3,615 | $449 | 2,730 | 78 |
| | DIABINESE 250 MG TABLET | $1,148 | $595 | $277 | $277 | 1,220 | 17 |
| | DIPENTUM 250 MG CAPSULE | $3,720 | $1,913 | $1,382 | $424 | 2,816 | 24 |
| | DOSTINEX 0.5 MG TABLET | $37,848 | $19,449 | $15,890 | $2,509 | 1,314 | 89 |
| | ESTRING 2 MG VAGINAL RING | $2,637 | $1,371 | $633 | $633 | 26 | 26 |
| | FLAGYL 375 CAPSULE | $959 | $516 | $234 | $209 | 283 | 9 |
| | FLAGYL 500 MG TABLET | $43 | $22 | $11 | $11 | 10 | 1 |
| | FLAGYL ER 750 MG TABLET SA | $364 | $187 | $104 | $73 | 42 | 6 |
| | FRAGMIN 10,000 UNITS SYRING | $4,117 | $2,134 | $991 | $991 | 80 | 8 |
| | FRAGMIN 10,000 UNITS/ML VIA | $31,381 | $16,108 | $7,637 | $7,637 | 679 | 22 |
| | FRAGMIN 2,500 UNITS SYRINGE | $5,630 | $2,890 | $1,370 | $1,370 | 131 | 46 |
| | FRAGMIN 5,000 UNITS SYRINGE | $12,502 | $6,454 | $3,024 | $3,024 | 97 | 22 |
| | FRAGMIN 7,500 UNITS SYRINGE | $772 | $205 | $283 | $283 | 6 | 2 |
| | GENOTROPIN 13.8 MG CARTRIDG | $158,210 | $86,767 | $43,076 | $28,367 | 286 | 41 |
| | GENOTROPIN 13.8 MG CARTRIDG | $1,103 | $551 | $276 | $276 | 2 | 1 |
| | GENOTROPIN 5.8 MG CARTRIDGE | $8,311 | $4,231 | $2,040 | $2,040 | 36 | 6 |
| | GENOTROPIN 5.8 MG CARTRIDGE | $0 | $0 | $0 | $0 | 0 | 0 |
| | GENOTROPIN 5.8 MG CARTRIDGE | $5,784 | $2,995 | $1,395 | $1,395 | 25 | 5 |
| | GENOTROPIN MINIQUICK 0.2 MG | $1,318 | $694 | $312 | $312 | 140 | 7 |
| | GENOTROPIN MINIQUICK 0.4 MG | $4,161 | $2,104 | $1,029 | $1,029 | 224 | 10 |
| | GENOTROPIN MINIQUICK 0.6 MG | $150 | $75 | $75 | $0 | 140 | 5 |
| | GENOTROPIN MINIQUICK 0.8 MG | $0 | $0 | $0 | $0 | 0 | 0 |
| | GENOTROPIN MINIQUICK 1 MG | $2,572 | $1,286 | $643 | $643 | 56 | 2 |
| | GENOTROPIN MINIQUICK 1.6 MG | $9,321 | $4,707 | $2,307 | $2,307 | 126 | 6 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | GLYSET 100 MG TABLET | $801 | $415 | $193 | $193 | 930 | 12 |
| | GLYSET 25 MG TABLET | $4,578 | $2,340 | $1,180 | $1,058 | 6,740 | 75 |
| | GLYSET 50 MG TABLET | $2,900 | $1,483 | $709 | $709 | 3,902 | 45 |
| | HALCION 0.25 MG TABLET | $767 | $395 | $186 | $186 | 540 | 12 |
| | INSPRA 25 MG TABLET | $3,515 | $1,586 | $964 | $964 | 1,050 | 31 |
| | INSPRA 50 MG TABLET | $920 | $460 | $230 | $230 | 270 | 9 |
| | LOMOTIL TABLET | $445 | $230 | $107 | $107 | 600 | 10 |
| | MEDROL 16 MG TABLET | $846 | $434 | $206 | $206 | 370 | 9 |
| | MEDROL 2 MG TABLET | $286 | $147 | $70 | $70 | 495 | 8 |
| | MEDROL 32 MG TABLET | $593 | $290 | $151 | $151 | 172 | 9 |
| | MEDROL 4 MG DOSEPAK | $47 | $25 | $11 | $11 | 42 | 2 |
| | MEDROL 8 MG TABLET | $122 | $65 | $29 | $29 | 79 | 5 |
| | MICRONASE 5 MG TABLET | $715 | $370 | $173 | $173 | 720 | 11 |
| | MIRAPEX 0.125 MG TABLET | $3,345 | $1,744 | $801 | $801 | 3,480 | 18 |
| | MIRAPEX 0.25 MG TABLET | $4,300 | $2,213 | $1,468 | $619 | 3,540 | 36 |
| | MIRAPEX 0.5 MG TABLET | $3,763 | $1,981 | $891 | $891 | 1,810 | 19 |
| | MIRAPEX 1 MG TABLET | $1,794 | $937 | $428 | $428 | 850 | 9 |
| | MIRAPEX 1.5 MG TABLET | $2,206 | $1,148 | $529 | $529 | 1,320 | 16 |
| | MOTRIN 400 MG TABLET | $357 | $185 | $86 | $86 | 1,360 | 8 |
| | MOTRIN 800 MG TABLET | $371 | $192 | $90 | $90 | 840 | 7 |
| | MYCOBUTIN 150 MG CAPSULE | $2,297 | $1,464 | $785 | $48 | 360 | 13 |
| | NICOTROL CARTRIDGE INHALER | $11,721 | $6,121 | $2,961 | $2,639 | 12,728 | 155 |
| | NICOTROL CARTRIDGE INHALER | $30,316 | $15,368 | $8,208 | $6,741 | 40,976 | 241 |
| | NICOTROL NS 10 MG/ML SPRAY | $438 | $228 | $114 | $95 | 110 | 10 |
| | NICOTROL NS 10 MG/ML SPRAY | $3,216 | $1,610 | $1,174 | $432 | 1,030 | 30 |
| | NORVASC 10 MG TABLET | $610,554 | $304,565 | $157,100 | $148,888 | 299,186 | 8,452 |
| | NORVASC 2.5 MG TABLET | $70,804 | $35,459 | $18,381 | $16,963 | 49,372 | 1,169 |
| | NORVASC 5 MG TABLET | $365,769 | $178,795 | $95,643 | $91,331 | 245,254 | 6,247 |
| | NORVASC 5 MG TABLET | $108,959 | $54,150 | $28,192 | $26,617 | 73,184 | 1,871 |
| | PROCARDIA XL 30 MG TABLET | $960 | $494 | $233 | $233 | 630 | 21 |
| | PROCARDIA XL 60 MG TABLET | $2,473 | $1,269 | $602 | $602 | 960 | 12 |
| | PROCARDIA XL 90 MG TABLET | $1,713 | $878 | $418 | $418 | 570 | 19 |
| | PROVERA 10 MG TABLET | $223 | $121 | $51 | $51 | 150 | 11 |
| | SOLU-CORTEF 100 MG ACT-O-VL | $6 | $3 | $2 | $2 | 2 | 1 |
| | SOLU-CORTEF 100 MG VIAL | $5 | $3 | $1 | $1 | 1 | 1 |
| | SOLU-CORTEF 250 MG ACT-O-VL | $6 | $3 | $1 | $1 | 1 | 1 |
| | SOLU-MEDROL 1,000 MG VIAL | $32 | $16 | $8 | $8 | 3 | 1 |
| | SOLU-MEDROL 125 MG VIAL | $6 | $3 | $1 | $1 | 1 | 1 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | SOLU-MEDROL 125 MG VIAL | $7 | $4 | $2 | $2 | 1 | 1 |
| | SOLU-MEDROL 500 MG VIAL | $71 | $10 | $30 | $30 | 14 | 2 |
| | VAGIFEM 25 MCG VAGINAL TAB | $384 | $197 | $118 | $68 | 120 | 15 |
| | VAGIFEM 25 MCG VAGINAL TAB | $2,739 | $1,431 | $654 | $654 | 891 | 57 |
| | VANTIN 100 MG TABLET | $263 | $135 | $64 | $64 | 62 | 4 |
| | VANTIN 100 MG TABLET | $157 | $83 | $47 | $27 | 38 | 3 |
| | VANTIN 100 MG/5 ML SUSPENSI | $2,672 | $1,378 | $647 | $647 | 2,950 | 25 |
| | VANTIN 100 MG/5 ML SUSPENSI | $99 | $51 | $24 | $24 | 100 | 2 |
| | VANTIN 200 MG TABLET | $5,805 | $3,042 | $1,459 | $1,304 | 1,057 | 59 |
| | VANTIN 200 MG TABLET | $1,370 | $720 | $398 | $251 | 274 | 17 |
| | VANTIN 50 MG/5 ML SUSPENSIO | $100 | $51 | $24 | $24 | 200 | 2 |
| | VANTIN 50 MG/5 ML SUSPENSIO | $56 | $30 | $13 | $13 | 100 | 2 |
| | VIAGRA 100 MG TABLET | $122,873 | $62,607 | $30,553 | $29,713 | 12,733 | 2,140 |
| | VIAGRA 100 MG TABLET | $3,125 | $1,609 | $758 | $758 | 324 | 55 |
| | VIAGRA 25 MG TABLET | $3,234 | $1,638 | $873 | $723 | 337 | 57 |
| | VIAGRA 50 MG TABLET | $52,240 | $26,334 | $13,158 | $12,748 | 5,413 | 916 |
| | VIAGRA 50 MG TABLET | $639 | $326 | $156 | $156 | 66 | 11 |
| | VIBRAMYCIN 25 MG/5 ML SUSP | $61 | $40 | $21 | $0 | 240 | 2 |
| | VIBRAMYCIN 50 MG/5 ML SYRUP | $45 | $22 | $22 | $0 | 100 | 1 |
| | VISTARIL 25 MG CAPSULE | $2,758 | $1,431 | $663 | $663 | 2,700 | 13 |
| | VISTARIL 25 MG/5 ML ORAL SU | $2,519 | $1,311 | $945 | $263 | 7,530 | 18 |
| | VISTARIL 25 MG/5 ML ORAL SU | $62 | $33 | $15 | $15 | 360 | 2 |
| | XALATAN 0.005% EYE DROPS | $32,380 | $16,146 | $8,180 | $8,053 | 1,549 | 418 |
| | XALATAN 0.005% EYE DROPS | $200,810 | $100,580 | $53,607 | $46,623 | 9,646 | 3,277 |
| | XANAX 0.25 MG TABLET | $3,853 | $1,988 | $932 | $932 | 4,065 | 40 |
| | XANAX 0.25 MG TABLET | $173 | $92 | $41 | $41 | 180 | 1 |
| | XANAX 0.25 MG TABLET | $715 | $368 | $174 | $174 | 720 | 12 |
| | XANAX 0.5 MG TABLET | $6,467 | $3,318 | $1,575 | $1,575 | 5,570 | 34 |
| | XANAX 0.5 MG TABLET | $350 | $185 | $82 | $82 | 270 | 2 |
| | XANAX 1 MG TABLET | $11,153 | $5,739 | $2,707 | $2,707 | 7,000 | 63 |
| | XANAX 1 MG TABLET | $577 | $301 | $138 | $138 | 360 | 4 |
| | XANAX 1 MG TABLET | $190 | $95 | $47 | $47 | 120 | 1 |
| | XANAX 2 MG TABLET | $5,238 | $2,700 | $1,269 | $1,269 | 1,950 | 17 |
| | XANAX XR 0.5 MG TABLET | $12,491 | $6,423 | $3,113 | $2,955 | 6,326 | 156 |
| | XANAX XR 1 MG TABLET | $19,523 | $10,027 | $4,819 | $4,677 | 8,068 | 185 |
| | XANAX XR 2 MG TABLET | $14,328 | $7,332 | $3,671 | $3,325 | 4,460 | 123 |
| | XANAX XR 3 MG TABLET | $18,437 | $9,468 | $4,678 | $4,291 | 3,863 | 107 |
| | ZINECARD 500 MG VIAL | $3,592 | $1,796 | $898 | $898 | 8 | 3 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | ZITHROMAX 1 GM POWDER PACKE | $118 | $62 | $28 | $28 | 5 | 4 |
| | ZITHROMAX 1 GM POWDER PACKE | $1,401 | $705 | $362 | $335 | 57 | 42 |
| | ZITHROMAX 100 MG/5 ML SUSP | $63,046 | $32,415 | $16,921 | $13,709 | 28,572 | 1,510 |
| | ZITHROMAX 200 MG/5 ML SUSP | $67,236 | $34,646 | $16,888 | $15,703 | 29,945 | 1,906 |
| | ZITHROMAX 200 MG/5 ML SUSP | $25,151 | $13,112 | $6,457 | $5,583 | 17,209 | 579 |
| | ZITHROMAX 200 MG/5 ML SUSP | $47,806 | $24,835 | $12,605 | $10,366 | 42,859 | 1,299 |
| | ZITHROMAX 250 MG TABLET | $49,455 | $24,881 | $13,069 | $11,505 | 6,585 | 810 |
| | ZITHROMAX 250 MG Z-PAK TAB | $266,415 | $134,002 | $71,177 | $61,236 | 34,985 | 5,838 |
| | ZITHROMAX 500 MG TABLET | $18,085 | $9,152 | $4,580 | $4,353 | 1,230 | 136 |
| | ZITHROMAX 500 MG TABLET | $27,546 | $13,825 | $7,303 | $6,418 | 1,822 | 599 |
| | ZITHROMAX 600 MG TABLET | $54,786 | $28,053 | $13,440 | $13,293 | 3,111 | 350 |
| | ZITHROMAX I.V. 500 MG VIAL | $420 | $210 | $105 | $105 | 16 | 3 |
| | ZYRTEC 1 MG/ML SYRUP | $22,361 | $11,658 | $5,625 | $5,077 | 88,442 | 504 |
| | ZYRTEC 1 MG/ML SYRUP | $8,208 | $4,280 | $2,214 | $1,715 | 32,792 | 177 |
| | ZYRTEC 10 MG CHEWABLE TABLE | $551 | $294 | $150 | $107 | 270 | 9 |
| | ZYRTEC 10 MG TABLET | $76,875 | $39,535 | $21,527 | $15,813 | 38,616 | 1,202 |
| | ZYRTEC 5 MG CHEWABLE TABLET | $975 | $497 | $250 | $228 | 480 | 14 |
| | ZYRTEC 5 MG TABLET | $5,565 | $2,882 | $1,539 | $1,144 | 2,790 | 66 |
| | ZYRTEC-D TABLET | $8,189 | $4,278 | $2,231 | $1,679 | 8,091 | 141 |
| | ZYVOX 100 MG/5 ML SUSPENSIO | $566 | $283 | $141 | $141 | 300 | 1 |
| | ZYVOX 600 MG TABLET | $57,080 | $29,071 | $14,005 | $14,005 | 1,010 | 44 |
| | ZYVOX 600 MG/300 ML IV SOLN | $2,108 | $1,116 | $496 | $496 | 8,400 | 2 |
| Pfizer-Roerig | ANTIVERT 12.5 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | ANTIVERT 25 MG TABLET | $214 | $110 | $52 | $52 | 300 | 10 |
| | ATARAX 100 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | CARDURA 4 MG TABLET | $352 | $179 | $86 | $86 | 300 | 3 |
| | CARDURA 8 MG TABLET | $191 | $101 | $45 | $45 | 150 | 5 |
| | DIFLUCAN 10 MG/ML SUSPENSIO | $4,127 | $2,143 | $1,095 | $889 | 3,815 | 87 |
| | DIFLUCAN 100 MG TABLET | $76,092 | $38,940 | $18,840 | $18,312 | 8,805 | 444 |
| | DIFLUCAN 150 MG TABLET | $27,950 | $14,227 | $7,101 | $6,621 | 1,829 | 1,188 |
| | DIFLUCAN 200 MG TABLET | $146,121 | $75,793 | $35,874 | $34,454 | 10,676 | 410 |
| | DIFLUCAN 40 MG/ML SUSPENSIO | $7,983 | $4,180 | $2,010 | $1,792 | 2,250 | 41 |
| | DIFLUCAN 50 MG TABLET | $857 | $438 | $209 | $209 | 155 | 8 |
| | DIFLUCAN/SALINE 400 MG/200 | $1,935 | $0 | $968 | $968 | 2,600 | 3 |
| | GEOCILLIN 382 MG TABLET | $70 | $37 | $16 | $16 | 30 | 1 |
| | GEODON 20 MG CAPSULE | $99,612 | $50,933 | $31,656 | $17,023 | 24,172 | 495 |
| | GEODON 40 MG CAPSULE | $153,963 | $78,475 | $45,385 | $30,103 | 36,075 | 747 |
| | GEODON 60 MG CAPSULE | $128,737 | $65,434 | $38,802 | $24,501 | 27,390 | 531 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | GEODON 80 MG CAPSULE | $310,195 | $158,987 | $95,492 | $55,716 | 67,017 | 1,278 |
| | GLUCOTROL XL 10 MG TABLET S | $30,528 | $15,654 | $7,695 | $7,178 | 34,751 | 664 |
| | GLUCOTROL XL 10 MG TABLET S | $1,933 | $925 | $504 | $504 | 2,220 | 42 |
| | GLUCOTROL XL 2.5 MG TAB SA | $3,296 | $1,701 | $798 | $798 | 6,998 | 173 |
| | GLUCOTROL XL 5 MG TABLET SA | $7,889 | $4,046 | $1,993 | $1,851 | 16,874 | 349 |
| | GLUCOTROL XL 5 MG TABLET SA | $627 | $327 | $161 | $139 | 1,380 | 24 |
| | NAVANE 20 MG CAPSULE | $5,548 | $2,843 | $1,686 | $1,019 | 2,856 | 46 |
| | PERMAPEN ISOJCT 600,000 UNI | $15 | $8 | $4 | $4 | 4 | 1 |
| | PFIZERPEN 20 MILLION UNITS | $150 | $79 | $35 | $35 | 100 | 1 |
| | RELPAX 20 MG TABLET | $2,299 | $1,088 | $626 | $585 | 150 | 25 |
| | RELPAX 40 MG TABLET | $33,933 | $17,259 | $8,575 | $8,100 | 2,202 | 367 |
| | TERRAMYCIN/POLYMYX EYE OINT | $14 | $7 | $3 | $3 | 4 | 1 |
| | UNASYN 1.5 GM VIAL | $1,033 | $517 | $258 | $258 | 144 | 6 |
| | UNASYN 3 GM ADD-VANTAGE VIA | $2,164 | $1,146 | $509 | $509 | 154 | 7 |
| | VFEND 200 MG TABLET | $29,707 | $15,173 | $7,267 | $7,267 | 963 | 23 |
| | VFEND 40 MG/ML SUSPENSION | $1,118 | $559 | $279 | $279 | 150 | 1 |
| | ZOLOFT 100 MG TABLET | $623,795 | $319,399 | $170,043 | $134,353 | 243,215 | 5,429 |
| | ZOLOFT 100 MG TABLET | $58,369 | $29,832 | $22,650 | $5,887 | 23,439 | 532 |
| | ZOLOFT 20 MG/ML ORAL CONC | $605 | $312 | $162 | $132 | 585 | 6 |
| | ZOLOFT 25 MG TABLET | $158,522 | $80,226 | $47,685 | $30,611 | 62,405 | 1,675 |
| | ZOLOFT 50 MG TABLET | $653,840 | $332,299 | $175,680 | $145,861 | 254,875 | 5,698 |
| | ZOLOFT 50 MG TABLET | $64,850 | $33,118 | $24,475 | $7,257 | 25,391 | 627 |
| Pharmacia | ACTIVELLA TABLET | $1,336 | $689 | $323 | $323 | 1,148 | 19 |
| | ACTIVELLA TABLET | $134 | $71 | $32 | $32 | 112 | 4 |
| | ALPRAZOLAM 0.25 MG TABLET | $2,100 | $1,087 | $514 | $499 | 17,277 | 231 |
| | ALPRAZOLAM 0.25 MG TABLET | $882 | $438 | $224 | $219 | 6,933 | 103 |
| | ALPRAZOLAM 0.25 MG TABLET | $678 | $343 | $172 | $163 | 5,616 | 74 |
| | ALPRAZOLAM 0.5 MG TABLET | $2,012 | $1,031 | $498 | $483 | 15,796 | 206 |
| | ALPRAZOLAM 0.5 MG TABLET | $1,428 | $724 | $356 | $348 | 11,307 | 142 |
| | ALPRAZOLAM 0.5 MG TABLET | $1,092 | $559 | $288 | $244 | 9,386 | 97 |
| | ALPRAZOLAM 1 MG TABLET | $3,472 | $1,782 | $858 | $832 | 26,257 | 255 |
| | ALPRAZOLAM 1 MG TABLET | $2,764 | $1,408 | $741 | $614 | 19,992 | 221 |
| | ALPRAZOLAM 1 MG TABLET | $608 | $311 | $148 | $148 | 4,629 | 44 |
| | ALPRAZOLAM 2 MG TABLET | $5,799 | $2,976 | $1,412 | $1,412 | 26,139 | 275 |
| | ALPRAZOLAM 2 MG TABLET | $2,823 | $1,450 | $689 | $684 | 12,981 | 124 |
| | AROMASIN 25 MG TABLET | $14,948 | $7,672 | $3,638 | $3,638 | 2,035 | 68 |
| | CAMPTOSAR 20 MG/ML VIAL | $21,995 | $8,330 | $6,832 | $6,832 | 159 | 14 |
| | CAMPTOSAR 20 MG/ML VIAL | $7,015 | $2,200 | $2,408 | $2,408 | 50 | 10 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | CAVERJECT 10 MCG VIAL | $124 | $66 | $29 | $29 | 6 | 1 |
| | CAVERJECT 10 MCG VIAL | $0 | $0 | $0 | $0 | 0 | 0 |
| | CAVERJECT 20 MCG KIT | $177 | $89 | $44 | $44 | 6 | 1 |
| | CAVERJECT 20 MCG VIAL | $334 | $172 | $81 | $81 | 12 | 2 |
| | CAVERJECT 20 MCG VIAL | $166 | $88 | $39 | $39 | 6 | 1 |
| | CAVERJECT 40 MCG VIAL | $0 | $0 | $0 | $0 | 0 | 0 |
| | CAVERJECT IMPULSE 10 MCG KI | $1,411 | $727 | $342 | $342 | 61 | 12 |
| | CAVERJECT IMPULSE 20 MCG KI | $5,060 | $2,598 | $1,275 | $1,186 | 200 | 35 |
| | CLEOCIN 100 MG VAGINAL OVUL | $4,347 | $2,082 | $1,167 | $1,098 | 276 | 92 |
| | CLEOCIN 2% VAGINAL CREAM | $4,897 | $2,399 | $1,281 | $1,216 | 3,910 | 96 |
| | CLEOCIN 75 MG/5 ML GRANULES | $4,277 | $2,224 | $1,169 | $884 | 17,864 | 75 |
| | CLEOCIN PHOS 150 MG/ML VIAL | $282 | $141 | $70 | $70 | 360 | 3 |
| | CLEOCIN PHOS 150 MG/ML VIAL | $4 | $2 | $1 | $1 | 2 | 1 |
| | CLINDAMYCIN HCL 150 MG CAPS | $9,097 | $4,410 | $2,470 | $2,217 | 8,813 | 250 |
| | CLINDAMYCIN HCL 300 MG CAPS | $8,201 | $4,202 | $2,242 | $1,757 | 2,399 | 95 |
| | CLINDAMYCIN HCL 300 MG CAPS | $2,601 | $1,290 | $655 | $655 | 702 | 31 |
| | CLINDAMYCIN PH 1% GEL | $4,012 | $1,932 | $1,270 | $810 | 4,680 | 78 |
| | CLINDAMYCIN PH 1% GEL | $1,630 | $837 | $540 | $254 | 1,530 | 50 |
| | CLINDAMYCIN PH 1% SOLUTION | $3,380 | $1,629 | $1,132 | $619 | 12,270 | 199 |
| | CLINDAMYCIN PH 1% SOLUTION | $285 | $134 | $82 | $68 | 840 | 25 |
| | CLINDAMYCIN PHOS 1% PLEDGET | $1,679 | $838 | $431 | $410 | 2,280 | 38 |
| | CLINDAMYCIN PHOS TOP LOTION | $4,885 | $2,549 | $1,227 | $1,108 | 6,840 | 113 |
| | COLESTID 1 GM TABLET | $1,539 | $795 | $372 | $372 | 2,730 | 19 |
| | COLESTID FLAVORED GRANULES | $124 | $62 | $31 | $31 | 60 | 1 |
| | COLESTID GRANULES PACKET | $214 | $110 | $52 | $52 | 120 | 2 |
| | CORTEF 10 MG TABLET | $753 | $386 | $184 | $184 | 1,920 | 18 |
| | CORTEF 20 MG TABLET | $633 | $324 | $154 | $154 | 6,000 | 10 |
| | CORTEF 5 MG TABLET | $1,652 | $848 | $402 | $402 | 6,910 | 74 |
| | DELTASONE 10 MG TABLET | $97 | $51 | $23 | $23 | 1,087 | 22 |
| | DELTASONE 10 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | DELTASONE 2.5 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | DELTASONE 5 MG TABLET | $16 | $8 | $4 | $4 | 150 | 4 |
| | DELTASONE 50 MG TABLET | $5 | $2 | $1 | $1 | 5 | 1 |
| | DEPO-ESTRADIOL 5 MG/ML VIAL | $58 | $52 | $4 | $1 | 10 | 2 |
| | DEPO-MEDROL 40 MG/ML VIAL | $180 | $90 | $45 | $45 | 40 | 4 |
| | DEPO-MEDROL 40 MG/ML VIAL | $53 | $28 | $12 | $12 | 10 | 2 |
| | DEPO-MEDROL 40 MG/ML VIAL | $50 | $26 | $12 | $12 | 7 | 3 |
| | DEPO-MEDROL 40 MG/ML VIAL | $25 | $13 | $6 | $6 | 5 | 1 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | DEPO-MEDROL 80 MG/ML VIAL | $182 | $70 | $56 | $56 | 20 | 4 |
| | DEPO-MEDROL 80 MG/ML VIAL | $23 | $12 | $6 | $6 | 2 | 1 |
| | DEPO-PROVERA 150 MG/ML SYRN | $17,098 | $14,870 | $1,161 | $1,067 | 300 | 300 |
| | DEPO-PROVERA 150 MG/ML SYRN | $1,636 | $1,404 | $119 | $113 | 31 | 31 |
| | DEPO-PROVERA 150 MG/ML SYRN | $1,161 | $1,045 | $61 | $55 | 22 | 22 |
| | DEPO-PROVERA 150 MG/ML SYRN | $53 | $48 | $3 | $3 | 1 | 1 |
| | DEPO-PROVERA 150 MG/ML VIAL | $26,380 | $22,569 | $1,985 | $1,825 | 483 | 479 |
| | DEPO-PROVERA 150 MG/ML VIAL | $276 | $248 | $14 | $14 | 5 | 5 |
| | DEPO-PROVERA 400 MG/ML VIAL | $423 | $381 | $21 | $21 | 10 | 1 |
| | DEPO-TESTOSTERONE 100 MG/ML | $160 | $80 | $40 | $40 | 30 | 3 |
| | DEPO-TESTOSTERONE 200 MG/ML | $1,346 | $697 | $324 | $324 | 230 | 11 |
| | DEPO-TESTOSTERONE 200 MG/ML | $749 | $383 | $183 | $183 | 68 | 17 |
| | DETROL 1 MG TABLET | $6,551 | $3,367 | $1,592 | $1,592 | 3,928 | 76 |
| | DETROL 2 MG TABLET | $23,478 | $11,920 | $6,793 | $4,764 | 13,672 | 280 |
| | DETROL 2 MG TABLET | $2,081 | $1,068 | $1,008 | $4 | 1,320 | 21 |
| | DETROL LA 2 MG CAPSULE SA | $26,514 | $13,590 | $6,968 | $5,955 | 9,231 | 251 |
| | DETROL LA 2 MG CAPSULE SA | $6,807 | $3,517 | $1,912 | $1,377 | 2,370 | 70 |
| | DETROL LA 2 MG CAPSULE SA | $774 | $402 | $186 | $186 | 270 | 9 |
| | DETROL LA 4 MG CAPSULE SA | $145,014 | $73,379 | $38,976 | $32,659 | 49,583 | 1,324 |
| | DETROL LA 4 MG CAPSULE SA | $40,758 | $21,026 | $13,803 | $5,929 | 13,799 | 393 |
| | DETROL LA 4 MG CAPSULE SA | $8,170 | $4,106 | $3,615 | $449 | 2,730 | 78 |
| | DIPENTUM 250 MG CAPSULE | $3,720 | $1,913 | $1,382 | $424 | 2,816 | 24 |
| | DOSTINEX 0.5 MG TABLET | $37,848 | $19,449 | $15,890 | $2,509 | 1,314 | 89 |
| | ESTRING 2 MG VAGINAL RING | $2,637 | $1,371 | $633 | $633 | 26 | 26 |
| | FLUCONAZOLE 10 MG/ML SUSP | $193 | $97 | $48 | $48 | 212 | 4 |
| | FLUCONAZOLE 100 MG TABLET | $7,218 | $3,609 | $1,804 | $1,804 | 982 | 54 |
| | FLUCONAZOLE 150 MG TABLET | $3,580 | $1,748 | $963 | $868 | 245 | 172 |
| | FLUCONAZOLE 200 MG TABLET | $7,670 | $3,835 | $2,211 | $1,624 | 628 | 28 |
| | FLUCONAZOLE 40 MG/ML SUSP | $0 | $0 | $0 | $0 | 0 | 0 |
| | FLUCONAZOLE 50 MG TABLET | $475 | $19 | $228 | $228 | 97 | 4 |
| | FLURBIPROFEN 100 MG TABLET | $175 | $87 | $47 | $40 | 445 | 7 |
| | FRAGMIN 10,000 UNITS SYRING | $4,117 | $2,134 | $991 | $991 | 80 | 8 |
| | FRAGMIN 10,000 UNITS/ML VIA | $31,381 | $16,108 | $7,637 | $7,637 | 679 | 22 |
| | FRAGMIN 2,500 UNITS SYRINGE | $5,630 | $2,890 | $1,370 | $1,370 | 131 | 46 |
| | FRAGMIN 5,000 UNITS SYRINGE | $12,502 | $6,454 | $3,024 | $3,024 | 97 | 22 |
| | FRAGMIN 7,500 UNITS SYRINGE | $772 | $205 | $283 | $283 | 6 | 2 |
| | GABAPENTIN 100 MG CAPSULE | $1,326 | $663 | $346 | $317 | 2,696 | 29 |
| | GABAPENTIN 300 MG CAPSULE | $6,502 | $3,199 | $1,782 | $1,521 | 5,752 | 65 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | GABAPENTIN 400 MG CAPSULE | $2,314 | $1,157 | $600 | $557 | 1,690 | 14 |
| | GENOTROPIN 13.8 MG CARTRIDG | $158,210 | $86,767 | $43,076 | $28,367 | 286 | 41 |
| | GENOTROPIN 13.8 MG CARTRIDG | $1,103 | $551 | $276 | $276 | 2 | 1 |
| | GENOTROPIN 5.8 MG CARTRIDGE | $8,311 | $4,231 | $2,040 | $2,040 | 36 | 6 |
| | GENOTROPIN 5.8 MG CARTRIDGE | $5,784 | $2,995 | $1,395 | $1,395 | 25 | 5 |
| | GENOTROPIN 5.8 MG CARTRIDGE | $0 | $0 | $0 | $0 | 0 | 0 |
| | GENOTROPIN MINIQUICK 0.2 MG | $1,318 | $694 | $312 | $312 | 140 | 7 |
| | GENOTROPIN MINIQUICK 0.4 MG | $4,161 | $2,104 | $1,029 | $1,029 | 224 | 10 |
| | GENOTROPIN MINIQUICK 0.6 MG | $150 | $75 | $75 | $0 | 140 | 5 |
| | GENOTROPIN MINIQUICK 0.8 MG | $0 | $0 | $0 | $0 | 0 | 0 |
| | GENOTROPIN MINIQUICK 1 MG | $2,572 | $1,286 | $643 | $643 | 56 | 2 |
| | GENOTROPIN MINIQUICK 1.6 MG | $9,321 | $4,707 | $2,307 | $2,307 | 126 | 6 |
| | GLYBURIDE 1.25 MG TABLET | $1,080 | $547 | $289 | $245 | 3,990 | 65 |
| | GLYBURIDE 2.5 MG TABLET | $7,701 | $3,869 | $1,966 | $1,865 | 19,015 | 329 |
| | GLYBURIDE 5 MG TABLET | $38,834 | $18,779 | $10,144 | $9,911 | 75,637 | 887 |
| | GLYBURIDE 5 MG TABLET | $8,059 | $4,089 | $2,086 | $1,883 | 15,620 | 194 |
| | GLYBURIDE 5 MG TABLET | $2,113 | $915 | $599 | $599 | 3,390 | 56 |
| | GLYBURIDE MICRO 3 MG TABLET | $57 | $29 | $14 | $14 | 150 | 2 |
| | GLYBURIDE MICRO 6 MG TABLET | $2,697 | $1,298 | $699 | $699 | 3,010 | 46 |
| | GLYSET 100 MG TABLET | $801 | $415 | $193 | $193 | 930 | 12 |
| | GLYSET 25 MG TABLET | $4,578 | $2,340 | $1,180 | $1,058 | 6,740 | 75 |
| | GLYSET 50 MG TABLET | $2,900 | $1,483 | $709 | $709 | 3,902 | 45 |
| | HALCION 0.25 MG TABLET | $767 | $395 | $186 | $186 | 540 | 12 |
| | IBUPROFEN 400 MG TABLET | $1,583 | $772 | $439 | $372 | 12,177 | 227 |
| | IBUPROFEN 400 MG TABLET | $1,017 | $485 | $270 | $261 | 8,470 | 140 |
| | IBUPROFEN 600 MG TABLET | $2,246 | $1,130 | $622 | $494 | 16,155 | 308 |
| | IBUPROFEN 600 MG TABLET | $1,607 | $809 | $409 | $389 | 11,867 | 216 |
| | IBUPROFEN 800 MG TABLET | $1,096 | $554 | $289 | $253 | 5,500 | 120 |
| | IBUPROFEN 800 MG TABLET | $259 | $121 | $69 | $69 | 1,459 | 24 |
| | MEDROL 16 MG TABLET | $846 | $434 | $206 | $206 | 370 | 9 |
| | MEDROL 2 MG TABLET | $286 | $147 | $70 | $70 | 495 | 8 |
| | MEDROL 32 MG TABLET | $593 | $290 | $151 | $151 | 172 | 9 |
| | MEDROL 4 MG DOSEPAK | $47 | $25 | $11 | $11 | 42 | 2 |
| | MEDROL 8 MG TABLET | $122 | $65 | $29 | $29 | 79 | 5 |
| | MEDROXYPROGESTERONE 10 MG T | $1,742 | $823 | $498 | $421 | 2,567 | 199 |
| | MEDROXYPROGESTERONE 10 MG T | $365 | $328 | $18 | $18 | 690 | 23 |
| | MEDROXYPROGESTERONE 2.5 MG | $252 | $130 | $84 | $38 | 816 | 20 |
| | MEDROXYPROGESTERONE 2.5 MG | $88 | $46 | $21 | $21 | 280 | 7 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | MEDROXYPROGESTERONE 5 MG TA | $875 | $439 | $247 | $189 | 2,072 | 64 |
| | METHYLPREDNISOLONE 4 MG TAB | $2,944 | $1,445 | $767 | $731 | 6,055 | 289 |
| | METHYLPREDNISOLONE 4 MG TAB | $912 | $381 | $271 | $260 | 2,504 | 47 |
| | MICRONASE 5 MG TABLET | $715 | $370 | $173 | $173 | 720 | 11 |
| | MIRAPEX 1.5 MG TABLET | $2,206 | $1,148 | $529 | $529 | 1,320 | 16 |
| | MISOPROSTOL 100 MCG TABLET | $719 | $370 | $174 | $174 | 960 | 8 |
| | MISOPROSTOL 100 MCG TABLET | $322 | $168 | $77 | $77 | 420 | 4 |
| | MOTRIN 400 MG TABLET | $357 | $185 | $86 | $86 | 1,360 | 8 |
| | MOTRIN 800 MG TABLET | $371 | $192 | $90 | $90 | 840 | 7 |
| | MYCOBUTIN 150 MG CAPSULE | $2,297 | $1,464 | $785 | $48 | 360 | 13 |
| | NICOTROL CARTRIDGE INHALER | $30,316 | $15,368 | $8,208 | $6,741 | 40,976 | 241 |
| | NICOTROL CARTRIDGE INHALER | $11,721 | $6,121 | $2,961 | $2,639 | 12,728 | 155 |
| | NICOTROL NS 10 MG/ML SPRAY | $3,216 | $1,610 | $1,174 | $432 | 1,030 | 30 |
| | NICOTROL NS 10 MG/ML SPRAY | $438 | $228 | $114 | $95 | 110 | 10 |
| | OXAPROZIN 600 MG CAPLET | $1,026 | $521 | $253 | $253 | 1,410 | 18 |
| | PROVERA 10 MG TABLET | $223 | $121 | $51 | $51 | 150 | 11 |
| | SOLU-CORTEF 100 MG ACT-O-VL | $6 | $3 | $2 | $2 | 2 | 1 |
| | SOLU-CORTEF 100 MG VIAL | $5 | $3 | $1 | $1 | 1 | 1 |
| | SOLU-CORTEF 250 MG ACT-O-VL | $6 | $3 | $1 | $1 | 1 | 1 |
| | SOLU-MEDROL 1,000 MG VIAL | $32 | $16 | $8 | $8 | 3 | 1 |
| | SOLU-MEDROL 125 MG VIAL | $7 | $4 | $2 | $2 | 1 | 1 |
| | SOLU-MEDROL 125 MG VIAL | $6 | $3 | $1 | $1 | 1 | 1 |
| | SOLU-MEDROL 500 MG VIAL | $71 | $10 | $30 | $30 | 14 | 2 |
| | SPIRONOLACT/HCTZ 25/25 TAB | $242 | $125 | $58 | $58 | 510 | 16 |
| | SPIRONOLACTONE 100 MG TABLE | $2,266 | $1,175 | $848 | $243 | 1,920 | 29 |
| | SPIRONOLACTONE 25 MG TABLET | $5,903 | $2,998 | $1,463 | $1,442 | 15,627 | 296 |
| | SPIRONOLACTONE 25 MG TABLET | $2,849 | $1,400 | $813 | $635 | 7,477 | 154 |
| | SPIRONOLACTONE 50 MG TABLET | $4,191 | $2,144 | $1,060 | $987 | 5,417 | 95 |
| | SULFASALAZINE 500 MG TABLET | $1,408 | $729 | $339 | $339 | 7,374 | 61 |
| | SULFASALAZINE 500 MG TABLET | $321 | $165 | $78 | $78 | 1,950 | 4 |
| | SYSTEM GENERATED from CLAIM | $1,202 | $579 | $318 | $306 | 1,590 | 31 |
| | SYSTEM GENERATED from CLAIM | $234 | $117 | $58 | $58 | 540 | 12 |
| | SYSTEM GENERATED from CLAIM | $160 | $80 | $40 | $40 | 390 | 6 |
| | TRIAZOLAM 0.125 MG TABLET | $6 | $3 | $3 | $0 | 3 | 1 |
| | TRIAZOLAM 0.25 MG TABLET | $2,152 | $1,105 | $524 | $523 | 2,952 | 88 |
| | TRIAZOLAM 0.25 MG TABLET | $724 | $373 | $178 | $173 | 994 | 31 |
| | VAGIFEM 25 MCG VAGINAL TAB | $2,739 | $1,431 | $654 | $654 | 891 | 57 |
| | VAGIFEM 25 MCG VAGINAL TAB | $384 | $197 | $118 | $68 | 120 | 15 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | VANTIN 100 MG TABLET | $263 | $135 | $64 | $64 | 62 | 4 |
| | VANTIN 100 MG TABLET | $157 | $83 | $47 | $27 | 38 | 3 |
| | VANTIN 100 MG/5 ML SUSPENSI | $2,672 | $1,378 | $647 | $647 | 2,950 | 25 |
| | VANTIN 100 MG/5 ML SUSPENSI | $99 | $51 | $24 | $24 | 100 | 2 |
| | VANTIN 200 MG TABLET | $5,805 | $3,042 | $1,459 | $1,304 | 1,057 | 59 |
| | VANTIN 200 MG TABLET | $1,370 | $720 | $398 | $251 | 274 | 17 |
| | VANTIN 50 MG/5 ML SUSPENSIO | $100 | $51 | $24 | $24 | 200 | 2 |
| | VANTIN 50 MG/5 ML SUSPENSIO | $56 | $30 | $13 | $13 | 100 | 2 |
| | XALATAN 0.005% EYE DROPS | $200,810 | $100,580 | $53,607 | $46,623 | 9,646 | 3,277 |
| | XALATAN 0.005% EYE DROPS | $32,380 | $16,146 | $8,180 | $8,053 | 1,549 | 418 |
| | XANAX 0.25 MG TABLET | $3,853 | $1,988 | $932 | $932 | 4,065 | 40 |
| | XANAX 0.25 MG TABLET | $715 | $368 | $174 | $174 | 720 | 12 |
| | XANAX 0.25 MG TABLET | $173 | $92 | $41 | $41 | 180 | 1 |
| | XANAX 0.5 MG TABLET | $6,467 | $3,318 | $1,575 | $1,575 | 5,570 | 34 |
| | XANAX 0.5 MG TABLET | $350 | $185 | $82 | $82 | 270 | 2 |
| | XANAX 1 MG TABLET | $11,153 | $5,739 | $2,707 | $2,707 | 7,000 | 63 |
| | XANAX 1 MG TABLET | $577 | $301 | $138 | $138 | 360 | 4 |
| | XANAX 1 MG TABLET | $190 | $95 | $47 | $47 | 120 | 1 |
| | XANAX 2 MG TABLET | $5,238 | $2,700 | $1,269 | $1,269 | 1,950 | 17 |
| | XANAX XR 0.5 MG TABLET | $12,491 | $6,423 | $3,113 | $2,955 | 6,326 | 156 |
| | XANAX XR 1 MG TABLET | $19,523 | $10,027 | $4,819 | $4,677 | 8,068 | 185 |
| | XANAX XR 2 MG TABLET | $14,328 | $7,332 | $3,671 | $3,325 | 4,460 | 123 |
| | XANAX XR 3 MG TABLET | $18,437 | $9,468 | $4,678 | $4,291 | 3,863 | 107 |
| | ZINECARD 500 MG VIAL | $3,592 | $1,796 | $898 | $898 | 8 | 3 |
| | ZYVOX 100 MG/5 ML SUSPENSIO | $566 | $283 | $141 | $141 | 300 | 1 |
| | ZYVOX 600 MG TABLET | $57,080 | $29,071 | $14,005 | $14,005 | 1,010 | 44 |
| | ZYVOX 600 MG/300 ML IV SOLN | $2,108 | $1,116 | $496 | $496 | 8,400 | 2 |
| Purdue Frederick Co. (Purdue Pharma) | CERUMENEX 10% EAR DROPS | $150 | $77 | $37 | $37 | 33 | 4 |
| | CERUMENEX 10% EAR DROPS | $217 | $115 | $72 | $30 | 60 | 5 |
| | MS CONTIN 100 MG TABLET SA | $5,194 | $2,712 | $1,241 | $1,241 | 1,080 | 4 |
| | MS CONTIN 15 MG TABLET SA | $82 | $41 | $20 | $20 | 90 | 1 |
| | MS CONTIN 30 MG TABLET SA | $2,675 | $1,356 | $660 | $660 | 1,600 | 9 |
| | MS CONTIN 30 MG TABLET SA | $301 | $160 | $71 | $71 | 180 | 1 |
| | MS CONTIN 60 MG TABLET SA | $2,281 | $1,195 | $543 | $543 | 700 | 6 |
| | MS CONTIN 60 MG TABLET SA | $1,624 | $828 | $398 | $398 | 540 | 6 |
| | MSIR 30 MG CAPSULE | $0 | $0 | $0 | $0 | 0 | 0 |
| | MSIR 30 MG TABLET | $54 | $29 | $13 | $13 | 150 | 1 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | UNIPHYL 400 MG TABLET SA | $3,044 | $1,522 | $761 | $761 | 2,855 | 74 |
| | UNIPHYL 600 MG TABLET SA | $1,955 | $1,005 | $475 | $475 | 1,290 | 28 |
| Purdue Pharma, L.P. | OXYCONTIN 10 MG TABLET SA | $45,008 | $22,624 | $11,192 | $11,192 | 32,998 | 365 |
| | OXYCONTIN 20 MG TABLET SA | $137,413 | $69,846 | $33,892 | $33,675 | 53,341 | 604 |
| | OXYCONTIN 40 MG TABLET SA | $413,848 | $206,971 | $103,438 | $103,438 | 90,550 | 804 |
| | OXYCONTIN 80 MG TABLET SA | $231,730 | $119,358 | $56,186 | $56,186 | 27,368 | 253 |
| | OXYFAST 20 MG/ML SOLUTION | $86 | $45 | $20 | $20 | 60 | 1 |
| | OXYIR 5 MG CAPSULE | $582 | $302 | $140 | $140 | 1,616 | 11 |
| | SPECTRACEF 200 MG TABLET | $2,292 | $1,189 | $572 | $532 | 1,261 | 56 |
| | UNIPHYL 400 MG TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| Reliant Pharmaceuticals, L.L.C. | AXID 15 MG/ML ORAL SOLUTION | $75 | $38 | $19 | $19 | 150 | 1 |
| | AXID 150 MG PULVULE | $1,306 | $687 | $310 | $310 | 480 | 6 |
| | DYNACIRC 2.5 MG CAPSULE | $78 | $41 | $18 | $18 | 60 | 1 |
| | DYNACIRC 2.5 MG CAPSULE | $641 | $330 | $156 | $156 | 480 | 14 |
| | DYNACIRC 5 MG CAPSULE | $1,167 | $583 | $292 | $292 | 600 | 5 |
| | DYNACIRC 5 MG CAPSULE | $4,707 | $2,433 | $1,137 | $1,137 | 2,480 | 47 |
| | DYNACIRC CR 10 MG TABLET SA | $10,637 | $5,454 | $2,591 | $2,591 | 3,880 | 108 |
| | DYNACIRC CR 10 MG TABLET SA | $2,532 | $1,303 | $614 | $614 | 930 | 24 |
| | DYNACIRC CR 5 MG TABLET SA | $4,301 | $2,200 | $1,050 | $1,050 | 2,460 | 70 |
| | DYNACIRC CR 5 MG TABLET SA | $849 | $439 | $205 | $205 | 510 | 11 |
| | INNOPRAN XL 120 MG CAP SA | $829 | $423 | $232 | $173 | 690 | 22 |
| | INNOPRAN XL 120 MG CAP SA | $516 | $264 | $126 | $126 | 434 | 15 |
| | INNOPRAN XL 80 MG CAPSULE S | $1,254 | $605 | $403 | $246 | 1,050 | 30 |
| | INNOPRAN XL 80 MG CAPSULE S | $456 | $234 | $111 | $111 | 390 | 7 |
| | RYTHMOL SR 225 MG CAPSULE | $985 | $492 | $246 | $246 | 240 | 4 |
| | RYTHMOL SR 325 MG CAPSULE | $1,753 | $887 | $564 | $302 | 480 | 4 |
| Sanofi-Synthelabo Inc. | AMBIEN 10 MG TABLET | $853,643 | $434,607 | $213,357 | $205,678 | 297,089 | 10,368 |
| | AMBIEN 10 MG TABLET | $20,387 | $10,322 | $5,614 | $4,451 | 6,994 | 252 |
| | AMBIEN 5 MG TABLET | $221,562 | $110,312 | $56,603 | $54,646 | 93,575 | 3,305 |
| | AMBIEN 5 MG TABLET | $5,891 | $2,935 | $1,516 | $1,440 | 2,577 | 89 |
| | CHEMET 100 MG CAPSULE | $440 | $233 | $104 | $104 | 82 | 3 |
| | DEMEROL 100 MG TABLET | $440 | $225 | $107 | $107 | 240 | 3 |
| | DRISDOL 50,000 UNITS CAPSUL | $302 | $158 | $141 | $3 | 217 | 4 |
| | HYDROXYCHLOROQUINE 200 MG T | $211 | $107 | $52 | $52 | 240 | 4 |
| | KAYEXALATE POWDER | $2,239 | $1,164 | $537 | $537 | 7,259 | 16 |
| | MEBARAL 100 MG TABLET | $826 | $426 | $200 | $200 | 990 | 11 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | MEBARAL 50 MG TABLET | $711 | $369 | $342 | $0 | 1,200 | 14 |
| | NEO-SYNEPHRINE 10% EYE DROP | $0 | $0 | $0 | $0 | 0 | 0 |
| | NEO-SYNEPHRINE 2.5% EYE DRP | $60 | $32 | $14 | $14 | 30 | 2 |
| | PHISOHEX 3% CLEANSER | $887 | $458 | $223 | $206 | 6,641 | 46 |
| | PHISOHEX 3% CLEANSER | $4,011 | $2,063 | $1,458 | $490 | 56,578 | 121 |
| | PHISOHEX 3% CLEANSER | $192 | $97 | $55 | $41 | 4,290 | 4 |
| | PHISOHEX 3% CLEANSER | $126 | $63 | $32 | $32 | 1,892 | 4 |
| | PLAQUENIL 200 MG TABLET | $2,218 | $1,142 | $538 | $538 | 1,370 | 17 |
| | PRIMAQUINE 26.3 MG TABLET | $16 | $9 | $4 | $4 | 14 | 1 |
| | TALWIN NX TABLET | $1,047 | $541 | $253 | $253 | 810 | 9 |
| | UROXATRAL 10 MG TABLET | $15,880 | $7,812 | $4,386 | $3,682 | 9,400 | 254 |
| Schering Corporation | CELESTONE 0.6 MG/5 ML SYRUP | $0 | $0 | $0 | $0 | 0 | 0 |
| | CLARINEX 5 MG TABLET | $25,017 | $12,701 | $7,371 | $4,945 | 10,777 | 317 |
| | CLARINEX 5 MG TABLET | $2,810 | $1,444 | $1,351 | $15 | 1,190 | 40 |
| | CLARINEX 5 MG TABLET | $71 | $36 | $18 | $18 | 30 | 1 |
| | DIPROLENE 0.05% GEL | $78 | $51 | $27 | $0 | 30 | 1 |
| | DIPROLENE 0.05% GEL | $924 | $437 | $243 | $243 | 500 | 10 |
| | DIPROLENE 0.05% LOTION | $814 | $389 | $291 | $134 | 600 | 18 |
| | DIPROLENE 0.05% LOTION | $5,546 | $2,723 | $1,560 | $1,263 | 3,600 | 55 |
| | DIPROLENE AF 0.05% CREAM | $2,589 | $1,345 | $622 | $622 | 930 | 22 |
| | DIPROLENE AF 0.05% CREAM | $5,102 | $2,634 | $1,358 | $1,111 | 2,800 | 56 |
| | ELOCON 0.1% CREAM | $15,936 | $8,039 | $4,210 | $3,687 | 8,595 | 417 |
| | ELOCON 0.1% CREAM | $48,884 | $24,959 | $12,869 | $11,055 | 44,295 | 961 |
| | ELOCON 0.1% LOTION | $2,118 | $1,089 | $577 | $452 | 2,100 | 56 |
| | ELOCON 0.1% LOTION | $7,919 | $4,039 | $2,330 | $1,551 | 8,445 | 134 |
| | ELOCON 0.1% OINTMENT | $86 | $30 | $43 | $13 | 45 | 2 |
| | ELOCON 0.1% OINTMENT | $729 | $379 | $188 | $163 | 660 | 14 |
| | FORADIL AEROLIZER 12 MCG CA | $32,828 | $16,710 | $8,359 | $7,758 | 22,860 | 368 |
| | FORADIL AEROLIZER 12 MCG CA | $30 | $15 | $8 | $8 | 12 | 1 |
| | FULVICIN UNITS/F 250 MG TAB | $0 | $0 | $0 | $0 | 0 | 0 |
| | IMDUR 120 MG TABLET SA | $0 | $0 | $0 | $0 | 0 | 0 |
| | IMDUR 30 MG TABLET SA | $2,750 | $1,427 | $661 | $661 | 1,520 | 25 |
| | IMDUR 60 MG TABLET SA | $749 | $385 | $182 | $182 | 390 | 5 |
| | INTRON A 10 MILLION UNITS V | $4,895 | $2,447 | $1,224 | $1,224 | 33 | 3 |
| | INTRON A 10MM UNITS/ML VIAL | $0 | $0 | $0 | $0 | 0 | 0 |
| | INTRON A 25 MILLION UNITS V | $9,398 | $4,791 | $2,303 | $2,303 | 30 | 6 |
| | INTRON A 5MM UNITS INJECT P | $9,127 | $4,819 | $2,154 | $2,154 | 29 | 7 |
| | K-DUR 20 MEQ TABLET SA | $359 | $190 | $85 | $85 | 600 | 5 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | LOTRIMIN 1% LOTION | $31 | $16 | $7 | $7 | 30 | 1 |
| | LOTRISONE CREAM | $0 | $0 | $0 | $0 | 0 | 0 |
| | LOTRISONE CREAM | $297 | $154 | $72 | $72 | 225 | 5 |
| | LOTRISONE LOTION | $21,732 | $11,052 | $5,982 | $4,698 | 12,000 | 352 |
| | NASONEX 50 MCG NASAL SPRAY | $302,512 | $153,021 | $85,221 | $64,270 | 74,060 | 4,245 |
| | NITRO-DUR 0.2 MG/HR PATCH | $1,348 | $689 | $329 | $329 | 630 | 13 |
| | NITRO-DUR 0.3 MG/HR PATCH | $10,677 | $5,523 | $2,577 | $2,577 | 4,590 | 127 |
| | NITRO-DUR 0.4 MG/HR PATCH | $823 | $431 | $196 | $196 | 330 | 11 |
| | NITRO-DUR 0.8 MG/HR PATCH | $2,196 | $1,119 | $539 | $539 | 840 | 20 |
| | NITRO-DUR 0.8 MG/HR PATCH | $484 | $251 | $116 | $116 | 180 | 6 |
| | PEG-INTRON 120 MCG KIT | $14,259 | $7,297 | $3,481 | $3,481 | 40 | 10 |
| | PEG-INTRON 150 MCG KIT | $30,155 | $15,569 | $7,293 | $7,293 | 82 | 21 |
| | PEG-INTRON 80 MCG KIT | $13,639 | $7,021 | $3,309 | $3,309 | 40 | 10 |
| | PEG-INTRON REDIPEN 120 MCG | $2,143 | $1,093 | $525 | $525 | 6 | 2 |
| | PEG-INTRON REDIPEN 150 MCG | $10,860 | $5,474 | $2,693 | $2,693 | 29 | 8 |
| | PEG-INTRON REDIPEN 50 MCG | $2,602 | $1,378 | $612 | $612 | 8 | 2 |
| | PROVENTIL 0.83 MG/ML SOLUTN | $263 | $132 | $66 | $66 | 432 | 1 |
| | PROVENTIL 90 MCG INHALER | $2,662 | $1,367 | $655 | $640 | 1,275 | 60 |
| | PROVENTIL HFA 90 MCG INHALE | $28,246 | $14,650 | $7,171 | $6,425 | 4,635 | 562 |
| | REBETOL 200 MG CAPSULE | $35,898 | $19,008 | $9,729 | $7,161 | 3,690 | 23 |
| | REBETOL 200 MG CAPSULE | $2,919 | $1,546 | $687 | $687 | 300 | 2 |
| | REBETOL 200 MG CAPSULE | $28,242 | $14,729 | $6,757 | $6,757 | 2,902 | 24 |
| | REBETOL 200 MG CAPSULE | $21,536 | $10,892 | $5,322 | $5,322 | 2,220 | 19 |
| | TEMODAR 100 MG CAPSULE | $40,774 | $20,794 | $9,990 | $9,990 | 265 | 23 |
| | TEMODAR 100 MG CAPSULE | $41,214 | $20,915 | $10,720 | $9,579 | 268 | 17 |
| | TEMODAR 20 MG CAPSULE | $12,918 | $6,577 | $3,170 | $3,170 | 420 | 27 |
| | TEMODAR 20 MG CAPSULE | $20,856 | $10,749 | $5,054 | $5,054 | 685 | 27 |
| | TEMODAR 250 MG CAPSULE | $34,380 | $17,416 | $8,957 | $8,006 | 90 | 18 |
| | TEMODAR 5 MG CAPSULE | $1,003 | $507 | $248 | $248 | 125 | 20 |
| | TEMODAR 5 MG CAPSULE | $392 | $206 | $93 | $93 | 50 | 3 |
| | VANCERIL INHALER | $0 | $0 | $0 | $0 | 0 | 0 |
| Serono, Inc. | NOVANTRONE 2 MG/ML VIAL | $3,402 | $1,701 | $851 | $851 | 25 | 2 |
| | REBIF 22 MCG/0.5 ML SYRINGE | $39,744 | $20,366 | $9,689 | $9,689 | 177 | 37 |
| | REBIF 44 MCG/0.5 ML SYRINGE | $30,467 | $15,557 | $7,455 | $7,455 | 132 | 22 |
| | SAIZEN 5 MG VIAL | $6,633 | $3,512 | $1,560 | $1,560 | 30 | 2 |
| | SAIZEN 8.8 MG VIAL | $61,759 | $31,766 | $14,996 | $14,996 | 176 | 10 |
| | SEROSTIM 6 MG VIAL | $148,766 | $76,216 | $36,275 | $36,275 | 672 | 26 |
| SmithKline Beecham | AMOXIL 125 MG/5 ML SUSPENSI | $3,224 | $1,656 | $865 | $703 | 74,810 | 491 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | AMOXIL 200 MG TABLET CHEW | $0 | $0 | $0 | $0 | 0 | 0 |
| | AMOXIL 200 MG/5 ML SUSPENSI | $40 | $20 | $10 | $10 | 250 | 5 |
| | AMOXIL 200 MG/5 ML SUSPENSI | $39 | $21 | $9 | $9 | 325 | 3 |
| | AMOXIL 200 MG/5 ML SUSPENSI | $331 | $171 | $95 | $65 | 2,700 | 26 |
| | AMOXIL 250 MG CAPSULE | $45 | $23 | $11 | $11 | 248 | 9 |
| | AMOXIL 250 MG/5 ML SUSPENSI | $5,462 | $2,816 | $1,391 | $1,255 | 106,445 | 665 |
| | AMOXIL 250 MG/5 ML SUSPENSI | $1,405 | $733 | $373 | $300 | 22,730 | 179 |
| | AMOXIL 400 MG/5 ML SUSPENSI | $25 | $13 | $6 | $6 | 150 | 3 |
| | AMOXIL 400 MG/5 ML SUSPENSI | $316 | $145 | $86 | $86 | 2,400 | 25 |
| | AMOXIL 400 MG/5 ML SUSPENSI | $869 | $450 | $220 | $199 | 7,026 | 61 |
| | AMOXIL 50 MG/ML PED DROPS | $59 | $31 | $14 | $14 | 225 | 10 |
| | AMOXIL 50 MG/ML PED DROPS | $586 | $302 | $164 | $120 | 2,820 | 86 |
| | AMOXIL 500 MG CAPSULE | $564 | $276 | $179 | $109 | 2,097 | 100 |
| | AUGMENTIN 125-31.25 SUSPEN | $1,536 | $793 | $422 | $321 | 5,400 | 35 |
| | AUGMENTIN 125-31.25 SUSPEN | $723 | $374 | $210 | $139 | 2,450 | 20 |
| | AUGMENTIN 125-31.25 SUSPEN | $166 | $84 | $52 | $29 | 525 | 7 |
| | AUGMENTIN 200-28.5 SUSPEN | $41 | $22 | $19 | $0 | 100 | 1 |
| | AUGMENTIN 200-28.5 SUSPEN | $0 | $0 | $0 | $0 | 0 | 0 |
| | AUGMENTIN 250-125 TABLET | $2,737 | $1,445 | $756 | $536 | 967 | 41 |
| | AUGMENTIN 250-62.5 SUSPEN | $10,723 | $5,547 | $2,756 | $2,420 | 20,550 | 130 |
| | AUGMENTIN 250-62.5 SUSPEN | $5,066 | $2,596 | $1,337 | $1,132 | 9,500 | 82 |
| | AUGMENTIN 250-62.5 SUSPEN | $833 | $410 | $232 | $192 | 1,550 | 13 |
| | AUGMENTIN 250-62.5 TAB CHEW | $461 | $189 | $136 | $136 | 171 | 6 |
| | AUGMENTIN 400-57 SUSPEN | $196 | $103 | $47 | $47 | 250 | 3 |
| | AUGMENTIN 400-57 SUSPEN | $304 | $157 | $74 | $74 | 400 | 4 |
| | AUGMENTIN 400-57 TAB CHEW | $541 | $291 | $157 | $94 | 144 | 7 |
| | AUGMENTIN 500-125 TABLET | $730 | $345 | $193 | $193 | 177 | 5 |
| | AUGMENTIN 875-125 TABLET | $1,400 | $727 | $347 | $327 | 254 | 12 |
| | AUGMENTIN ES-600 SUSPENSION | $1,201 | $647 | $302 | $252 | 2,550 | 17 |
| | AUGMENTIN ES-600 SUSPENSION | $22,928 | $11,839 | $6,238 | $4,851 | 48,615 | 242 |
| | AUGMENTIN ES-600 SUSPENSION | $25,248 | $12,994 | $6,495 | $5,759 | 47,303 | 573 |
| | AUGMENTIN ES-600 SUSPENSION | $62,374 | $32,290 | $15,965 | $14,119 | 126,950 | 979 |
| | AUGMENTIN ES-600 SUSPENSION | $1,423 | $720 | $408 | $295 | 2,925 | 24 |
| | AUGMENTIN XR 1000-62.5 TAB | $2,056 | $956 | $583 | $517 | 762 | 36 |
| | AUGMENTIN XR 1000-62.5 TAB | $7,584 | $3,589 | $2,102 | $1,893 | 2,866 | 100 |
| | AUGMENTIN XR 1000-62.5 TAB | $1,118 | $569 | $332 | $217 | 436 | 19 |
| | AUGMENTIN XR 1000-62.5 TAB | $23,948 | $12,005 | $6,230 | $5,714 | 8,855 | 334 |
| | AVANDIA 2 MG TABLET | $52,764 | $26,292 | $14,120 | $12,352 | 27,580 | 580 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | AVANDIA 4 MG TABLET | $139,526 | $69,109 | $35,537 | $34,879 | 51,437 | 1,161 |
| | AVANDIA 4 MG TABLET | $31,746 | $16,198 | $8,201 | $7,347 | 11,641 | 221 |
| | AVANDIA 4 MG TABLET | $191,862 | $95,671 | $51,829 | $44,361 | 70,745 | 1,626 |
| | AVANDIA 8 MG TABLET | $210,944 | $105,657 | $53,368 | $51,918 | 42,335 | 1,112 |
| | AVANDIA 8 MG TABLET | $56,129 | $27,639 | $15,357 | $13,133 | 11,164 | 281 |
| | BACTROBAN 2% CREAM | $19,673 | $9,940 | $5,584 | $4,148 | 9,105 | 547 |
| | BACTROBAN 2% CREAM | $90,011 | $45,899 | $24,330 | $19,782 | 51,074 | 1,528 |
| | BACTROBAN 2% OINTMENT | $7,883 | $4,051 | $2,146 | $1,685 | 3,874 | 165 |
| | BACTROBAN NASAL 2% OINTMENT | $2,287 | $1,036 | $647 | $604 | 401 | 28 |
| | PAXIL 10 MG TABLET | $10,069 | $5,218 | $2,939 | $1,913 | 3,804 | 104 |
| | PAXIL 10 MG/5 ML SUSPENSION | $2,153 | $1,103 | $730 | $320 | 5,125 | 20 |
| | PAXIL 20 MG TABLET | $13,244 | $6,849 | $4,725 | $1,669 | 4,798 | 120 |
| | PAXIL 20 MG TABLET | $11,542 | $5,983 | $2,955 | $2,604 | 4,504 | 99 |
| | PAXIL 30 MG TABLET | $15,329 | $7,948 | $4,293 | $3,088 | 5,399 | 132 |
| | PAXIL 40 MG TABLET | $6,705 | $3,509 | $1,982 | $1,214 | 2,355 | 60 |
| | PAXIL CR 12.5 MG TABLET | $83,715 | $41,979 | $23,195 | $18,540 | 31,768 | 916 |
| | PAXIL CR 25 MG TABLET | $193,487 | $98,585 | $51,598 | $43,305 | 71,598 | 1,858 |
| | PAXIL CR 37.5 MG TABLET | $58,282 | $29,841 | $16,660 | $11,781 | 20,428 | 631 |
| | RELAFEN 750 MG TABLET | $1,527 | $783 | $372 | $372 | 820 | 5 |
| | TIMENTIN 31 GM BULK VIAL | $964 | $482 | $241 | $241 | 7 | 2 |
| Takeda Pharmaceuticals America | ACTOS 15 MG TABLET | $95,260 | $46,314 | $24,834 | $24,112 | 29,259 | 802 |
| | ACTOS 15 MG TABLET | $35,885 | $17,963 | $9,740 | $8,182 | 11,015 | 303 |
| | ACTOS 15 MG TABLET | $408 | $204 | $153 | $51 | 120 | 4 |
| | ACTOS 30 MG TABLET | $209,540 | $102,327 | $55,951 | $51,261 | 40,417 | 1,104 |
| | ACTOS 30 MG TABLET | $41,075 | $20,531 | $10,768 | $9,776 | 7,914 | 212 |
| | ACTOS 30 MG TABLET | $4,679 | $2,408 | $1,931 | $340 | 900 | 20 |
| | ACTOS 45 MG TABLET | $200,194 | $100,310 | $52,591 | $47,293 | 35,661 | 985 |
| | ACTOS 45 MG TABLET | $17,079 | $8,736 | $6,200 | $2,143 | 3,030 | 83 |
| | ACTOS 45 MG TABLET | $1,211 | $606 | $476 | $130 | 210 | 5 |
| Tap Pharmaceuticals Inc. | LUPRON 2-WK 1 MG/0.2 ML KIT | $5,182 | $2,591 | $1,295 | $1,295 | 12 | 6 |
| | LUPRON DEPOT 11.25 MG 3MO K | $18,436 | $9,443 | $5,647 | $3,345 | 12 | 12 |
| | LUPRON DEPOT 22.5 MG 3MO KI | $54,391 | $24,869 | $14,761 | $14,761 | 29 | 29 |
| | LUPRON DEPOT 3.75 MG KIT | $30,498 | $15,117 | $8,339 | $7,043 | 60 | 60 |
| | LUPRON DEPOT 7.5 MG KIT | $17,519 | $8,612 | $6,573 | $2,335 | 28 | 28 |
| | LUPRON DEPOT-4 MONTH KIT | $37,424 | $19,281 | $9,072 | $9,072 | 16 | 16 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | LUPRON DEPOT-PED 11.25 MG K | $29,089 | $15,035 | $7,027 | $7,027 | 26 | 26 |
| | LUPRON DEPOT-PED 15 MG KIT | $31,942 | $16,478 | $7,732 | $7,732 | 26 | 20 |
| | LUPRON DEPOT-PED 7.5 MG KIT | $600 | $300 | $150 | $150 | 1 | 1 |
| | PREVACID 15 MG CAPSULE DR | $7,269 | $3,661 | $3,245 | $364 | 1,740 | 49 |
| | PREVACID 15 MG CAPSULE DR | $170,936 | $86,049 | $46,965 | $37,921 | 40,472 | 943 |
| | PREVACID 15MG SUSPENSION DR | $14,891 | $7,601 | $3,802 | $3,487 | 3,734 | 113 |
| | PREVACID 30 MG CAPSULE DR | $1,175,075 | $590,922 | $312,033 | $272,121 | 274,255 | 8,064 |
| | PREVACID 30 MG CAPSULE DR | $49,132 | $25,007 | $21,420 | $2,705 | 11,690 | 347 |
| | PREVACID 30MG SUSPENSION DR | $22,202 | $11,403 | $7,183 | $3,616 | 5,573 | 149 |
| | PREVACID NAPRAPAC 375 | $62 | $0 | $31 | $31 | 42 | 1 |
| | PREVACID NAPRAPAC 375 | $206 | $104 | $62 | $40 | 140 | 3 |
| | PREVACID NAPRAPAC 500 | $1,222 | $564 | $329 | $329 | 861 | 11 |
| | PREVPAC PATIENT PACK | $55,058 | $23,308 | $16,311 | $15,439 | 2,809 | 202 |
| | SPECTRACEF 200 MG TABLET | $88 | $47 | $21 | $21 | 56 | 3 |
| | SYSTEM GENERATED from CLAIM | $3,789 | $1,924 | $933 | $933 | 1,140 | 28 |
| | SYSTEM GENERATED from CLAIM | $7,035 | $3,529 | $2,142 | $1,364 | 2,413 | 61 |
| Warrick Pharmaceuticals Corp. | ALBUTEROL 0.83 MG/ML SOLUTI | $211 | $112 | $53 | $46 | 1,185 | 9 |
| | ALBUTEROL 0.83 MG/ML SOLUTI | $27,885 | $14,319 | $7,063 | $6,502 | 160,642 | 1,127 |
| | ALBUTEROL 0.83 MG/ML SOLUTI | $138 | $69 | $34 | $34 | 795 | 5 |
| | ALBUTEROL 5 MG/ML SOLUTION | $500 | $258 | $121 | $121 | 1,175 | 24 |
| | ALBUTEROL 5 MG/ML SOLUTION | $727 | $369 | $179 | $179 | 1,440 | 55 |
| | ALBUTEROL 90 MCG INHALER | $204,180 | $104,383 | $52,963 | $46,834 | 186,108 | 9,503 |
| | BETAMETHASONE DP 0.05% OINT | $109 | $56 | $27 | $27 | 75 | 4 |
| | BETAMETHASONE DP 0.05% OINT | $2,198 | $1,079 | $572 | $547 | 2,250 | 45 |
| | CLOTRIMAZOLE 1% CREAM | $273 | $145 | $83 | $46 | 435 | 17 |
| | CLOTRIMAZOLE 1% CREAM | $80 | $34 | $23 | $23 | 150 | 5 |
| | CLOTRIMAZOLE 1% CREAM | $485 | $247 | $172 | $66 | 1,170 | 26 |
| | CLOTRIMAZOLE/BETAMETH CREAM | $610 | $272 | $169 | $169 | 390 | 21 |
| | CLOTRIMAZOLE/BETAMETH CREAM | $4,754 | $2,359 | $1,297 | $1,099 | 4,590 | 102 |
| | GRISEOFULVIN ULTRA 125 MG T | $0 | $0 | $0 | $0 | 0 | 0 |
| | GRISEOFULVIN ULTRA 250 MG T | $28 | $4 | $12 | $12 | 67 | 2 |
| | ISOSORBIDE MN 120 MG TAB SA | $15,217 | $7,667 | $3,775 | $3,775 | 8,825 | 200 |
| | ISOSORBIDE MN 30 MG TAB SA | $69,473 | $34,409 | $17,717 | $17,347 | 67,005 | 1,708 |
| | ISOSORBIDE MN 60 MG TAB SA | $49,051 | $25,107 | $12,137 | $11,807 | 58,784 | 1,367 |
| | LABETALOL HCL 200 MG TABLET | $423 | $224 | $100 | $100 | 1,080 | 9 |

Exhibit B

All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | LABETALOL HCL 300 MG TABLET | $500 | $265 | $118 | $118 | 840 | 12 |
| | OXAPROZIN 600 MG TABLET | $134 | $71 | $31 | $31 | 180 | 3 |
| | POTASSIUM CL 10 MEQ TAB SA | $8,805 | $4,422 | $2,201 | $2,183 | 27,283 | 625 |
| | POTASSIUM CL 20 MEQ TAB SA | $38,976 | $19,804 | $9,803 | $9,370 | 76,243 | 1,482 |
| | POTASSIUM CL 20 MEQ TAB SA | $953 | $446 | $258 | $249 | 1,762 | 49 |
| | POTASSIUM CL 20 MEQ TAB SA | $534 | $253 | $141 | $141 | 966 | 31 |
| | RIBAVIRIN 200 MG CAPSULE | $17,626 | $8,854 | $4,386 | $4,386 | 2,184 | 13 |
| | RIBAVIRIN 200 MG CAPSULE | $250 | $125 | $62 | $62 | 140 | 1 |
| | RIBAVIRIN 200 MG CAPSULE | $7,341 | $3,700 | $1,821 | $1,821 | 920 | 8 |
| | SUCRALFATE 1 GM TABLET | $2,120 | $1,090 | $515 | $515 | 5,192 | 48 |
| | SUCRALFATE 1 GM TABLET | $1,219 | $621 | $487 | $111 | 2,857 | 38 |
| Westwood-Squibb Pharmaceuticals | CAPITROL 2% SHAMPOO | $1,405 | $724 | $512 | $168 | 7,150 | 58 |
| | DOVONEX 0.005% CREAM | $5,740 | $2,973 | $1,614 | $1,153 | 2,880 | 46 |
| | DOVONEX 0.005% CREAM | $14,677 | $7,300 | $4,532 | $2,845 | 8,280 | 68 |
| | DOVONEX 0.005% OINTMENT | $11,469 | $5,842 | $3,592 | $2,035 | 5,750 | 92 |
| | DOVONEX 0.005% OINTMENT | $84,622 | $43,600 | $22,896 | $18,126 | 48,430 | 305 |
| | DOVONEX 0.005% SOLUTION | $7,794 | $4,030 | $2,799 | $964 | 4,440 | 74 |
| | EURAX 10% CREAM | $664 | $344 | $163 | $156 | 2,820 | 40 |
| | EURAX 10% LOTION | $1,276 | $650 | $313 | $313 | 6,836 | 16 |
| | EURAX 10% LOTION | $204 | $91 | $69 | $45 | 780 | 12 |
| | EXELDERM 1% CREAM | $98 | $51 | $27 | $20 | 105 | 7 |
| | EXELDERM 1% CREAM | $406 | $169 | $134 | $103 | 540 | 16 |
| | EXELDERM 1% CREAM | $384 | $201 | $123 | $60 | 660 | 11 |
| | EXELDERM 1% SOLUTION | $757 | $391 | $203 | $163 | 870 | 29 |
| | LAC-HYDRIN 12% CREAM | $55 | $29 | $13 | $13 | 385 | 1 |
| | ULTRAVATE 0.05% CREAM | $1,074 | $550 | $279 | $245 | 495 | 20 |
| | ULTRAVATE 0.05% CREAM | $13,129 | $6,687 | $3,399 | $3,042 | 8,690 | 173 |
| | ULTRAVATE 0.05% OINTMENT | $1,230 | $632 | $315 | $282 | 585 | 29 |
| | ULTRAVATE 0.05% OINTMENT | $17,574 | $8,942 | $5,147 | $3,486 | 11,760 | 215 |
| | WESTCORT 0.2% CREAM | $102 | $53 | $25 | $25 | 135 | 3 |
| | WESTCORT 0.2% CREAM | $483 | $246 | $118 | $118 | 720 | 12 |
| | WESTCORT 0.2% OINTMENT | $35 | $19 | $8 | $8 | 45 | 1 |
| Wyeth Laboratories | ALESSE-28 TABLET | $213 | $191 | $21 | $0 | 168 | 2 |
| | ATIVAN 0.5 MG TABLET | $2,441 | $1,263 | $909 | $269 | 2,780 | 24 |
| | ATIVAN 1 MG TABLET | $6,401 | $3,267 | $1,567 | $1,567 | 5,910 | 34 |
| | ATIVAN 2 MG TABLET | $6,629 | $3,404 | $1,612 | $1,612 | 4,010 | 37 |
| | ATIVAN 2 MG/ML VIAL | $27 | $14 | $13 | $0 | 4 | 1 |

Exhibit B
All Drugs Purchased by Nassau County in 2004

| Manufacturer | DRUG NAME | TOTAL AMOUNT PAID | FEDERAL SHARE | STATE SHARE | LOCAL AMOUNT PAID | QTY DISPENSED | CLAIMS |
|---|---|---|---|---|---|---|---|
| | CORDARONE 200 MG TABLET | $358 | $190 | $84 | $84 | 100 | 1 |
| | EFFEXOR 100 MG TABLET | $9,727 | $5,015 | $3,271 | $1,441 | 4,971 | 76 |
| | EFFEXOR 25 MG TABLET | $7,186 | $3,670 | $1,782 | $1,733 | 4,289 | 93 |
| | EFFEXOR 37.5 MG TABLET | $15,905 | $8,013 | $4,761 | $3,131 | 9,299 | 202 |
| | EFFEXOR 50 MG TABLET | $2,663 | $1,382 | $641 | $641 | 1,530 | 23 |
| | EFFEXOR 75 MG TABLET | $30,269 | $15,285 | $9,171 | $5,813 | 16,529 | 239 |
| | EFFEXOR XR 150 MG CAPSULE S | $296,694 | $152,047 | $80,506 | $64,140 | 90,487 | 2,160 |
| | EFFEXOR XR 37.5 MG CAP SA | $116,441 | $58,571 | $35,233 | $22,637 | 43,132 | 840 |
| | EFFEXOR XR 75 MG CAPSULE SA | $406,642 | $207,474 | $109,556 | $89,611 | 135,866 | 2,415 |
| | EQUAGESIC TABLET | $509 | $269 | $120 | $120 | 440 | 4 |
| | ISORDIL 10 MG TABLET SL | $0 | $0 | $0 | $0 | 0 | 0 |
| | ISORDIL 40 MG TABLET | $163 | $86 | $38 | $38 | 240 | 2 |
| | LO/OVRAL-28 TABLET | $442 | $398 | $22 | $22 | 336 | 12 |
| | ORUVAIL 100 MG CAPSULE SA | $425 | $225 | $100 | $100 | 190 | 7 |
| | ORUVAIL 200 MG CAPSULE SA | $479 | $253 | $113 | $113 | 157 | 6 |
| | OVRETTE TABLET | $0 | $0 | $0 | $0 | 0 | 0 |
| | PHENERGAN 12.5 MG SUPPOS | $88 | $45 | $22 | $22 | 21 | 2 |
| | PHENERGAN 12.5 MG TABLET | $358 | $186 | $112 | $60 | 1,027 | 21 |
| | PHENERGAN 25 MG TABLET | $35 | $18 | $8 | $8 | 60 | 1 |
| | PHENERGAN 25 MG/ML AMPUL | $92 | $48 | $22 | $22 | 32 | 2 |
| | PROTONIX 20 MG TABLET EC | $7,764 | $3,972 | $2,049 | $1,744 | 2,245 | 76 |
| | PROTONIX 40 MG TABLET EC | $1,363,100 | $678,993 | $366,389 | $317,719 | 397,285 | 12,370 |
| | PROTONIX IV 40 MG VIAL | $609 | $322 | $143 | $143 | 25 | 1 |
| | RAPAMUNE 1 MG TABLET | $50,636 | $25,022 | $12,807 | $12,807 | 15,980 | 146 |
| | RAPAMUNE 2 MG TABLET | $3,382 | $1,729 | $827 | $827 | 360 | 7 |
| | SONATA 10 MG CAPSULE | $57,251 | $29,167 | $14,136 | $13,948 | 20,793 | 613 |
| | SONATA 5 MG CAPSULE | $5,832 | $2,980 | $1,461 | $1,391 | 2,569 | 81 |
| | SYNALGOS-DC CAPSULE | $323 | $171 | $76 | $76 | 300 | 5 |
| | SYNALGOS-DC CAPSULE | $86 | $43 | $22 | $22 | 80 | 2 |
| | TRIPHASIL-28 TABLET | $34 | $31 | $2 | $2 | 28 | 1 |
| | **TOTALS:** | **$84,764,057** | **$43,010,950** | **$23,386,632** | **$18,366,474** | **34,482,974** | **695,647** |